UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SIBYL COLON,

       Plaintiff,

   - against -


THE CITY OF NEW YORK, *et al.*,

      Defendants.

No. 16-CV-4540
(VSB)(OTW)

ALLISON WILLIAMS,

       Plaintiff,

   - against-


THE CITY OF NEW YORK, *et al*.,

      Defendants.

No. 16-CV-8193
(VSB)(OTW)

Consolidated for Pre-Trial Purposes


**LOCAL RULE 56.1 STATEMENT IN SUPPORT OF THE NYCHA DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF SIBYL COLON**


           KELLY D. MACNEAL
           Executive Vice President for Legal
           Affairs and General Counsel
           Attorney for the
           NYCHA Defendants
           New York City Housing Authority
           90 Church Street, 11th Floor
           New York, NY 10007
           Tel. 212-776-5259


Jane E. Lippman
Of Counsel

Defendants New York City Housing Authority ("NYCHA"), Michael Kelly, and Brian Clarke (collectively, the "NYCHA Defendants"), by their attorney, Kelly D. MacNeal, Executive Vice President for Legal Affairs and General Counsel of the New York City Housing Authority, Jane E. Lippman, Of Counsel, as the moving parties for this Motion for Summary Judgment against Plaintiff Sibyl Colon ("Colon"), submit the following statement of material facts as to which there is no genuine issue to be tried, in accordance with Rule 56 of the Federal Rules of Civil Procedure and Southern and Eastern Districts Local Rule 56.1.

**The Parties**

1.      NYCHA is a public benefit corporation organized under the New York State Public Housing Law.  As of 2019, NYCHA has 173,762 public housing apartments in 2,351 residential buildings in 316 individual developments throughout the five boroughs. Declaration of Jane E. Lippman in Support of the NYCHA Defendants' Motion for Summary Judgment ("Lippman Dec."), Exhibit 2 (The NYCHA Defendants' Answer at ¶ 8); https://www1.nyc.gov/assets/nycha/downloads/pdf/NYCHA-Fact-Sheet_2019_08-01.pdf.

2.      Defendant Michael Kelly was the General Manager of NYCHA between 2009 and 2012 and between 2015 and 2018.  In that capacity, Kelly oversaw the day-to-day operations of the agency, including property management, administration, resident services, and maintenance.  Lippman Dec., Exhibit 7 (May 3, 2019 Deposition Transcript of Michael Kelly ("May 3, 2019 Kelly Dep. Tr.") at 7:15-8:3, 9:7-20); Exhibit 9 (September 23, 2019 Deposition Transcript of Michael Kelly ("Sept. 23, 2019 Kelly Dep. Tr.") at 7:14-9:2).

3.      Defendant Brian Clarke was employed by NYCHA for 22 years in various titles, and in 2015, his title was Senior Vice President of Operations for Property Management.  In that capacity, Clarke supervised multiple departments and reported to the General Manager.

Lippman Dec., Exhibit 10 (June 13, 2019 Deposition Transcript of Brian Clarke ("June 13, 2019 Clarke Dep. Tr.") at 7:8-8:24, 9:11-12, 10:15, 25:12-20); Declaration of Brian Clarke ("Clarke Dec.") at ¶¶ 2-3.

4.       At all relevant times herein, Defendant Melissa Mark-Viverito (the "Former Speaker") served as Council Speaker of the New York City Council.  In that capacity, the Former Speaker represented and advocated for her constituents.  Lippman Dec., Exhibit 3 (Defendant Melissa Mark-Viverito's Answer at ¶ 9); Exhibit 12 (Deposition Transcript of Melissa Mark-Viverito ("Mark-Viverito Dep. Tr.") at 35:21-23).

5.       Colon is an African-American woman and former NYCHA employee.  Lippman Dec., Exhibit 1 (Complaint at ¶¶ 6, 60).

6.       Between June 1, 2015 and her resignation from NYCHA on August 28, 2015, Colon was the Director of the NYCHA Optimal Property Management Department, or "OPMD." Lippman Dec., Exhibit 5 (Deposition Transcript of Colon ("Colon Dep. Tr.") at 55:9-18, 60:7-24, 233:6-19, 250:6-7); Exhibit 1 (Complaint at ¶¶ 18, 57-60).

7.       Allison Williams ("Williams") is an African-American woman and retired NYCHA Housing Manager.  Lippman Dec., Exhibit 32 (Williams Amended Complaint at ¶ 6); Exhibit 6 (Deposition Transcript of Williams ("Williams Dep. Tr.") at 23:4-6, 27:16-18, 232:2-12).

8.       Between 2006 and her retirement on May 1, 2017, Williams was the Housing Manager at Mill Brook Houses, a NYCHA development in the Bronx.  She was not demoted or transferred from Mill Brook to another NYCHA development.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 23:4-13, 232:2-12, 28:6-7, 232:1-12, 260:8-9).

**NYCHA Begins Preparations For The OPMOM Pilot Program In 2014 With A Launch Date Of January 2015; The Original 18 Developments In The OPMOM Program Receive Additional Resources, And Development Managers Have More Control Over Staffing Needs**

9.      In 2014, NYCHA began preparing for a property management model pilot program called the Optimal Property Management Operating Model, or "OPMOM."  These preparations included training for staff and putting together the project plan.  The OPMD oversaw OPMOM. [1]  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 92:11-94:13); Exhibit 6 (Williams Dep. Tr. at 38:10-39:12); Exhibit 18 (OPMOM Informational Document and NYCHA News Releases).

10.      OPMOM was "about implementing asset management – true asset management based on the HUD[2] structure . . . what [NYCHA] really wanted to do was to, one, put the resources and responsibilities and the accountability at the local level, at the property management level, and reduce, as much as [NYCHA] could, central office control."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 20:12-21:4); Exhibit 18 (OPMOM Informational Document and NYCHA News Releases).

11.      Under the HUD model of asset management, costs are determined at the property management level.  The HUD formula for finance and budgeting allocates 70 percent of the budget to the property and 30 percent to central administrative costs.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 21:5-20 and errata sheet); Exhibit 18 (OPMOM Informational Document and NYCHA News Releases).

12.      OPMOM was launched into operation in January 2015.  The original 18 OPMOM developments were in Brooklyn, the Bronx, and Manhattan, and there was a Regional Asset

---

[1] "OPMD" and "OPMOM" are used interchangeably in the record.

[2] HUD refers to the United States Department of Housing and Urban Development, which oversees public agencies, including NYCHA.

Manager ("RAM") assigned to each borough.  Mill Brook Houses was one of the original 18

OPMOM developments.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 83:21-

84:9); Exhibit 6 (Williams Dep. Tr. at 34:3-8); Exhibit 18 (OPMOM Informational Document

and NYCHA News Releases).

13.     At the 18 developments that were part of OPMOM, the Managers "had the

opportunity to identify the needs that they had at the property and put into the budget the number

of positions they felt they needed by – by title."  "[T]he housing manager had the discretion to

set up their property . . . for the number of positions that they felt they needed . . . for the

properties in OPMOM program."  Lippman Dec., Exhibit 11 (July 1, 2019 Clarke Dep. Tr. at

29:16-22, 35:12-19); Exhibit 6 (Williams Dep. Tr. at 35:20-36:17, 36:25-38:9).

14.     The 18 OPMOM developments received disproportionately more money and

resources to operate compared to other NYCHA developments.  Lippman Dec., Exhibit 8 (July

3, 2019 Deposition Transcript of Michael Kelly ("July 3, 2019 Kelly Dep. Tr.") at 25:6-10);

Exhibit 11 (July 1, 2019 Clarke Dep. Tr. at 43:14-18); Clarke Dec. at ¶¶ 15, 17.

15.     OPMOM was part of a long term strategic plan called Next Generation or

NextGen NYCHA.  NYCHA's goal was to eventually incorporate its entire portfolio into

NextGen.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 67:1-18); Exhibit 18 (OPMOM

Informational Document and NYCHA News Releases).

**NYCHA Interviews Janet Abrahams In November 2014 For A Vice President Level
Position Running OPMOM And Implementing The HUD Asset Management Model With
Which She Has Experience**

16.     On November 7, 2014, NYCHA Executive Vice-President Cathy Pennington

emailed General Manager Cecil House and strongly recommended Janet Abrahams, her former

colleague at the Newark Housing Authority, for "new executive leadership" and attached

Abrahams' resume to the email.  Lippman Dec., Exhibit 19 (November 7, 2014 Email from Cathy Pennington to Cecil House attaching Janet Abrahams' Resume); Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 34:19-35:6).

17.     At the time Pennington emailed Cecil House, Janet Abrahams had been the Chief Operating Officer of the Newark Housing Authority since 2006.  Even prior to working at the Newark Housing Authority, Abrahams had an extensive background in public housing and real estate asset management, as well as numerous certifications and extensive training and education in her field.  Lippman Dec., Exhibit 19 (November 7, 2014 Email from Cathy Pennington to Cecil House attaching Janet Abrahams' Resume).

18.     Abrahams was operating a public housing asset management model for the Newark Housing Authority that was very similar to OPMOM.  Abrahams also previously ran a public housing asset management model for the Chicago Housing Authority, where she worked prior to the Newark Housing Authority.  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 36:10-24); Exhibit 19 (Janet Abrahams' Resume attached to November 7, 2014 Email from Cathy Pennington to Cecil House).

19.     On November 9, 2014, Pennington emailed House, "Cecil I spoke with Janet this weekend and would like to fill you in on her situation and why I think she would be a great addition to your PH team."  On November 10, 2014, House responded to Pennington, "I am interested.  Let's talk."  Lippman Dec., Exhibit 19 (November 9 and 10, 2014 Emails between Cathy Pennington and Cecil House).

20.     Abrahams and her background and qualifications in asset management, which were the "princip[les] of OPMOM," were brought to [NYCHA] Chair's [Shola Olatoye ("the Chair")] attention at this time, and Abrahams was considered to be "an excellent candidate to

5

manage the OPMOM Program."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 34:17-35:3).

21.    On November 25, 2014, Janet Abrahams interviewed with the Chair, House, and Executive Vice-President and Chief Administrative Officer Natalie Rivers.  Abrahams "impressed everyone."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 35:2-7, 38:17-21); Exhibit 20 (Outlook Calendar Invitations for Janet Abrahams Interview).

22.    On December 5, 2014, the Chair emailed Todd Gomez, an Executive at Bank of America Merrill Lynch and Janet Abrahams' reference, to ask him whether he had, "Any thoughts on [Abrahams] as a strong senior operations colleague?"  In response to the Chair's inquiry regarding Janet Abrahams, Gomez confirmed that Abrahams "was an excellent potential candidate."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 35:2-11); Exhibit 21 (December 5, 2015 Email Chain Between Shola Olatoye and Todd Gomez).

23.    Chair Olatoye emailed Gomez back, "Fantastic news.  She had a good interview.  I like her.  Wanted to gut check."  Lippman Dec., Exhibit 21 (December 5, 2015 Email Chain Between Shola Olatoye and Todd Gomez).

24.    Cecil House's negotiations with Janet Abrahams regarding taking the job as "OPMOM vice president" were not consummated due to a disagreement over salary.  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 35:11-14, 39:6-9).

25.    In late January 2015, Cecil House appointed Kevin Norman, Director of Mixed Finance, as the Director of OPMOM.  Lippman Dec., Exhibit 18 (OPMOM Informational Document and NYCHA News Releases at NYCHA 2).[3]

---

[3] NYCHA followed by a number indicates the Bates number of a document produced by the NYCHA Defendants.

26.     Kevin Norman reported to Cecil House, although he may have briefly reported to Brian Clarke when House left NYCHA.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 15:3-15).

27.     Cecil House and Kevin Norman left NYCHA in March or April 2015.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 14:5-13, 27:7-13); Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 35:14-18).

**Colon's NYCHA Employment History and Qualifications**

28.     Colon commenced working at NYCHA in 1985 as a Housing Assistant and held several other titles during her NYCHA career.  Lippman Dec., Exhibit 4 (Colon's Human Resources Record Card).

29.     Colon held the title of Housing Manager longer than any other title during her NYCHA employment and held civil service status in that title.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 42:4-6); Exhibit 4 (Colon's Human Resources Record Card).

30.     According to the resume Colon submitted for the OPMOM Director position on April 8, 2015, as a Housing Manager, she, "Managed a large size housing development"; "Supervised project personnel"; "Secured public and private agency cooperation and kept financial records and accounts"; "Planned the assignment of apartments and the collection of rents"; and "Prepared reports and budgets."  Lippman Dec., Exhibit 22 (April 8, 2015 Email Attaching Colon's Resume).

31.     Although the resume Colon submitted for the OPMOM Director position states that she was a Borough Administrator in the Brooklyn Property Management Department from 2003 to 2004, she was a Borough Administrator in Brooklyn for only three months; Colon was on workers' compensation leave from July 2003 until August 2009 as the result of a car accident.

Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 27:15-28:4, 28:21-23, 29:20-30:1); Exhibit 4 (Colon's Human Resources Record Card); Exhibit 22 (April 8, 2015 Email Attaching Colon's Resume).

32.     Colon was a Borough Administrator in the Manhattan Property Management Department for one year before she applied for the OPMOM Director position.  As a Borough Administrator, Colon supervised property managers and superintendents, although she does not recall the number of her direct reports.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 31:5-22); Exhibit 4 (Colon's Human Resources Record Card).

33.     Colon earned $100,000 as a Borough Administrator.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 61:12-62:15, 246:2-8).

34.     Colon has no education or training in asset management.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 18:4-6).

**NYCHA Appoints Colon As OPMOM Director**

35.     When Kevin Norman left NYCHA, Brian Clarke was tasked with filling three Director vacancies as quickly as possible: Director of Manhattan Property Management, Director of OPMOM, and Director of Mixed Finance.  A Borough Director job description, reporting to the Senior Vice President for Operations and originally posted in January 2015, was used for all three positions.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 27:20-28:4); Exhibit 23 (Borough Director Job Posting Notices Dated January 27, 2015); Declaration of Harvey Chaitoff ("Chaitoff Dec.") at ¶¶ 3-4.

36.     A job posting specifically for an OPMD Director position was not posted until May 2016, and this posting specified that the OPMD Director would report to the Vice President for the OPMD.  At that point, Janet Abrahams was the Vice President for the OPMD.  Lippman

Dec., Exhibit 23 (Director for OPMOM Job Posting Notice Dated May 23, 2016); Chaitoff Dec. at ¶¶ 5-6.

37.     The Manhattan Director position was filled first, and the Mixed Finance Director position was filled second.  The OPMOM Director position was filled last.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 28:18-29:3, 30:19-31:5 and errata sheet).

38.     Human Resources reviewed resumes first, and if the candidate met the minimum criteria, the resumes would be sent to Brian Clarke's office, and his office would review the resumes and "figure out which candidates we would interview."  After reviewing resumes, Clarke and his office "would put together a list and schedule interviews" with a panel.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 29:8-30:14).

39.     Colon claims she saw a posting for the OPMOM Director position in October 2014 on a "bulletin board."  However, there was no job posting for the OPMOM Director position in October 2014, and a Borough Director job description was not posted until January 2015.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 49:10-25); Chaitoff Dec. at ¶¶ 4-5.

40.     Colon claims that she applied for the OPMOM Director position because Sheila Pinckney, Brian Clarke's Senior Advisor, "suggested that [Colon] submit for the OPMOM director's position."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 24:14-25:12, 26:18-19).

41.     Colon emailed Brian Clarke on April 8, 2015, stating, "As per my conversation with Sheila Pinckney, I've attached my resume in desirous [sic] of an interview for the Borough Director's position."  By "Borough Director," Colon claims she was applying for the OPMOM Director position.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 24:14-25:4); Exhibit 22 (April 8, 2015 Email Attaching Colon's Resume).

42.     Colon recalls that the panel who interviewed her in May was composed of Brian Clarke, Human Resources Director Kenya Salaudeen, and Cal Bruno, who was "the director of the budgeting department.  Something to that affect [sic]."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 58:14-59:7).

43.     Brian Clarke recalls reviewing Colon's resume, although in reviewing her resume again during his deposition, he "thought she had actually been a borough administrator longer than what [Colon's] resume reflects," and he noted that "the OPMOM Director position was a two-step promotion."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 34:14-35:19 and errata sheet).

44.     Colon does not know whether any external candidates were ever under consideration for the OPMOM Director position.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 231:18-232:4).

45.     Colon was selected by the majority of the panel and commenced working as OPMOM Director on June 1, 2015 at a salary of $135,000.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 32:17-23); Exhibit 5 (Colon Dep. Tr. at 61:9-11, 269:17-19).

46.     Michael Kelly was not involved in the hiring of Colon, and he did not review her resume before her hiring.  Lippman Dec., Exhibit 7 (May 3, 2019 Kelly Dep. Tr. at 13:20-15:6).

47.     As OPMOM Director, Colon reported to Brian Clarke.  She never reported directly to Michael Kelly.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 11:22-12:2, 51:9-10); Exhibit 7 (May 3, 2019 Kelly Dep. Tr. at 13:11-19); Exhibit 5 (Colon Dep. Tr. at 83:7-10).

**As OPMOM Director, Colon Was An At Will Employee With No Due Process Or Tenure Rights And Could Be Removed From That Title Without Cause**

48.     Colon does not know whether she had tenure rights in her position as Director of OPMOM.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 62:20-63:21).

49.     Colon felt there needed to be a "process" before she could be dismissed or demoted from the OPMOM Director position without warning or cause.  However, Plaintiff never saw any policy specific to a Director title regarding this "process."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 63:22-65:4).

50.     Colon never asked anyone whether she had the right to a "process" before she could be demoted or dismissed as Director OPMOM, and her understanding of her rights in that position was based on her previous experience in other titles at NYCHA.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 64:16-65:4, 66:7-13).

51.     Colon claims that she could not be demoted from the Director position without having received a counseling memorandum.  Colon believes she had to have "done" something "wrong" in order to be removed as Director of OPMOM without "due process."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 291:11-292:5); Exhibit 13 (Deposition Transcript of Luis Ponce ("Ponce Dep. Tr.") at 59:15-60:2).

52.     NYCHA employees may obtain permanent status in a civil service title by appointment from a civil service list established through competitive examination administered by the Department of Citywide Administrative Services and subsequently by successfully passing a probationary period.  Chaitoff Dec. at ¶ 8.

53.     Colon did not have civil service status as Director of OPMOM.  Colon served on a provisional basis in the civil service title of Administrative Housing Manager and in the

business capacity as Director of OPMOM.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at, 62:16-19); Chaitoff Dec. at ¶¶ 9-10.

54.     Employees such as Colon who serve in civil service titles on a provisional basis have no tenure in these titles and, as such, are employed in these titles at will.  They are not entitled under New York State Civil Service Law to notice, pre-termination hearings, or due process of any kind before removal from their title.  Chaitoff Dec. at ¶¶ 11-12.

55.     Because employees who serve in civil service titles on a provisional basis are employed in these titles at will, they may be removed from these titles without cause and without a reason.  Chaitoff Dec. at ¶¶ 11-12.

56.     No due process of any kind was required to remove Colon from her OPMOM Director position, which Colon held provisionally.  She could therefore be removed as Director of OPMOM without cause or a showing of performance deficiencies and without due process, consistent with her at will status.  Nor was it necessary for NYCHA to provide Colon with notice of performance deficiencies through the issuance of counseling memoranda or in any other manner, as she could be removed without cause.  Chaitoff Dec. at ¶¶ 12-14; Exhibit 17 (Deposition Transcript of Kenya Salaudeen ("Salaudeen Dep. Tr.") at 58:11-18).

57.     A counseling memorandum may record particular events or conduct that could be construed as misconduct or incompetent performance and can serve as evidence that an employee was put on notice regarding specific misconduct or incompetent job performance.  Chaitoff Dec. at ¶ 14.

**Colon's Performance as OPMOM Director**

58.     Colon never saw any written standards by which her performance as the OPMOM Director would be judged and did not know whether she would receive any sort of performance review.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 65:16-66:6).

59.     Colon never spoke to the previous OPMOM Director regarding the responsibilities and requirements of the position.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 56:13-57:3).

60.     Colon does not know how many NYCHA developments were intended to be included in OPMOM over time or the timeline for expansion.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 70:12-16, 73:9-15).

61.     Colon does not know whether the OPMOM developments were given more resources and does not know whether the OPMOM developments used the same formula for budgeting as other NYCHA developments.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 70:17-22, 71:5-8, 73:22-74:24).

62.     Colon saw her role as OPMOM Director as limited to a "mentoring, guidance sort of role," and she had "constant meetings" with her staff to discuss "[a]ny issues that they were having and ways [she] can help them perform."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 75:18-76:10).

63.     Colon would analyze performance indicators, speak to her team, and "just point out things the way [she] can help them to become better."  When asked for examples of the "things" she would point out to her team, Colon testified, "For example if their rent collection numbers were high.  Did you do early intervention procedure?  Did you do the chronic rent delinquency procedure?  Did you follow the procedures and policies of the Housing Authority to

help improve your performance indicators[?]"  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 77:3-78:1).

64.     Three Regional Asset Managers, or "RAMs," reported directly to Colon: James Artis in the Bronx, Octavia Hayward in Brooklyn, and Shinay Jones in Manhattan.  The RAMS supervised the field staff, oversaw the developments, and provided guidance and support to the development Managers.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 78:17-79:21).

65.     Colon felt that it was her responsibility to provide guidance to the development Managers and to the RAMs because "[she] is an expert at what [she] does."  According to Colon, "The way OPMOM was set up it was more of a guidance and support, encouragement, strategic initiative to help guide and support the locations to their best performance."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 79:18-80:7).

66.     The only other example Colon could provide at her deposition of providing coaching, guidance, and support to the RAMS besides chronic rent delinquency tips was with respect to how to conduct local disciplinary hearings.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 80:8-83:6).

67.     On July 24, 2015, Colon emailed Brian Clarke and stated, "I am still struggling with identifying my role/boundaries within the OPMD model.  I am trying not to overstep the boundaries, while also empowering the Managers and to help them find solutions."  Lippman Dec., Exhibit 24 (July 24, 2015 Email from Colon to Brian Clarke).

68.     Colon sent her July 24, 2015 email to Clarke about "struggling" with her "role/boundaries" notwithstanding her claim that on July 9, 2015, she felt she had been given a "clearer mandate" by Brian Clarke regarding her job responsibilities.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 89:9-91:5); Clarke Dec. at ¶ 10.

69.    On July 27, 2015, Colon learned that an apartment at Wagner Houses, where a bedridden, disabled tenant lived with another adult and four children, had become flooded with raw sewage.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 93:21-96:4).

70.    Although Colon had previously served three counseling memoranda on RAM Shinay Jones – including one for failing to answer her blackberry and emails – Colon relied on Jones to "go and put her eyes on the situation."  Jones did not respond to Colon's requests and did not visit the apartment.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 94:21-96:4, 98:20-99:16); Exhibit 25 (August 3, 2015 Request for Termination of Employment).

71.    Colon then waited until July 29, 2015 to visit the sewage flooded apartment herself and assess the situation and the needs of the tenant and other residents in the apartment.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 97:28-99:16); Exhibit 25 (July 29, 2015 Email from Colon to Brian Clarke).

72.    Brian Clarke believed that the Wagner Houses situation was "poorly handled at the local level, at the regional asset level and at the director level within the OPMOM program."  Lippman Dec., Exhibit 11 (July 1, 2019 Clarke Dep. Tr. at 62:21-63:9).

73.    During Colon's tenure as OPMOM Director, Brian Clarke received "a lot of complaints" from development resident leaders who "felt that they were sold a bill of goods.  That they were told that they were going to be involved in key decisions and things like that, and that didn't happen."  These complaints reflected on Colon's performance during her three-month tenure as OPMOM Director.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 126:2-131:23).

74.    Brian Clarke observed that Colon did not have a clear understanding of how OPMOM differed from NYCHA's traditional, centralized operating model, did not have a clear

understanding of her role as Director, and did not know how to achieve OPMOM's asset management goals within the OPMOM framework.  Colon also struggled with conflict resolution and problem-solving.  In light of these deficiencies, he recommended to NYCHA Human Resources Director Kenya Salaudeen that Colon receive additional training.  However, Colon resigned before she could receive additional training.  Clarke Dec. at ¶¶ 7-12.

**Colon Tries To Take Credit For Improvements In OPMOM Developments That Commenced Before She Became Director In June 2015; OPMOM Developments Received Additional Resources And Were Expected To Show Improvements In Their Performance**

75.     The Complaint alleges that prior to Colon's hiring as OPMOM Director, OPMOM developments were "ranked dead last in NYCHA division rankings."  By "division rankings," Colon first testified she was referring to "borough offices," and then testified that she was referring to "performance indicators."  However, Colon concedes that only some OPMOM developments were "dead last" in "certain performance indicators."  Lippman Dec., Exhibit 1 (Complaint at ¶ 20); Exhibit 5 (Colon Dep. Tr. at 268:20-270:17).

76.      Colon claims that during her tenure as OPMOM Director in June, July, and August 2015, she was responsible for improving various metrics in OPMOM developments, including the Service Level Agreement ("SLA") and apartment turnover and renovation times.  Lippman Dec., Exhibit 1 (Complaint at ¶¶ 20-22).

77.     Metrics are reflected on a balanced scorecard, which shows various measurements on a monthly basis.  The measurements are computed by the NYCHA Research Department.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 80:2-10, 88:6-9, 98:6-11).

78.     An SLA score represents the time it takes to perform ordinary routine repairs performed by maintenance workers; however, Colon could not give an example of a routine repair during her deposition.  NYCHA's goal was to have a seven-day service level for the entire

16

agency.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 266:12-267:14); Exhibit 8 (July 3, 2019

Kelly Dep. Tr. at 29:3-8); Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 60:13-61:8, 64:2-65:2,

81:3-4); Exhibit 14 (Deposition of James Artis ("Artis Dep. Tr.") at 10:15-11:19, 24:22-25:14).

79.    Colon does not know how any of the metrics on a development scorecard were

calculated, and she never calculated an SLA score.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at

263:9-264:23, 265:20-266:1).

80.    Repairs performed by the skilled trades and outside vendors were not included in

the SLA score but were represented on a balanced scorecard.  Colon could not give an example

of a repair done by an outside vendor during her deposition.  Lippman Dec., Exhibit 5 (Colon

Dep. Tr. at 268:15-19, 276:10-25).

81.    Colon does not know what a statistically sufficient period of time would be to

judge at trend in the performance of a development, and she does not know what the NYCHA

Research Department would consider a sufficient period of time to judge a trend in the

performance of a development.  Rather, she "look[s] for positive trends in the direction the

development needs to go.  It's not for [her] a time frame."  Lippman Dec., Exhibit 5 (Colon Dep.

Tr. at 261:14-262:11, 262:22-263:6).

82.    Colon alleges that the SLA score for OPMOM developments was 27 days before

she became Director of the OPMD.   However, the OPMOM balanced scorecard shows that in

January 2015, when OPMOM began, the SLA score (listed as Maintenance Service Level on the

scorecard) was 21.5 days, and when Colon became Director in June 2015, it was 24.1 days.

Colon claims that the Director of the NYCHA Research Department, Sybille Luis, provided her

with a different balanced scorecard or "chart"; however, Plaintiff did not produce any such

"chart" in discovery. Lippman Dec., Exhibit 1 (Complaint at ¶ 22); Exhibit 5 (Colon Dep. Tr. at

277:17-280:20); Exhibit 26 (Magnified OPMOM Balanced Scorecard January-July 2015).

83.     Colon alleges that during her tenure as Director of the OPMD, "the amount of

time it took for the OPMD to effectuate the apartment turnover process decreased from 89 days

to 48 days." In fact, when Colon became the Director in June 2015, the apartment turnover time

(listed as Apartment Turnaround on the scorecard) had already decreased from 89.8 days in

January 2015 to 55.8 days in May and 50.5 days in June 2015, and Colon concedes this.

Lippman Dec., Exhibit 1 (Complaint at ¶ 22); Exhibit 5 (Colon Dep. Tr. at 281:12-283:19);

Exhibit 26 (Magnified OPMOM Balanced Scorecard January-July 2015).

84.     Colon alleges that during her tenure as Director, "the amount of time it took for

OPMD to renovate an apartment for a new tenant to move into decreased from 62 days to 48

days." In fact, when Colon became the Director in June 2015, the renovation time (listed as Apt.

Prep. Time on the scorecard) had already decreased from 48.5 days in January 2015 to 34.3 days

in May and 26.3 days in June. Colon claimed she had a "chart" that showed different numbers,

but no such "chart" was produced in discovery. Lippman Dec., Exhibit 1 (Complaint at ¶ 22);

Exhibit 5 (Colon Dep. Tr. at 283:20-284:17); Exhibit 26 (Magnified OPMOM Balanced

Scorecard January-July 2015).

85.     In its early stages of operating with 18 units, OPMOM "received a

disproportionate amount of money to operate." According to Kelly, "[S]o consequently service

level response times and regarding the variety of the other issues that show on the balance[d]

scoresheet, that there was improvement compared to the rest of the portfolio is not a surprise to

[Kelly] considering that those 18 units were allocated a higher budget to manage than the rest of

the portfolio," and improvements were "actually fueled or funded with a disproportionate

amount of resources."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 25:6-22); Clarke Dec. at ¶ 17.

86.     The initial OPMOM developments not only had "additional resources," but "additional manpower for the 18 sites.  They had additional maintenance workers specifically." Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 43:22-44:6); Clarke Dec. at ¶¶ 15, 17.

87.     The NYCHA performance metrics must be evaluated on a "cumulative average through the course of the year and on a year-to-year basis."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 11:20-12:18, 16:7-12, 17:15-21); Clarke Dec. at ¶ 16.

88.     Around August or September 2015, "there was a shift" in the way NYCHA approached maintenance work to provide better customer service.  Rather than having an inspector identify the service need and then enter that information into a work order system, a maintenance worker would go to the apartment, "identify the work needed to be done," "carry with them a tool kit and replacement parts for as much as they could possibly do, and open and close a work order in realtime.  So on balance what used to take 20 or 30 days, would take an hour or two.  This was a shift not only for OPMOM, but the entire agency.  "That effort caused the service level [days] for the entire agency to drop dramatically during the latter part of 2015." Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 30:12-33:12).

89.     Any improvement – or lack of improvement – in the scorecard metrics would not have been the only factor in Brian Clarke's evaluation of Colon's performance as Director of the OPMD.  Since Colon was Director of the OPMD for only three months, Clarke did not complete an annual performance review for her.  Clarke Dec. at ¶¶ 7, 13-15.

**NYCHA And The Former Speaker's Office Receive Complaints From Spanish-Speaking Mill Brook Houses Residents Regarding Poor Customer Service From Williams And The Management Office; The Former Speaker Requests A Meeting With NYCHA To Address The Language Barrier**

90.     In October 2014, NYCHA received an email from Gloria Cruz, the Former Speaker's staff member, regarding a complaint from a Mill Brook resident that he felt "like he's being bullied by management because he cannot speak English.  This issue is making him sick and upset please can you help us with this issue."  Colon was unaware of this complaint. Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 116:16-117:17); Exhibit 28 (October 30, 2014 Email).

91.     In the spring of 2015, Marcela Medina, the State Legislative Affairs Officer in the NYCHA Intergovernmental Department whose responsibilities included interacting with elected officials, learned from one of the Former Speaker's staff members, Diana Ayala, that during a tenant association meeting, Williams told the Mill Brook Houses residents that she did not want to hear any "mira mira talk."  Many, if not most, of the Mill Brook residents were Hispanic, and some had limited or no English language proficiency.  Williams' no "mira mira talk" comment was offensive and inappropriate.  Medina's supervisor, Brian Honan, was also made aware of this comment.  Declaration of Marcela Medina ("Medina Dec.") at ¶ 4; Lippman Dec., Exhibit 16 (Deposition Transcript of Marcela Medina ("Medina Dep. Tr.") at 6:11-8:13, 10:3-24).

92.     On May 14, 2015, Brian Honan, the Director of State and City Legislative Affairs for NYCHA and Marcela Medina's supervisor, emailed the Chair stating, "The manager at Mill Brook is making it very difficult for [the Former Speaker] to support OPMOM.  Yesterday I heard from three of her staff members who complained about a recent meeting at the development.  The manager told residents that OPMOM makes it easier for her to evict tenants, so people need to pay their rent (she said that she would evict people for owing as little as 35

dollars); and she make [sic] a very insensitive remark about Spanish speaking residents."
Lippman Dec., Exhibit 27 (May 14, 2015 Email Chain Between Brian Honan and Shola
Olatoye); Exhibit 16 (Medina Dep. Tr. at 17:11-16).

93.    Luis Ponce, a NYCHA Senior Vice President, told Colon that Williams had told
the Mill Brook Houses residents "no meda meda speaking in here."  Lippman Dec., Exhibit 5
(Colon Dep. Tr. at 110:18-111:4; 185:9-186-8, 187:2-7, 190:15-21, 198:2-6).

94.    Colon did not know at any time during her NYCHA employment that the office of
the Former Speaker had received complaints about Williams' treatment of Mill Brook Houses
residents.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 105:23-106:4).

95.    The Former Speaker requested a meeting with NYCHA "based on complaints
from constituents that their needs were not being met" by NYCHA.  The Former Speaker "got a
lot of constituents and residents from Mill Brook that were coming physically to [her] office to
ask for [their] intervention, because they were complaining that Spanish speaking residents that
their issues were not being addressed by the management office at Mill Brook.  So, the staff
raised this as a growing issue; and so we kept – the staff kept asking NYCHA to address these
concerns, and at that point, no changes were happening.  So, [the Former Speaker] requested a
meeting with NYCHA."  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 15:6-24); Exhibit
28 (October 30, 2014 Email; List of Complaints Made to the Former Speaker's Office).

96.    Gloria Cruz, who managed constituent services in the Former Speaker's office,
made it clear to the Former Speaker that there were many constituents who were Spanish-
speaking residents of Mill Brook, who were coming to the Former Speaker's office with
concerns regarding repairs or other issues.  These Spanish-speaking Mill Brook residents were
"not feeling welcome in the management office" and were having a hard time communicating

because the management office did not have a bilingual employee.  These Spanish-speaking

residents "would come to [the Former Speaker's office], knowing that [they] have a fully

bilingual staff."  The Spanish-speaking residents at Mill Brook were "not able to communicate

effectively with the NYCHA management office" due to a "language barrier."  Lippman Dec.,

Exhibit 12 (Mark-Viverito Dep. Tr. at 16:12-17:2, 18:25-19:12, 37:12-38:3, 43:19-22); Exhibit

28 (October 30, 2014 Email; List of Complaints Made to the Former Speaker's Office).

      97.    Spanish-speaking Mill Brook Houses residents "felt that they were made to feel

ashamed if they did not speak English.  And that was consistent.  It was not one or two

occurrences.  This is reason for [the Former Speaker's] intervention; it was becoming a very

prominent feature, and [the Former Speaker's office] were becoming a de facto NYCHA office

for Mill Brook – for the Spanish-speaking residents.  So, that was going to be unsustainable, and

as a representative, [the Former Speaker] had to advocate for [her] constituents that were making

those expressions.  So, the meeting [with NYCHA] was to share what [the Former Speaker's

office's] experiences had been, and obviously, since the management office was not addressing

those concerns, that was the reason" that the Former Speaker wanted to meet with NYCHA.

"[A]gain, what was NYCHA going to do to . . . about the lack of responsiveness?  What were

they going to do about it?"  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 18:12-21,

19:12-20, 22:2-27:2, 27:11-22, 36:13-37:11); Exhibit 28 (October 30, 2014 Email; List of

Complaints Made to the Former Speaker's Office).

      98.    The constituents from Mill Brook Houses who were complaining to the Former

Speaker's office were "Spanish-speaking."  The Former Speaker has never "indicated what their

background, race, or their ethnicity is.  Those that came to [the Former Speaker's] office that

were Spanish-dominant and Spanish-speaking, had concerns.  [The Former Speaker's] questions

to NYCHA [in the meeting] were constantly about Spanish-speaking, Spanish-dominant residents, what are you doing to address their concerns."  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 33:19-34:19); Exhibit 28 (October 30, 2014 Email; List of Complaints Made to the Former Speaker's Office).

99.     The Former Speaker's staff was constantly communicating with NYCHA management at Mill Brook to address the concerns of the residents that were coming to them. Constituents were "consistently coming to [the Former Speaker's office] and saying that there was a challenge that they were having with the management office.  The meeting was for [NYCHA] to hear us out, to then process that information, and address the concerns that were being raised.  That's what [the Former Speaker does] as an advocate.  That's what the [Former Speaker does] as a City Council member: Representation of [her] constituents."  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 35:2-36:12); Exhibit 28 (October 30, 2014 Email; List of Complaints Made to the Former Speaker's Office).

100.    Because the Spanish-speaking Mill Brook Houses residents complained to the Speaker's office that they were unable to communicate with the staff in the Mill Brook management office, the Manager of Mill Brook would not have received these complaints.  The Former Speaker's office was "now serving as a de facto management office, racking up the complaints from the constituents, and having to express those concerns to the management office," and that was not the role of the Former Speaker's office.  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 42:10-43:5, 45:5-24); Exhibit 28 (October 30, 2014 Email; List of Complaints Made to the Former Speaker's Office).

101.    Williams was not aware that in the spring of 2015, the Former Speaker's office received complaints that Williams had been disrespectful to Spanish speaking tenants.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 159:7-18).

102.    Williams concedes that it makes sense that residents who felt that she had been disrespectful to them would go to the Former Speaker's office with complaints instead of to her. However, Williams thinks that the Former Speaker's office should have called her and told her "if you said that, tone it down."  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 159:19-160:3).

**During The July 30, 2015 Meeting At The Office Of The Former Speaker, The Language Barrier At Mill Brook Houses Was Discussed, And The Possibility Of Hiring A Bilingual Housing Assistant Was Raised**

103.    NYCHA's Intergovernmental Office handled the arrangements for the meeting with the Former Speaker.  One of the core functions of the Intergovernmental Department "was to assist elected officials with any issue, case, concern they may have going forward."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 41:19-23); Exhibit 16 (Medina Dep. Tr. at 14:2-7).

104.    On July 29, 2015, Brian Honan emailed Brian Clarke to remind him that the Former Speaker wanted to meet with the Mill Brook Manager the following day and asked him to make sure the Manager was there.  Brian Clarke responded that Colon and Regional Asset Manager James Artis would also attend the meeting.  Colon forwarded the email chain to Williams.  Lippman Dec., Exhibit 29 (July 29 and July 30, 2015 Email Chain Regarding Meeting with Former Speaker); Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 132:6-20).

105.    In response to Brian Honan's email regarding the July 30, 2015 meeting with the Former Speaker, Brian Clarke emailed Honan that he, James Artis, and Sibyl Colon would attend the meeting.  Clarke recalls several reasons for the July 30, 2015 meeting with the Former

Speaker: During a tenant association meeting at Mill Brook Houses, "tenants were not allowed to speak in the language they were most comfortable speaking.  There were customer services issues with the office, and there were also maintenance issues with the property."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 42:5-43:5, 134:20-135:23); Exhibit 29 (July 29 and July 30, 2015 Email Chain Between Brian Clarke, Brian Honan, James Artis, Sibyl Colon, and Williams Regarding Meeting with Former Speaker).

106.     Brian Clarke recalls, "Specifically at a [Mill Brook Houses] tenant association meeting that was attended by the manager [Williams], she – the way that I understood it, she told folks not to speak to her or try to communicate with her in Spanish.  I think she said something like 'no mira, mira, mira here,' kind of in a derogatory way, and an offensive manner."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 135:24-136:13); Clarke Dec. at ¶ 19.

107.     While he was a RAM, Artis supervised five developments in the Bronx, including Mill Brook Houses.  Artis was responsible for "supervising the managers at those developments and overseeing those developments."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 9:16-10:14).

108.     Colon did not know the purpose of the meeting and did not try to find out other than calling Clarke, who was unavailable.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 117:18-119:8, 121:17-122:14, 124:14-17).

109.     Williams did not know and did not ask anyone the purpose of the meeting.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 190:16-191:8).

110.     Marcela Medina attended the July 30, 2015 meeting at the office of the Former Speaker and took notes.  Colon and Williams do not know who Medina is.  Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 17:11-13, 20:17-21:21, 65:23-25); Declaration of Marcela

Medina ("Medina Dec.") at ¶ 3; Exhibit 30 (Marcela Medina's Notes); Exhibit 5 (Colon Dep. Tr. at 129:3-6); Exhibit 6 (Williams Dep. Tr. at 193:10-194:2).

111.     Marcela Medina attended the July 30, 2015 meeting with her supervisor Brian Honan.  Medina recalls that the Former Speaker, Brian Honan, James Artis, Colon, the tenant association president Princella Jamerson, Allison Williams, and a staff member from the Former Speaker's office were present at the meeting.  Brian Clarke attended the meeting via telephone. Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 17:11-13, 20:17-21:21, 35:15-36:9).

112.     Michael Kelly did not attend the July 30, 2015 meeting with the Former Speaker. Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 54:9-55:2).

113.     During the July 30, 2015 meeting, the Former Speaker expressed that she was not happy with the language access barriers NYCHA residents were encountering, and there were long waits for a translator through the language bank.  Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 25:10-26:3, 46:19-47:8); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

114.     The Former Speaker "felt that she wanted to work with NYCHA to figure out how to bring better language services, very clearly, not only in her district but also citywide, and was generally or seemed to be not very content with some examples of barriers that constituents had posed to her."  Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 26:8-13 and errata sheet); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

115.     The Former Speaker "spoke about various hurdles that NYCHA residents have experienced," such as, "Elderly residents having to wait in the management office for hours before someone could assist them in their language," and "Residents taking off from work because they were not clear whether somebody was going to visit their unit to make a repair, or whatever issue they may have had, to address any issue they may have had due to a language

barrier." Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 28:3-15); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

116.   During the meeting, the tenant association president at Mill Brook Houses, Princella Jamerson indicated that she was "concerned that residents who did not speak English primarily were not getting the assistance they required." Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 36:3-37:4); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

117.   An overview of OPMOM was also discussed during the July 30, 2015 meeting with the Former Speaker. Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 44:11-45:5, 48:22-49:18); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

118.   During the July 30, 2015 meeting, the Former Speaker also noted that Mill Brook Houses staff was "rude" to the Mill Brook residents. Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 46:2-7); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

119.   During the July 30, 2015 meeting, the Former Speaker inquired whether NYCHA "ever assigned staff based on language access needs to the developments where [NYCHA] had data on the languages spoken by the residents, and she specifically said, 'for example, housing assistant.'" Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 49:19-50:3 and errata sheet); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

120.   In response to the Former Speaker's inquiry, "NYCHA stated that information is collected on the language that residents speak. And [the Former Speaker] brought up a suggestion, which was if NYCHA has these stats, is it possible when redirecting staff or hiring new staff, to hire positions within the management office where the staffing or the staff person could speak the language – any of the languages needed within these developments. Again, making a connection between NYCHA having statistics and making an effort." Lippman Dec.,

Exhibit 16 (Medina Dep. Tr. at 53:12-21); Exhibit 30 (Marcela Medina's Notes); Medina Dec. at ¶ 3.

121.     Medina thought that a bilingual Housing Assistant "would be a great role" at Mill Brook that "meets the resident's [sic] language needs."  Housing Assistants interact with residents on a "constant basis."  Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 50:4-9, 53:22-25); Exhibit 30 (Marcela Medina's Notes; July 31, 2015 Email Chain Between Marcela Medina and Jennifer Montalvo); Medina Dec. at ¶¶ 3-4; Exhibit 31 (Housing Assistant (Bilingual) Job Specification).

122.     "[U]nder OPMOM, one of the interesting good things of the program . . . was that developments could hire staff to meet all sorts of needs, and this went from staff at the management office to staff on the grounds to the staff that dealt with what [NYCHA] call[s] skill[ed] trades. . . and one of the takeaways from the [July 30, 2015] meeting was that NYCHA would look into securing an additional line for someone within the management office who spoke Spanish to be hired.  Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 59:24-60:10).

123.     Bilingual Housing Assistant is a civil service job title.  Oral proficiency in a foreign language must be demonstrated by passing a test.  Lippman Dec., Exhibit 31 (Housing Assistant (Bilingual) Job Specification); Exhibit 5 (Colon Dep. Tr. at 145:2-147:7).

124.     The meeting concluded "in NYCHA agreeing to look at the general language access policy.  For Mill Brook specifically, it was to see about a Spanish bilingual line for someone in the management office."  Lippman Dec., Exhibit 16 (Medina Dep. Tr. at 69:9-19 and errata sheet).

125.     NYCHA could not create a new, budgeted position at Mill Brook for a bilingual Housing Assistant; there had to be a vacancy in the position.  After Janet Abrahams became Vice

President of the OPMD, the OPMD was no longer under the purview of Brian Clarke.  It would then have been the responsibility of the Mill Brook Houses Property Manager or RAM to request a bilingual Housing Assistant to fill any Housing Assistant vacancy.  Clarke Dec. at ¶¶ 12, 21.

126.   Brian Clarke denies that the Former Speaker or anyone else requested that he "remove the manager at Mill Brook Houses," and the Former Speaker never requested a "Spanish manager" at Mill Brook Houses.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 136:22-137:4); Clarke Dec. at ¶¶ 18, 20.

127.   James Artis recalls that during the July 30, 2015 meeting with the Former Speaker, the Former Speaker asked what NYCHA does when there is a language barrier at a development between the management office and the residents.  Artis responded that "when we have a language barrier, what we normally do is we have what is called a language bank where we contact the language bank and they provide us with a Spanish speaking person over the phone."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 25:16-19, 29:24-30:11).

128.   James Artis recalls that during the July 30, 2015 meeting, the Former Speaker wasn't "yelling," "but she was excited and passionate about the fact that that [the language bank] was unacceptable and she was adamant about there should be a Spanish speaking individual in the office."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 30:19-23).

129.   James Artis recalls that at no time during the July 30, 2015 meeting with the Former Speaker did "anybody request a Spanish manager."  "What was requested was a Spanish speaking – somebody that spoke Spanish."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 26:24-27:3).

130.    The Former Speaker recalls that Gloria Cruz and Diana Ayala from her staff and Princella Jamerson attended the meeting.  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 15:25-17:2, 18:4-8).

131.    The Former Speaker was not previously aware that NYCHA used a language bank and does not recall anyone raising the language bank during the July 30, 2015 meeting. However, the Former Speaker believes that "the use of a language bank is not an effective way to communicate with constituents."  This is because "you are not physically with the room in the person [sic], and a lot of nuance is left.  It's leaving it up to the translator to figure things out. It's not an effective way of providing services to the constituents of New York City."  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 21:3-8, 29:11-15, 38:13-39:4).

**Colon and Williams Conflate The Word "Spanish," Meaning A Language, With An Ethnicity; Williams Admits That She Told The Former Speaker She Did Not Like To Wait For A Certified Translator Through The NYCHA Language Bank And Relied On The Maintenance Staff To Translate; And The Former Speaker Does Not Refer To Latinos As "Spanish" And Did Not Request A "Spanish Manager" At Mill Brook**

***Colon***

132.    Colon recalls that the Former Speaker, James Artis, Allison Williams, the Former Speaker's aide Gloria Cruz, the Tenant Association President Princella Jamerson, and a "young Hispanic male" attended the meeting, and Brian Clarke attended via teleconference.  Colon assumed the "young Hispanic male" was Hispanic "based on his appearance."  Princella Jamerson is African American.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 128:7-129:2, 130:11-15, 131:8-19, 155:12-13); Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 132:21-25).

133.    Colon claims that during the July 30, 2015 meeting, the Former Speaker "said that she wanted a Spanish manager [at Mill Brook Houses] about three times."  Lippman Dec.,

Exhibit 5 (Colon Dep. Tr. at 136:1-3, 136:10-21, 137:15-16, 139:8-10, 190:1-6); Exhibit 1 (Complaint at ¶¶ 29, 31-32).

134.    The Colon Complaint, which is verified, alleges that at the outset of the July 30, 2015 meeting, the Former Speaker asked, "How are your handling your Spanish speaking residents at Millbrook Houses?"  However, Colon testified at her deposition that the Former Speaker commenced the meeting by asking Williams, "What are you doing for the Spanish residents at Mill Brook Houses."  Lippman Dec., Exhibit 1 (Complaint at ¶ 26); Exhibit 5 (Colon Dep. Tr. at 132:3-10).

135.    Colon concedes that during the July 30, 2015 meeting, Artis asked the Former Speaker "are there issues with translations services here" and mentioned the language bank. Artis also confirmed with Williams that Williams used the language bank for translation services.   Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 135:14-23).

136.    The language bank is staffed by volunteer NYCHA employees who are certified translators.  In person translation services are available only by appointment.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 133:10-135:13).

137.    Colon never used the NYCHA language bank during her tenure working at NYCHA.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 135:10-13).

138.    Colon claims that the word "Spanish" in the alleged phrase "Spanish manager" means "all sorts of Spanish people . . . It's hard for me to say what I interpret as Spanish.  My husband was Spanish."  Colon's husband was from Puerto Rico and was "Indian."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 139:8-25, 144:3-4).

139.    Colon's son, who is half African American and half Puerto Rican, refers to himself as "Spanish."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 140:23-25).

140.     Colon told Luis Ponce, "And everybody thinks I'm Spanish" because of her "last name."  By "Spanish," Colon meant "Hispanic."  Lippman Dec., Exhibit 13 (Ponce Dep. Tr. at 53:3-8, 54:7-12); Exhibit 5 (Colon Dep. Tr. at 287:1-9, 290:23-291:3).

141.     Colon equates the word "Spanish" with "someone of Hispanic or Latino origin" and believes that "Hispanic and Spanish" are "interchangeable."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 142:25-143:2, 164:25-165:3, 166:18-20).

142.     Colon concedes that during the meeting with the Former Speaker, the possibility of hiring a bilingual Housing Assistant was discussed.  Colon further concedes that it was her understanding that the Former Speaker's alleged demand for a "Spanish Manager" meant someone who spoke the Spanish language.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 145:2-146:12).

143.     Colon concedes that "some Spanish people don't speak Spanish."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 143:6-15).

144.     Colon believes that a language requirement for a job is illegal.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 288:21-289:1).

145.     After the July 30, 2015 meeting with the Former Speaker, Artis and Colon discussed the meeting and "came to the conclusion that Ms. Viverito wanted a Spanish speaking manager at [Mill Brook Houses]."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 37:17-25, 38:14-17).

*Allison Williams*

146.     Williams recalls that the Former Speaker, Sibyl Colon, James Artis, Princella Jamerson, Brian Honan, Gloria Cruz, and an "unknown Hispanic man" on the Former Speaker's staff attended the meeting, and Brian Clarke attended telephonically.  She does not remember if

32

anyone attended whom she had not previously met.  Lippman Dec., Exhibit 32 (Williams

Amended Complaint at ¶ 16); Exhibit 6 (Williams Dep. Tr. at 193:10-196:18).

147.    Williams concedes that the Former Speaker began the July 30, 2015 meeting by

inquiring, "How are you handling your Spanish speaking residents at Mill Brook Houses?"

Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 197:19-198:5); Exhibit 32 (Williams Amended

Complaint at ¶ 17).

148.    Williams responded to the Former Speaker's question, "we use the language

bank," and James Artis also mentioned the language bank.  Lippman Dec., Exhibit 6 (Williams

Dep. Tr. at 198:6-13, 198:22-199:7); Exhibit 32 (Williams Amended Complaint at ¶ 18).

149.    Williams also told the Former Speaker during the July 30, 2015 meeting that

when she needs a Spanish language translator, she "sometimes goes to the maintenance

department downstairs to get someone who speaks Spanish."  Colon recalls Williams stating that

her superintendent speaks Spanish "and he helps as well."  Lippman Dec., Exhibit 6 (Williams

Dep. Tr. at 211:2-213:9); Exhibit 5 (Colon Dep. Tr. at 136:22-24, 153:7-8).

150.    Williams told the Former Speaker that she asked the Supervisor of Caretakers to

translate for her "because the language bank for Spanish is usually very busy and they put you on

hold forever, and [she] did not feel it was fair to the tenants having them sit there.  They say we

will call you back, but you could be waiting and waiting and waiting and waiting and the tenant

is just sitting there."  "[I]t was not just disrespectful to the resident but disrespectful to me."

Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 211:25-212:10, 220:24-221:14).

151.    Williams concedes that the long wait for translation services through the language

bank was "the nature of the beast."  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 224:10-13).

152.     Williams would call "maintenance downstairs and upstairs" and "asked them to translate if the language bank did not get back to [her], and most of the time they did not get back to [her]."  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 212:11-24, 219:16-220:3).

153.     Williams did not know how to obtain in-person translation services or translation of a document when she worked at NYCHA.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 221:20-222:8).

154.     Williams claims that the only Housing Assistant at Mill Brook who spoke Spanish was Celeste Mangum, but "she was terminated" and "was not at Mill Brook a long time." Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 224:19-225:4).

155.     Williams claims that the Former Speaker stated during the July 30, 2015 meeting that the use of the language bank for translation services was "unacceptable."  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 211:9-14).

156.     Williams claims that during the July 30, 2015 meeting, the Former Speaker stated she wanted to replace her as the Manager of Mill Brook Houses "with a 'Spanish Manager.'" Lippman Dec., Exhibit 6 (William Dep. Tr. at 199:16-200:5); Exhibit 32 (Williams Amended Complaint at ¶ 20).

157.     Williams concedes, however, that two days after the July 30, 2015 meeting, she attended a meeting where Colon and Artis were present, and she told them she "felt [she] was being bullied because [she] did not speak Spanish."  Colon and Artis told Williams that she "wasn't" being bullied.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 213:17-214:2, 215:5-14) (emphasis added).

158.    Williams interprets the word "Spanish" as meaning Hispanic or Latino and equates the word "Spanish" with an ethnicity.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 200:8-15); Exhibit 32 (Williams Am. Compl. at ¶¶ 20, 21, 23, 24).

159.    Williams does not know whether the word "Spanish" indicates a language. Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 200:16-201:11).

160.    Williams claims that "Spanish means like if I perm my hair and the men start to speak Spanish to me," and she has a "full face" of makeup.  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 201:21-202:18).

161.    Williams does not know whether there are Black people who self-identify as Latino or Spanish.  Williams agreed with her attorney Marcel Florestal when he questioned her during her deposition that he looks African American, and she would not know that he is one half Dominican and "pretty fluent in Spanish."  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 203:4-7, 300:7-23).

162.    Williams claims that the Former Speaker "wanted a Spanish manager who speaks Spanish, but she just said Spanish.  If [Williams] spoke Spanish [she] [doesn't] know if [the Former Speaker] would have been happy with that."  Lippman Dec., Exhibit 6 (Williams Dep. Tr. at 205:16-25).

***The Former Speaker Does Not Refer To Latinos As "Spanish;" A "Spanish Manager" or "Spanish Person" Is From Spain***

163.    The Former Speaker's question to NYCHA during the meeting was "there are needs that the Spanish-speaking residents have that management office is not addressing.  How are you going to address it?  Clearly, there was a lack of communication; there – there needed to be additional support."  Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 20:5-13).

164.   The Former Speaker did not make the statement, "I want a Spanish manager." A "Spanish manager" or a "Spanish person" is "a person from Spain." Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 21:19-21, 31:21-33:10).

165.   The Former Speaker would "never use the term 'Spanish person' to reference [herself] or to reference a Latino or to reference a[n] African American – a Latino or Puerto Rican person. That's not [her] terminology." To the Former Speaker, "Spanish" only includes people from Spain. Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 33:6-15, 39:11-20, 40:16-18, 41:2-16).

166.   To the Former Speaker, "A Spanish person is not a Latino person." Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 39:21-25).

167.   The Former Speaker never "refuse[d] to hire somebody because they were not the right color," and never "hire[d] somebody because they were the right color." Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 29:18-30:7).

168.   The Former Speaker never "refuse[d] to hire somebody because they were not the right ethnicity," and never "hire[d] somebody because they were the right ethnicity." Lippman Dec., Exhibit 12 (Mark-Viverito Dep. Tr. at 30:8-22).

**After The July 30, 2015 Meeting With The Former Speaker, Brian Clarke Asked Colon To Transfer Williams To Another Development Outside The OPMOM Program Due To Her Poor Performance And Poor Customer Service; Colon Claimed An Inspector General Investigation And Human Resources Impeded The Transfer**

169.   NYCHA exercises its discretion to determine whether to transfer Managers; NYCHA does not need to obtain the Housing Manager's consent before a transfer. Provided there is a vacancy available, NYCHA may transfer a manager to another location. NYCHA's Human Resources Department must check if there is a civil service list in case there is already a candidate for a vacancy or see if someone is coming back from leave. If NYCHA transfers a

36

Housing Management to another development, the employee does not lose seniority, and the salary remains the same.  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 139:19-140:5, 141:22-142:13, 145:24-146:2); Exhibit 5 (Colon Dep. Tr. at 103:18-105:1); Exhibit 6 (Williams Dep. Tr. at 30:4-7, 32:6-24).

170.    On July 31, 2015, the day after the meeting with the Former Speaker, Colon met with Brian Clarke in his office.  Colon claims that Clarke told her he was going on vacation the following week, and in his absence, he wanted Colon to perform various assignments including "to remove and replace Allison [Williams] from Mill Brook Houses and replace her with a Spanish Hispanic manager."  Colon further claims that Clarke told her to "reach out to Kenya Salaudeen, the HR director to implement his directives regarding Allison Williams," "tell Kenya don't use the words Spanish Manager," "tell her it's for the cultural sensitivity needs of the development."  Colon did not say anything in response to Clarke; she just "listened" and "took notes."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 159:21-162:22).

171.    Brian Clarke wanted to "transfer [Allison Williams] out of the OPMOM program" to manage another NYCHA development.  The transfer was for performance reasons and poor customer service.  In particular, Brian Clarke "thought it was just unbelievable that a property manager would ridicule tenants because of their inability to speak English and violate a Mayoral order for language access for city services at a public meeting.  That was the straw that really kind of broke the camel's back for [him]."  Clarke also wanted to have Williams "disciplined for what she did at that meeting."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 137:14-138:21).

172.    Brian Clarke asked Colon to contact Human Resources to effectuate the transfer of Williams to another development.  This was "because all transfers go through HR.  And the

reason why is, one, we need to know whether or not there is an open location to move her to. There has to be a budget line.  Two, you know is somebody coming back from leave."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 142:14-22); Exhibit 11 (July 1, 2019 Clarke Dep. Tr. at 75:9-14, 77:24-78:7).

173.    Brian Clarke never told Colon "to transfer Allison Williams because she didn't speak Spanish."  Clarke wanted to transfer Allison Williams "for performance issues," issues which she had even before the OPMOM program.  Lippman Dec., Exhibit 11 (July 1, 2019 Clarke Dep. Tr. at 78:12-24).

174.    Sheila Pinckney emailed Colon on August 6, 2015, while Brian Clarke was on vacation, and asked her whether Williams had been moved from Mill Brook Houses.  Colon responded to Sheila Pinckney that "HR needs more information from us.  There is also an ig investigation going on.  HR wants to talk to the ig's office first."  The "ig" stands for the Inspector General.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 192:19-194:8, 195:9-10); Exhibit 33 (August 6 and 7, 2015 Email Chain).

175.    On August 7, 2015, Colon emailed Brian Clarke and copied Sheila Pinckney, stating that Richard Bennardo in Human Resources "wants to set up a meeting with the Manager, with myself in attendance to gather more facts.  I've also reached out to Gil Mazon to have Ms. Williams receive additional training."  The additional training related to the "meda meda" statement Williams made to the Mill Brook residents.  Lippman Dec., Exhibit 33 (August 6 and 7, 2015 Email Chain); Exhibit 5 (Colon Dep. Tr. at 187:2-188:5, 199:25-200:4).

176.    On August 12, 2015, Colon emailed Brian Clarke, "I have experienced difficulty with the transferring of the Manager at Mill Brook.  HR is requesting information that I am unable to provide.  I've spoken to both Mr. Ponce and Ms. Pinckney about this.  The IG's are

also involved as well and stated to 'not do any further action as they were in the middle of an investigation.  We reached out to the local political office where we had the meeting at and they did not provide complaint documentation or specifics."  Lippman Dec., Exhibit 33 (August 12, 2015 Email).

177.    Colon claims that when she returned from her vacation on August 24, 2015, she told Brian Clarke that transferring Allison Williams from Mill Brook Houses was "illegal." Colon did not state why the transfer was illegal.  Rather, "[She] said it's illegal.  That's the why [she] gave him."  Colon claims that it was "at this point" she was "expressing opposition to what [she] was being asked to do."  Brian Clarke denies Colon told him this.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 216:2-217:16, 218:20-23); Clarke Dec. at ¶ 22.

178.    On August 25, 2015, Colon emailed Brian Clarke, "HR informed me that we needed more specific information in reference to the cultural needs of the residents, in order to transfer the Manager at Mill Brook.  Lippman Dec., Exhibit 33 (August 25, 2015 Email Chain).

179.    Colon claims that on August 26, 2015, she again told Brian Clarke the transfer was "illegal," and "it was along those lines that it was racial.  I can't do it and it just can't be done."  Brian Clarke denies that Colon ever told him the transfer was "illegal" or "along those lines that it was racial," and she never raised any concerns regarding the legality of the transfer. Brian Clarke denies Colon told him this.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 233:24-234:17); Clarke Dec. at ¶ 22.

180.    Colon claims that James Artis told her the Inspector General was investigating Allison Williams.  However, Brian Clarke called and met with the Inspector General after he returned from vacation and was told there was no investigation into Allison Williams.  Rather, the Inspector General was conducting an investigation of tenants at the property and told Clarke

"they had less than a favorable experience working with [Williams]."  Lippman Dec., Exhibit 5

(Colon Dep. Tr. at 195:6-196:10, 203:25-204:22); Exhibit 11 (July 1, 2019 Clarke Dep. Tr. at

58:3-59:14, 61:18-62:9).

181.    The Complaint alleges that Brian Clarke yelled at [Colon], "'What's in [Allison

Williams'] folder, you have to do this.'"  Colon claims she contacted James Artis "and ordered

him to go through Ms. Williams's folder and find any negative infraction, and report back to her

. . . James Artis called Ms. Colon later that day, and complained that he felt like he was being

forced to go on [sic] 'fishing expedition', because there was no infraction in Ms. Williams's

folder that would warrant a termination."  Colon further claims that James Artis looked in

Williams' "folder" and told Colon "'there's nothing there but one write up from a training class

that she didn't go up.'"  Lippman Dec., Exhibit 1 (Complaint at ¶¶ 50-52); Exhibit 5 (Colon Dep.

Tr. at 208:17-209:13).

182.    James Artis denied that Colon asked him to "go through Ms. Williams' employee

file."  Instead, Colon asked Artis if Williams "had any memos," and he told her, "[He] only

wrote [Williams] up one time."  Artis has "a thing" that he "doesn't look into peoples [sic]

folders that [he] supervise[s] because [he] gives them a chance," and "looking in the folder,

that's, like, something [he] [doesn't] do."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 39:11-13,

42:16-43:2).

183.    James Artis only started supervising Williams in January 2015.  Colon never

spoke to any of Williams' previous supervisors about her performance.  Lippman Dec., Exhibit 5

(Colon Dep. Tr. at 209:14-24).

184.    At no time during Colon's NYCHA employment did she review Williams'

personnel file or her location folder, and she never spoke to anyone in the Bronx Borough Office

regarding Williams' performance.  James Artis did not tell Colon about Williams' 2009 or 2015 local disciplinary hearings or the counseling memoranda she had received, and Colon did not verify for herself whether Williams had a disciplinary history.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 107:9-12, 210:2-18, 303:2-13); Exhibit 34 (Record of Local Hearings Against Allison Williams; Counseling Memoranda).

185.    Colon did not know before her deposition that Williams had a disciplinary record, including local disciplinary hearings in July 2009 and January 2015.  Williams' January 2015 Notice of Local Hearing/Specification of Charges was signed by James Artis.  Colon also did not know that Williams had also received many counseling memoranda from her supervisors. Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 106:5-12); Exhibit 34 (Record of Local Hearings Against Allison Williams and Counseling Memoranda).

186.    James Artis does not think that Colon "tried to remove Ms. Williams as [M]anager of the Mill Brook Houses."  Lippman Dec., Exhibit 14 (Artis Dep. Tr. at 39:7-10).

187.    Brian Clarke emailed Colon on August 25, 2015 and asked her "where are we with moving the manager of Mill Brook."  Colon concedes that Clarke did not tell her to terminate Williams.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 103:13-104, 226:5-17); Exhibit 33 (August 25, 2015 Email Chain).

### NYCHA Human Resources Did Not Tell Colon That Williams' Transfer Was Illegal

188.    Colon alleges that she told Human Resources Director Kenya Salaudeen that Brian Clarke "wanted to terminate Ms. Williams as the Manager of the Millbrook Houses, to be transferred somewhere else, replaced with a Latino Manager, and that Manager Kelley [sic] and the Council Speaker wanted it done immediately due to the 'cultural sensitivity' needs of the residents."  Lippman Dec., Exhibit 1 (Colon Compl. at ¶ 36).

41

189.    Colon alleges that Kenya Salaudeen, "who is also African American," told her, "'I don't care if Obama wants it done, what you are proposing is illegal and you can be sued!'" Colon alleges that Salaudeen "further stated that as an African American woman she felt offended that she was being forced to terminate another African American woman, just because she's African American, but, she nonetheless, would set up a meeting with HR Deputy Director Richard Bennardo to see what they can do."  Lippman Dec., Exhibit 1 (Complaint at ¶ 37).

190.    Kenya Salaudeen has no recollection of having a conversation with Colon "with respect to removing Allison Williams as the manager of Mill Brook Houses."  Lippman Dec., Exhibit 17 (Salaudeen Dep. Tr. at 25:16-22).

191.    Kenya Salaudeen has no recollection of Colon "telling [her] that Brian Clarke requested that she remove Allison Williams as the manager of Mill Brook Houses and say that if anybody asks, say that it was due to the cultural sensitivity of the residents."  Lippman Dec., Exhibit 17 (Salaudeen Dep. Tr. at 25:23-26:8).

192.    Kenya Salaudeen has no recollection of Colon "calling [her] specifically about removing Allison Williams" and has no recollection of "having a specific conversation about Allison Williams with Sibyl Colon."  Lippman Dec., Exhibit 17 (Salaudeen Dep. Tr. at 26:12-25).

193.    Kenya Salaudeen has no recollection of telling Colon "that [she doesn't] care if President Obama wanted it done that she can't do it."  Lippman Dec., Exhibit 17 (Salaudeen Dep. Tr. at 27:2-7).

194.    Kenya Salaudeen has no recollection of "telling Miss Colon that [she was] offended as a black woman for what she was asking."  Lippman Dec., Exhibit 17 (Salaudeen Dep. Tr. at 27:8-12).

195.    Kenya Salaudeen has no recollection of "telling Miss Colon that Brian[]
[Clarke's] directives were illegal and discriminatory."  Lippman Dec., Exhibit 17 (Salaudeen
Dep. Tr. at 27:13-17).

196.    Kenya Salaudeen has no recollection of speaking with Richard Bennardo about
conversations with Luis Ponce concerning Plaintiff Allison Williams, or about additional training
for Williams.  Lippman Dec., Exhibit 17 (Salaudeen Dep. Tr. at 28:20-29:9).

197.    Colon alleges that Human Resources employee Marla Edmonson told her that
transferring Allison Williams "would be illegal."  However, Marla Edmonson denied telling
Colon this.  Lippman Dec., Exhibit 1 (Complaint at ¶ 39); Exhibit 15 (Edmonson Dep. Tr. at
13:15-14:3).

***Luis Ponce Did Not Tell Colon That It Was Illegal Or Discriminatory To "Remove" Williams
As The Mill Brook Manager***

198.    Colon claims that Luis Ponce told her that transferring Williams from Mill Brook
Houses was "illegal."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 187:14-16).

199.    Luis Ponce spoke to Colon about transferring Williams from Mill Brook Houses
to another development.  However, Ponce did not tell Colon that "it was [his] opinion that
Brian[] [Clarke's] directive to remove Ms. Williams as the Manager of Millbrook was illegal,"
and he did not tell Colon "that Brian Clark's [sic] directive to remove Ms. Williams as the
manager of the Millbrook Houses was discriminatory."  Lippman Dec., Exhibit 13 (Ponce Dep.
Tr. at 38:15-39:6, 40:7-11, 40:24-41:6).

**The Chair Goes On Maternity Leave in Spring 2015; When She Returns, She Tells General
Manager Michael Kelly That Janet Abrahams Was Her "First Choice" To Run OPMOM,
And She Wants To Hire Janet Abrahams To Run And Expand OPMOM**

200.    Shortly after Michael Kelly joined NYCHA in April 2015, the Chair went on
maternity leave.  Upon the Chair's return from maternity leave in the end of July 2015, "she

approached [Michael Kelly] and asked if [he] knew Janet Abrahams.  [Kelly] told her [he had]

heard of her.  She said she was very impressed with [Janet Abrahams] and wanted [Kelly] to

interview with her and see her appropriate level to be recruited and to pick up the discussions

Cecil House had with her prior to his leaving."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly

Dep. Tr. at 35:18-36:10).

201.     Janet Abrahams "was the first choice to assume that position [managing

OPMOM] long before [Kelly] got [to NYCHA.]"  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly

Dep. Tr. at 34:19-24, 39:3-5).

202.     Prior to effectuating the Chair's decision to "aggressively recruit Janet

Abraham[s]," Michael Kelly "checked with the human resources department at NYCHA" and

confirmed that Colon "was an at-will employee and as such, it was within our privileges to make

that offer to Janet at the time."  Kelly confirmed Colon's at will status with Kerri Jew, who was

the Executive Vice President for Administration, which included the Human Resources

Department.  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 48:24-49:15).

203.     The SLA numbers "were not part of the decision making" in removing Colon as

Director of OPMOM.  Rather, Michael Kelly "saw a candidate that [he] knew had the experience

and the ability to take the modeling, the 18 property modeling of OPMOM, and produce a

program that would move it to the change of management for the entire portfolio; of which, Janet

Abraham[s] successfully did."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 47:5-

18).

204.     On July 27, 2015, Kilsys Payamps-Roure, Kelly's Chief of Staff, emailed Juanita

Acosta, Kelly's assistant, and asked her to call Janet Abrahams and request that she send a copy

of her resume "as soon as possible."  Payamps-Roure made this request because "[i]n

conversations with the [C]hair directly or the chair and [Kelly], [Kelly's] [C]hief of [S]taff was directed to get a copy of Janet's resume and she in turn asked [Kelly's] [S]ecretary to follow up." Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 57:3-58:14); Exhibit 35 (July 27, 2015 Email from Kilsys Payamps-Roure).

205.    On July 28, 2015, Kilsys Payamps-Roure emailed the Chief of Staff for the Deputy Mayor for Housing & Economic Development and attached Janet Abrahams' resume to the email, stating, "attached is the resume of Janet Abrahams who we are considering for the position of EVP of Operations.  Would you like to meet with her before we make an official offer?"  Payamps-Roure then proceeded to schedule interviews.  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 58:15-59:24); Exhibit 35 (July 28, 2015 Email from Kilsys Payamps-Roure).

206.    Michael Kelly and others met with Janet Abrahams "and were very impressed.  It was concluded that she would be an exceptional candidate to move OPMOM from the 18 units that were serving as the model program to a full-blown program that was looking to, in a phase manner, replace all of NYCHA's management protocols to this OPMOM Protocol because she was successful in doing specifically the same thing in Newark and in Chicago and the end of August 2015 a general offer was put out to Janet to assume those responsibilities and she accepted at the end of August and began work in September."  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 36:10-24, 38:21-25).

207.    The "short answer" to why Colon was removed as Director "is that a candidate has been pre-vetted by the [C]hair and the Authority prior to [Kelly's] arrival, and it was decided this professional would be better suited to manage OPMOM," and, "it was decided to remove

Sibyl Colon from that position."  This decision was made by Kelly and the Chair.  Lippman

Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 37:3-11).

208.    On August 18, 2015, Natalie Rivers informed Brian Clarke and Kilsys Payamps-

Roure by email that Janet Abrahams was scheduled to start on or about September 28th, 2015.

Payamps-Roure forwarded the email to Michael Kelly and the Chair, among others.  Lippman

Dec., Exhibit 36 (August 18, 2015 Email Chain).

209.    On August 20, 2015, NYCHA communicated a formal written offer to Janet

Abrahams, offering her the position of Vice President for the OPMD at the salary of $175,000.

Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 39:10-15); Exhibit 36 (August 20, 2015

Email from Natalie Rivers to Janet Abrahams).

210.    Colon reported to Brian Clarke, but when Janet Abrahams joined NYCHA as

Vice President, she reported to the General Manager, Michael Kelly, and OPMOM was "moved

out" from under Brian Clarke.  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 59:25-

60:13 and errata sheet); Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 57:22-23).

211.    Janet Abrahams was hired as Vice President and then, "per design, she was

promoted to [S]enior [V]ice [P]resident."  Janet Abrahams came to NYCHA as a Vice President

to "oversee[] OPMOM," and she replaced Sibyl Colon in overseeing OPMOM.  Lippman Dec.,

Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 60:17-25, 61:2-9); Exhibit 13 (Ponce Dep. Tr. at 78:8-

11); Exhibit 38 (Janet Abrahams' Human Resources Record Card).

212.    Vice President is a higher title than Director.  As Vice President, Abrahams had

"access" to "higher levels in the Authority, and had access to approve higher level [sic] of

monetary amounts for budgets and for contracts."  Lippman Dec., Exhibit 13 (Ponce Dep. Tr. at

80:2-81:13).

213.    In August 2015, Michael Kelly informed Brian Clarke that Janet Abrahams would be taking over OPMOM.  Kelly told Clarke that Colon would be replaced because "[Kelly and the Chair] had recruited somebody who had successfully implemented asset management at two other Housing Authorities, and they had an opportunity to bring her on board, and they wanted to take advantage of that opportunity."  Kelly also told Clarke that Abrahams "was with Newark Housing Authority . . . she ran operations there, and she had formally dealt with a similar position at the Chicago . . . Housing Authority."  Lippman Dec., Exhibit 10 (Clarke June 13, 2019 Dep. Tr. at 51:9-54:4).

214.    Michael Kelly told Brian Clarke that Janet Abrahams had "a different management approach to the property rather than the traditional type of NYCHA, and so wanted to bring in somebody who had different experiences, as well as, you know, implementing the asset management program."  Kelly and the Chair "were looking for somebody who had experience working . . . at a . . . public [h]ousing [a]uthority, having successfully implemented . . . . asset management."  Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 58:3-12, 59:23-60:8).

215.    Brian Clarke was not involved in the decision to hire Janet Abrahams and had no input in the decision.  In fact, Brian Clarke was surprised when Michael Kelly told him that Janet Abrahams had been hired to take over OPMOM because he "wasn't involved in the [Janet Abrahams] decision-making process and wasn't aware that that was going on."  Lippman Dec., Exhibit 10 (Clarke June 13, 2019 Dep. Tr. at 51:3-53:5, 56:6-14, 57:4-11); Clarke Dec. at ¶ 12.

216.    Brian Clarke's opinion of the decision to replace Colon with Janet Abrahams was favorable.  Clarke had "done a tour of Newark Housing Authority" and was "very impressed with the work that [Abrahams] had done there," so Clarke "knew that they were getting

47

somebody who successfully had done this . . . on the national stage." Janet Abrahams "had successfully implemented [asset management at] two other challenging . . . [h]ousing [a]uthorities" and was "recruited" by NYCHA "to come in and really implement asset management." Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 56:7-57:3).

217.    Brian Clarke also "understood why" Michael Kelly and the Chair had wanted to bring in Janet to run OPMOM: The Chair's "vision for the program was really to manage things differently than the way that it had been done. She wanted to really bring in somebody who had a really different point of view, somebody you didn't have – you know, wasn't brought up through, you know, NYCHA, and, you know, frankly also someone like me who had been with the agency for two decades, even though I came from the outside, still was kind of considered, you know, a long time NYCHA employee, so the program was – not only was Sibyl [Colon] reassigned, but the program was also moved out from under [Clarke]." Lippman Dec., Exhibit 10 (June 13, 2019 Clarke Dep. Tr. at 57:11-23).

218.    Janet Abrahams is African American. Chaitoff Dec. at ¶ 15.

**Brian Clarke Offered Colon A Senior Administrator Position At A Salary Of $122,000;
Colon Instead Resigned Immediately**

219.    On August 28, 2015, Colon met with Michael Kelly and Brian Clarke. Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 233:11-19, 237:14-238:3); Exhibit 1 (Colon Compl. at ¶¶ 56-57).

220.    Colon claims that during the meeting on August 28, 2015, Michael Kelly stated, "'I've decided to go with someone else that I used to work with in Chicago. This has nothing to do with your job performance. You're doing a great job. I just decided to go with someone else in Chicago.'" Kelly told Colon that Brian Clarke was going to give her another position. Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 239:1-13, 241:19-22).

221.    Brian Clarke offered Colon a Senior Administrator position in the Management

Services Department run by Lillian Harris, with a salary of $122,000.  Lippman Dec., Exhibit 5

(Colon Dep. Tr. at 242:17-244:18-245:7, 301:20-22).

222.    Colon claims that Senior Administrator is a "made up title."  However, Colon

previously held an Administrator title in the Manhattan and Brooklyn Property Management

Departments.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 244:18-23); Exhibit 22 (April 8, 2015

Email Attaching Colon's Resume).

223.    Colon claims she "wrote the blueprint and the program" for the Management

Services Department, served on a task force for this Department, and, "Wrote a whole lot of

documents up for that department to be created."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at

246:6-23).

224.    Although Colon claims she "basically took the lead in creating [the Management

Services Department," she declined the Senior Administrator position and resigned immediately

because the position "was still under Brian [Clarke's] leadership," and "[she] was already

physically illed [sic] by being forced to create a racist act," and "Brian Clarke had asked [her] to

commit a crime."  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 246:24-250:7).

225.    Colon claims she would not have supervised anyone in the Management Services

Department, which was a new department.  However, Colon testified that she does not know the

current size of the Management Services Department and does not know whether she would have

had supervisory responsibilities had she accepted the position.  Lippman Dec., Exhibit 5 (Colon

Dep. Tr. at 245:6-11, 257:24-258:9).

226.    Although the verified Complaint claims that Lillian Harris "doesn't know her own

department as well as [Colon]," Colon does not know whether that is true and had never worked

with Harris before Colon resigned.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 258:21-259:12);

Exhibit 1 (Complaint at ¶ 59).

 227. Colon believes that Regional Asset Manager Octavia Hayward immediately

replaced her as the Director.  Colon claims she knows this because she "talk[s] to many people in

the Housing Authority."  Lippman Dec., Exhibit 5 Colon Dep. Tr. at 253:7-254:11); Exhibit 1

(Complaint at ¶ 59).

 228. After Colon left NYCHA, there was no acting Director of OPMOM, and NYCHA

did not hire another OPMOM Director until May 2016.  NYCHA hired Janet Abrahams as Vice

President of OPMOM, and she reported to General Manager Michael Kelly.  Lippman Dec.,

Exhibit 14 (Artis Dep. Tr. at 56:4-57:22); Exhibit 37 (August, September, and October 2015

Organization Charts; May 20, 2016 email from Lorraine Roman on behalf of Janet Abrahams).

 229. Octavia Hayward became OPMOM Director in May 2016.  Lippman Dec.,

Exhibit 37 (August, September, and October Organization Charts; May 20, 2016 email from

Lorraine Roman on behalf of Janet Abrahams).

 230. Octavia Hayward was an "effective" Director.  Lippman Dec., Exhibit 9 (Sept.

23, 2019 Kelly Dep. Tr.at 34:5-35:4 and errata sheet).

 231. In October 2016, Janet Abrahams was promoted to Senior Vice President for

NextGen Operations.  Lippman Dec., Exhibit 38 (Janet Abrahams' Human Resources Record

Card).

 232. Janet Abrahams successfully expanded the OPMOM property modeling from the

18-development pilot program.   Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 47:13-

18).

233.     In July 2017, Janet Abrahams left NYCHA to become the Executive Director of the Baltimore Housing Authority.  Lippman Dec., Exhibit 8 (July 3, 2019 Kelly Dep. Tr. at 47:19-22); Exhibit 38 (Janet Abrahams' Human Resources Record Card).

**NYCHA's Equal Employment Opportunity Policy**

234.     NYCHA's Equal Employment Opportunity Policy provides equal opportunities for all qualified applicants and personnel and prohibits discrimination on the basis of, inter alia, race, in all terms and conditions of employment, including but not limited to work assignments, salary and benefits, performance evaluations, and promotions, and prohibits retaliation for complaining of unlawful discrimination.  Lippman Dec., Exhibit 39 (NYCHA Equal Employment Opportunity Policy Statements).

235.     Colon is aware of NYCHA's equal opportunity policies and acknowledged receipt of the policy statements online.  Lippman Dec., Exhibit 5 (Colon Dep. Tr. at 329:14-22).

**This Action**

236.     Colon filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") dated September 28, 2015, indicating race and national origin discrimination and retaliation.  Colon filed another Charge of Discrimination with the EEOC dated December 1, 2015; this Charge indicated race, retaliation, color, and national origin as the cause of discrimination.  On January 27, 2016, NYCHA received the Charges with a Notice of Charge of Discrimination dated January 8, 2016; the Notice of Charge indicated race, national origin, and retaliation as the bases of alleged discrimination.  The EEOC issued a Notice of Right to Sue dated April 26, 2016.  Lippman Dec., Exhibit 40 (EEOC Charges, Notice of Charge, and Notice of Right to Sue).

237.     Colon filed a Complaint on June 17, 2016.  Lippman Dec., Exhibit 1 (Complaint).

238.     In a March 26, 2018 Opinion & Order, the Court granted the NYCHA

Defendants' motion to dismiss Colon's hostile work environment claim against NYCHA,

Section 1985 claim against Michael Kelly and Brian Clarke, First Amendment retaliation claim

against NYCHA, and intentional infliction of emotional distress claim against Michael Kelly and

Brian Clarke; and denied the NYCHA Defendants' motion to dismiss Colon's retaliation claims

under Title VII, the NYSHRL, and the NYCHRL against NYCHA; retaliation claim under 42

U.S.C. Section 1983 against Kelly and Clarke; and aiding and abetting claim under the NYSHRL

against Kelly and Clarke.  The Court dismissed all claims against the City Defendants.  *See*

docket entry no. 43.

239.     The NYCHA Defendants answered the Complaint on May 9, 2018.  Lippman

Dec., Exhibit 2 (The NYCHA Defendants' Answer).

240.     In a March 22, 2019 Opinion & Order, the Court granted Colon's motion for

reconsideration as to her claim for aiding and abetting under the NYSHRL against the Former

Speaker and reinstated the Former Speaker as a Defendant in the case.  *See* docket entry no. 76.

241.     The Former Speaker answered the Complaint on April 5, 2019.  Lippman Dec.,

Exhibit 3 (Defendant Melissa Mark-Viverito's Answer).

Dated: New York, New York
     January 17, 2020

                         Respectfully submitted,

                         KELLY D. MACNEAL
                         EVP for Legal Affairs and General Counsel
                         New York City Housing Authority
                         Attorney for the NYCHA Defendants
                         90 Church Street, 11th Floor
                         New York, NY 10007
                         Tel. No.: (212) 776-5259
                         Fax No.: (212) 776-5404
                         E-mail: jane.lippman@nycha.nyc.gov

                       By:       /s/ *Jane E. Lippman*
                             Jane E. Lippman (JL7461)

Jane E. Lippman
Of Counsel