UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

SIBYL COLON,

                                        Plaintiff,

                    -against-

THE CITY OF NEW YORK, NEW YORK CITY
HOUSING AUTHORITY, NEW YORK CITY
COUNCIL SPEAKER MELISSA MARK-VIVERITO,
MICHAEL KELLY, and BRIAN CLARKE,

                                        Defendants.

------------------------------------------------------------------- x

**DEFENDANT MARK-VIVERITO'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

16 Civ. 4540 (VSB)

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, defendant former New York City Council Speaker Melissa Mark-Viverito, by her attorney, JAMES E. JOHNSON, Corporation Counsel of the City of New York, submits the following statement of material facts as to which she contends that there is no genuine issue to be tried.

**A.      Procedural History**

1.      Sibyl Colon, a former director of the New York City Housing Authority ("NYCHA") Optimal Property Management Operating Model Program ("OPMOM"), alleges that Melissa Mark-Viverito ("Mark-Viverito") aided and abetted retaliatory actions in violation of the New York State Human Rights Law ("SHRL").  *See* Complaint ("Complaint"), dated June 17, 2016, Exhibit A[1] and *Colon v. City of New York*, No. 16 Civ. 4540 (VSB), 2019 U.S. Dist. LEXIS 48188 (S.D.N.Y. Mar. 22, 2019).

---

[1] Unless otherwise indicated, all references to "Exhibit" or to "Ex." are to the exhibits which are annexed to the Declaration of Natalie S. Marcus, dated January 17, 2020 ("Marcus Decl."), submitted in support of Defendant's Motion for Summary Judgment.

2.      Following a motion to dismiss, the City of New York was dismissed from the action as were all the claims that were brought against Mark-Viverito.  *See Colon v. City of New York*, No. 16 Civ. 4540 (VSB), 2018 U.S. Dist. LEXIS 49582 (S.D.N.Y. Mar. 26, 2018). Plaintiff moved for reconsideration of that decision and the Court reinstated the SHRL aiding and abetting retaliation claim against Mark-Viverito.  *See Colon* 2019 U.S. Dist. LEXIS 48188, at *8.

3.      Plaintiff alleges that she was removed from her position as Director of the OPMOM because of her purported opposition to the transfer of a manager out of the Mill Brook Houses ("Mill Brook").  *See* Compl. ¶ 62, Ex. A.

**B.      Background**

4.      On August 5, 1985, plaintiff commenced her employment with NYCHA, in the civil service title of housing assistant.  *See* Human Resources Department Record Card, NYCHA 4501- NYCHA 4502, Ex. O.

5.      On May 12, 2015, plaintiff was promoted to the position of Director of OPMOM.  *See* Human Resources Department Record Card, NYCHA 4501- NYCHA 4502, Ex. O.

6.      Plaintiff did not have a civil service title as the Director of OPMOM.  *See* Colon Depo. at 62:16-19, Ex. B.

7.      Plaintiff was an at-will employee.  *See* Kelly Depo. July 3, 2019 at 49:2-15, Ex. D.

8.      Plaintiff remained the Director of OPMOM until her resignation on August 28, 2015.  *See* Human Resources Department Record Card, NYCHA 4501- NYCHA 4502, Ex. O.

9.      Allison Williams served as a housing manager from 1999 until her retirement from NYCHA on May 1, 2017.  *See* Williams May 8, 2019 Depo. at 23:4-6, 27:14-18, Ex. H.

10.      Williams retired after working for NYCHA for 33 years.  *See* Williams May 8, 2019, Depo. at 286:12-13, Ex. H.

11.      Mill Brook is a development that is operated by NYCHA.  *See* Introducing OPMOM, dated Dec. 5, 2014, NYCHA 4, Ex. P.

12.      In 2006, Williams started working at Mill Brook as a housing manager.  *See* Williams May 8, 2019 Depo. at 28:6-7, Ex. H.

13.      Michael Kelly served as the General Manager of NYCHA from April 2015 until 2018.  *See* Kelly May 3, 2019 Depo. at 7:15-8:3; 9:7-11, Ex. C.

14.      In 2015, Brian Clarke was the NYCHA Senior Vice President of Operations for Property Management.  *See* Clarke June 13, 2019 Depo. at 25:18-20, Ex. F.

15.      As the Director of OPMOM, plaintiff reported to Clarke.  *See* Clarke July 1, 2019 Depo. at 70:18-20, Ex. G.

16.      Clarke reported to Kelly.  *See* Kelly May 3, 2019 Depo. at 11:7-14, Ex. C.

17.      Marcela Medina served as the State Legislative Affairs Officer in NYCHA's City and State Legislative Affairs Department.  *See* Medina Depo. at 6:11-19, Ex. I.

18.      Brian Honan served as the Director of NYCHA Intergovernmental Special Legislative Affairs.  *See* Colon Depo. at 121:6-8, Ex. B.

19.      James Artis was the Regional Asset Manager for the Bronx in the OPMOM Program.  *See* Clarke June 13, 2019 Depo. at 40:18-20, Ex. F.

20.     As the Regional Asset Manager for the Bronx, Artis supervised Williams. *See* Artis Depo. at 18:3-14, Ex. J.

21.     In July 2015, Mark-Viverito was a member of the New York City Council and the New York City Council Speaker. *See* Mark-Viverito Depo. at 7:17-20, Ex. K.

**C.     OPMOM Program**

22.     The OPMOM Program was launched in January 2015 as a pilot program consisting of 18 NYCHA properties including Mill Brook. *See* Colon Depo. at 55:9-18, 66:24-25; Clarke June 13, 2019 Depo. at 93:18-20, 95:21-25; Kelly July 3, 2019 Depo. at 55:8-9; Introducing OPMOM, dated Dec. 5, 2014, NYCHA 4, Exs. B, F, D, P.

23.     The OPMOM model gave a development's managers more control in terms of staffing and budget. *See* Williams May 8, 2019 Depo. at 36:10-13, Ex. H.

24.     Under the OPMOM model it was the manager's responsibility to determine the development's staffing needs. *See* Williams May 8, 2019 Depo. at 36:14-17, Ex. H.

25.     OPMOM allowed property managers to (1) take more control over their location, (2) become more involved with budgeting, and (3) have more control over hiring. *See* Colon Depo. at 69:9-70:3, Ex. B.

26.     When the OPMOM pilot program was changed to a NYCHA-wide initiative it was renamed the Next Generation Operation. *See* Kelly Sept. 23, 2019 Depo. at 70:15-20, 155:8-14, Ex. E.

**D.     NYCHA Language Bank**

27.     The NYCHA language bank assists residents with translation services. *See* Medina Depo. at 46:23-24, Ex. K.

- 4 -

28.     The NYCHA language bank contains a list of certified translators that provide translation services for various languages.  *See* Colon Depo. at 133:10-14, Ex. B.

29.     The translators listed in the NYCHA language bank are volunteer employees from NYCHA.  *See* Colon Depo. at 133:15-17, Ex. B.

30.     The NYCHA language bank provides over the phone translation.  *See* Colon Depo. at 134:10-12, Ex. B.

31.     If in-person translation services are needed, then an appointment must be scheduled with the NYCHA language bank.  *See* Colon Depo. at 134:13-14, Ex. B.

**E.     Williams's Disciplinary History**

32.     On August 3, 2009, Williams entered into a Local Hearing Settlement Agreement whereby she agreed to a loss of two days of annual leave in exchange for the dismissal of three charges for failure to perform her duties.  *See* Local Hearing Settlement Agreement, dated August 3, 2009, NYCHA 1426; Notice of Local Hearing/Specification of Charges, dated July 21, 2009, NYCHA 1427, Exs. Q, R.

33.     On January 20, 2015, Williams was served with three charges for incompetency and/or misconduct.  *See* Notice of Local Hearing/Specification of Charges, dated January 14, 2015, NYCHA 2059, Ex. S.

34.     On February 4, 2015, Williams was found guilty of two of the charges and one charge was withdrawn.  *See* Record of Local Hearing Conducted by Neutral, dated February 4, 2015, NYCHA 2060, Ex. T.

35.     Williams's penalty was a reprimand.  *See* Record of Local Hearing Conducted by Neutral, dated February 4, 2015, NYCHA 2060; Williams May 8, 2019 Depo. at 188:23-25; Exs. T, H.

36.     Williams was subject to numerous counseling memoranda including memoranda that were issued in 2007, 2008, 2009, 2011, 2012, 2013, and 2014.  *See* Counseling Memo: Failure to Report Information as Requested, dated Dec. 6, 2007, NYCHA 1260 - NYCHA 1261; Counseling Memo: Chronic Rent Delinquents, dated Dec. 6, 2017, NYCHA 1262- NYCHA 1263; Counseling Memo: Time and Attendance, dated Sept. 30, 2008, NYCHA 1264; Counseling Memo: Failure to Prepare General Managers Visit, dated Sept. 30, 2008, NYCHA 1265- NYCHA 1266; Counseling Memo: Failure to Submit Chronic Rent Delinquents, dated October 10, 2008, NYCHA 1267- NYCHA 1268; Counseling Memo: Failure to Update Legal Action for Rent Delinquents, dated March 12, 2009, NYCHA 1269; Counseling Memo: Failure to Conduct Joint Building Inspections, dated Mar. 12, 2009, NYCHA 1270; Counseling Memo: Failure to Update Legal Action for Rent Delinquents, dated July 13, 2009, NYCHA 1271- NYCHA 1272; Counseling Memo: Failure to Update TTL, dated Mar. 2, 2011, NYCHA 1273; Counseling Memorandum, dated May 8, 2012, NYCHA 1274; Counseling Memo, dated Feb. 26, 2013, NYCHA 1275; Counseling Memorandum, dated Feb. 19, 2014, NYCHA 1276; Counseling Memorandum, dated July 17, 2014, NYCHA 1277; Counseling Memorandum: Work Orders (Tickets), dated Nov. 26, 2014, dated NYCHA 1278- NYCHA 1279; Exs. U, V, W, X, Y, Z, AA, BB, CC, DD, EE, FF, GG, HH.

**F.     October – December 2014**

37.     In October 2014, Gloria Cruz (Mark-Viverito's constituent services liaison) emailed NYCHA that a Mill Brook resident had complained to Mark-Viverito's office that "[e]very time [the Mill Brook resident] goes to the office he feels like he's being bullied by management because he cannot speak English.  This issue is making him sick and upset please can you help us with this issue."  *See* Email from Vega to Taylor, Williams and others, sent October 30, 2014, NYCHA 673- NYCHA 680, Ex. II.

38.     In November 2014, it was brought to the attention of the NYCHA Chair (Olatoye) that there was an individual named Janet Abrahams who was very grounded in the principles of the OPMOM Program and that she would make an excellent candidate to manage the program.  *See* Kelly July 3, 2019 Depo. at 34:17-35:3; Email from Pennington to House, sent Nov. 7, 2014, NYCHA 4896 – NYCA 4899, Exs. D, JJ.

39.     In November 2014, Abrahams was interviewed by the NYCHA General Manager (Cecil House), the NYCHA Chief Administrative Officer (Natalie Rivers) and the Chair of NYCHA (Olatoye).  *See* Kelly July 3, 2019 Depo. at 35:2-6, 38:17-20, Ex. D.

40.     Kelly testified that Abrahams impressed him during the interview.  *See* Kelly July 3, 2019 Depo. at 35:6-7, Ex. D.

41.     In early December 2014, Olatoye reached out to a colleague who had worked with Abrahams in Chicago and confirmed that she was an excellent candidate.  *See* Kelly July 3, 2019 Depo. at 35:8-11, Ex. D.

42.     On December 4, 2014, Olatoye wrote to Todd Gomez that she had interviewed Abrahams and was seeking feedback from him about Abrahams.  *See* Email from Olatoye to Gomez, sent December 5, 2014, NYCHA 4924, Ex. KK.

43.     Gomez had previously worked with Abrahams at the Chicago Housing Authority.  *See* Email from Olatoye to Gomez, sent December 5, 2014, NYCHA 4924, Ex. KK.

44.     Gomez responded that Abrahams was the "best" and "authentic and really cares about her work."  *See* Email from Gomez to Olatoye, sent Dec. 5, 2014, NYCHA 4924, Ex. KK.

45.     House had conversations with Abrahams regarding her possibly accepting a position as the Vice President of OPMOM.  *See* Kelly July 3, 2019 Depo. at 35:11-13, Ex. D.

46.     Those negotiations did not result in Abrahams taking the job and House left NYCHA in April 2015.  *See* Kelly Depo. July 3, 2019 at 35:11-15, Ex. D.

47.     Kelly testified that Abrahams was the first choice for the position.  *See* Kelly July 3, 2019 Depo. at 39:4-5, Ex. D.

48.     At that time, Kevin Norman was managing OPMOM.  *See* Kelly July 3, 2019 Depo. at 35:15-16, Ex. D.

49.     Norman left NYCHA in approximately April 2015.  *See* Kelly July 3, 2019  Depo. at 35:15-17, Ex. D.

50.     In approximately April 2015, Olatoye went on maternity leave.  *See* Kelly July 3, 2019 Depo. at 35:22-23, Ex. D.

**G.     July 2015**

51.     On July 1, 2015, Mark-Viverito's office requested a meeting with NYCHA.  *See* Email from Sinnwell to Honan, sent July 1, 2015, NYCHA 1778, Ex. LL.

52.     Mark-Viverito requested the meeting because she had received complaints from constituents that their needs were not being met.  *See* Mark-Viverito Depo. at 15:6-8, Ex. K.

53.     Mark-Viverito testified that many Mill Brook residents were asking her office for assistance because they were Spanish-speaking residents whose issues were not being addressed by the Mill Brook management.  *See* Mark-Viverito Depo. at 15:14-20, Ex. K.

54.     Mark-Viverito testified that the Spanish-speaking residents of Mill Brook were coming to her office because they were having a hard time communicating with the management office of Mill Brook.  *See* Mark-Viverito Depo. at 18:22-19:12, Ex. K.

55.     Mark-Viverito testified that the individuals who contacted her office to express these concerns were Spanish-dominant and Spanish-speaking individuals.  *See* Mark-Viverito Depo. at 34:2-4, Ex. K.

56.     Prior to the July 30, 2015 meeting, Mark-Viverito's staff had repeatedly asked NYCHA to address these concerns to no avail.  *See* Mark-Viverito Depo. at 15:20-24, Ex. K.

57.     The purpose of the meeting was to find out what NYCHA was doing to address the concerns of the Mill Brook Spanish speaking residents.  *See* Mark-Viverito Depo. at 18:15-18, Ex. K.

58.     Mark-Viverito testified that it was unsustainable for her office to continue to serve as a de facto NYCHA office for the Mill Brook Spanish-speaking residents.  *See* Mark-Viverito Depo. at 19:12-20, Ex. K.

59.     Mark-Viverito wanted to work with NYCHA to figure out how to bring better language services citywide.  *See* Medina Depo. at 26:8-11, Ex. I.

60.     On July 1, 2015, Honan wrote to Clarke and Ponce (NYCHA Senior Vice President of Operations) regarding the anticipated meeting that "this will not be a good meeting as they've expressed their unhappiness with the manager in the past."  *See* Email sent by Honan to Clarke and Ponce, sent July 1, 2015, NYCHA 1778; Ponce Depo. at 11:11-15, Exs. LL, L.

61.     In July 2015, Olatoye returned from maternity leave and asked Kelly if he knew Abrahams.  *See* Kelly July 3, 2019 Depo. at 36:3-5, Ex. D.

62.     Kelly testified that Olatoye was very impressed with Abrahams and asked him to interview her and to resume the discussions that the prior General Manager had with Abrahams regarding her potential employment with NYCHA.  *See* Kelly July 3, 2019 Depo. at 36:6-13, Ex. D.

63.     It was determined by Olatoye and Kelly that Abrahams would be an exceptional candidate to move OPMOM from the 18 units that were serving as a model program to a full-blown program that was to replace all of NYCHA's management protocols with the OPMOM Protocol.  *See* Kelly July 3, 2019 Depo. at 36:10-20, Ex. D.

64.     Abrahams had been successful in implementing such a change in the Newark and Chicago housing authorities.  *See* Kelly July 3, 2019 Depo. at 36:13-20, Ex. D.

65.     Kelly checked with NYCHA's human resources department and determined that plaintiff was an at-will employee and as such it was within NYCHA's ability to make an offer to Abrahams.  *See* Kelly July 3, 2019 Depo. at 49:2-15, Ex. D.

66.     On July 28, 2015, Abrahams provided a copy of her resume to Acosta (secretary to the General Manager).  *See* Email from Abrahams to Acosta, sent July 28, 2015, NYCHA 4931; Email from Acosta to Payamps-Roure to Acosta, sent July 28, 2015, NYCHA 4932; Kelly July 3, 2019 Depo. at 57:15-19, Exs. MM, NN, D.

67.     On July 28, 2015, the Chief of Staff to the General Manager emailed the Chief of Staff for the Deputy Mayor for Housing and Economic Development a copy of Abrahams's resume because they were considering Abrahams for the position of Executive Vice President of Operations.  *See* Email from Payamps-Roure to Patchette, sent July 28, 2015, NYCHA 4939, Ex. OO.

68.     On July 28, 2015, the Chief of Staff to the General Manager asked Acosta to schedule a meeting between the Chief of Staff for the Deputy Mayor for Housing and Economic Development (James Patchett) and Abrahams as well as a meeting between Abrahams and the Chief of Staff to the General Manager.  *See* Email from Payamps-Roure to Acosta, sent July 28, 2015, NYCHA 4936, Ex. PP.

69.     On July 29, 2015, Honan sent Clarke an email reminding him that the Mark-Viverito meeting had been scheduled for July 30, 2015 and that Mark-Viverito would like to meet the Mill Brook manager.  *See* Email from Honan to Clarke, sent July 29, 2015, NYCHA 2739, Ex. QQ.

70.     Artis responded the following morning, that the manager of Mill Brook (Williams) had been out sick for the last two days and that he would inform Honan if she did not report to work that day.  *See* Email from Artis to Honan, Clarke, and Colon, sent July 30, 2015, NYCHA 2738, Ex. RR.

71.     Later that morning, Artis sent another email informing Clarke, Honan, and plaintiff that Williams was in the office and had been informed of the meeting.  *See* Email from Artis to Honan, Clarke, and Colon, sent July 30, 2015, NYCHA 2738, Ex. RR.

72.     The plaintiff, Medina, Mark-Viverito, Honan, Artis, Williams, Princella Jamerson (Mill Brook Tenant Association President), Diana Ayala (from Mark-Viverito's office) and Cruz attended the July 30, 2015 meeting at the Bronx office of Mark-Viverito.  *See* Medina Depo. at 20:17-21:4; 47:17-19; Colon Depo. at 131:8-9; Mark-Viverito Depo. at 15:25-16:7, 16:12-20, 18:4-8; Clarke June 13, 2019 Depo. at 40:15-17, Exs. I, B, K, F.

73.     Clarke joined the meeting by telephone.  *See* Clarke June 13, 2019 Depo. at 38:19-39:3, Ex. F.

74.     Mark-Viverito's office was a block away from Mill Brook.  *See* Williams May 8, 2019 Depo. at 192:12-16, Ex. H.

75.     During the meeting, Mark-Viverito's questions to NYCHA were about Spanish-speaking and Spanish-dominant residents and what was being done to address their concerns.  *See* Mark-Viverito Depo. at 34:4-7, Ex. K.

76.     Mark-Viverito asked Williams how she was handling the Spanish-speaking residents at Mill Brook.  *See* Williams May 8, 2019 Depo. at 291:13-23, Ex. H.

77.     Williams responded that they use the NYCHA language bank.  *See* Williams May 8, 2019 Depo. at 197:24-198:13, Ex. H.

78.     Mark-Viverito said that the use of the language bank was unacceptable.  *See* Williams May 8, 2019 Depo. at 292:10-13, Ex. H.

79.     Mark-Viverito did not believe the use of a language bank was an effective means of communication because the translator is not physically present in the room with the person requiring the translation services so a lot of nuance is lost; this situation results in the translator being left to figure out how to properly translate the conversation.  *See* Mark-Viverito Depo. at 38:13-39:4, Ex. K.

80.     Williams explained that she has called the Spanish speaking Mill Brook superintendents or the supervisor of the caretakers to translate for her and Mark-Viverito responded that was not acceptable.  *See* Williams May 8, 2019 Depo. at 211:12-212:2; Colon Depo. at 136:23-25, Exs. H, B.

81.     Artis explained that when they are faced with a language barrier, they use the NYCHA language bank to find a Spanish speaking person who can provide translation services over the telephone.  *See* Artis Depo. 30:5-11, Ex. J.

82.     Mark-Viverito said that it was unacceptable to have translation services over the telephone and that they needed a Spanish-speaking person in the room.  *See* Williams Depo. 292:18-292:5, 293:6-9; Artis Depo. at 30:13-17, Exs. H, J.

83.     Mark-Viverito allegedly stated that she wanted a "Spanish manager" and plaintiff testified that she understood this to mean that Mark-Viverito wanted a manager who spoke the Spanish language.  *See* Colon Depo. at 146:8-12, Ex. B.

84.     Mark-Viverito testified that the phrase "Spanish manager" refers to someone from Spain.  *See* Mark-Viverito Depo. at 32:24-25, Ex. K.

85.     Mark-Viverito testified that she would not use the term "Spanish person" to refer to herself, a Latino, or an African-American.  *See* Mark-Viverito Depo. at 33:9-15, Ex. K.

86.     Mark-Viverito testified that she would refer to a Latino person as Latino.  *See* Mark-Viverito Depo. at 33:16-18, Ex. K.

87.     During the meeting, when Mark-Viverito referred to her Spanish-speaking constituents, she did not refer to any particular race or ethnicity.  *See* Mark-Viverito Depo. at 33:19-25, Ex. K.

88.     Mark-Viverito testified that did not know whether the manager of Mill Brook spoke Spanish.  *See* Mark-Viverito Depo. at 34:20-22, Ex. K.

89.     During the meeting, plaintiff noted that NYCHA does not have a title called bilingual housing managers but does have bilingual housing assistants.  *See* Colon Depo. at 136:6-9, Ex. B.

90.     Plaintiff explained that having a bilingual housing assistant at Mill Brook might be of assistance to Williams because a bilingual housing assistant speaks Spanish.  *See* Colon Depo. at 136:10-11, 146:2-7, Ex. B.

91.     Plaintiff asked Williams if Mill Brook had a vacant housing assistant position and Williams responded that it did not.  *See* Colon Depo. at 136:11-13, Ex. B.

92.     Plaintiff offered to contact human resources and try to get a bilingual housing assistant line placed at Mill Brook.  *See* Colon Depo. at 136:13-16, Ex. B.

93.     During the meeting, Mark-Viverito explained that there was a tenants' association meeting where the tenants were not allowed to speak in the language they were most comfortable speaking.  Moreover, she explained that, there were customer service issues with the office, and there were maintenance issues with the property.  *See* Clarke June 13, 2019 Depo. at 135:6-12, Ex. F.

94.     Specifically, during a tenants' association meeting, Williams told the tenants not to speak to her in Spanish or to try to communicate with her in Spanish.  *See* Clarke June 13, 2019 Depo. at 135:24-136:10, Ex. F.

95.     During the tenants' association meeting, Williams said "no mira, mira, mira here" in a derogatory and offensive manner.  *See* Clarke June 13, 2019 Depo. at 136:8-10, Ex. F.

96.     At the conclusion of the meeting, NYCHA agreed to review its general language access policy.  *See* Medina Depo. at 69:9-15, Ex. I.

97.     NYCHA also agreed to inquire if it was possible to create a Spanish bilingual line for someone in the management office at Mill Brook.  *See* Medina Depo. at 69:17-19, Ex. I.

98.     During the July 30, 2015 meeting, Mark-Viverito never used the words "Latino" or "Hispanic" but rather used the word "Spanish."  *See* Williams May 8, 2019 Depo. at 296:8-12, Ex. H.

99.     Mark-Viverito testified that a Spanish person is not a Latino person.  *See* Mark-Viverito Depo. at 40:7, Ex. K.

100.    Mark-Viverito testified that she never uses the term "Spanish person" to refer to a Latino person.  *See* Mark-Viverito Depo. at 40:16-18, Ex. K.

101.    Plaintiff and Williams testified that an individual could be Hispanic or Spanish but not speak the Spanish language.  *See* Colon Depo at 143:12-15; Williams Depo. May 8, 2019 Depo. at 205:8-14, Exs. B, H.

102.    Williams testified that an individual can speak Spanish fluently without being Spanish.  *See* Williams Depo. May 8, 2019 Depo. at 202:22-25, Ex. H.

103.    During the July 30, 2015 meeting, none of the attendees including Mark-Viverito asked Clarke to remove Williams.  *See* Clarke June 13, 2019 Depo. at 136:19-21, Ex. F.

104.    Medina took notes during the July 30, 2015 meeting.  *See* Medina Depo. at 43:15-44:5; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

105.    Medina's notes state "staff is very rude" and Medina testified that the meaning of that note was that several staff members from Mill Brook were rude to the residents of Mill Brook.  *See* Medina Depo. at 46:2-7; Medina Notes, dated July 30, 2015,  NYCHA 4582, Exs. I, SS.

106.    Medina's notes also state "Language Bank – help residents – long waits" because, Medina testified that, during the meeting Mark-Viverito and her staff mentioned that there were long waits for the residents of Mill Brook before they could receive translation

services.  *See* Medina Depo. at 46:19-47:8; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

107.    Medina's notes also state "Housing Assistant?" because, (as she testified), that, Mark-Viverito asked if NYCHA ever assigned staff such as housing assistants to the developments based on data on the languages spoken by the residents.  *See* Medina Depo. at 49:19-50:3; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

108.    Medina testified that she placed a question mark after the words "Housing Assistant" because using housing assistants to help meet a resident's language needs was an interesting idea since housing assistants engage in constant contact with the residents.  *See* Medina Depo. at 50:4-9, 53:22-25; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

109.    Medina's notes also state "see about hiring a Spanish speaker" because Medina testified that NYCHA intended to look into securing an additional line to hire someone within the management office who spoke Spanish.  *See* Medina Depo. at 60:7-10; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

110.    Medina testified that Mark-Viverito did not appear angry at the meeting but rather appeared upset and not content with the language barrier issue.  *See* Medina Depo. at 27:2-21, Ex. S.

111.    Medina testified that Mark-Viverito appeared to be upset that elderly residents had to wait in the management office for hours before someone could assist them in their language.  *See* Medina Depo. at 28:5-9, 47:3-8; Medina Notes, dated July 30, 2015, NYCHA 4582, Ex. I, SS.

112.    Medina testified that Mark-Viverito also appeared to be upset that residents had to take time off from work because they were not sure whether somebody was going to visit their unit in order to make a repair.  *See* Medina Depo. at 28:11-15, Ex. I.

113.    After the meeting, Artis and plaintiff had a discussion and came to the conclusion that Mark-Viverito wanted a Spanish-speaking manager at Mill Brook.  *See* Artis Depo. 37:17-25, Ex. J.

114.    On July 31, 2015, Medina wrote that Mark-Viverito wants NYCHA to deal with the "language barrier issue" and "the idea is to bring in a housing assistant who can speak Spanish."  *See* Email from Medina to Montalvo, sent July 31, 2015, NYCHA 2852, Ex. TT.

115.    Clarke decided to transfer Williams out of the OPMOM Program because she was not a good manager.  *See* Clarke June 13, 2019 Depo. at 137:14-138:2, Ex. F.

116.    Williams was not prepared for meetings and failed to create corrective action plans to address pending issues.  *See* Clarke June 13, 2019 Depo. at 138:4-10, Ex. F.

117.    Clarke decided to seek Williams's transfer out of the OPMOM Program upon learning that in addition to Williams's work performance issues, she had told Mill Brook residents (who had limited ability to speak or understand English) that they should not communicate with Williams at a public meeting.  *See* Clarke June 13, 2019 Depo. at 138:4-20, Ex. F.

118.    Williams's actions ran in direct contravention of a key component of the OPMOM Program, which was tenant engagement.  *See* Clarke June 13, 2019 Depo. at 138:4-20, Ex. F.

119.    In order to have tenant engagement, it was imperative for tenants be able to communicate with NYCHA.  *See* Clarke June 13, 2019 Depo. at 139:7-18, Ex. F.

120.    Clarke wanted Williams removed from the OPMOM Program and disciplined for her actions at the public meeting.  *See* Clarke June 13, 2019 Depo. at 138:19-21, Ex. F.

121.    Clarke discussed his recommendation of transferring Williams out of Mill Brook with Kelly.  *See* Clarke June 13, 2019 Depo. at 140:24-25, Ex. F.

122.    Kelly did not object to Clarke's recommendation of transferring Williams out of Mill Brook.  *See* Clarke June 13, 2019 Depo. at 141:6-9, Ex. F.

123.    Because Williams's civil service title was property manager she could be transferred at the discretion of management.  *See* Clarke June 13, 2019 Depo. at 145:24-146:2; Colon Depo. at 104:11-14, 145:13-17, Exs. F, B.

124.    On July 31, 2015, plaintiff had a meeting with Clarke.  *See* Colon Depo. at 160:20-23, Ex. B.

125.    Clarke was going on vacation and he wanted plaintiff to complete three assignments: (1) terminate a NYCHA employee, (2) write up another NYCHA employee and place him on an improvement performance plan, and (3) transfer Williams from Mill Brook.  *See* Colon Depo. at 161:5-8, Ex. B.

126.    Clarke told plaintiff to contact Kenya Salaudeen (NYCHA Director of Human Resources) so as to implement the transfer of Williams.  *See* Colon Depo. at 161:10-12; Clarke June 13, 2019 Depo. at 49:7-9, Exs. B, F.

127.    Plaintiff was instructed to contact the Human Resources Department because that department could determine if there were any vacant manager positions where Williams could be transferred to.  *See* Clarke June 13, 2019 Depo. at 142:17-22, Ex. F.

128.    Plaintiff testified that Clarke instructed plaintiff to tell Salaudeen that the Williams transfer was necessary due to the cultural sensitivity needs of the Mill Brook development.  *See* Colon Depo. at 161:13-15, Ex. B.

129.    Plaintiff did not respond to Clarke's instructions regarding these three tasks identified in paragraph 125 above.  *See* Colon Depo. at 162:10-12; Ex. B.

130.    While Clarke was on vacation he contacted Luis Ponce (NYCHA Senior Vice President of Operations) and asked Ponce to follow-up on the transfer of the Mill Brook manager.  *See* Ponce Depo. at 11:11-15, 38:22-39:2, Ex. L.

131.    Clarke told Ponce that he had asked plaintiff to work on the Williams transfer and that he would like to have the transfer completed by the time he returned from vacation.  *See* Ponce Depo. at 38:22-39:6, Ex. L.

**H.    August 2015**

132.    Approximately two days after the July 30, 2015 meeting, Colon attended a meeting with Williams, Artis, OPMOM managers and the Tenant Association President.  *See* Williams May 8, 2019 Depo. at 213:23-214:24, Ex. H.

133.    Williams told plaintiff and Artis that she felt bullied at the July 30, 2015 meeting because she did not speak Spanish.  *See* Williams May 8, 2019 Depo. at 213:17-215:11, Ex. H.

134.    Plaintiff and Artis responded that Williams was not being bullied.  *See* Williams May 8, 2019 Depo. at 215:12-14, Ex. H.

135.     On August 3, 2015, plaintiff called Salaudeen regarding the Williams transfer.  *See* Colon Depo. at 166:6-18, Ex. B.

136.     Plaintiff testified that she told Salaudeen that Williams was to be replaced with a Hispanic manager.  *See* Colon Depo. at 167:10-12, Ex. B.

137.     Plaintiff testified that Salaudeen said she was offended by that request and that such a request was illegal because it was a race based transfer.  *See* Colon Depo. at 167:13-23, 169:15-18, Ex. B.

138.     Salaudeen denied telling plaintiff that such a transfer was illegal, that she did not care if President Obama wanted the transfer completed, and that such a transfer could not occur.  *See* Salaudeen Depo. at 27:2-17, Ex. M.

139.     Plaintiff asked Marla Edmonson (a member of the NYCHA Human Resources Employee Relations Department) about transferring Williams to another location.  *See* Edmonson Depo. at 6:19-7:6, 44:7-15, Ex. N.

140.     Edmonson advised plaintiff that after reviewing Williams's Human Resources file Williams could not be transferred.  *See* Edmonson Depo. at 12:4-11, Ex. N.

141.     The file that Edmonson reviewed did not accurately reflect the contents of Williams's personnel file or location folder.  *See* Edmonson Depo. at 45:4-9, Ex. N.

142.     Edmonson never told plaintiff that an attempt to transfer Williams was illegal.  *See* Edmonson Depo. at 6:19-7:6; 13:20-14:3, Ex. N.

143.     On August 6, 2015, Sheila Pinckney (Senior Advisor, Office of the SVP Operations) sent plaintiff an email inquiring whether the "move [was] completed" "regarding the Property Manager at Mill Brook Houses."  *See* Email from Pickney to Colon, sent August 6, 2015, NYCHA 3517- NYCHA 3518, Ex. UU.

144.    That same day, Colon responded that "HR needs more information from us. There is also is an ig [inspector general] investigation going on. HR wants to talk to the ig's office first." *See* Email from Colon to Pickney, sent August 6, 2015, NYCHA 3517, Ex. UU.

145.    In late August 2015, Clarke was informed by the Inspector General that plaintiff was not under investigation but rather that the Inspector General was investigating tenants at Mill Brook. *See* Clarke July 1, 2019 Depo. at 62:2-9, Ex. G.

146.    On August 7, 2015, plaintiff asked Williams to respond to a July 28, 2015 inquiry made by the Bronx Borough President's office concerning a young mother with a five-month-old daughter who did not have a working refrigerator. *See* Email from Colon to Williams, sent August 7, 2015, NYCHA 3556-3557, Ex. VV.

147.    On August 12, 2015, plaintiff emailed Clarke that she was "experienc[ing] difficulty with the transferring of the Manager at Mill Brook." *See* Email from Colon to Clarke, sent August 12, 2015, NYCHA 3666, Ex. WW.

148.    Later that day, Clarke called plaintiff and inquired about the status of the Williams transfer. *See* Colon Depo. at 207:4-17, Ex. B.

149.    Plaintiff told Clarke "what was going on." *See* Colon Depo. at 207:17-19, Ex. B.

150.    Clarke responded that plaintiff had failed him and had not carried out her assignment. *See* Colon Depo. at 207:19-20, Ex. B.

151.    Plaintiff went on vacation from August 17, 2015 through August 23, 2015. *See* Colon Depo. at 212:1-3, Ex. B.

152.    In July and August 2015, Abrahams was interviewed by Kelly, Olatoye, and the Chief of Staff to the Deputy Mayor of New York City.  *See* Kelly July 3, 2019 Depo. at 38:21-24, Ex. D.

153.    On August 18, 2015, Kelly emailed his Chief of Staff (Payamps-Roure) "Let's find out where we are with [Abrahams's] start date and our move with sybil [sic]."  *See* Email from Kelly to Payamps-Roure, sent Aug. 18, 2015, NYCHA 3916, Ex. XX.

154.    Later that day, Rivers wrote to Clarke and Payamps-Roure that "[Abrahams] is scheduled to start on or around September 28th."  *See* Email from Rivers to Clarke and Payamps-Roure, NYCHA 4109, Ex. YY.

155.    On August 20, 2015, Abrahams was formally offered a job with NYCHA as the Vice President of the Optimal Property Management Department.  *See* Kelly July 3, 2019 Depo. at 36:21-23; Email from Rivers to Abrahams, sent Aug. 20, 2015, NYCHA 4278-NYCHA 4282, Exs. D, ZZ.

156.    Abrahams accepted the job offer and began working for NYCHA in September 2015 overseeing the OPMOM Program.  *See* Kelly July 3, 2019 Depo. at 36:21-24; Kelly Sept. 23, 2019 Depo. at 61:2-5; 78:8-17, Exs. D, E.

157.    Kelly and NYCHA Chair Olatoye made the decision to remove plaintiff as the Director of OPMOM.  *See* Clarke June 13, 2019 Depo. at 51:11-19, Ex. F.

158.    Kelly told Clarke that plaintiff was to be replaced by Abrahams.  *See* Clarke June 13, 2019 Depo. at 51:3-52:15, Ex. F.

159.    Kelly told Clarke that NYCHA had recruited Abrahams and Abrahams had successfully implemented asset management at two other Housing Authorities.  *See* Clarke June 13, 2019 Depo. at 52:16-23, Ex. F.

160.    Clarke was surprised when he received this news because he was not involved in the decision making process to hire Abrahams or to remove plaintiff as the Director of OPMOM.  *See* Clarke June 13, 2019 Depo. at 51:20-23, 52:16-53:5, Ex. F.

161.    On August 24, 2015, plaintiff spoke to Clarke regarding her attempt to effectuate the transfer of Williams out of Mill Brook.  *See* Colon Depo. at 216:2-5, Ex. B.

162.    Plaintiff told Clarke that the transfer could not be completed because it was "illegal" but plaintiff did not provide Clarke with an explanation as to why the transfer was "illegal."  *See* Colon Depo. at 216:2-19, Ex. B.

163.    On August 25, 2015, Clarke emailed plaintiff "Where are we with moving the manager from Millbrook?"  *See* Email from Clarke to Colon, sent August 25, 2015, NYCHA 4252, Ex. AAA.

164.    Plaintiff responded that "HR informed me that we needed more specific information in reference to the cultural needs of the residents, in order to transfer the Manager at Mill Brook….James was contacted by the IG's office and was told that they were conducting an active in [sic] investigation on the Manager and to hold off on any further actions.  At this point, HR advised me that they would like to see the IG's referral before moving forward on the transfer request."  *See* Email from Colon to Clarke, sent August 25, 2015, NYCHA 4251 – NYCHA 4252, Ex. AAA.

165.    At 8:26 a.m. on August 26, 2015, Payamps-Roure emailed Clarke that "Since there is a concern that Sybille Colon [sic] might hear of Janet Abrahams coming on board to run OPMOM from other folks, we would like [to] give her the news of her new assignment this week."  *See* Email from Payamps-Roure to Clarke, sent Aug. 26, 2015, NYCHA 4257, Ex. BBB.

166.     At the conclusion of a meeting that was held on August 26, 2015, plaintiff told Clarke that the transfer was "illegal" and "it was along those lines that it was racial." *See* Colon Depo. at 233:24-237:17, Ex. B.

167.     On August 28, 2015, plaintiff had a meeting with Kelly and Clarke. *See* Colon Depo. at 239:1-5, Ex. B.

168.      Kelly told plaintiff that he had decided to hire someone that he used to work with in Chicago and that he had a new position for plaintiff. *See* Colon Depo. at 239:5-11, 241:19-22 Ex. B.

169.     Plaintiff was to serve as a senior administrator in the Management Service Department. *See* Colon Depo. at 143:12-16, Ex. B.

170.     Plaintiff designed and created the Management Services Department. *See* Colon Depo. at 246:11-14, 21:23, 248:8-10, 258:14-16, Ex. B.

171.     Instead of accepting this new position, plaintiff immediately resigned from NYCHA. *See* Colon Depo. at 250:6-7, Ex. B.

I.     **2016 -2017**

172.     On May 23, 2016, Octavia Hayward (Regional Asset Manager for Brooklyn) became the new Director of the OPMOM Program. *See* Email from Abrahams to Almanzar and others, sent May 20, 2016; Kelly Sept. 23, 2019 Depo. at 22:20-23:4, Exs. CCC, E.

173.     There was no acting director of OPMOM between the departure of plaintiff and the appointment of Hayward. *See* Kelly Sept. 23, 2019 Depo. 41:16-21, Ex. E.

174.     During the summer of 2016, Abrahams was promoted to Senior Vice President. *See* Kelly Sept. 23, 2019 Depo. at 78:8-17, Ex. E.

175.     Kelly testified that Abrahams had the experience and the ability to take the 18 property modeling of OPMOM and produce a program that would expand it to the entire NYCHA portfolio.  *See* Kelly July 3, 2019 Depo. at 47:13-17, Ex. D.

176.     Kelly testified that Abrahams did this successfully.  *See* Kelly July 3, 2019 Depo. at 47:18, Ex. D.

177.     Abrahams remained at NYCHA until July 2017 when she accepted the job of executive director of the Baltimore Housing Authority.  *See* Kelly Sept. 23, 2019 Depo. at 78:20-21, 155:2-7, Ex. D.

Dated: New York, New York
      January 17, 2020

**JAMES E. JOHNSON**
Corporation Counsel of the
   City of New York
**Attorney for Defendant Mark-Viverito**
100 Church Street, Rm. 2-197
New York, New York 10007-2601
(212) 356-2629
nmarcus@law.nyc.gov


By:            /s/Natalie S. Marcus
               Natalie S. Marcus
          Assistant Corporation Counsel