**EXHIBIT 6**

A. Williams

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x

SIBYL COLON,

                    Plaintiff(s),   Case No.

                                 16-04540

       -against-

THE CITY OF NEW YORK, NEW YORK CITY HOUSING

AUTHORITY, NEW YORK CITY COUNCIL SPEAKER MELISSA

MARK-VIVERITO, MICHAEL KELLY and BRIAN CLARKE,

                  Defendant(s).

------------------------------------------- x

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------- x

ALLISON WILLIAMS,

                    Plaintiff(s),   Case No.

                               16-CV-08193

       -against-

THE CITY OF NEW YORK, NEW YORK CITY HOUSING

AUTHORITY, NEW YORK CITY COUNCIL SPEAKER MELISSA

MARK-VIVERITO, MICHAEL KELLY and BRIAN CLARKE,

                  Defendant(s).

------------------------------------------- x

    DEPOSITION of the Plaintiff, ALLISON

WILLIAMS, taken by the Defendants, held at the

offices of New York City Housing Authority, 250

Broadway, New York, New York, on May 8th, 2019, at

10:00 a.m., before a Notary Public of the State of

New York.

```
 1                        A. Williams
 2   A P P E A R A N C E S:
 3
 4        THE FLORESTAL LAW FIRM, PLLC
                  Attorneys for Plaintiff(s)
 5                48 Wall Street
                  New York, New York 100005
 6
          BY:   MARCEL FLORESTAL, ESQ.
 7
 8
          NEW YORK CITY HOUSING AUTHORITY
 9        GENERAL LITIGATION
                  Attorneys for Defendant(s) NEW YORK
10                CITY HOUSING AUTHORITY, MICHAEL
                  KELLY, BRIAN CLARKE
11                250 Broadway
                  New York, New York 10007
12
          BY:   JANE E. LIPPMAN, ESQ.
13
14
15        NEW YORK CITY LAW DEPARTMENT
          OFFICE OF THE CORPORATION COUNSEL
16                Attorneys for Defendant(s) NEW YORK
                  CITY COUNCIL SPEAKER MELISSA
17                MARK-VIVERITO
                  100 Church Street
18                New York, New York 10007
19        BY:   J. CORBIN CARTER, ESQ.
                  ASSISTANT CORPORATION COUNSEL
20
21                     xxxxx
22
23
24
25
```

```
 1                    A. Williams
 2         Q     You wanted to work for The City?
 3         A     Yes.
 4         Q     Am I correct that you retired from
 5    NYCHA May 1st, 2017?
 6         A     You are correct.
 7         Q     You were working at Mill Brook
 8    Houses at the time you retired from NYCHA,
 9    right?
10         A     I was.
11         Q     Were you ever transferred from Mill
12    Brook Houses to another development?
13         A     No.
14         Q     Do you recall the year you started
15    to work for NYCHA?
16         A     '84, 1984.
17         Q     What was the first position you
18    held?
19         A     Teller.
20         Q     You had Civil Service status in
21    that title?
22         A     Yes.
23         Q     What does it mean to have Civil
24    Service status in the title?
25              MR. FLORESTAL:  Objection.
```

```
 1                     A. Williams
 2      A     Two years up to '99.
 3      Q     Then what happened?
 4      A     I became a manager.
 5      Q     Did you have Civil Service status
 6  in that title?
 7      A     Not when I was there, but I took
 8  the test then.
 9      Q     Initially you were provisional?
10      A     Yes.
11      Q     You took a test and then had Civil
12  Service status?
13      A     Yes.
14      Q     You were Housing Manager in '99?
15      A     Yes.
16      Q     And you were Housing Manager until
17  you retired?
18      A     Yes.
19      Q     Where did you work as a Housing
20  Manager?
21      A     Sack Wern.
22      Q     Where is that?
23      A     In the Bronx.  I worked there from
24  '99 to 2000, I think.  I don't remember.
25      Q     Okay.
```

```
 1                      A. Williams
 2          A    I went to Forest Houses.  I don't
 3   know when I went there.  Okay, I went to
 4   Forest Houses, but I don't know what year,
 5   but I was there until 2006.
 6          Q    You went to Mill Brook in 2006?
 7          A    Yes.
 8          Q    Why did you leave Sack Wern and go
 9   to Mill Brook?
10          A    You have no choice, they tell you
11   to go.
12          Q    Is that administrative?
13          A    Transfer is.  I think you might
14   know better.  I assume -- I am not privileged
15   to that.  They tell you report there and work
16   there and you get up, pack your stuff and go
17   to the next place.
18          Q    NYCHA transfers you to the other
19   development?
20          A    Yes.
21          Q    You don't know why?
22          A    No.
23          Q    Did you ever ask why?
24          A    No.  That's what they do, they move
25   the managers around after a while.
```

<pre>
 1                        ·A. Williams

 2    NYCHA transferred you?

 3         A    Yes.

 4         Q    Does NYCHA need to obtain the

 5    consent of a Housing Manager before NYCHA can

 6    transfer the manager?

 7         A    No.

 8              MR. FLORESTAL:  Objection.

 9              You may answer.

10              THE WITNESS:  No.

11         Q    When you were Housing Manager, your

12    union was Local 237?

13         A    Yes.

14         Q    Do you know whether the Collective

15    Bargaining Agreement between NYCHA and 237

16    addresses involuntary transfer of Housing

17    Managers?

18         A    I don't know.

19         Q    Is it your understanding that a

20    Housing Manager has to be terminated from

21    NYCHA employment before being transferred to

22    another development?

23              MR. FLORESTAL:  Objection.

24              You may answer if you know.

25         A    I don't know.
</pre>

```
 1                           A. Williams
 2          A     Right.
 3          Q     Have you ever seen any NYCHA policy
 4     about transfers?
 5          A     Not for managers.
 6          Q     When a manager is transferred to
 7     another development, as you were, the manager
 8     does not lose any seniority?
 9          A     No.
10          Q     When a Housing Manager transfers to
11     another development, the salary remains the
12     same, right?
13                MR. FLORESTAL:   Objection.
14          Q     Go ahead.
15          A     Yes.
16          Q     When you transferred, you said from
17     Sack Wern to Forest to Mill Brook --
18          A     Yes.
19          Q     -- your seniority stayed the same?
20          A     Yes.
21          Q     Your salary stayed the same?
22          A     Yes.
23          Q     Right?
24          A     Yes.
25          Q     What is OPMOM?
```

```
 1                      A. Williams
 2       A     Yes.
 3       Q     Am I correct Mill Brook was one of
 4  the original eighteen developments in the
 5  OPMOM pilot program?
 6             MR. FLORESTAL:  Objection.
 7             Answer if you know.
 8       A     Yes.
 9       Q     Did you request that Mill Brook
10  become part of OPMOM?
11       A     No.
12       Q     Do you know how it became a part of
13  OPMOM?
14       A     No.
15       Q     Did you ask anyone?
16       A     No.
17       Q     You have no idea why Mill Brook was
18  selected?
19             MR. FLORESTAL:  Objection.  Asked
20        and answered.
21             MS. LIPPMAN:  That is not a valid
22        objection.  She's doing fine.
23             MR. FLORESTAL:  She answered three
24        times.
25       A     No.
```

```
 1                       A. Williams
 2        Q    You have no idea?
 3             MR. FLORESTAL:  Objection.
 4        A    No.
 5        Q    Did you have an understanding at
 6   the time of how developments were to be
 7   selected?
 8        A    My understanding was they just
 9   wanted us in a group; like the developments
10   from the Bronx, we were all centered around
11   each other.
12        Q    Was every development in the Bronx
13   part of OPMOM?
14        A    Not at the beginning.  There were
15   just five of us.
16        Q    What were the others, if you
17   remember?
18        A    Mill Brook, Melrose, Mott Haven,
19   Mitchell and Patterson.
20        Q    How were developments run at NYCHA
21   outside of OPMOM?
22        A    You're told what to do and you do
23   it.
24        Q    How did OPMOM differ from that?
25             MR. FLORESTAL:  Objection.
```

```
 1                    A. Williams
 2        Q    Go ahead.
 3        A    It was supposed to be that I made
 4   the decisions.
 5        Q    The manager had more control?
 6        A    Supposedly, yes.
 7        Q    It was supposed to be less
 8   centralized?
 9        A    Yes.
10        Q    The OPMOM model gave more control
11   to the development managers in terms of
12   staffing and budget?
13        A    Yes.
14        Q    Wasn't it supposed to be the
15   manager's responsibility to determine his or
16   her development staffing needs?
17        A    Yes.
18             MS. LIPPMAN:  Mark this as B.
19             (Whereupon a document was marked
20        Defendant's Exhibit B for identification
21        as of this date.)
22        Q    Have you ever seen this document
23   before marked just now as Exhibit B?
24        A    I don't remember.
25        Q    This was a document produced by
```

```
1                        A. Williams
2      your attorney in this litigation.
3                  Look at the bottom of the page
4      where it says Project Participants.
5                  Do you see that?
6           A    Yes.
7           Q    Mill Brook is listed at the bottom.
8                  Do you see that?
9           A    Yes.
10          Q    Mill Brook was one of the original
11     eighteen participants in the pilot program?
12          A    Yes.
13          Q    "Timing-pilot pick up January 1st,
14     2015."
15                 Do you see that in the middle of
16     the page?
17          A    Yes.
18          Q    Look at where it says Project Goals
19     on the left.  There is a heading Optimize
20     Organizational Structure and Staffing.
21                 Do you see that?
22          A    Yes.
23          Q    "Staffing levels set by property
24     manager within constraints of development
25     budget," and under that it says:
```

1                    A. Williams

2    "Development staff to meet property needs."

3              Do you see that?

4         A    Yes.

5         Q    Under the OPMOM program, it was

6    your responsibility as manager to determine

7    the staffing needs within the constraints of

8    your budget?

9         A  · Yes.

10        Q    Let look at the lower right corner

11   where it says:  "To optimize property budget

12   and central cost."

13        A    Yes.

14        Q    Bottom up, budgeting process?

15        A    Yes.

16        Q ·  Do you know what that means?

17        A    I don't remember.

18        Q    Did you ever ask anyone about that?

19        A    Maybe, but I don't remember.

20        Q    Did you have OPMOM budget training

21   in November of 2014?

22        A    Yes.

23        Q    Where it says "budget tailoring to

24   each development's needs," do you see that?

25        A    Yes.

1                          A. Williams

2        Q    Do you know what that means?

3        A    I don't recall.

4        Q    When you had the budget training in

5    November of 2014, were you trained on how the

6    budget would work within your development?

7              MR. FLORESTAL:   Objection.

8        A    I don't recall.

9        Q    Do you remember going to the

10   training?

11       A    Yes, I remember in 2014 going to

12   the training.

13       Q    Am I correct that Kevin Norman was

14   running OPMOM when it started in January of

15   2015?

16       A    No.

17       Q    Kevin Norman was not running it

18   then?

19       A    No.

20       Q    Who was running it?

21       A    Cecil House.

22       Q    Cecil House?

23       A    And Kevin came in after.  He

24   retired or resigned and Kevin took over.

25       Q    Cecil House was the general

```
1                        A. Williams
2         Q    I asked if you understood Spanish
3    in Spanish and you answered no.
4         A    No.
5         Q    You do not speak Spanish?
6         A    No.
7         Q    Were you aware, in the spring of
8    2015, the speaker's office received
9    complaints you had been disrespectful to
10   Spanish speaking tenants?
11        A    Not at all.
12        Q    Were you aware the speaker's office
13   received complaints during a tenant meeting
14   when you said you did not want to hear any
15   "Muro Muro" (phonetic) talk from the
16   residents?
17             Were you aware of that?
18        A    No.
19        Q    There were some residents who felt
20   you were disrespectful, so doesn't it make
21   sense they would go to the speaker's office
22   instead of to you?
23        A    Yes, but would it make sense that
24   the speaker's office would call me and say
25   you know what, there was someone who said
```

```
 1                    A. Williams
 2    such and such and if you said that, tone it
 3    down?  I don't talk to people like that.  I
 4    don't go home to a mansion in the sky.  I
 5    respect everyone.  If you're wealthy and pay
 6    a thousand dollars for something or if you
 7    pay a dollar for something, you are the same
 8    person and you deserve the same respect.
 9    Okay?
10            I am not going to go for that.  I
11    was there for eleven years and never got a
12    complaint.  I am not going to change
13    overnight, no.  Now all of a sudden in 2015 I
14    am getting complaints?  You're getting
15    complaints because I am disrespectful?
16            Don't you know how many meetings I
17    went to and how many Spanish people showed up
18    at the meetings, but in 2015 all of a sudden
19    I am disrespectful to them?
20        Q    You said you were there for eleven
21    years?
22        A    Yes.
23        Q    And you never got complaints?
24        A    No.  And when you get a lot of
25    complaints, you know, your boss comes down
```

```
1                          A. Williams
2          Q     Do you recall what percent of Mill
3     Brook tenants had limited English proficiency
4     in 2015?
5          A     I don't remember.
6          Q     More or less than half?
7          A     I don't know.
8          Q     Do you know if the annual
9     recertification of income asks if the head of
10    the household could read and understand
11    documents in English?
12               Do you know if it was on there?
13         A     I don't know.
14         Q     You don't remember?
15         A     I don't remember.
16         Q     You attended a meeting on July 30,
17    2015 at former Speaker Mark-Viverito's
18    office?
19         A     Yes.
20         Q     How were you notified of the
21    meeting?
22         A     Email.
23         Q     Who was the email from?
24         A     I don't know.
25         Q     When were you sent the email?
```

```
 1                      A. Williams
 2       A    I don't know.
 3       Q    Were you told anything about the
 4  reason for the meeting?
 5       A    No.
 6       Q    Did you ask anyone the reason for
 7  the meeting?
 8       A    No.
 9       Q    Is there a reason you did not ask?
10       A    Normally -- well, first of all, you
11  do not go to the meetings when you have
12  elected officials, so I was okay, I will go
13  there, I am not doing anything wrong.  There
14  is no reason for me to care why she's calling
15  me up to the office.  Maybe she wants to do
16  something more.
17       Q    I thought you said it was kind of
18  unusual to get that kind of request?
19       A    Yes, because we got requests from
20  other officials but didn't usually go to the
21  meetings, so I was curious why they wanted us
22  to go to this one, but I did not ask.
23       Q    You had no idea?
24       A    No idea.
25       Q    Did you discuss the meeting with
```

```
 1                      A. Williams
 2        Q     You walked up the block yourself?
 3        A     Yes.
 4        Q     Was anyone else there when you
 5   arrived at the former speaker's office for
 6   the meeting?
 7        A     I don't remember who was there at
 8   the time, but there were probably people
 9   there.
10        Q     Look at paragraph 16 of the Amended
11   Complaint, Defendant's A.
12        A     Paragraph 16?
13        Q     Yes, ma'am, on page 4.
14        A     Okay.
15        Q     Read it to yourself.
16        A     Okay.
17        Q     Is that paragraph correct?
18        A     Yes, those people were there.
19        Q     Was there anyone else there besides
20   the people listed in the paragraph?
21        A     Gloria was there. She's there.
22   Who else was there?
23        Q     Was Marcella Medina there?
24        A     Who is that?
25        Q     Do you know who Marcella Medina is?
```

```
 1                    A. Williams

 2      A    No.

 3      Q    Okay.

 4      A    There was someone there, but I

 5  don't know who they were.  I think it was a

 6  man, but I am not sure.

 7      Q    Did he work for NYCHA?

 8      A    I don't know.  Once I got there I

 9  started focusing.  I realized something was

10  wrong.  I started to focus on what was

11  actually going on.

12      Q    Who is the unknown Hispanic man on

13. Counsel Speaker's staff?

14           Who is that?

15      A    I don't know.

16           MR. FLORESTAL: Objection.

17      Q    How do you know he was Hispanic?

18      A    Good Lord.

19      Q    How did you know?

20      A    I don't know.

21      Q    Do you know why it says unknown

22  Hispanic man?

23           MR. FLORESTAL:  Objection.

24      A    I don't know.

25      Q    You don't know if that is true or
```

```
 1                        A. Williams
 2    not?
 3              MR. FLORESTAL:  Objection.
 4         A    No.
 5         Q    Does Pamela Jamerson ring a bell?
 6              MR. FLORESTAL:  Objection.
 7         Q    Is that the same person?
 8         A    Prensella (phonetic)?
 9              MR. FLORESTAL:  Is that a mistake?
10              MS. LIPPMAN:  Note my objection.
11              MR. FLORESTAL:  I am allowed to ask
12         her a question.
13              MS. LIPPMAN:  What you're doing is
14         totally improper.
15              MR. FLORESTAL:  Off the record.
16              (Whereupon a discussion was held
17         off the record.)
18              MR. FLORESTAL:  Back on the record.
19         Q    Pamela should really be Prensella?
20         A    As far as I know, yes.
21         Q    Who is that?
22         A    The TA president.
23         Q    Did you know her?
24         A    Yes.
25         Q    She had been the TA president for a
```

```
 1                         A. Williams
 2    while?
 3         A     Yes.
 4         Q     Her name was Prensella?
 5         A     Yes.
 6         Q     Was there anyone at the meeting you
 7    had not met?
 8         A     I focused on some people because I
 9    knew something was not right and it dawned on
10    me something is not right.  When I went in I
11    knew I did not do anything wrong.
12         Q     I want to get you out of here at
13    5 o'clock if I can, so was there anyone at
14    the meeting you had not met before?
15         A     I don't remember.
16         Q     Were there any totally unfamiliar
17    faces?
18         A     I don't remember.
19         Q     Do you remember if you introduced
20    yourself to anyone?
21         A     We introduced ourselves going
22    around the room.
23         Q     Okay.
24         A     But I was not focused on that, I
25    was focused on I knew something was wrong.
```

```
1                      A. Williams
2     That is what I focused on.
3          Q    Did anyone come up to you and
4     introduce themselves?
5          A    We just went around the table and I
6     said I am Allison Williams from Mill Brook
7     Houses.
8          Q    You came in and sat down and you
9     all introduced yourselves?
10         A    Yes.
11         Q    Brian Clarke was on the phone?
12         A    I believe.
13         Q    Did anyone else enter the meeting
14    after you arrived?
15         A .  I don't remember.
16         Q    Do you remember if everyone was
17    there when you got there?
18         A    I don't remember.
19       · Q    Look at paragraph 17 of the Amended
20    Complaint.
21         A    Okay.
22         Q    Are you with me?
23         A    Yes.
24         Q    The council speaker began the
25    meaning by inquiring:   "How are you handling
```

1                    A. Williams

2    your Spanish speaking residents at Mill Brook

3    Houses?"

4              Is that correct?

5         A    Yes.

6         Q    Did she say anything else at that

7    specific moment or just how are you handling

8    your Spanish speaking residents at Mill Brook

9    and Mr. Artis answering?

10        A    I recall answering.  I think I was

11   in shock, to be perfectly honest with you,

12   and certain things happened.  I said we use

13   the language bank.

14        Q    What happened next?

15        A    I knew something was terribly

16   wrong.

17        Q    Just answer the question.

18        A    No, because answering the question

19   is not giving you exactly what happened and

20   why I cannot answer the question.  I believe

21   I was in shock.

22        Q    In paragraph 18 it says:  "James

23   Artis replied that they followed NYCHA's

24   written policy which stipulates that they

25   utilize a language bank containing NYCHA

```
 1                        A. Williams
 2    certified translators to deal with all
 3    non-English speaking residents."
 4              Did he mention the language bank
 5    first?
 6        A    I said we use the language bank and
 7    maybe he repeated it in the Housing terms.
 8        Q    You are getting at what I am
 9    getting at.
10              So the council speaker said how are
11    you handling your Spanish speaking residents
12    at Mill Brook and then you jump in and
13    mention the language bank?
14        A    She was talking to me and I said we
15    use the language bank.
16        Q    Paragraph 19, look at that.
17        A    Okay.
18        Q    It says:  "The council speaker
19    exclaimed, while slamming both hands on the
20    table:  'That's unacceptable.'"
21              Go to paragraph 20:  "The council
22    speaker proceeded to state that she was very
23    unhappy with the management of the Mill Brook
24    Houses and wanted to replace the current
25    manager with a 'Spanish manager.'"
```

```
 1                         A. Williams
 2              Do you see that?
 3        A    Yes.
 4        Q    Are those two paragraphs correct?
 5        A    Yes.
 6        Q    That is what you said?
 7        A    Yes.
 8        Q    Am I correct you interpret the word
 9   "Spanish" as meaning Hispanic or Latino?
10        A    Yes.
11        Q    The word "Spanish" equates to you
12   to ethnicity?
13        A    Yes.
14        Q    Right?
15        A    In this instance.
16        Q    Doesn't the word "Spanish" indicate
17   a language?
18              MR. FLORESTAL:   Objection.
19        Q    Ma'am?
20        A    Just wait a second.
21        Q    You cannot consult with your
22   attorney.   There is an open question.
23              MR. FLORESTAL:   I can object, and I
24         do object.
25        Q    It is not a privilege question, so
```

```
 1                      A. Williams
 2   you need to answer.
 3          A    I don't know.
 4          Q    Looking again at paragraph 17 where
 5   you are asked how are you handling your
 6   Spanish speaking residents at Mill Brook
 7   Houses --
 8          A    Yes.
 9          Q    -- Spanish is a language; isn't it?
10               MR. FLORESTAL:   Objection.
11          A    I don't know.
12          Q    Well, what does Spanish speaking
13   mean?
14          A    At that point you said Spanish
15   speaking and that is different than Spanish.
16   Some people can be Asian and speak Spanish,
17   so to define she's from Spain or Puerto Rico,
18   she's Spanish.   They may consider it as not a
19   language, but you said Spanish speaking and
20   that is different.
21          Q    Are Spanish and Spanish speaking
22   the same thing?
23          A    No.
24          Q    Why not?
25          A    Spanish speaking means you're
```

```
 1                    A. Williams
 2   speaking it.  Spanish means like if I perm my
 3   hair and the men start to speak Spanish to me
 4   --
 5        Q    I did not understand one word of
 6   what you just said.  You turned your head
 7   away and looked at your attorney.  Neither I
 8   nor the court reporter could hear your
 9   answer, so please slow down and talk to me.
10        A    I had residents come into my office
11   when my hair is permed, and upon walking into
12   my office, and I am talking about a full
13   face, and immediately start to speak in
14   Spanish.  The term I use is speaking Spanish,
15   they are speaking Spanish to me, so I say I
16   am not Spanish.  They say you look Dominican.
17   I said no, I am not, so don't speak to me in
18   Spanish.
19             Spanish speaking and Spanish are
20   two different things.  Someone can say she's
21   Spanish, but you don't know what she is.  You
22   figure she's some sort of Latino person or
23   now you have some black people that speak
24   Spanish, so you say no, she is not Spanish,
25   she just speaks Spanish.
```

```
 1                    A. Williams
 2           The word "speaks" to me makes all
 3   of the difference in the world.
 4      Q     Are there black people that
 5   self-identify as Latino or Spanish, do you
 6   know?
 7      A     I don't know.  I do not.
 8      Q     Have you ever been to Central
 9   America or South America or the Caribbean?
10      A     Not to Central America or South
11   America.  I have friends on the block who are
12   black but Spanish speaking.
13      Q     Do you think you can self-identify
14   for every black person what they consider
15   themselves?
16      A     I am just telling you what I think
17   when you asked me about Spanish speaking.  I
18   don't care about everyone.  You asked me if
19   there was a difference between Spanish and
20   Spanish speaking and this is what Allison
21   Williams thinks, and I am saying for her
22   there is a difference between Spanish and
23   Spanish speaking.
24      Q     What did the speaker mean?
25      A     I don't know.
```

```
 1                    A. Williams
 2      A    They're Spanish, but not Spanish
 3  speaking.  They could be Spanish, but not
 4  Spanish speaking.
 5      Q    What I'm trying to get to is this
 6  --
 7      A    You keep asking me the same thing.
 8      Q    -- to you, someone could be
 9  Hispanic and not speak Spanish and maybe
10  they're Spanish and maybe they're not; is
11  that right?
12      A    Could be.  I don't know.  You could
13  speak Spanish and I could say you're Spanish
14  speaking, but you don't look Spanish to me.
15  I am going by what Allison William thinks.
16      Q    I have Spanish ancestry, so could I
17  be a Spanish manager?
18      A    I don't know.
19      Q    Why not?
20      A    She wanted a Spanish manager who
21  speaks Spanish, so just stop playing.  She
22  wanted a Spanish manager who speaks Spanish,
23  but she just said Spanish.  If I spoke
24  Spanish I don't know if she would have been
25  happy with that.
```

```
 1                    A. Williams
 2        Q    Did anyone say anything else?
 3        A    Not that I recall.
 4        Q    Did you say anything else?
 5        A    To the speaker?
 6        Q    During the meeting.
 7        A    Yes.  She said how do I deal with
 8   the tenants.
 9        Q    After that?
10        A    I said language bank, and she said
11   that was not acceptable, then I said I call
12   someone from downstairs, an employee, to come
13   up and translate for me, and she said that
14   was not acceptable.
15             What else did I have?  There was
16   something else.  There was all of the tools
17   the Authority gives us, she said that that
18   was not acceptable.  She said you go to talk
19   to someone downstairs?  I said no.  I called
20   downstairs.  If the super is there or if Raf
21   is there, I call.
22        Q    Who is Raf?
23        A    The superintendent.
24        Q    Okay.
25        A    And Mitchell is downstairs, the
```

1                       A. Williams

2    supervisor of caretakers, and I ask him to

3    come over and translate for me because the

4    language bank for Spanish is usually very

5    busy and they put you on hold forever, and I

6    did not feel it was fair to the tenants

7    having them sit here.  They say we will call

8    you back, but you could be waiting and

9    waiting and waiting and waiting and the

10   tenant is just sitting there.

11        Q    When you say downstairs, you mean

12   the maintenance staff?

13        A    Yes, but I don't go downstairs.  He

14   was probably in the field.

15        Q    Who?

16        A    Mitchell Ramos.

17        Q    What is his title?

18        A    Supervisor of caretakers.

19        Q    And the other man's title?

20        A    Superintendent.  We call

21   maintenance downstairs and upstairs, and I

22   called them and asked them to translate if

23   the language bank did not get back to me, and

24   most of the time they did not get back to me.

25        Q    The superintendent, you said his

1                    A. Williams

2    office was upstairs but he was downstairs

3    supervising?

4         A    Yes.

5         Q    Was the maintenance staff out in

6    the field a lot?

7         A    The super would be out in the field

8    and Mitchell and I called them and asked them

9    to come to the office.

10        Q    Is it NYCHA policy to call the

11   maintenance staff when you need to translate?

12        A    I don't know.  It's not against the

13   rules.

14        Q    Is there a written policy that says

15   you should do that, if you know?

16        A    I don't know.

17        Q    How did the meeting conclude?

18        A    We left.  We went back to the

19   office.  I went back to the office.  I was

20   pissed.  That was it.  We left and we had

21   another meeting about two days later.  This

22   meeting did not sit well with me.

23             We had another meeting two days

24   later and I went to my boss, Sibyl and Artis,

25   I said I felt that I was being bullied

```
 1                        A. Williams
 2  because I did not speak Spanish.
 3       Q     You had a meeting with Artis?
 4       A     Yes.
 5       Q     Who was at the meeting.
 6       A     The TA people were there.
 7       Q     TA means what?
 8       A     Tenant Association.
 9       Q     Two days later, at 250 Broadway
10  there was a meeting?
11       A     Yes.
12       Q     For TA presidents?
13       A     I assume so.  They were there.
14       Q     Were all of the managers there, the
15  OPMOM managers?
16       A     Probably some people was off that
17  day, but those that were there were there.
18       Q     Two days after the July 30th
19  meeting there was a meeting at 250?
20       A     Yes.
21       Q     Miss Colon was there?
22       A     Yes.
23       Q     And Mr. Artis was there?
24       A     Yes.
25       Q     Do you remember if anyone else was
```

1                    A. Williams

2    there?

3         A    No.   Just the usual suspects, the

4    other managers.

5         Q    You told Miss Colon and Mr. Artis

6    you felt you were bullied?

7         A    The meeting did not sit well with

8    me.  I kept thinking about it.  It did not

9    feel right and I went to the two of them, I

10   said at that meeting I felt like I was being

11   bullied.

12        Q    What did they say?

13        A    They said I wasn't, but it just did

14   not sit right.

15        Q    Did you guys say anything else?

16        A    I don't remember.

17             MS. LIPPMAN:   Mark this as Exhibit

18        R.

19             (Whereupon an article was marked

20        Defendant's Exhibit R for identification

21        as of this date.)

22        Q    You talk to the press about your

23   lawsuit, right?

24        A    Not The Amsterdam News.  I don't

25   know where they got it from.

```
 1                    A. Williams

 2        Q    Do you see that?

 3        A    Yes.

 4        Q    Do you remember making that

 5   statement to any reporter?

 6        A    I don't remember, but I don't

 7   believe that I spoke with this reporter.

 8        Q    Do you remember saying --

 9        A    I don't remember.

10        Q    Different question.

11             Do you recall saying during the

12   meeting we have a language bank?

13        A    Which one?

14        Q    The meeting with Mark-Viverito.

15        A    Yes.

16        Q    Next paragraph goes on to say:

17   "Williams then said she told Mark-Viverito

18   she sometimes goes to the maintenance

19   department downstairs to get someone who

20   speaks Spanish."

21             Do you see that?

22        A    Yes.

23        Q    Did you say that during the

24   meeting?

25             MR. FLORESTAL:   Objection.
```

```
 1                     A. Williams
 2        A    I did.  I said it before.  I said
 3   that, yes.
 4        Q    Is there a reason it's not in the
 5   Amended Complaint?
 6             MR. FLORESTAL:  Objection.
 7        A    I don't know.
 8        Q    What is the language bank?
 9        A    The language bank is what the
10   Authority uses if someone speaks -- well,
11   it's a bunch of languages there that tells
12   you how to ask a question.  You call up the
13   number, there is a number, every Housing
14   Assistant at Mill Brook had it.  If you get a
15   non-English speaking person, you have them
16   sit down, you call the number and you ask for
17   someone who speaks Spanish.  If someone is
18   there, you put the person on speakerphone and
19   I say ask her this question and she would,
20   and the person would continue and say it in
21   Spanish so you get to know what she wants,
22   the Spanish speaking person or anybody.  They
23   had all languages there.
24        Q    The language bank was staffed by
25   NYCHA volunteers; is that correct?
```

                    A. Williams

1

2        A     I don't know.  I don't know how

3   they do it.  I don't know.

4        Q     Was there a wait or could you get

5   through right away?

6             Earlier you said sometimes it took

7   a while.

8        A     At the beginning it was -- I recall

9   it was okay, you could get someone.  But

10  after a while they say I will call you back

11  and you wait and the tenant sits and waits

12  and waits and waits, so after a while it was

13  not just disrespectful to the resident but

14  disrespectful to me.

15       Q     Was the translation service over

16  the phone or in person?

17       A     Over the phone.

18       Q     Just over the phone?

19       A     Yes.

20       Q     What if you needed a written

21  document translated?

22       A     I don't know.  I never needed that.

23  If they send something they wanted us to put

24  under the doors, they would have one side in

25  English and then the other in Spanish.  I'm

```
 1                    A. Williams
 2   sure someone there could translate it.  I
 3   don't know, it never happened to me.  I don't
 4   know.
 5        Q     What if you needed someone in
 6   person to translate?
 7        A     That never happened.  I don't know
 8   what they would do.
 9        Q     Did you need an appointment with
10   the language bank?
11        A     No.  The tenant comes in.  You just
12   walk in.  Sometimes they make an appointment,
13   but you walk in and someone sees you.
14        Q     If the translation service was
15   needed immediately and you could not get
16   someone on the phone in the language bank,
17   what would you do?
18        A     I ask for Raf, my super, or call
19   for Mitchell Ramos, the supervisor of
20   caretakers, to have him come and translate.
21        Q     What if they were in the field?
22        A     If they were in the field I'd call
23   them and they would say okay and it will be
24   ten minutes.  Most of the time the tenants
25   just waited and one of them would come in.
```

A. Williams

1
2     do remember doing that.  I don't know when,
3     but I did it.
4          Q     Do you remember talking to your
5     office staff about the wait at the language
6     bank?
7          A     No.  I said make sure to call the
8     language bank if someone does not understand
9     English.
10         Q     Did anyone complain about the
11    amount of time?
12         A     I don't recall, but is the nature
13    of the beast.
14         Q     You said you would call the
15    superintendent or Mitchell?
16         A     Yes.
17         Q     Who is the super?
18         A     Rafael Martinez and Mitchell Ramos.
19         Q     Did anyone upstairs speak Spanish?
20         A     Celeste, but she was terminated.
21         Q     Was it because of her T&A?
22         A     Yes.
23         Q     She spoke Spanish?
24         A     Yes.
25         Q     She was able to communicate with

```
 1                    A. Williams
 2   them?
 3        A    She was not at Mill Brook a long
 4   time, but when she was there.
 5        Q    Do you claim that former General
 6   Manager Michael Kelly, Brian Clarke and
 7   former Speaker Mark-Viverito worked together
 8   to remove you as the manager of Mill Brook?
 9             Do you claim that?
10             MR. FLORESTAL:  Objection.
11        A    I believe so.
12        Q    What are the facts --
13        A    I don't have them.
14        Q    Tell me the facts upon which you
15   base the belief.
16        A    I been at Mill Brook for eleven
17   years and there were just three years I had
18   problems that were unbelievable.  Everything.
19   I was not respected as a manager.  I did not
20   get the emails I should have and they know
21   better.
22        Q    Which email?
23        A    About Miss Coutrier when she was
24   transferred from Patterson to me.  I should
25   have been on the email.
```

1                        A. Williams

2        Q    Look at paragraph 27 of the Amended

3   Complaint.

4             Are you with me?

5        A    Yes.

6        Q    Read it to yourself.

7        A    Okay.

8        Q    You were not replaced, right?

9        A    No.

10       Q    You stayed the manager of Mill

11   Brook until you retired on May 1st, 2017?

12       A    Yes.

13       Q    Look at paragraphs 29 through 30

14   and read them to yourself and look up when

15   you're done.

16       A    Okay.

17       Q    Are you with me?

18       A    Yes.

19       Q    Paragraph 29, you said that there

20   was a meeting on August 28, 2015?

21       A    Yes.

22       Q    What was the purpose of the

23   meeting?

24       A    We had a meeting -- this was for

25   OPMOM.  We had a meaning every month.  What

```
 1                    A. Williams
 2       A    Yes.
 3       Q    You interpreted that to mean who?
 4            MR. FLORESTAL:  Objection.
 5       A    Anybody who spoke Spanish.
 6       Q    Anybody who spoke Spanish?
 7       A    Yes.
 8       Q    Even non-Hispanic people who spoke
 9  Spanish at the development?
10       A    Anyone that speaks Spanish.  He
11  probably meant the people that do not speak
12  English.  Spanish speaking people who do not
13  speak English.  Otherwise, it makes no sense.
14       Q    You said:  "I use the tools that
15  the Housing Authority gives me."
16       A    Yes.
17       Q    What were you referring to?
18       A    The language bank, my staff
19  translating.  I was referring to whatever is
20  necessary.  I do not apologize for calling
21  Mitchell or Raf upstairs to translate if the
22  Authority felt it was fine to let a tenant
23  wait in the office to wait for a call back
24  for 30 minutes or longer.
25       Q    After the discussion about Spanish
```

1                    A. Williams

2     Spanish speaking tenants.  They got to be

3     able to call someone.

4          Q    Do you know if the Housing

5     Assistants put the poster Miss Molina gave

6     you up?

7          A    I don't know.

8          Q    You retired on May 1st, 2017?

9          A    Yes.

10         Q    At the time you filed your Amended

11    Complaint, October 26, 2016, you were still

12    working for NYCHA?

13         A    Yes.

14              MS. LIPPMAN:  Mark this as exhibit

15         T.

16              (Whereupon Answers to

17         Interrogatories were marked Defendant's

18         Exhibit T for identification as of this

19         date.)

20         Q    I'll hand you a document marked as

21    Defendant's T.  Look at it.

22         A    Okay.

23         Q    Turn to the last page where it says

24    Verification.

25         A    Yes.

```
 1                      A. Williams
 2            MR. CARTER:  I have no further
 3       questions.
 4            MR. FLORESTAL:  I have some
 5       questions.
 6   EXAMINATION
 7   BY MR. FLORESTAL:
 8       Q    Thank you for your patience and for
 9   sticking it out.
10            You're not Spanish, are you?
11       A    No.
12       Q    When you think of Spanish speaking,
13   you do not think of somebody like me?
14       A    No.
15       Q    I actually look African-American,
16   right?
17            MS. LIPPMAN:  Objection.  You are
18       leading your witness.
19       Q    You would not know that I am
20   actually one half Dominican and pretty fluent
21   in Spanish, would you?
22            MS. LIPPMAN:  Objection.
23       A    No.
24       Q    Did the council speaker ask you
25   whether you spoke Spanish?
```

EXHIBIT 7

1

UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT OF NEW YORK
----------------------------------------X
SIBYL COLON,

                    PLAINTIFF (S),

        -against- INDEX NO: 16-04540

THE CITY OF NEW YORK, NEW YORK CITY HOUSING
AUTHORITY, NEW YORK CITY COUNCIL SPEAKER
MELISSA MARK-VIVERITO, MICHAEL KELLY, and
BRIAN CLARKE,
                    DEFENDANT (S).
----------------------------------------X,


                    DATE:  May 3, 2019
                    TIME:  10:28 a.m.


        (CAPTION TO CONTINUE ON NEXT PAGE.)

```
 1                                                    2
 2   ----------------------------------------X,
 3   ALLISON WILLIAMS,
                            PLAINTIFF (S),
 4
                 -against- INDEX NO: 16-cv-08193
 5
     THE CITY OF NEW YORK, NEW YORK CITY HOUSING
 6   AUTHORITY, NEW YORK CITY COUNCIL SPEAKER
     MELISSA MARK-VIVERITO, MICHAEL KELLY, and
 7   BRIAN CLARKE,
 8                            DEFENDANT (S).
     ----------------------------------------X
 9
10
11                    DATE:  May 3, 2019
12                    TIME:   10:28 a.m.
13
14
15        EXAMINATION BEFORE TRIAL of a
16   Defendant/Third-Party Defendant,
17   NEW YORK CITY HOUSING AUTHORITY, by a
18   witness, MICHAEL KELLY, taken by the
19   Plaintiff, pursuant to Notice, held at the
20   FLORESTAL LAW FIRM, PLLC, 48 Wall Street,
21   New York, New York 10004, before a Notary
22   Public of the State of New York.
23
24
25
```

```
 1                                          3
 2   A P P E A R A N C E S:
 3
 4   FLORESTAL LAW FIRM, PLLC
     Attorney for the Plaintiff
 5   48 Wall Street
     New York, New York 10005
 6   BY: MARCEL FLORESTAL, ESQ.
 7
 8   ZACHARY W. CARTER, ESQ.
     Attorney for the Defendant
 9   THE CITY OF NEW YORK
     100 Church Street
10   New York, New York 10007
     BY:   J. CORBIN CARTER, ESQ.
11
12
     GENERAL LITIGATION
13   Attorneys for the Defendant
     NEW YORK CITY HOUSING AUTHORITY
14   250 Broadway
     New York, New York 10007
15   BY: JANE E. LIPPMAN, ESQ.
16
17   ALSO PRESENT:
           Sibyl Colon and Leslie R. Bennet
18
19         *         *         *
20
21
22
23
24
25
```

```
 1                      KELLY              7
 2              Please state your name again for
 3    the record.
 4         A.    Michael Kelly.
 5         Q.    Please state your address.
 6    Please state the same address that you
 7    stated before.
 8         A.    250 Broadway, New York, New York
 9    10007.
10         Q.    Good morning, Mr. Kelly, I would
11    like to go in to some background
12    information.  Have you ever been employed by
13    NYCHA?
14         A.    Yes.
15         Q.    Please tell me your history with
16    NYCHA, your employment history
17    chronologically, if you will.
18         A.    I worked at NYCHA in two
19    different times um, once um, between 2010
20    and 2012 and again between 2015 and 2018.
21         Q.    Can you go through the two
22    separate times that you worked at NYCHA?
23    And in what capacity were you working for
24    NYCHA, between 2010 and 2012?
25         A.    I worked in the same capacity, in
```

```
 1                     KELLY                8
 2    both those periods, as the general manager
 3    of the New York City Housing Authority.
 4         Q.     And again, you mentioned you
 5    worked between 2015 and 2018, so what
 6    happened between 2013 and 2015?
 7         A.     Um, I took a position at the
 8    Philadelphia Housing Authority as an
 9    executive director and receiver.  And then
10    left there to take a position as the
11    director of the Department of Housing and
12    Community Development in Washington, D.C.
13         Q.     Okay, so two separate positions?
14         A.     Yes, sir.
15         Q.     And why did you leave the D.C.
16    position?
17         A.     Change in mayoral administration.
18         Q.     Were you terminated or did you
19    leave on your own?
20         A.     No, there was a different mayor
21    and there is sort of, when a new mayor comes
22    in, they actually have a prerogative of
23    cleaning the cabinet, in which I was a
24    member of the mayoral cabinet.
25         Q.     They took that prerogative?
```

```
 1                        KELLY                 9
 2        A.      Yes, it is standard from my
 3   experience.
 4                MS. LIPPMAN:  What was that?
 5                (Whereupon, the referred to
 6        answer was read back by the reporter.)
 7        Q.      At what point did you start
 8   working for NYCHA, the second time around?
 9        A.      It was in April of 2015.
10        Q.      What was your position then?
11        A.      General manager.
12        Q.      Tell me about the general
13   manager, exactly what were your
14   responsibilities, as a general manager?
15        A.      Um generally, there are
16   responsible for day-to-day operations of the
17   agency.  Um, which included um, property
18   management, um, the administration, um,
19   resident services, um and maintenance
20   operation.
21        Q.      It seems like a lot of
22   responsibility.
23                MS. LIPPMAN:  Objection.
24                MR. FLORESTAL:  It is not a
25        question, it is making a comment.
```

```
1                        KELLY                    13
2         Q.      I am sorry, you look like you
3   wanted to finish.
4         A.      No, I answered your question.
5         Q.      At what level, at all levels?
6         A.      No, at the direct report level.
7         Q.      Did you ever interview anybody
8   outside of the direct report level for
9   positions?
10        A.      Yes.
11        Q.      Are you familiar with Sibyl
12  Colon, the former director of OPMOM?
13        A.      Yes.
14        Q.      How are you familiar with Sibyl
15  Colon?
16        A.      I worked with her.
17        Q.      Did she report to you, at any
18  point?
19        A.      No.
20        Q.      Do you know how she came about to
21  attain that position, as -- well, let me
22  refer to it as "the former director of
23  OPMOM"?
24                MS. LIPPMAN:   Objection, I am
25        just going to object for the record.
```

```
1                        KELLY                14

2           This is not one of the topics of the

3           30B6 deposition.  At this point I won't

4           instruct the witness not to answer, he

5           can answer.

6                   MR. FLORESTAL:  Off the record.

7                   MS. LIPPMAN:  No, I would like to

8           stay on the record.

9                   MR. FLORESTAL:  No, I want to say

10          off the record.

11                  (Whereupon, an off-the-record

12          discussion was held.)

13                  MR. FLORESTAL:  So can you read

14          my last question please.

15                  (Whereupon, the referred to

16          question was read back by the

17          reporter.)

18          Q.      Yes, do you know how she came

19   about to attain that position?

20          A.      Well, there was an opening in the

21   position and um, Brian Clarke hired her.

22          Q.      Did you have anything to do with

23   the hiring of Sibyl Colon?

24          A.      Um, no.

25          Q.      Did you um, review her resume?
```

```
 1                         KELLY                15

 2        A.      No.

 3        Q.      Did you speak with her at all,

 4   about the position, prior to her obtaining

 5   that position?

 6        A.      I may have, I do not recall.

 7        Q.      Now, you stated that you

 8   interviewed um, non-direct reports for

 9   positions, did you not?

10                MS. LIPPMAN:  Objection.

11        A.      The question is?

12                MR. FLORESTAL:  Withdrawn, I am

13        sorry it is vague.

14        Q.      Do you ever interview non-direct

15   reports, for positions of employment?

16        A.      I have in the past, yes.

17        Q.      Any reason why you didn't

18   interview Sibyl Colon?

19        A.      Um, I do not recall.

20        Q.      Are you familiar with the former

21   senior vice president of NYCHA, Brian

22   Clarke?

23        A.      Yes.

24        Q.      And how are you familiar with

25   Brian Clarke?
```

**EXHIBIT 8**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

SIBYL COLON,

                    Plaintiff,

       -against-

THE CITY OF NEW YORK, ET AL.,

                    Defendants.

Index No.:  CV-1604540

---------------------------------------X

ALLISON WILLIAMS,

                    Plaintiff,

       -against-

THE CITY OF NEW YORK, et al.,

                    Defendants.

Index No.:  CV-16-08193

---------------------------------------X

                48 Wall Street

                New York, New York

                July 3, 2019

                11:53 a.m.

      (CAPTION CONTINUED ON FOLLOWING PAGE)

July 3, 2019

2                  CONTINUED EXAMINATION BEFORE TRIAL of

3    MICHAEL KELLY, a Defendant herein, taken pursuant to

4    Federal Rules of Testimony, and held at the

5    above-mentioned time and place before Colleen Ruic,

6    a Notary Public of the State of New York.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEITZ Court Reporting... A Lexitas Company
800-678-0166

2   A P P E A R A N C E S:

3

        FLORESTAL LAW FIRM, PLLC
4       Attorneys for Plaintiffs
            48 Wall Street, Suite 11
5           New York, New York 10005
6       BY:  MARCEL FLORESTAL, ESQ.

7

8

9       NEW YORK CITY HOUSING AUTHORITY
        GENERAL LITIGATION
10      Attorneys for Defendants
        NYCHA, MICHAEL KELLY, BRIAN CLARKE
11          250 Broadway
            New York, New York 10007

12
        BY:  JANE E. LIPPMAN, ESQ.
13

14

15      NEW YORK CITY LAW DEPARTMENT
        OFFICE OF THE CORPORATION COUNSEL
16      Attorneys for Defendant
        MELLISA MARK-VIVERITO
17          100 Church Street
            New York, New York 10007

18
        BY:  J. CORBIN CARTER, ESQ.
19

20

21

22

23

24

25

1                    KELLY
2         A.    Correct.
3         Q.    What number is June?
4         A.    76.7.
5         Q.    In July, what number does it reflect
6    in July?
7         A.    69.2 days.
8         Q.    In August, what number does that
9    reflect?
10        A.    65.6 days.
11        Q.    Do you recall seeing those numbers
12   while you were a general manager in 2015?
13        A.    Well, part of my monthly reports to
14   the board of commissioners included not only the
15   OPMOM properties, but all the properties on the
16   topic of vacant unit turnaround time.  I'm not
17   familiar with these specific numbers, but I'm
18   familiar with the process these numbers would be
19   generated from.
20        Q.    In your opinion, or rather is the
21   goal for that specific category, the vacant
22   available units aging, for that specific
23   category, is the goal for the numbers to be
24   trending up or for the numbers to be trending
25   down?

1                          KELLY

2                MS. LIPPMAN:  Objection.

3        A.    Again, as I stated earlier, it's

4    difficult to put trending with this because you

5    never know when a fire is going to happen or

6    legal issues come into play sometimes for

7    reentry.  There's a lot of factors that can

8    effect it.  There's also factors on a particular

9    month a lot of units could have very minimal

10   amount of maintenance work required for

11   rehabilitating them.  So subsequently, the

12   turnaround time could be very short.  So an

13   indicator like this for my purposes and my

14   understanding not a trending per month, but on a

15   cumulative average through the course of the

16   year and on a year-to-year basis to make sure

17   the agency is trending in a shorter period of

18   time.

19       Q.    Going back to this category, did you

20   finish your response by the way?

21       A.    Yes.  I did, sir.

22       Q.    Okay.  So my question to you is, is a

23   lower number better than a higher number?

24                MS. LIPPMAN:  Objection.

25        A.    Yes, sir.

1                          KELLY

2       not a fair measure in my opinion.  It's because

3       of the various factors that go beyond the

4       property manager.  It could be trending upward,

5       and if there are mitigating reasons for that,

6       even if it's in a series, that would have to be

7       considered.  That's why I think on a measure

8       like this looking at it on a much larger time

9       frame; annually and semiannually measuring

10      progress, that in terms of serial month periods

11      -- a serial period of 2012, '13, '14, or a

12      serial of spring, August, fall, winter.  So

13      because of the nature of this particular

14      indicator, it does need to be measured monthly

15      and it is.  If there is performance that is

16      moving in positive directions, that's a laudable

17      occurrence, but it's one that I think, again,

18      the term is balanced and there's a lot of

19      factors that need to be put in consideration.

20           Q.    So that I understand you clearly, are

21      you saying that a number that takes multiple

22      months into account, the average multiple months

23      is more reflective of progress in that specific

24      category then just looking at these various

25      snapshots in time month by month; is that what

```
 1                    KELLY
 2   you are saying?
 3              MS. LIPPMAN:  Objection.
 4      A.    Repeat the question.
 5      Q.    Let me back up a little bit.  I
 6   presented you with the break up of the
 7   month-by-month break up of the vacant available
 8   units aging category.  You are saying that it's
 9   not fair to look at just the month by month;
10   correct?
11      A.    No.  I'm not saying the word fair --
12              MS. LIPPMAN:  Objection.
13      A.    -- I'm saying balanced.  You need to
14   look at both.
15      Q.    Okay.  You need to look at the month
16   by month in conjunction with what?
17      A.    Larger time periods.
18      Q.    Okay, larger time periods.  Like
19   what, for instance?
20      A.    Like seasons, like years, like
21   semiannually.
22      Q.    Would comparing --
23      A.    Again, sir, if I can.  There are
24   instances where capital funds which are used to
25   repair units that have been off line for a long
```

```
1                        KELLY
2          Q.    Now, this is not measuring month by
3     month, is it?
4                     MS. LIPPMAN:   Objection.
5          A.    It states it was from January through
6     August.   What I probably did not say, but I
7     think is important in this line of questioning,
8     is that OPMOM in the early stages of 18 units
9     received a disproportionate amount of money to
10    operate.   There was a desire on the agency's
11    behalf to really invest in this program, so
12    consequently service level response times and
13    regarding the variety of the other issues that
14    show on the balance scoresheet, that there was
15    improvement compared to the rest of the
16    portfolio is not a surprise to me considering
17    that those 18 units were allocated a higher
18    budget to manage than the rest of the portfolio.
19    I think it's important to note for the record
20    that this is wonderful stuff, but it was stuff
21    that was actually fueled or funded with a
22    disproportionate amount of resources.
23         Q.    I'm looking at -- going back to
24    Plaintiff's Exhibit Number 7, I notice the
25    numbers are trending up in the same category,
```

```
1                            KELLY
2         A.    Yes.
3         Q.    Let's talk about the SLAs.  What does
4    the SLA measure?
5                    MS. LIPPMAN:  Objection.
6         A.    It measures the amount of time that a
7    maintenance work order can be completed or was
8    completed.
9         Q.    Is there a target that OPMOM tried to
10   achieve in 2015; was there a target?
11        A.    Yeah, seven days.
12        Q.    In January of 2015, do you know what
13   the SLA number was?
14        A.    For OPMOM, it's stated here 21.4
15   days.
16        Q.    What was that number in February?
17        A.    25.1 days.
18        Q.    I'm going to fast forward to June;
19   what was that number in June?
20        A.    24.1 days.
21        Q.    What was that number in July?
22        A.    17 days.
23        Q.    Okay.  In your opinion, is the July
24   number better than the June number?
25                    MS. LIPPMAN:  Objection.
```

```
 1                          KELLY
 2         A.    Yes.
 3         Q.    What was that number in August?
 4         A.    7.5 days.
 5         Q.    In your opinion, is the August number
 6  better than the July number?
 7         A.    Yes.
 8                    MS. LIPPMAN:  Objection.
 9         Q.    Is the August number better than the
10  June number?
11         A.    In my opinion, yes.
12         Q.    Okay.  So in your opinion, did OPMOM
13  meet it's SLA goals in August?
14                    MS. LIPPMAN:  Objection.
15         A.    No.
16         Q.    Why not, sir?
17         A.    It's noted here it was 7.5 days, and
18  7 days is the target.
19         Q.    Did it meet it in September?
20         A.    Yes, it did, as well as the rest of
21  the agency.  It should be noted that as general
22  manager around this time, this August, September
23  time, there was a shift in the way we approached
24  the measuring of maintenance service level days.
25  Prior to this, inspectors would go into an
```

1                          KELLY

2    apartment, identify what the simple -- I call it

3    simple, singular maintenance service need was,

4    put that into our larger work order system, have

5    it dispatched to a maintenance worker to do the

6    work.  Agency wide it was the same 20, 25 days

7    as it was noted here in early 2015.  In the

8    latter part of 2015, to provide higher customer

9    service, as well as to reduce the service level,

10   a sift in the approach to delivering maintenance

11   was that the maintenance worker, not an

12   independent inspector, would go in, identify the

13   work needed to be done.  They would carry with

14   them a tool kit and replacement parts for as

15   much as they could possibly do, and open and

16   close a work order in realtime.  So on balance

17   what used to take 20 or 30 days, would take an

18   hour or two.  This was a shift not only for

19   OPMOM, but the entire agency.  If you look at

20   these numbers compared to the entire agency,

21   they all trended the same way.

22        Q.     Please explain to me, again, what do

23   you mean by there was a shift in the entire

24   agency; what do you mean by that?

25                 MS. LIPPMAN:  Objection.

```
 1                       KELLY
 2         A.    I will try to repeat what I just
 3    said.
 4         Q.    Please?
 5         A.    After, as general manager, I reviewed
 6    the process for the delivery of maintenance
 7    work, it was decided with consultation from
 8    senior staff and consultation with the other
 9    maintenance supervisors that the approach that
10    we were using to have a third-party-inspection
11    unit come through to identify what work needed
12    be done at a particular apartment, to have that
13    work listed and identified and put into the
14    larger work order system, that work would then
15    be assigned to maintenance workers to do the
16    work.  There was a relatively large time lag
17    between when that work was inputted, when that
18    work could be assigned, when that work could be
19    scheduled, and when that work can be done.  On
20    average, agency wide, we were trending in the
21    three to four-week period for that.  By making a
22    shift in how we approached the delivery of
23    maintenance work orders to provide the
24    maintenance workers with a cart that included
25    the average types of work that they would
```

1                    KELLY

2    discover in an apartment during their visit,

3    would actually go through, identify what work

4    needed to be done, actually do the work, and

5    open and close the work order in that time.

6    Work that they were not able to do, complex work

7    I mentioned earlier that requires other trades,

8    would be identified and that work would be

9    assigned to the work order system and work being

10.  done concurrently.  That effort caused the

11   service level for the entire agency to drop

12   dramatically during the latter part of 2015.

13        Q.   Sir, is lead paint testing considered

14   complex work?

15             MS. LIPPMAN:  Objection.  You

16        can answer.

17        A.   Testing itself is not complex work.

18   The remediation can be very complex.

19        Q.   Walk me through the testing part of

20   it.  How simple is lead paint testing; to test

21   an apartment for lead paint, how simple a task?

22        A.   I didn't say simple.  It requires --

23   well, there's different forms of identification

24   beginning with the visual inspection of peeling

25   paint and to the use of a -- I forget the

```
 1                        KELLY
 2    acronym -- XRF machine; a larger machine that
 3    can identify lead much more accurately than a
 4    usual inspection, are I believe the two major
 5    type of ways lead can be identified.  Testing
 6    though, forgive me for not answering the
 7    question specifically, has to be done through
 8    some sort of a machine.
 9         Q.    Was NYCHA in possession of the
10    testing machines in 2015?
11                   MS. LIPPMAN:  Objection.  I'm
12              instructing the witness not to answer
13              this.  There's a pending government
14              investigation on lead.  You will have
15              to take this to the judge.
16                   MR. FLORESTAL:  I will.
17         Q.    Mr. Kelly, why was Sibyl Colon
18    removed as a director of OPMOM?
19         A.    In November of 2014, it was brought
20    to the chair's attention that there was a
21    professional who was very grounded in what we
22    were considering the principals of OPMOM, and
23    would be an excellent candidate to manage the
24    OPMOM Program.
25         Q.    I'm sorry, when was that?
```

```
 1                    KELLY
 2        A.    November of 2014.  That candidate was
 3   Janet Abraham.  Janet was brought in to
 4   interview with then General Manager Cecil House,
 5   as well as the Chief Administrative Officer
 6   Natalie Rivers, and the chair.  She impressed
 7   everyone, and the chair at that point in the end
 8   of November, early December, reached out to a
 9   colleague who had worked with Janet in Chicago
10   and confirmed that she was an excellent
11   potential candidate.  Cecil House continued to
12   have conversations with Janet about her taking
13   the job as OPMOM vice president.  Those
14   negotiations were not consummated.  Cecil left
15   in April of 2015.  OPMOM was being managed by
16   Kevin Norman for a period.  Kevin Norman left
17   shortly after that.  Sibyl Colon was assigned to
18   that position to manage the OPMOM Program.  I
19   began work in April of 2015, pretty much
20   concurrent with Cecil House leaving, with Kevin
21   Norman leaving, and with the appointment of
22   Sibyl Colon.  Shortly after I started, the
23   chair, Shola Olatoye, left for maternity leave.
24   During that period I was tasked with doing
25   preparations for budget hearing with the council
```

1                    KELLY

2    and just getting reoriented as the general

3    manager of NYCHA.  Upon the chair's return in

4    the end of July of 2015, she approached me and

5    asked if I knew Janet Abrahams.  I told her I

6    heard of her.  She said she was very impressed

7    with her and she wanted me to interview with her

8    to see her appropriate level to be recruited and

9    to pick up the discussions Cecil House had with

10   her prior to his leaving.  I met with Janet

11   along with others; the chief of staff to the

12   deputy mayor and others met with Janet and were

13   very impressed.  It was concluded that she would

14   be an exceptional candidate to move OPMOM from

15   the 18 units that were serving as the model

16   program to a full-blown program that was looking

17   to, in a phase manner, replace all of NYCHA's

18   management protocols to this OPMOM Protocol

19   because she was successful in doing specifically

20   the same thing in Newark and in Chicago and the

21   end of August of 2015 a general offer was put

22   out to Janet to assume those responsibilities

23   and she accepted at the end of August and began

24   work in September.

25        Q.    I'm sorry, when was the offer made to

```
 1                        KELLY
 2   Janet?
 3        A.     August of 2015.  The short answer is
 4   that a candidate has been pre vetted by the
 5   chair and Authority prior to my arrival, and it
 6   was decided this professional would be better
 7   suited to manage OPMOM in its standard role and
 8   it was decided to remove Sibyl Colon from that
 9   position.
10        Q.     Who decided that?
11        A.     The chair and myself.
12        Q.     What did you and the chair use as a
13   basis to remove Ms. Colon from her position as
14   director?
15                   MS. LIPPMAN:  Objection.
16        A.     The interview process discussed
17   reference checking --
18        Q.     Whose interview process?
19        A.     The NYCHA interview process.
20        Q.     And my question to you is what do you
21   mean by the interview process?
22        A.     Anyone being hired by NYCHA would go
23   through a process in which they would meet with
24   other professionals and be asked questions and
25   to decide if they should be hired or not.
```

```
 1                        KELLY
 2        Q.    Did you interview Sibyl Colon?
 3        A.    No.
 4        Q.    Do you know who interviewed Sibyl
 5   Colon?
 6        A.    No, I do not.
 7        Q.    When you say, the interview process,
 8   are you referring to the interview process of
 9   Sibyl Colon?
10        A.    No, I'm not.
11        Q.    Whose interview process are you
12   referring to?
13        A.    Janet Abraham.
14        Q.    Talk to me about the interview
15   process of Janet Abraham.
16              MS. LIPPMAN:   Objection.
17        A.    She was first interviewed in November
18   and December of 2014 by then General Manager
19   Cecil House, Chief Administrator Officer Natalie
20   Rivers and the Chair Shola Olatoye; that's when
21   she was first interviewed.   In July, August of
22   2015 she was brought back in and interviewed
23   with myself and the chair and with the chief of
24   staff to the deputy mayor of New York City and
25   that's what was the interview process.   So it
```

```
 1                       KELLY
 2    was a two-prong process; once in late 2014 and
 3    again in the summer of 2015.  It was intended,
 4    from my understanding, she was the first choice
 5    to assume that position long before I got there.
 6          Q.    Do you know why the negotiation to
 7    bring her in was not consummated?
 8          A.    No.  Anecdotally, I heard it had to
 9    do with salary.  I wasn't part of that.
10          Q.    Do you know if she was given the
11    salary that she wanted when she started in
12    August of 2015?
13          A.    I can't recall.  I know she did
14    accept the offer, though, at the salary that was
15    offered.
16          Q.    Did you speak with, did you ever
17    speak with Shola Olatoye about the performance
18    of OPMOM at any time in 2015?
19          A.    I met with her regularly and spoke
20    with her on almost all operational topics.
21          Q.    Did she have an opinion of how she
22    believed OPMOM was progressing?
23          A.    I don't understand the question.
24          Q.    Did she ever express to you an
25    opinion as to how she believed OPMOM was
```

1                    KELLY

2    and I'm good, but I'm not selfish.  Off the

3    record.

4        (A discussion was held off the record.)

5        Q.    After reviewing the fact sheet, is

6    there anything you want to add?

7        A.    As I stated earlier, the second

8    bullet realtime repairs reflects one of the

9    tools we used for dramatically decreasing the

10   average service levels of 5.5, not only with

11   OPMOM, but the entire portfolio.  It is

12   interesting that this bullet actually explains

13   what I was trying to explain a minute ago.  By

14   having simple repairs such as minor plumbing,

15   smoke detectors, and window guards being done at

16   the time of inspection.  So this actually sort

17   of reinforces the reasoning why there was

18   dramatic decreases in the service levels.

19       Q.    That was a good thing; correct?

20       A.    All of these are good things.

21       Q.    Good OPMOM thing; right?

22       A.    Yes, and it's not inconceivable that

23   using this different approach on top of the

24   additional resources that OPMOM had during this

25   2015 period, truly explains why there has been

```
1                     KELLY
2    such dramatic improvement and probably
3    relatively higher improvement compared to the
4    other sites because of additional manpower for
5    the 18 sites.  They had additional maintenance
6    workers specifically.
7         Q.    Do you think management had anything
8    to do with it?
9              MS. LIPPMAN:   Objection.
10        A.    Well, it is part of the balanced
11   scorecard and the property manager function was
12   divided into two categories; one, which was the
13   property management around servicing tenant's
14   administrative requirements including annual
15   recertification of incomes and change in family
16   composition and stuff.  The other was the
17   maintenance function, of which the simple
18   repairs maintenance function would be under.  So
19   management would be responsible as per the
20   dictates of OPMOM being the manager responsible
21   for all of the activities that happen on-site,
22   but there's a little nuance within that of who
23   has the responsibility for maintenance versus
24   property management.
25        Q.    Would it be safe to say if the
```

1                      KELLY

2      performance of a manager, this would be one of

3      many that would need to be looked at in a

4      balanced manner.

5          Q.    Did you look at that performance

6      indicator prior to removing Sibyl Colon as the

7      director of OPMOM?

8                  MS. LIPPMAN:   Objection.

9          A.    No.  It was not part of the decision

10     making.

11         Q.    What was part of your decision

12     making?

13         A.    That I saw a candidate that I knew

14     had the experience and the ability to take the

15     modeling, the 18 property modeling of OPMOM, and

16     produce a program that would move it to the

17     change of management for the entire portfolio;

18     of which, Janet Abraham successfully did.

19         Q.    Is she still there?

20         A.    No.  She took on the responsibilities

21     as the executive director of the Baltimore

22     Housing Commission.

23         Q.    When did she leave NYCHA?

24         A.    I don't know exactly when.

25         Q.    Do you know why she left NYCHA?

```
 1                       KELLY
 2              MS. LIPPMAN:  Objection.
 3       A.    She left to take the job of the
 4   executive director of the Baltimore Housing
 5   Commission.
 6       Q.    To your recollection, was she there
 7   even a year?
 8       A.    I don't recall.
 9              MS. LIPPMAN:  Off the record.
10       (A discussion was held off the record.)
11              MS. LIPPMAN:  I need a quick
12          break.
13       (A recess was taken at 1:20 until 1:27)
14              MS. LIPPMAN:  Mr. Kelly wants
15          to clarify a couple of his previous
16          answers.
17       Q.    That is subsequent to us taking a
18   break.  So I wasn't privy to, but I'm not sure
19   if he was advised by his counsel --
20              MS. LIPPMAN:  He can go ahead.
21              THE WITNESS:  For the record,
22          based on the last question you asked,
23          Janet was here for a couple of years,
24          at least, and on the earlier issue
25          about review of performance of
```

1                           KELLY

2           Ms. Colon, I checked with the human

3           resources department at NYCHA prior to

4           the decision to move on to the

5           decision by the chair to aggressively

6           recruit Janet Abraham that it was

7           noted that Sibyl was an at-will

8           employee and as such, it was within

9           our privileges to make that offer to

10          Janet at the time.

11     Q.   That was a conversation you had with

12  whom?

13     A.   With Kerry Jew.  She served as the

14  executive vice president for administration,

15  which included human resources.

16     Q.   Going back to a previous statement

17  you made; Janet Abraham was here for a couple of

18  years?

19     A.   Yes.

20     Q.   Do you recall when to when?

21     A.   No.

22     Q.   When did she start?

23     A.   Started in September 2015.

24     Q.   Is she there now?

25     A.   No.

```
1                         KELLY
2            directing the witness.
3                 MS. LIPPMAN:  Right, because
4            you are an expert on 30B6 witnesses.
5                 MR. FLORESTAL:  No, but you
6            are.
7                 MS. LIPPMAN:  Yes.  I am
8            actually.
9        Q.    Mr. Kelly, were you aware of a
10   meeting that occurred on July 30, 2015, at the
11   office at the Bronx office of the then City
12   Counsel Speaker Mellisa Mark-Viverito?
13                 MS. LIPPMAN:  Objection.
14       A.    I'm aware there was a meeting.  Yes,
15   sir.
16       Q.    How are you aware of that meeting?
17       A.    In discussions with my attorney --
18                 MS. LIPPMAN:  We don't want to
19            talk about discussions with your
20            attorney.  I will object to the
21            question to the extent it calls for
22            attorney client privilege.
23       A.    Something in the newspaper I remember
24   reading.
25       Q.    Were you present at the meeting?
```

1                         KELLY
2          A.    No.
3          Q.    When did OPMOM begin, Mr. Kelly?
4                MS. LIPPMAN:  Objection.
5          A.    I don't know exactly; it started as
6    part of Shola Olatoye's, then chair,
7    administration of the department, I believe.
8          Q.    How many properties made up OPMOM?
9          A.    18 properties to begin with.
10         Q.    Did you review the performance of all
11   18 properties?
12               MS. LIPPMAN:  Objection.
13         A.    I received regular balance
14   scorecards.  So in that -- but I do not recall
15   reviewing any individual performance of any
16   individual property manager.
17         Q.    Those balance scorecards, what did
18   they measure?
19         A.    It measured the various factors that
20   make up the responsibilities of property
21   managing.
22         Q.    And did the balance scorecards, did
23   they break the properties down into individual
24   properties?
25               MS. LIPPMAN:  Objection.

```
 1                          KELLY
 2        A.      (Perusing).
 3        Q.      First, I would like to ask, do you
 4   know what Plaintiff's Exhibit A is, sir?
 5        A.      It looks like a series of emails that
 6   go from Monday, July 27, 2015, through July 30,
 7   2015.
 8        Q.      Who are those emails from, each
 9   email.  You can tell me who each is from?
10        A.      The first is from Kilsys
11   Payamps-Roure.
12        Q.      Can you tell me who that is?
13        A.      She served as my chief of staff.
14   Chief of staff to the general manager.
15        Q.      Who was this email sent to?
16        A.      Juanita Acosta.
17        Q.      Who was that?
18        A.      My secretary.  Secretary to the
19   general manager.
20        Q.      What is this email saying?
21               MS. LIPPMAN:  Objection.
22        A.      From Kilsys it says (reading),
23   Juanita, can you call the person below tomorrow
24   and ask her to send a copy of her resume as soon
25   as possible; Janet Abraham.
```

```
 1                        KELLY
 2        Q.    Can you tell us about this email?
 3              MS. LIPPMAN:   Objection.
 4        A.    Looks like my chief of staff asked my
 5   secretary to reach out to Janet Abraham to ask
 6   her to send her a copy of her resume.
 7        Q.    Do you know why a chief of staff
 8   would be asking for Janet Abraham's resume at
 9   this point?
10        A.    In conversations with the chair
11   directly or the chair and myself, my chief of
12   staff was directed to get a copy of Janet's
13   resume and she in turn asked my secretary to
14   follow up.
15        Q.    I would like to fast forward to NYCHA
16   Bates Number 4936?
17        A.    Okay.
18        Q.    Specifically, I would like for you to
19   read the bottom email; last email from the
20   bottom?
21        A.    From Kilsys Payamps-Roure to James
22   Patchet.
23              MS. LIPPMAN:   To himself or do
24        you want him read it out loud?
25              THE WITNESS:   I'm sorry.   I
```

```
 1                        KELLY
 2           should have asked that question.
 3           Q.      Please read it out loud?
 4           A.      (Reading), James, attached is the
 5      resume of Janet Abraham, who we are considering
 6      for the position EVP of operations.  Would you
 7      like to meet with her before we make an official
 8      offer.
 9           Q.      Can you tell me what EVP of
10      operations stand for?
11           A.      Executive vice president.
12           Q.      Do you recall what the job
13      description for the executive vice president
14      was?
15           A.      Generally, it would report directly
16      to the general manager and would be responsible
17      for the property management function, as well as
18      the maintenance function, as well as the major
19      system function, as well as the OPMOM Program.
20           Q.      Do you have more?
21           A.      No.
22           Q.      Would you consider that a senior
23      operations -- at a senior operations level?
24           A.      Yes.
25           Q.      The director of OPMOM, who did the
```

```
 1                        KELLY
 2    director of OPMOM report to?
 3                 MS. LIPPMAN:  Objection.
 4         A.    Well, it initially reported to Brian
 5    Clarke, and then it eventually reported to the
 6    general manager.
 7         Q.    Okay.  I'm sorry.  It initially
 8    reported to Brian Clarke?
 9         A.    Yes.
10         Q.    And then what happened?
11         A.    And then the position was converted
12    to a senior vice president and as such, it
13    reported directly to the general manager.
14         Q.    When was it converted to a senior
15    vice president?
16         A.    I don't know the exact time.
17         Q.    So it was the director's position
18    that was converted to a senior vice president's
19    position?
20                 MS. LIPPMAN:  Objection.
21         A.    At the time of working with Janet
22    Abraham, she was brought on as a vice president
23    to serve as the director of OPMOM, and then per
24    design, she was promoted to senior vice
25    president.
```

1                    KELLY

2        Q.    So it's your testimony that she was

3    brought on as a vice president to serve as the

4    director of OPMOM; correct?

5        A.    As overseeing OPMOM.  To be clear

6    about the titles, she was brought in as a vice

7    president to oversee OPMOM.

8        Q.    Was that to replace Sibyl Colon?

9        A.    Yes.

10             MR. FLORESTAL:  I'm going to

11        take a break right here.

12             MS. LIPPMAN:  Okay.  How long

13        of a break do you want?

14             MR. FLORESTAL:  Let's take 15

15        minutes?

16             MS. LIPPMAN:  Okay.

17    (A recess was taken at 2:00 until 2:15).

18             MR. FLORESTAL:  I would like

19        something else marked.

20                (Section of transcript, 3 pages

21        was marked as Plaintiff's Exhibit B

22        for identification, as of this date.)

23        Q.    I'm handing you what has been marked

24    Plaintiff's Exhibit B.  It is a three-page

25    exhibit.  Please take a look at it and look up

**EXHIBIT 9**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK.
-----------------------------------------x
SIBYL COLON,

                    Plaintiff,

          -against-          Index No:
                             16-04540

THE CITY OF NEW YORK, NEW YORK CITY HOUSING
AUTHORITY, NEW YORK CITY COUNCIL SPEAKER
MELISSA MARK-VIVERIO, MICHAEL KELLY and
BRIAN CLARKE,
                    Defendants.
-----------------------------------------x
ALLISON WILLIAMS,
                    Plaintiffs,

          -against-          Index No:
                             16-CV-08193

THE CITY OF NEW YORK, NEW YORK CITY HOUSING
AUTHORITY, NEW YORK CITY COUNCIL SPEAKER
MELISSA MARK-VIVERIO, MICHAEL KELLY and
BRIAN CLARKE,

                    Defendants.
-----------------------------------------x
                    Deitz-Lexitas Wall Street
                    48 Wall Street, 10th Floor
                    New York, New York

                    September 23, 2019
                    11:25 A.M.

          (DEPOSITION of MICHAEL KELLY)

1

2                    September 23, 2019

                     11:25 A.M.

3

4          EXAMINATION BEFORE TRIAL of the

5   Defendant/Third-Party Defendant, MICHAEL KELLY,

6   taken by the Plaintiff, in the above-entitled

7   action, held at the above time and place,

8   pursuant to Notice, before Vanessa Walker, a

9   shorthand reporter, a Notary Public of the

10  State of New York.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2    A P P E A R A N C E S:
 3
 4    FLORESTAL LAW FIRM
                Attorneys for Plaintiff
 5              48 Wall Street
                New York, New York 10005
 6
      BY:    MARCEL FLORESTAL, ESQ.
 7
 8
 9    ZACHARY W. CARTER, ESQ
      CORPORATION COUNSEL
10    NEW YORK CITY LAW DEPARTMENT
                Attorneys for Defendant
11              100 Church Street
                New York, New York 10007
12
      BY:    J. CORBIN CARTER, ESQ.
13
14
15    GENERAL LITIGATION
                Attorneys for Defendant
16              NEW YORK CITY HOUSING AUTHORITY
                250 Broadway
17              New York, New York 10007
18    BY:    JANE E. LIPPMAN, ESQ.
19
20
21
22
23
24
25
```

```
 1                        M. KELLY
 2    Q.    And please state your address.
 3    A.    250 Broadway, New York, New York, 10008.
 4    Q.    Mr. Kelly, what did you review in order
 5    to prepare for this deposition?
 6    A.    I looked at some e-mails, and I talked
 7    to my attorney.
 8    Q.    Some e-mails from whom?
 9    A.    Some e-mail from various people
10    regarding the hiring of Janet Abrahams.
11    Q.    Besides your attorney, did you speak
12    with anybody to prepare?
13    A.    No.
14    Q.    We're going to go through some
15    background information again, Mr. Kelly.  How
16    long were you at NYCHA for?
17    A.    I was there in two different periods.
18    One with Mayor Bloomberg was 2009, 2012 and
19    again from 2015 to 2018.
20    Q.    Were you there in the same capacity?
21    A.    Yes, I was.
22    Q.    What capacity was that?
23    A.    I served as general manager of the New
24    York City Housing Authority.
25    Q.    So that we have a nice and clean record.
```

```
 1                    M. KELLY
 2   What years under Mayor Bloomberg and then
 3   subsequently what years were you there for?
 4   A.      I was there for 2009 through 2012 under
 5   Mayor Bloomberg, and 2015 through 2018 under
 6   Mayor DeBlasio.
 7   Q.      It was in the same capacity as general
 8   manager?
 9   A.      Correct.
10   Q.      Can you tell me what were your
11   responsibilities as general manager?
12   A.      I was responsible for the day-to-day
13   operations of the agency.
14   Q.      What does that mean exactly?
15   A.      Similar to a chief executive officer of
16   a corporation, I was responsible for the
17   management of sever major functions of the New
18   York City Housing Authority.
19   Q.      Like what?
20   A.      The information technology department,
21   the Section 8 program, the capital program,
22   finance and administration, capital projects
23   and operations.
24   Q.      I count approximately six different
25   departments; am I correct?
```

1                        M. KELLY

2    A.      Approximately.

3    Q.      Who answered to you directly?

4    A.      Six different individuals.

5    Q.      Do you recall their names?

6    A.      Many of them, yes.

7    Q.      What were they?

8    A.      Bob Barano (phonetic).  He's the

9    director of information technology.  Cathy

10   Pennington was the director of the Section 8

11   program.  Brian Clarke managed property

12   management.  Luis Ponce was responsible for the

13   special services -- operation of special

14   services.  Ray Rivera was responsible for

15   capital projects.  Those are some names off the

16   top of my head, sir.

17   Q.      So Brian Clarke and Luis Ponce both

18   reported to you, in addition to the other

19   individuals that you mentioned?

20   A.      Yes, sir.

21   Q.      Did anyone who reported directly to them

22   who are immediately under them report to you,

23   also?

24   A.      No.

25   Q.      So you only dealt with them and nobody

```
 1                          M. KELLY
 2    A.      According to the e-mail, I don't recall
 3    exactly.  I have no reason to believe it would
 4    not be on or about May 23, 2018.
 5    Q.      So you believe Octavia Hayward became
 6    the director of OPMOM at that time as indicated
 7    in the e-mail?
 8    A.      Yes, sir.
 9    Q.      Do you recall interacting with her as
10    the director of OPMOM?
11                   MS. LIPPMAN:  Objection.
12    A.      Yes.  And I would actually -- she would
13    be in the meetings, and she would -- I would
14    have discussions with whatever the programs
15    were and I would interact with her.
16    Q.      Do you have -- did you form a general
17    opinion of her as a director of OPMOM whether
18    or not she was effective?
19    A.      I believe so.
20    Q.      What was that opinion?
21    A.      That she was effective in her position.
22    Q.      What makes you say that?
23    A.      Janet Abrahams was the direct report.  I
24    didn't report with her directly, but the fact
25    that Janet Abrahams would report progress,
```

```
 1                    M. KELLY
 2   there was the assumption that the folks that
 3   work for her, particularly the person right
 4   under her, was doing a good job.
 5   Q.     Looking at the second page, I'm looking
 6   at the box that says salary and I see 73,144
 7   and next to it 78,879.  And I see a -- 177,733.
 8   Do you recall how much Octavia Hayward made in
 9   that position as director of OPMOM?
10                    MS. LIPPMAN:  Objection.
11   A.     No, I do not recall.
12   Q.     Would it be safe to say it would be
13   between 78,879 and 188,733?
14                    MS. LIPPMAN:  Objection.  Go
15         ahead.
16   A.     Based on this job posting, yes.
17   Q.     Have you seen this job posting before?
18   A.     No, I have not.
19   Q.     How are job postings generated in NYCHA?
20                    MS. LIPPMAN:  Objection.
21         Outside the scope of the 30B6 topics.
22         Go ahead.
23   A.     Through the human resources department.
24   Job posting would be administered through the
25   HR of NYCHA.
```

# ERRATA SHEET FOR THE DEPOSITION TRANSCRIPTS OF MICHAEL KELLY

RE: *Sibyl Colon v. The City of New York, et al.*, No. 16-CV-4540 (VSB)(OTW)
*Allison Williams v. The City of New York, et al.*, No. 16-CV-8193 (VSB)(OTW)

**DATES TAKEN: May 3, 2019 and July 3, 2019**

### MAY 3, 2019

| PAGE | LINE NUMBER | CORRECTION | REASON |
|------|-------------|------------|--------|
| 11 | 12-15 | "Chief of staff was Kilsys Pampore, um Brian Clarke, Lou Ponce, Bob Morano was in charge of information technology" should be "Chief of staff was Kilsys Payamps-Roure, Brian Clarke, Lou Ponce, Bob Morano was in charge of information technology, Kerri Jew, Richard Couch, Josephine Russo, Cathy Pennington, Natalie Rivers, Ray Ribeiro, Melanie Hart, and Victor Martinez." | Correction/Clarification/Typographical Error – Witness recalled additional direct reports. |

### JULY 3, 2019

| PAGE | LINE NUMBER | CORRECTION | REASON |
|------|-------------|------------|--------|
| 9 | 20 | "Balance Scorecard" should be "Balanced Scorecard" | Typographical Error |
| 47 | 24 | "I don't know exactly when" should be "Janet Abrahams left NYCHA in July 2017." | Correction – Witness recalled date after deposition |
| 48 | 8 | "I don't recall" should be "Janet Abrahams worked at NYCHA between September 2015 and July 2017." | Correction – Witness recalled dates after deposition |

| 50 | 6 | "I don't remember" should be, "Janet Abrahams left NYCHA in July 2017." | Correction – Witness recalled date after deposition |
| 51 | 9 | "Again, sir, I don't know" should be "Janet Abrahams left NYCHA in July 2017." | Correction – Witness recalled date after deposition |
| 60 | 11-13 | "And then the position was converted to a senior vice president and as such, it reported directly to the general manager" should be, "And then the position was converted to a senior vice president, and with this conversion Janet Abrahams was promoted to senior vice president, and as such, the position still reported directly to the general manager." | Clarification |
| 60 | 16 | "I don't know the exact time" should be "Janet Abrahams became Senior Vice President in October 2016." | Correction – Witness recalled date after deposition |

Michael Kelly

Subscribed and sworn to before me

this 3rd day of September, 2019

CHRISTINA M SALERNO
Notary Public, State of New York
Reg. No. 02SA6384142
Qualified in Kings County
Commission Expires 12/31/2022

2

# ERRATA SHEET FOR THE SEPTEMBER 23, 2019 DEPOSITION TRANSCRIPT OF MICHAEL KELLY

RE: *Sibyl Colon v. The City of New York, et al.*, No. 16-CV-4540 (VSB)(OTW)
   *Allison Williams v. The City of New York, et al.*, No. 16-CV-8193 (VSB)(OTW)

**DATE TAKEN: September 23, 2019**

| PAGE | LINE NUMBER | CORRECTION | REASON |
|---|---|---|---|
| 9 | 8 | "Bob Barano" should be "Bob Marano." | Typographical Error |
| 34 | 4 | "May 23, 2018" should be "May 23, 2016." | Typographical Error |
| 38 | 14-15 | "arrest of an employee" should be "arrest of an employee in May 2015." | Clarification |
| 39 | 20-23 | "The NYCHA appointed a vice president to manage OPMOM. I do not recall if there was an acting director immediately after Sibyl Colon's leaving" should be, "NYCHA appointed a vice president to manage OPMOM. NYCHA did not appoint an acting director of OPMOM to replace Sibyl Colon after she left." | Clarification/Correction – Witness recalled information after deposition |
| 40 | 4 | "I don't know" should be, "No, NYCHA did not appoint an acting director." | Correction – Witness recalled information after deposition |
| 45 | 18 | "I do not know at all. I do not know" should be, "I do not know at all. I do not know. But as I previously testified, Ms. Hayward does not state what she is the acting director of, and her signature block states that she is a Regional Manager of OPMOM." | Clarification |
| 49 | 9 | "No" should be "No. And this email does not state that Sibyl Colon had reached out to a local political office to try to remove Allison Williams. Instead, the email states, "'We | Clarification |

1

| | | reached out to the local political office where we had the meeting at and they did not provide any complaint documentation or specifics.'" | |
|---|---|---|---|
| 49 | 14 | "core sight" should be "foresight" | Typographical Error |
| 49 | 15 | "personal" should be "personnel" | Typographical Error |
| 52 | 7 | "He did not" should be, "He did not. The email you showed me does not state that Brian Clarke asked Sibyl Colon to reach out to a local political office to try to have Allison Williams removed as the Manager of Mill Brook Houses.  And Brian Clarke never told me that he asked Sibyl Colon to reach out to a local political office or anyone else to try to have Allison Williams removed as the Manager of Mill Brook Houses." | Clarification |
| 70 | 8-9 | "7/18/2018 posted date to 228" should be, "7/18/2017 posting date to 7/28" | Typographical Error |
| 73 | 3 | "7/18/2018" should be "7/2017." | Typographical Error |
| 74 | 16 | "It does not look like so based on the posting of this" should be, "It does not look like so based on the posting of this.  As I previously testified, Ms. Abrahams left NYCHA in July 2017, and this posting is dated July 18, 2017.  Also, Ms. Abrahams' promotion to the Senior Vice President title in October 2016 was an internal promotion and was not posted.  As I've already testified, Ms. Abrahams was hired as a Vice President and then promoted to Senior Vice President per design." | Clarification. |

| 78 | 7 | "Yes" should be, "Yes, Senior Vice President for Next Generation Operations was Janet Abrahams' title when she was promoted in 2016. As I've already testified, she was hired in 2015 as a Vice President." | Clarification |
|---|---|---|---|
| 80 | 10 | "Yes, it was" should be, "Yes, it was her salary when she was promoted to Senior Vice President in 2016." | Clarification |
| 95 | 21 | "Yes" should be, "Yes. Initially we thought we might hire Janet Abrahams at the EVP level. After meeting with her, it was clear to us that she would be a very valuable member of our team. We decided to hire her at the VP level with the full expectation that she would grow into a larger role, which she did." | Clarification |

Michael Kelly

Subscribed and sworn to before me

this 25 day of October , 2019

CHRISTINA M SALERNO
Notary Public, State of New York
Reg. No. 02SA6384142
Qualified in Kings County
Commission Expires 12/31/2022

3

Page 156
September 23, 2019

```
 1                          M. KELLY
 2              MS. LIPPMAN:  I have no further
 3      questions.
 4              MR. CARTER:  Nothing for me.
 5              MR. FLORESTAL:  I'm done.
 6              (Whereupon, the deposition
 7      concluded at 3:37 p.m.)
 8
 9         _____
           MICHAEL KELLY
10
        Signed and subscribed to
11      before me, this 23rd day
        of October  2019.
12
           _____
13      Notary Public
14
15              CHRISTINA M SALERNO
                Notary Public, State of New York
16              Reg. No. 02SA6384142
                Qualified in Kings County
17              Commission Expires 12/31/2022
18
19
20
21
22
23
24
25
```

DEITZ Court Reporting... A Lexitas Company
800-678-0166

EXHIBIT 10

UNITED STATES DISTRICT COURT                        1
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------ X
SIBYL COLON,

                              CV-16-04540(VSB)

                    Plaintiff,

              - against –

THE CITY OF NEW YORK, NEW YORK CITY HOUSING
AUTHORITY, NEW YORK CITY COUNCIL SPEAKER MELISSA
MARK-VIVERITO, MICHAEL KELLY, and BRIAN CLARKE,

                    Defendants.
------------------------------------------------ X
ALLISON WILLIAMS,

                    Plaintiff,

                              CV-16-08193(VSB)

              - against -

THE CITY OF NEW YORK, NEW YORK CITY HOUSING
AUTHORITY, NEW YORK CITY COUNCIL SPEAKER MELISSA
MARK-VIVERITO, MICHAEL KELLY, and BRIAN CLARKE,

                    Defendants.
------------------------------------------------ X

                    48 Wall Street
                    New York, New York 10005

                    June 13, 2019
                    10:36 a.m.


        EXAMINATION BEFORE TRIAL of the
Defendant, BRIAN CLARKE, pursuant to Order, before
Krystina Kornak, a Notary Public within and for the
State of New York.

```
 1   A P P E A R A N C E S:                          2
 2
     FLORESTAL LAW FIRM, PLLC
 3       Attorneys for Plaintiff
         48 Wall Street, Suite 11
 4       New York, New York 10005
         212-918-4416
 5
     BY:      MARCEL FLORESTAL, ESQ.
 6           LESLIE R. BENNETT, ESQ., of counsel
 7
     NEW YORK CITY HOUSING AUTHORITY
 8   GENERAL LITIGATION
         Attorneys for Defendants
 9       NEW YORK CITY HOUSING AUTHORITY
         MICHAEL KELLY, and BRIAN CLARKE
10       250 Broadway
         New York, New York 10007
11       212-776-5259
         Jane.lippman@nycha.nyc.gov
12
     BY:      JANE E. LIPPMAN, ESQ.
13
14   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF THE CORPORATION COUNSEL
15       Attorneys for Defendant
         MELISSA MARK-VIVERITO
16       100 Church Street
         New York, New York 10007
17       212-356-2078
         Jocarter@law.nyc.gov
18
     BY:      J. CORBIN CARTER, ESQ.
19
20
     ALSO PRESENT:
21
     SIBYL COLON, Plaintiff
22
23
24
25
```

1                      - BRIAN CLARKE -                    7

2          A.    Yes.

3          Q.    Who was that?

4          A.    My counsel.

5          Q.    Did you speak with anybody else besides

6    your counsel?

7          A.    No.

8          Q.    Now, Mr. Clarke, have you ever been

9    employed by NYCHA?

10         A.    Yes.

11         Q.    How long were you employed by NYCHA?

12         A.    22 years.

13         Q.    Can we go through your history with

14   NYCHA, starting from the first position up to the

15   last?

16         A.    Sure.  In June of 1996 I was recruited

17   to be the lead detection and abatement coordinator

18   for the Authority.  I held that position within the

19   technical service department for three years.  In

20   1999 I was promoted to the deputy director for the

21   technical service department.  I held that position

22   until, let's see, March of 2004 when I was promoted

23   to director of the technical services department.

24   In 2007 I was promoted to assistant deputy general

25   manager of operations for support services.  I held

1                    - BRIAN CLARKE -                    8

2    that position until -- I think it was 2011, 2012

3    when I was promoted to vice president of operations

4    for support services.  I was then promoted in -- I'm

5    trying to think of the date, whether it was late

6    2014, early 2015 to, you know, vice president of

7    operations for property management, and was

8    subsequently promoted to senior vice president of

9    operations for property management.

10           Q.    Okay.  It's a long history.

11           A.    Yeah.

12           Q.    Now you mentioned 2011 you were

13   promoted to VP?

14           A.    Yes.

15           Q.    Would that be considered a senior

16   position at NYCHA?

17                 MS. LIPPMAN:   Objection.

18                 You could answer.

19           A.    Yes.

20           Q.    From 2014 to 2015 you were senior VP?

21           A.    No.  I was senior VP -- I think it was

22   from like -- it was sometime in 2015 when I was

23   promoted to senior VP, you know, until 2017

24   November of 2017.

25           Q.    Would that be considered a senior

```
 1                      - BRIAN CLARKE -                    9
 2    executive position in NYCHA?
 3               MS. LIPPMAN:   Objection.
 4               Go ahead.
 5         A.    Yes.
 6         Q.    What does it mean to be in a senior
 7    executive position?  What sort of authority do you
 8    have as a senior executive at NYCHA?
 9               MS. LIPPMAN:   Objection.
10               Go ahead.
11         A.    So first you oversee, at least in my
12    case, multiple departments.  You certainly have
13    certain thresholds for, you know, approving, you
14    know -- signing off, I should say.  Signing off on
15    contracts, because different thresholds would then
16    require, you know, potentially board approval.
17    Things along those lines.  So there's, you know, the
18    financial piece.  Supervising multiple, you know,
19    departments.  You know, as a supervisor or senior
20    you are overseeing day-to-day operations, which has
21    multiple responsibilities in functions.  You make,
22    you know, recommendations regarding personnel
23    actions.  Also sign off on, you know, certain, you
24    know, procedures, you know, within the agency.
25    Those procedures may require other signatures
```

```
1                        - BRIAN CLARKE -              10
2     including, you know, mine, but generally speaking
3     those are some of the responsibilities.
4          Q.    Are there other levels above you as a
5     senior VP?
6          A.    Yes.
7          Q.    How many other levels are there above
8     you?
9          A.    Well, there's the general manager;
10    there's the Chair; there's the, you know, the board;
11    there's -- and that's generally the supervisory
12    hierarchy.
13         Q.    Do you answer to the board?
14               MS. LIPPMAN:   Objection.
15         A.    I answer to the general manager and
16    would have to make presentations to the board, but
17    when you -- I'm not clear on what you're trying to
18    ask when you say "answer to the board."
19         Q.    I think you've cleared it up for me.
20         A.    Okay.
21         Q.    Okay, thank you.
22               Are you familiar with the former
23    director of OPMOM, Sibyl Colon?
24         A.    Yes.
25         Q.    How are you familiar with Sibyl Colon?
```

```
1                    - BRIAN CLARKE -              11
2          A.    We worked together at the New York City
3     Housing Authority for a number of years.  She served
4     as the director of the OPMOM program for a few
5     months in 2015.
6          Q.    How many years did you with Sibyl Colon
7     for?
8          A.    I'm not -- I'm not -- well, can you
9     please clarify what you mean by "work"?
10         Q.    Maybe you could clarify.  You said
11    we've worked together, so I'm trying to understand
12    what you mean by, we worked together for a number of
13    years.
14         A.    So there's over 11,000 employees at the
15    time, you know, a different number throughout the
16    years of employees, so we worked together there.  I
17    worked -- my most close interaction with Sibyl was
18    when she was director of OPMOM, and then I had met
19    Sibyl once when she was a manager I think at one of
20    the Lower East Side developments, Riis houses.  I
21    can't remember what year.
22         Q.    Okay, that's my question.
23               At what point did Sibyl report to you?
24         A.    I think it was late May.
25         Q.    Of what year?
```

```
1                         - BRIAN CLARKE -              12
2          A.    Of 2015.  Late May, early June.
3          Q.    Prior to that did Sibyl ever report to
4     you directly?
5          A.    No.
6          Q.    Did Sibyl report to you indirectly
7     prior to that?
8                MS. LIPPMAN:  Objection.
9                Go ahead.
10         A.    Can you clarify?
11         Q.    Did you supervise Sibyl's -- at any
12    point prior to May of 2015 did you supervise Sibyl's
13    immediate supervisor?
14         A.    Yes.
15         Q.    Who was that?
16         A.    Oh, well --
17               THE WITNESS:  Can I explain?
18         A.    So there's different organizational
19    hierarchies.  There's different roles and
20    responsibilities at different levels, so as senior
21    VP of property management had, you know, directors
22    reporting to me.  Sibyl was an administrator in one
23    of the property management departments -- I think
24    it's Manhattan property management department -- and
25    she reported to a deputy director, who reported to a
```

```
1                    - BRIAN CLARKE -              15
2         A.    Yes.
3         Q.    In what position did Kevin Norman hold?
4         A.    He was director of the OPMOM program.
5         Q.    Prior to Sibyl Colon?
6         A.    Yes.
7         Q.    Did he report directly to you at the
8    time?
9         A.    No.
10        Q.    Who did he report to?
11        A.    Cecil House.  Can I just correct?
12        Q.    Sure.
13        A.    Cecil and Kevin left within the same
14   time frame.  There might have been a short time
15   where Kevin reported to me in the OPMOM program.
16        Q.    Who was Cecil House?
17        A.    Cecil House was a former general
18   manager of NYCHA.
19        Q.    So it's your testimony that Kevin
20   Norman reported to you at some point?
21              MS. LIPPMAN:  Objection.
22        A.    Can you clarify?
23        Q.    Oh, no.  Maybe you could clarify for
24   me, because your statement was he might have, and
25   I'm presuming you're referring to Kevin Norman.  He
```

```
 1                    - BRIAN CLARKE -                20
 2    Williams was the manager of Mill Brook houses?
 3            A.    No.
 4            Q.    Was she there before you became the
 5    SVP?
 6                  MS. LIPPMAN:   Objection.
 7            A.    I believe so.
 8            Q.    What was the mission of OPMOM?
 9                  MS. LIPPMAN:   Objection.
10            A.    So can you just clarify for me what you
11    mean by "mission"?
12            Q.    Well, did OPMOM have any written
13    material in which they had certain goals that they
14    wanted to meet?
15            A.    Yeah.  I mean, the reason why I asked
16    for the clarification, you know, of course is we
17    want to have a line to the overall agency's mission,
18    but specifically this program was really about
19    implementing asset management -- true asset
20    management based on the HUD structure, and -- I'm
21    just trying to think of the right term.  Based on
22    the principals, I should really say, of asset
23    management, but to really get down to it, it was --
24    what we really wanted to do was to, one, put the
25    resources and the responsibilities and the
```

```
1                    - BRIAN CLARKE -              21

2    accountability at the local level, at the property

3    management level, and reduce, as much as we could,

4    central office control.

5         Q.    Now you used the phrase, which is not

6    an everyday phrase, "asset management." Can you

7    sort of elaborate what you mean by that?

8         A.    So what I mean by that, and it's kind

9    of -- I'll be restating it a little bit, but what

10   HUD wants to do is really all the costs, you know,

11   for the program to be at the property level, and

12   with those costs, the expenses and the decisions

13   behind those expenses to -- for them to be made at

14   the property management level. HUD has a formula

15   when it comes down to finance and budgeting, but

16   they're looking for, you know, 77 -- you know,

17   70 percent direct, you know, expenses, you know, at

18   the property, and then the 30 percent for

19   administration, which could be supervisory and then

20   also towards, you know, central office.

21              MR. FLORESTAL:  Just to clarify, this

22         is a 30(B)(6) question, meaning, this is a

23         question posed to NYCHA.

24              MS. LIPPMAN:  What question?  You're

25         about to ask something?
```

```
1                         - BRIAN CLARKE -                25
2        Q.    Why did they leave?
3        A.    I believe they all had better
4   opportunities.  So the -- and then I was -- at the
5   same time I was promoted relatively at the same time
6   in this position.  And then when the general manager
7   left, the OPMOM program was moved to report to me,
8   so I had to fill three vacancies, and these are
9   three high-level positions at that time.
10       Q.    What year was that?
11       A.    That's 2015.
12       Q.    So in 2015 you were acting manager, is
13  what you're saying?
14       A.    Well the --
15             MS. LIPPMAN:  Objection.
16       A.    I wasn't called acting director of the
17  OPMOM program.
18       Q.    What was your title?
19       A.    I was senior vice president of
20  operations for property management, and they had
21  moved the program under me when everybody else left,
22  and so the -- so we did a posting.  The posting
23  covered the three -- you know, the three positions.
24  The -- and -- we also -- so we put the posting up.
25  I'm just trying to remember, I apologize, and
```

```
1                    - BRIAN CLARKE -              27
2              MS. LIPPMAN:   Objection.
3         A.    No.
4         Q.    Please clarify for me.  When you took
5    over the OPMOM program who did you take it over
6    from?
7         A.    So when the general manager left the
8    program was reporting to me.  It was moved to report
9    to me.  And the general manager left, I think it
10   was, you know, late March, early April.
11        Q.    Two thousand and --
12        A.    '15.  At that same time Alana Augusta
13   and Kevin Norman also left the agency and --
14        Q.    And who are they?
15             MS. LIPPMAN:   Were you finished?
16        A.    No, but that's all right.
17        Q.    If you're not finished, by all means,
18   please let me know.  This is not a dictatorship
19   here.
20        A.    Okay.  So we had these three vacancies.
21   I was relatively new to the position, and we had to
22   fill them, you know, as quickly as we could, so we
23   posted, and it was kind of like a multiple posting.
24        Q.    When you say "we had these three
25   vacancies," what were the vacancies?
```

```
 1                    - BRIAN CLARKE -              28
 2        A.    Director of Manhattan property
 3   management; director of the OPMOM; and director of
 4   mixed finance program.
 5        Q.    Got it.  Continue.
 6        A.    So we did an internal and external
 7   posting.
 8        Q.    For?
 9        A.    For the OPMOM and mixed finance, you
10   know, position, as well as the, you know, director
11   of Manhattan property management position.  So when
12   the posting went out we took, you know, candidates
13   for those positions, both internal and external.
14   And so what we did is we reviewed -- you know, we
15   reviewed their resumes, put together, you know, an
16   interview, you know, schedule, interviewed folks,
17   and we filled the Manhattan director position.
18        Q.    How long did it take to fill the
19   Manhattan --
20        A.    I don't -- I don't recall the time
21   frame, but it was, you know, that was the one we
22   filled -- the Manhattan property management director
23   was the one that we filled first.  Then I'm unclear
24   on the, you know, exact dates or how long it took,
25   but we next filled the mixed finance, you know,
```

```
 1                    - BRIAN CLARKE -                    29
 2    position; and the OPMOM position we did not fill
 3    from the internal and external, you know, posting.
 4         Q.    Now at this time that these positions
 5    were filled you were still acting as GM?
 6              MS. LIPPMAN:  Objection.
 7         A.    I was never acting as GM.
 8         Q.    Now when you say we reviewed resumes,
 9    who is "we"?
10         A.    So it's a combination of human
11    resources.  Then I would review them.  The panel for
12    whoever was on the panel would review them.  Had
13    folks -- you know, I would bounce resumes off staff,
14    you know, in my office.
15         Q.    You would review every single resume?
16         A.    No.  So the human resources would --
17    you know, they would review and there might be some
18    that wouldn't -- you know, that didn't meet the
19    minimum criteria, but there was -- and then whatever
20    resumes would be sent over to my office we would
21    review and figure out which candidates we would
22    interview.
23         Q.    How would that work?  Would human
24    resources review first or did that go in any
25    particular order?
```

```
 1                    - BRIAN CLARKE -              30
 2         A.    The human resource would do just kind
 3    of a quick preliminary, you know, review, and then
 4    they would come over to my office.
 5         Q.    So from human resources to your office?
 6         A.    Yes.
 7         Q.    From there would you review them?
 8         A.    Yes, I would.
 9         Q.    Then what would you do with the ones
10    that you approve?
11         A.    We would put together a list and
12    schedule interviews.
13         Q.    With who?  With the panel?
14         A.    Yeah, with the panel.
15         Q.    Now without giving us an exact date,
16    was the position for OPMOM the last position to be
17    filled?
18              MS. LIPPMAN:  Objection.
19         Q.    Was the position for director of OPMOM
20    the last position to be filled?
21         A.    I believe so.
22         Q.    So the director of the Manhattan
23    properties was filled before the director of OPMOM
24    position was filled, correct?
25         A.    Yes.
```

```
 1                    - BRIAN CLARKE -              31
 2         Q.    Director of mixed finance was filled
 3    before the position of director of OPMOM, correct?
 4         A.    They were relatively around the same
 5    time, but I believe that was before.
 6         Q.    Do you know why that was?
 7               MS. LIPPMAN:  Objection.
 8         Q.    Why did it take so long to fill the
 9    position of director of OPMOM?
10         A.    Well I mean the -- so we started, you
11    know, the posting in -- I guess it was March and we
12    filled the position by the end of, you know, May.
13         Q.    So you started the posting in
14    March of 2015?
15         A.    Yeah.  Yeah.
16         Q.    And the position was filled by when?
17         A.    End of May, early June.
18         Q.    How was the choice for the director of
19    OPMOM made?
20               MS. LIPPMAN:  Objection.
21               Go ahead.
22         A.    So we have a panel.  We would review
23    the -- you know, we would review the resumes.  Then
24    we would conduct interviews, then we would do a
25    short list and review those folks that would be on
```

```
 1                      - BRIAN CLARKE -                 32
 2    the short list for the positions, and then the
 3    panel -- each member of the panel would make a
 4    recommendation on who they felt was the best
 5    candidate for that position, and then once we had
 6    that candidate then we would make the recommendation
 7    to the general manager, and the general manager
 8    would meet with that person, and then ultimately
 9    would either agree with the recommendation or not.
10         Q.    How many candidates made it to the
11    short list, do you recall?
12         A.    I don't recall exactly.
13         Q.    How did the panel make its decision;
14    was it by majority rule?
15         A.    The -- generally speaking -- generally
16    speaking, yes.  Yeah.
17         Q.    Would it be safe to say that the
18    majority thought that Sibyl Colon was the proper fit
19    for the position of director of OPMOM?
20               MS. LIPPMAN:  Objection.
21         A.    Yes.
22         Q.    Your answer is yes?
23         A.    Yes.
24         Q.    When you hired Sibyl Colon for the
25    director of OPMOM did you feel that she would be
```

```
1                        - BRIAN CLARKE -              34
2     Sibyl interviewed very well for the position.  At
3     least in my opinion.
4          Q.   Well the panel voted, correct?
5          A.   Yeah.
6          Q.   Would it be safe to say in the panel's
7     opinion too, at least the majority of the panel's
8     opinion?
9          A.   Yes.
10              MR. FLORESTAL:  I'd like an exhibit
11         marked, please.
12              (Whereupon, an e-mail was marked as
13         Plaintiff's Exhibit 1 for identification.)
14         Q.   You've been handed what has been marked
15    as Plaintiff's Exhibit 1.  I'm just going to ask you
16    just to read it to yourself and please look up when
17    you're through.
18         A.   Okay.
19         Q.   Mr. Clarke, do you recall -- first of
20    all, can you tell us what this is?
21         A.   This is an e-mail and a resume from
22    Sibyl Colon.
23         Q.   Do you recall receiving this e-mail?
24         A.   You know, I don't recall the specifics
25    of it, but, you know, certainly acknowledge it.
```

```
 1                      - BRIAN CLARKE -                35
 2          Q.    Do you acknowledge that this e-mail was
 3   sent to you?
 4          A.    Yes.
 5          Q.    Do you acknowledge that you received
 6   this e-mail?
 7          A.    Yes.
 8          Q.    Do you acknowledge reading this e-mail?
 9          A.    Yes.  I just read it.
10          Q.    What was your opinion of Ms. Colon's
11   resume?
12          A.    Well, I don't recall my opinion
13   exactly, you know, back -- you know, back then, but,
14   you know, she certainly has been employed with NYCHA
15   for a long time, and had, you know, various
16   positions within the agency, and the -- in looking
17   at this now I thought she had actually been a
18   borough administrator longer than what this
19   reflects.
20          Q.    I'd like to focus your attention on a
21   few specific sections.  I'm looking at 2009, 2014
22   NYCHA special initiatives; do you see that line?
23          A.    Yes.
24          Q.    Do you know what that is?  What is
25   NYCHA special initiatives, do you know?
```

```
 1                      - BRIAN CLARKE -              41
 2    Verizon Wireless for GLTE snap on there so -- if you
 3    could explain to us exactly what you are saying in
 4    that e-mail?
 5         A.    I'm responding to the e-mail that's
 6    listed below from Brian Honan where he asked, "Who
 7    else will be attending the meeting with the
 8    manager?"
 9         Q.    What meeting is Brian Honan referring
10    to in this e-mail?
11         A.    It's the meeting at Council Member
12    Viverito's office.
13         Q.    Did the council member request to meet
14    with any particular individual for this meeting?
15               MS. LIPPMAN:  Objection.
16               MR. CARTER:  Objection.
17         A.    I don't recall the details of who was
18    requested to be there.
19         Q.    Is there anything that might help
20    refresh your recollection as to who was requested to
21    be at that meeting?
22         A.    The arrangements for the meeting are
23    handled through the intergovernmental office.
24    Obviously there looks like there was a request from
25    the Housing manager, and then the regional asset
```

```
 1                      - BRIAN CLARKE -              42
 2   manager for the area, the director for the area, and
 3   me are attending with the manager.  Exactly who was
 4   invited I don't remember all those details.
 5          Q.    Did you inquire as to why Speaker
 6   Mark-Viverito wanted to meet with you, the Housing
 7   manager, Sibyl Colon, and Mr. Artis?
 8                MS. LIPPMAN:  Objection.
 9                MR. CARTER:  Objection.
10          A.    Can you just repeat the question?  I'm
11   sorry.
12          Q.    Did you inquire with Mr. Honan as to
13   why the Speaker Mark-Viverito wanted to meet with
14   you, the Housing manager, Ms. Colon, and Mr. Artis?
15                MS. LIPPMAN:  Objection.
16                MR. CARTER:  Objection.
17          A.    I don't recall the specifics, but I'm
18   sure I would have.
19          Q.    Do you recall what he said?
20          A.    The .-- I don't recall exactly what he
21   said, but obviously there were, you know,
22   performance issues up at, you know, Mill Brook
23   houses.
24          Q.    What sort of performance issues did he
25   say?
```

```
1                    - BRIAN CLARKE -              43
2         A.    Like I said, I don't recall the exact
3   details or anything along those lines, but I know
4   there's customer service in the office as well as,
5   you know, maintenance issues.
6         Q.    When there are performance issues with
7   a particular development what is the process of
8   rectifying those issues?
9              MS. LIPPMAN:  Objection.
10        A.    Well it really depends on what those
11  issues.  I mean, you have to really kind of
12  understand what's the underlying issues, so I would
13  need more specifics behind that to really be able to
14  answer you properly.
15        Q.    We'll get to that.
16             MR. FLORESTAL:  Before that I'd like to
17        have another exhibit marked.
18             (Whereupon, two e-mails was marked as
19        Plaintiff's Exhibit 3 for identification.)
20        Q.    Please review what has been marked as
21  Plaintiff's Exhibit 3, and please look up when
22  you're through.
23        A.    Okay.
24        Q.    Can you please tell us what Plaintiff's
25  Exhibit 3 is?
```

```
 1                     - BRIAN CLARKE -              51
 2   Sometime in August of 2015.
 3        Q.    What occurred in August of 2015 that
 4   led to her being removed as the director of OPMOM?
 5             MS. LIPPMAN:  Objection.
 6        A.    I wasn't involved in the
 7   decision-making process for that, so I don't know
 8   the -- you know, the specifics.
 9        Q.    Who did Sibyl report to?
10        A.    Me.
11        Q.    So who made the decision to remove her
12   as the director of OPMOM?
13             MS. LIPPMAN:  Objection.
14        A.    It's my understanding that it was the
15   general manager and the Chair.
16        Q.    Who would those two individuals be?
17   The names.
18        A.    Michael Kelly as the general manager,
19   and Shola Olatoya.
20        Q.    Now when you say it was your
21   understanding, what do you mean by that?
22        A.    I was not involved in the
23   decision-making process.
24        Q.    No.  Just your understanding part, what
25   was -- what is your understanding based on?
```

```
 1                    - BRIAN CLARKE -                    52
 2              MS. LIPPMAN:  I'm going to object to
 3         the extent that the question calls for the
 4         discloser of attorney-client privilege
 5         information.
 6              So if you could answer the question
 7         without disclosing any conversation with
 8         counsel please do.
 9         A.    Can you repeat the question?
10              MR. FLORESTAL:  I'll just have her read
11         it.
12              (Whereupon, the requested portion of
13         the record was read back.)
14         A.    I was informed, you know, by the
15    general manager that Sibyl would be replaced.
16         Q.    What exactly did he say to you?
17         A.    The -- I don't recall the exact, you
18    know, conversation, but more or less that they had
19    recruited somebody who had successfully implemented
20    asset management at two other Housing Authorities,
21    and they had an opportunity to bring her on board,
22    and they wanted to take advantage of that
23    opportunity.
24         Q.    What was your response?
25         A.    I was surprised.
```

```
 1                    - BRIAN CLARKE -                53
 2          Q.    Why were you surprised?
 3          A.    Because I wasn't involved in the
 4    decision-making process, and wasn't aware that that
 5    was going on.
 6          Q.    Does the general manager normally make
 7    decisions without -- decisions about OPMOM without
 8    informing you?
 9                MS. LIPPMAN:  Objection.
10          A.    The -- I don't know.
11          Q.    At what point did the general manager
12    inform you he would remove Sibyl Colon?
13          A.    It was sometime in August.  I can't
14    recall the exact date.
15          Q.    Did he say who he would be filling the
16    position with?
17          A.    Yes.
18          Q.    Who was that?
19          A.    Janet Abrahams.
20          Q.    Did he say who Janet Abrahams was?
21                MS. LIPPMAN:  Objection.
22          A.    Yes.
23          Q.    What did he say?
24          A.    She was with Newark Housing Authority.
25    I forget -- I don't know her exact title, but she
```

```
 1                    - BRIAN CLARKE -              54
 2   ran operations there, and she had formally dealt in
 3   a similar position at the Chicago, you know, Housing
 4   Authority.
 5        Q.    So it's your testimony that Janet
 6   Abrahams was brought in to replace Sibyl Colon?
 7              MS. LIPPMAN:  Objection.
 8        A.    Yes.
 9              MR. FLORESTAL:  Can we take another
10        break?  I just want to take a five-minute
11        break.
12              MS. LIPPMAN:  Sure.  Five minutes is
13        fine.  If we could keep an eye on the time.
14        Mr. Kelly will be here at one.
15              (Whereupon, a lunch break was taken at
16        12:14 p.m.)
17              (Back on the record at 12:55 p.m.)
18              (Whereupon, the requested portion of
19        the record was read back.)
20        Q.    Just so we're clear, Mr. Clarke, is
21   that your position or is that NYCHA's position?
22              MS. LIPPMAN:  Objection.
23              I'm sorry, was that one of the topics?
24        Which number?
25              MR. BENNETT:  It's number three.
```

```
1                      - BRIAN CLARKE -                56
2                 (Back on the record.)
3                 (Whereupon, the requested portion of
4          the record was read back.)
5          A.     NYCHA's understanding.
6          Q.     What was your understanding?
7          A.     I wasn't -- like, I wasn't involved in
8     the decision process or had any input to it, but the
9     way that I understand it is that Janet had
10    successfully implemented two other challenging, you
11    know, Housing Authorities; and that she was
12    recruited, you know, by the agency to come in and
13    really implement asset management, you know, for the
14    agency.
15         Q.     What was your opinion of that decision?
16                MS. LIPPMAN:  Objection.
17         A.     Well the -- so, you know, a couple of
18    reactions, but one is I knew of Janet.  I've done a
19    tour of Newark Housing Authority a couple of years
20    prior, and was very impressed with her and the
21    person that ran the Section 8 program, so I knew --
22    I was very impressed with the work that she had done
23    there, so when Mr. Kelly informed me, you know, of
24    that -- you know, of the decision I was -- so I knew
25    of her.  I knew that they were getting somebody who
```

```
 1                     - BRIAN CLARKE -              57
 2      successfully had done this, you know, on the
 3      national stage.   Right?   You know, two very
 4      challenging Housing Authority agencies, but I was
 5      also surprised, because I hadn't been consulted or
 6      provided any input, wasn't aware that that was, you
 7      know, being done; but I also -- and I asked, like,
 8      if it was -- you know, if it was a final decision,
 9      done deal, if there's any discussion on it, and I
10      was informed, you know, it was a done -- you know, a
11      done deal that -- and, you know, I understood why.
12      Because they really -- the Chair's, you know, vision
13      for the program was really to manage things
14      differently than the way that it had been done.  She
15      wanted to really bring in somebody who had a really
16      different point of view, somebody who didn't have --
17      you know, wasn't brought up through, you know,
18      NYCHA, and, you know, frankly also someone like me
19      who had been with the agency for two decades, even
20      though I came from the outside, still was kind of
21      considered, you know, a long time NYCHA employee, so
22      the program was -- not only was Sibyl reassigned,
23      but the program was also moved out from under me.
24           Q.    Did Mr. Kelly explain to you what he
25      meant by wanting OPMOM to be managed differently?
```

```
 1                    - BRIAN CLARKE -                    58
 2        A.    What's that?
 3        Q.    Did Mr. Kelly explain to you what he
 4   meant by wanting --
 5        A.    I don't remember the details -- you
 6   know, all the details of the discussion, you know,
 7   per se, but, you know, it was a different management
 8   approach to the property rather than the traditional
 9   type of NYCHA, and so wanted to bring in somebody
10   who had different experiences, you know, working at
11   the public Housing Authorities, as well as, you
12   know, implementing the asset management program.
13        Q.    When you say you don't remember, did
14   you review any documentation prior to this
15   deposition to prepare?
16             MS. LIPPMAN:  When he says he doesn't
17        remember what?
18        Q.    Well, you just said you don't remember.
19        A.    You're talking about -- you asked me
20   about a conversation, and, you know, the details of
21   the conversation.  I don't understand word for word
22   what the -- I don't remember what the details were,
23   but -- and so that's what I was trying to explain to
24   you, but in general this is what was explained to
25   me.
```

```
 1                    - BRIAN CLARKE -                59
 2              MS. LIPPMAN:  I'm just going to object
 3         that actually the topics regarding Janet
 4         Abraham's hiring at NYCHA to lead the OPMOM
 5         is topic number seven, and that is Michael
 6         Kelly's topic.  And I have the e-mail
 7         actually that I sent you saying who would
 8         testify each topics.
 9              MR. FLORESTAL:  Off the record for a
10         minute.
11              (Whereupon, an off-the-record
12         discussion was held at this time.)
13              (Back on the record.)
14              (Whereupon, the requested portion of
15         the record was read back.)
16         Q.    So did Mr. Kelly explain to you what he
17    meant by he wanted to manage the program
18    differently?
19         A.    So just -- I thought I had answered
20    that.
21         Q.    I'm sorry, I'm just trying to be clear.
22    You might have.
23         A.    Like I said, I don't remember word for
24    word, but in general what I understood is that they
25    were looking for somebody who had experience
```

1                    - BRIAN CLARKE -                    60

2       working, you know, in an agency other than NYCHA,

3       and working at a, you know, public Housing

4       Authority, having successfully implemented, you

5       know, asset management.  Somebody who has a

6       different point of view; who wasn't, you know,

7       brought up through, you know, the -- who was brought

8       up the NYCHA ranks and how NYCHA manages properties.

9               Q.    Mr. Clarke, did the OPMOM program

10      utilize a system called SLA?

11              A.    Well the -- it's not a system.

12              Q.    Please explain what it is?

13              A.    So that's a statistic, that's a service

14      level average, is what it's called.

15              Q.    Please explain what that is exactly?

16              A.    So that's during any 30-day rolling

17      time period, depending upon what the measurable is,

18      what's open and what's closed during that 30-day

19      rolling time period.

20              Q.    Now when you say "measurable," please

21      elaborate?  What do you mean by "measurable"?

22              A.    So for example, the work orders.  You

23      know, so -- so it's a statistic used at any one

24      point in time, the performance of -- you know, it

25      could be an entity, could be an individual, could

1                    - BRIAN CLARKE -                    61
2    be, you know, a property, you know, a department,
3    etcetera.  It's a metric.  And for that
4    measurable -- so, for example, with service
5    requests, let's say, work orders, and we could talk
6    specifically about maintenance work orders, it's
7    during any 30-day time period the -- the age of the
8    open and closed work orders over that time period.
9            Q.    Do you recall how OPMOM was performing
10   prior to Ms. Colon becoming the director in terms of
11   the SLA measurement?
12            MS. LIPPMAN:  Objection.
13       A.    So the -- we were, you know -- the --
14   so it depends.  You know, like, the -- so you're
15   just talking specifically about SLA?
16       Q.    Yes.
17       A.    Because there were other measurables
18   for the overall program.
19            Q.    Please talk about the other measurables
20   before you answer that first question.
21       A.    Sure.  So one of the approaches is
22   what's called a balance scorecard, so the areas that
23   we were looking really to kind of focus performance
24   and improve in were, you know, finance.  One is, you
25   know, work orders.  Also customer service.  And the

```
 1                    - BRIAN CLARKE -              64
 2        Q.    Focusing your attention on the SLA.
 3   Can you give me an example of what would a bad SLA
 4   be, if you can?
 5               MS. LIPPMAN:   Objection.
 6        A.    So the goal was to have, you know, a
 7   seven-day service level, so, you know, anything
 8   above that is -- you know, you want to make sure you
 9   have a plan in place to try and drive it down and
10   understand what are the underlying issues that's
11   contributing to that.
12        Q.    Now when you say the goal was to have a
13   seven-day service level, is that specifically for
14   OPMOM?
15        A.    No, that was for the entire agency.
16        Q.    Do you recall what the OPMOM program's
17   SLA level was prior to Ms. Colon becoming the
18   director?
19               MS. LIPPMAN:   Objection.
20        A.    I don't know what the exact service
21   level was or which one, which measurable you're
22   talking about.
23        Q.    You mentioned that the goal was a
24   seven-day level for the SLA.  Was that your goal or
25   was that NYCHA's goal?
```

```
1                   - BRIAN CLARKE -               65
2        A.    That was the agency's goal.
3        Q.    Did you have a goal, you personally?
4        A.    I have lots of goals.
5        Q.    In reference to the SLA?
6        A.    Yeah.  What you want to do is you want
7  to have constant approval.
8        Q.    Now we're talking about you, you as a
9  director?
10       A.    I want constant improvement.  You know,
11 the agency is, you know, a challenged agency.
12 Right?  Ageing infrastructure, not enough, you know,
13 operating funds or capital funds to, you know,
14 fully, you know, support and manage the properties
15 the way they should, and so what we wanted to do was
16 try and prove from where we were, so we wanted to
17 try and get -- you know, a constant improvement is
18 what we wanted to do, so my goal was constantly to
19 improve.  The overall goal was seven days and I
20 wanted to make sure we were moving in that
21 direction.
22             MR. FLORESTAL:  We have another
23        exhibit.
24             (Whereupon, a series of e-mails was
25        marked as Plaintiff's Exhibit 4 for
```

```
 1                      - BRIAN CLARKE -                80
 2          Q.    It says, "Optimal property management
 3    operating model OPMOM, balance scorecard."  Do you
 4    know what that is referring to?
 5                MS. LIPPMAN:  Objection.
 6          A.    Yes.
 7          Q.    What is it referring to?
 8          A.    It's referring to, what we call, the
 9    balance scorecard for various metrics that we have
10    for measuring the performance of a property.
11          Q.    Is that indicating that it's on the
12    agenda?
13                MS. LIPPMAN:  Objection.
14          A.    Yes.
15          Q.    And below balance scorecard I see Fix
16    It Forward, my NYCHA app, real-time repairs.  Do you
17    know what that indicates?
18          A.    Yes, I do.  Just give me a moment to
19    try and recollect.
20                MS. LIPPMAN:  I'm just going to object
21          to that.
22          Q.    Take your time.
23          A.    Okay, yeah.  So Fix It Forward was one
24    of the initiatives that we had for trying to, you
25    know, complete entire repairs.  What I mean by that
```

1                       - BRIAN CLARKE -                    81

2    is there's different types of repairs, depending

3    upon complexity.  Simple repairs only require a

4    maintenance worker.  More complex can require

5    multiple trades, and this is -- to the best of my

6    recollection this was -- Fix It Forward was an

7    attempt to try and complete the entire repair as

8    quickly as we can, because the first visit to a

9    service request for most of the work order types was

10   a maintenance worker, and they may go there and they

11   may be able to make a simple repair or it may

12   require skill trades, so the -- so this was an

13   attempt to try and get all those repairs in a

14   shorter amount of time.

15        Q.    How is that different from the balance

16   scorecard?

17             MS. LIPPMAN:   Objection.

18        A.    Well the balance scorecard is more or

19   less a metric report.  Fix It Forward was an

20   initiative to actually, you know, improve the, you

21   know, the work process.

22        Q.    So does the balance scorecard measure

23   performance in the Fix It Forward initiative?

24             MS. LIPPMAN:   Objection.

25        A.    No.

```
 1                    - BRIAN CLARKE -                83
 2    at 18 pilot developments are supported in building
 3    their own budgets and determining staffing needs
 4    with the goals of decreasing maintenance times and
 5    improving customer service."  And it lists Brooklyn,
 6    and it lists the Bronx, and Manhattan.  Under Bronx
 7    and Manhattan it has Mill Brook, Patterson, Mott
 8    Haven, Mitchel, Melrose, East River,
 9    Wilson/White/Metro North, Jefferson, Wagner, and
10    Lincoln.  And the Brooklyn it reads, Howard, Tilden,
11    Seth Low, Langston Hughes, Woodson, Unity Plaza, Van
12    Dyke, and Brownsville.  Effective September 28, 2015
13    Janet Abrahams has been appointed as the new vice
14    president for operations overseeing OPMOM.
15              My first question is:  Did the OPMOM
16    program have any Brooklyn properties --
17              MS. LIPPMAN:  Objection.
18         Q.   In --
19              MR. FLORESTAL:  Can I finish my
20         question, please.
21         Q.   Did the OPMOM program have any Brooklyn
22    properties under Sibyl Colon?
23              MS. LIPPMAN:  Objection.
24         A.   Yes.
25         Q.   It did.  Which Brooklyn properties did
```

1                    - BRIAN CLARKE -                    84

2    it have?

3         A.    So as the director, you know, all the

4    properties are under her supervision, you know,

5    under her leadership, so there's regional asset

6    managers who have, you know, different areas, so

7    there was a regional asset manager for Brooklyn,

8    there was one for the Bronx, and there was one for

9    Manhattan.

10         Q.    Do you recall the properties that were

11    under OPMOM while Sibyl Colon was the director?

12              MS. LIPPMAN:   Objection.

13         A.    Yes.

14         Q.    What were they?

15         A.    Well this is the list right here.

16         Q.    All of them?

17         A.    Yeah.  I mean, some of these are

18    consolidated, so they have some smaller developments

19    associated with them, but don't have a management

20    office, but these are really where the management

21    offices are and what we consider to be, you know,

22    the properties per se.

23         Q.    So looking at these properties does the

24    SLA metric take into account all the properties as a

25    whole or does it distinguish between properties?

1                    - BRIAN CLARKE -                88

2    21.5 days in January 2015 to 7.5 days in August

3    2015." So it's actually looking from January to

4    August; am I correct?

5              MS. LIPPMAN:   Objection.

6         A.    What they did is they looked at it

7    month to month.  Like I said, it's a high-level

8    summary, so they're not putting all the statistics

9    in there.  So as I said, certainly from what I'm

10   looking at here it looks like a positive indicator,

11   but I just want to put the caveat, it's always the

12   devil is in the details.  For example, if a property

13   was at 7.5 in August, but they were at five in July,

14   you know, I wouldn't necessarily say that's

15   positive.  But looking at this -- and as this report

16   and knowing how research presents information, I

17   would say this is positive.  I just want you to be

18   aware of that.

19        Q.    If a development was not performing up

20   to par would that not be reported in the report to

21   the board also?

22             MS. LIPPMAN:   Objection.

23        A.    This is a high-level summary

24   presentation, so it's not getting into the specifics

25   of each property, so this is just an overall

```
 1                      - BRIAN CLARKE -                    92

 2          Q.    It refers to the time period that it's

 3    indicating, correct?

 4                MS. LIPPMAN:  Objection.

 5          A.    You're going you need to explain.

 6          Q.    I'll point it out to you.

 7                MR. CARTER:  Off the record.

 8                (Whereupon, an off-the-record

 9          discussion was held at this time.)

10                (Back on the record.)

11          Q.    So the OPMOM program began in

12    January of 2015, correct?

13          A.    No.

14          Q.    When did it begin?

15          A.    Sometime in 2014.

16          Q.    I just want to refer you to the page

17    before that.  The page before the one you're on

18    right now.  Actually, at the very bottom it has an

19    11 at the bottom; do you see that?

20          A.    Page 11, yeah.

21          Q.    I'll just read it out loud.  It says,

22    "OPMOM launched in January 2015, local property

23    managers at 18 pilot developments are supported in

24    building their own budgets and determining staffing

25    needs with the goals of decreasing maintenance times
```

```
1                        - BRIAN CLARKE -              93
2    and improving customer service," correct?
3         A.    Yes, that's what it says.
4         Q.    So in essence this is indicating that
5    the OPMOM program was launched in January of 2015,
6    correct?
7              MS. LIPPMAN:  Objection.
8         A.    So, yes, it was launched into
9    operation, but there was preparation prior to that;
10   training for staff, putting together the project
11   plan, you know, for the program.  So it wasn't just
12   throwing in a light switch, there was a lot of
13   preparation that was put into the program.
14        Q.    I'm sorry if I was vague with my
15   question.  My question for you was when it began?
16             MS. LIPPMAN:  Objection.
17        A.    So you need to --
18        Q.    When did the OPMOM program begin?
19             MS. LIPPMAN:  Objection.
20        A.    So it began sometime in 2014.  Right?
21   As a -- you know, as a pilot program for, as I
22   explained before, introducing, you know,
23   implementing true, you know, asset management into
24   the agency, so there was a lot of preparation work
25   done prior to January.
```

```
1                    - BRIAN CLARKE -              94
2          Q.    Then is it your testimony that these
3    minutes to the board are in fact invalid?
4               MS. LIPPMAN:  Objection.
5          A.    No.  No, not at all.  All I'm saying --
6    if I could just get to the point.  You're saying --
7    you asked me when did the program begin.  So it
8    began in 2014, but it went to full-scale operation
9    where they are actually measuring performance in
10   January.  They wanted to kick it off in the
11   beginning of the year, but there was months, and
12   months, and months of preparation for the program;
13   training for staff, project plan.  You know.
14         Q.    So who was the director of OPMOM in
15   2014?
16         A.    So for a portion of it, it was Kevin
17   Norman.
18         Q.    What was his title?
19         A.    He was director of OPMOM.
20              MR. FLORESTAL:  Just for the record,
21         we'll request -- well, I'm sorry, off the
22         record.
23              (Whereupon, an off-the-record
24         discussion was held at this time.)
25              (Back on the record.)
```

```
 1                      - BRIAN CLARKE -              98
 2              MS. LIPPMAN:  Objection.
 3              MR. FLORESTAL:  Fair question.
 4         Q.   How are these statistics calculated?
 5    It's a fair question.  If you know?
 6         A.   You know, the statistics -- you know,
 7    these are all basically, you know, math calculations
 8    by the research department, so they're using
 9    information data that's in our systems, in our work
10    order system, in this case our Maximo system, to
11    provide statistical data on performance.
12         Q.   So a measurement from -- what sort of.
13    data would be used to measure apartment turnaround
14    time from January to August?
15              MS. LIPPMAN:  Objection.
16         Q.   If you know?
17         A.   So they're going to look at the date
18    that an apartment was vacant to the date that the
19    apartment was occupied.
20         Q.   Do they look at these days month by
21    month?
22              MS. LIPPMAN:  Objection.
23         A.   No.  The dates are calculated cross
24    months.
25         Q.   What does that mean?
```

```
 1                    - BRIAN CLARKE -              126
 2        Q.    The second one, "Manager engages
 3   resident leadership on key decisions"; do you see
 4   that?
 5        A.    Yes.
 6        Q.    Who is the manager -- do you know who
 7   the manager is that this goal is referring to?
 8        A.    Property manager.
 9        Q.    To your knowledge, did Ms. Colon meet
10   that goal?
11              MS. LIPPMAN:   Objection.
12        A.    I -- so -- I would say, no.
13        Q.    Why would you say no?
14        A.    Because she was there a relatively
15   short amount of time.  We had -- there were some
16   resident leadership that was engaged, had a very
17   good relationship with their property managers, and
18   there's others that weren't; and then also on top of
19   this, this was during the summertime, when it's
20   difficult to have -- you know, June, July, and
21   August, it's difficult to have well attended TA
22   meetings and getting meetings with the resident
23   leadership, so I know that there were some
24   properties that had good relationships, and then
25   others there were not; and as far as the key
```

1                    - BRIAN CLARKE -              127

2     decisions, I did receive a lot of complaints that

3     resident leaders felt that they were sold a bill of

4     goods.  That they were told that they were going to

5     be involved in key decisions and things like that,

6     and that didn't happen.

7          Q.    Now when you say you received a lot of

8     complaints, how were those complaints received?

9          A.    So they came in from the TA leaders

10    themselves.  Just to put it into context, you know,

11    this was during Sibyl's, you know, time there as

12    well as, you know, predating her as well, and even

13    for a little bit of time after that.

14         Q.    Were these complaints via e-mail?  How

15    were they transmitted to you?

16         A.    Mostly would be phone calls or at

17    meetings.  We would periodically meet with the TAs

18    from the properties, and that was the feedback.  You

19    know, there was some that was good, and some that

20    was not good.

21         Q.    Are there any documentary evidence of

22    these complaints?

23              MS. LIPPMAN:   Objection.

24         A.    I don't know.  I don't know.

25         Q.    Now when you say, "I don't know," are

```
1                    - BRIAN CLARKE -              128
2    you answering for yourself or are you answering on
3    behalf of NYCHA?
4               MS. LIPPMAN:   Objection.
5         A.    So I am answering on behalf of myself.
6    And then let me clarify.  I know that we had
7    resident surveys and things along those lines
8    through their research department on the program.  I
9    don't think -- I think that was really put in place
10   I think -- might have been after Sibyl.  I don't
11   know if it was during that time frame, but we would
12   get feedback that way, from how it overall was
13   performing.  From a -- that was one of the points.
14        Q.    Would those complaints be a factor in
15   her work performance?
16        A.    The complaints -- so you're talking
17   about a three-month period.  Right?  Where, you
18   know, you have 18 developments and, you know, to say
19   that the managers were engaged in key resident
20   leadership decisions, you know, certainly during her
21   time there that was not the case.  And as I said,
22   when we did meet with resident leaders there were
23   some that were really happy about the program and
24   were into it, and other folks that did not feel that
25   they were engaged and that things had improved, so
```

```
 1                    - BRIAN CLARKE -              129
 2   it was a mixed bag.
 3        Q.    I'd like to focus on NYCHA's position
 4   on this.  So my question to you is:  The complaints
 5   that you just testified to, did they reflect on her
 6   work performance?
 7             MS. LIPPMAN:  Objection.
 8             Which topic is this now?  I'm sorry,
 9        I'm lost.  Because you asked him NYCHA's
10        position.  I'm just looking at the topics.
11        Which one is it?  Which topic is that?
12             MR. FLORESTAL:  Work performance as
13        director of optimal management department.
14             MS. LIPPMAN:  Can I have the question
15        read back?
16             (Whereupon, the requested portion of
17        the record was read back.)
18             MS. LIPPMAN:  Okay, got it.
19        A.    So, yeah.  I mean, like, you know,
20   overall that's one of things that we're looking at,
21   is whether or not -- you know, resident engagement.
22   We were certainly trying to improve customer service
23   at the properties.  One of the things was resident
24   feedback, and also wanting to engage the residents
25   in, you know, key decisions about developments, and
```

```
1                       - BRIAN CLARKE -              130
2     that certainly didn't happen, you know, during
3     Sibyl's time there.  As I said, it was three months.
4     The program was early on rolling out, and it was one
5     of the criticisms of the program that I did hear
6     from resident leadership.
7          Q.    Which resident leadership did you hear
8     that from?
9          A.    Let me see if I can remember.  I can't
10    remember the names of folks.
11         Q.    Do you remember the developments?
12         A.    Well Mill Brook.
13         Q.    Mill Brook?
14         A.    Yeah.
15         Q.    Let's talk about Mill Brook.
16               MS. LIPPMAN:  Do you want him to finish
17         his answer?
18         A.    I was actually trying to recollect
19    which ones we heard from.
20         Q.    Okay.
21         A.    I know Lincoln houses.  If I could look
22    at the list, maybe that will help me.
23         Q.    Sure.
24        'A.    East River, yeah.  I mean, like I said,
25    I can't remember the specifics.  Mitchel.  I mean, I
```

```
 1                      - BRIAN CLARKE -                131

 2     know like most of the Bronx and many of the

 3     Manhattan were not happy, and I think Tilden, I

 4     think Seth Low.

 5          Q.    Just to make things easier on you, as

 6     you go through the list and you're recollecting

 7     please articulate what you're recollecting, so we

 8     could go back to -- well, let's go with Seth Low.

 9     What do you recollect --

10          A.    I'm telling you in generalities, that

11     overall that piece of being engaged in key decisions

12     at the property did not feel like they were, you

13     know, getting that.  That the resident engagement

14     piece was -- it was one of the criticisms of the

15     program certainly early on.

16          Q.    What do you mean by "early on"?  How

17     early on?

18          A.    I would say after the, you know, first

19     few months, after the first year, you know, there

20     were some certainly complaints about that.

21          Q.    When did Sibyl Colon --

22          A.    And there were complaints during her

23     time, yeah.  During June, July, and August.  But as

24     I said, that's a more difficult time for resident

25     engagement, because of, you know, kids, people are
```

```
 1                    - BRIAN CLARKE -              132
 2    away.
 3               MR. FLORESTAL:  Do we need a break?
 4               (Whereupon, a short break was taken.)
 5               (Back on the record.)
 6          Q.   Mr. Clarke, I'd like to focus your
 7    attention on July 30, 2015.  Do you recall a meeting
 8    at the office of then Council Speaker Melissa
 9    Mark-Viverito?
10          A.   Yes.
11          Q.   What can you tell us about that
12    meeting?
13          A.   It was a meeting at the Council
14    Member's office that her office requested through
15    our department of intergovernmental relations,
16    because of issues at the Mill Brook houses.
17          Q.   Do you recall who requested the
18    meeting, a name?
19          A.   Brian Honan contacted me regarding the
20    meeting.
21          Q.   Were you physically at the meeting?
22          A.   No, I was not.
23          Q.   Did you attend the meeting?
24          A.   Via phone.  I attended the meeting via
25    phone.
```

```
 1                    - BRIAN CLARKE -                134
 2         Q.    Was Brian Honan at the meeting?
 3         A.    Yes.
 4         Q.    Was Gloria Cruz at the meeting?
 5         A.    I don't know.
 6         Q.    Was Marcela -- I'm sorry?
 7         A.    I don't know.  I don't recall.
 8         Q.    Was Marcela Medina at the meeting?
 9         A.    I don't know.  I don't recall.
10         Q.    Was Luis Ponce at the meeting?
11         A.    No.
12         Q.    Anybody else you could recall who was
13  at the meeting?
14         A.    No.
15         Q.    Do you recall what the issue was that
16  Council Speaker wanted to address at the meeting?
17              MS. LIPPMAN:  Objection.
18              MR. CARTER:  Objection.
19         A.    Can you repeat the question?
20         Q.    Do you recall why the Council Speaker
21  called the meeting?  Did she explain?
22              MS. LIPPMAN:  Objection.
23              MR. CARTER:  Objection.
24         A.    There were, you know, issues at the,
25  you know, Mill Brook property that she wanted to
```

```
 1                    - BRIAN CLARKE -              135
 2    discuss with the -- you know, discuss with the
 3    manager, you know, governmental; is, you know, the
 4    reason why the meeting was called.
 5          Q.    What issues did she state?
 6          A.    So there were a couple of issues.  One
 7    issue had to do, in particularly, with an attendance
 8    association meeting where tenants were not allowed
 9    to speak in the language they were most comfortable
10    speaking.  There were customer service issues with
11    the office, and there were also maintenance issues
12    with the property.
13          Q.    Can you elaborate a bit more about the
14    customer service issues?
15          A.    Sure.  That the management office
16    wasn't responsive to resident complaints.
17          Q.    What was the last issue you stated?
18          A.    Maintenance.  There were maintenance
19    complaints.
20          Q.    What were the issues regarding
21    maintenance complaints?
22          A.    I don't recall the specifics behind it,
23    but, you know, it's issues with apartments.
24          Q.    Going back to the first issue that you
25    mentioned.  I think you stated that residents were
```

```
 1                    - BRIAN CLARKE -              136
 2   not allowed to speak in the language that they felt
 3   comfortable?
 4        A.    Yeah.  Specifically at a tenant
 5   association meeting that was attended by the
 6   manager, she -- the way that I understood it, she
 7   told folks that not to speak to her or try to
 8   communicate with her in Spanish.  I think she said
 9   something like "no mira, mira, mira here," kind of
10   in a derogatory way, and an offensive manner.
11        Q.    Who said that?  Who said no mira, mira
12   here?
13        A.    The manager, Alison Williams.
14        Q.    Who did she say that to?  Do you recall
15   a name?
16        A.    I do not recall a name.
17        Q.    How long did that meeting last?
18        A.    I don't recall.
19        Q.    Did the Speaker request that you remove
20   the manager at the Mill Brook houses?
21        A.    No.
22        Q.    Did anyone at the meeting request that
23   you remove the manager of the Mill Brook houses?
24        A.    No.
25        Q.    Did the speaker ever say at the meeting
```

```
 1                    - BRIAN CLARKE -              137
 2   that I want a Spanish manager?
 3              MR. CARTER:  Objection.
 4        A.    No.
 5        Q.    Do you recall how the Mill Brook
 6   houses -- do you recall what their SLA score was up
 7   to at the time of the meeting?
 8        A.    No.
 9        Q.    Did you personally want to remove the
10   manager of the Mill Brook houses?
11              MS. LIPPMAN:  Objection.
12        A.    Can you please explain what you mean by
13   "remove"?
14        Q.    Did you want her removed as the manager
15   of the Mill Brook houses and replaced with somebody
16   else?
17              MS. LIPPMAN:  Objection.
18        A.    So just to be clear, I wanted to
19   transfer her out of the OPMOM program, so thereby,
20   you know, transferring her as the manager at Mill
21   Brook houses; from being manager at Mill Brook
22   houses to another location.
23        Q.    Why did you want to do that?
24        A.    Because Alison was -- I'm trying to use
25   the right, you know, correct professional term --
```

1                    - BRIAN CLARKE -                    138

2    was not a good manager.  Her performance, certainly

3    while I was involved with the program, was not good.

4    She was never prepared for meetings, she never had a

5    corrective action plan for whatever the issue was,

6    and frankly I just thought it was just unbelievable

7    that a property manager would ridicule tenants

8    because of their inability to speak English, and

9    violate a Mayoral order for language access for city

10   services at a public meeting.  That was the straw

11   that really kind of broke the camel's back for me.

12   This program, the optimal property management

13   program, was supposed to be the vanguard of how we

14   were going to change the way that we were going to

15   manage our properties.  Customer service, resident

16   engagement was a key part of that, and for a manager

17   to tell somebody who is limited English speaking

18   that, you know, don't communicate with me, you know,

19   at a public meeting, that was just it for me, and I

20   wanted to have her removed from the program and then

21   also disciplined for what she did at that meeting.

22        Q.    Was that also a violation of a NYCHA

23   policy?

24        A.    So the -- I don't recall -- I

25   believe -- well it's a violation of a Mayoral order

```
 1                    - BRIAN CLARKE -            139
 2   for language access.
 3        Q.    What order is that?
 4        A.    I think it's --
 5        Q.    We could look it up?
 6        A.    I think it's -- it was under Mayor
 7   Bloomberg.  The reason why I know this is because I
 8   was -- one of the things I was responsible for was
 9   putting in place a customer contact center, so the
10   call center, walk-in centers for NYCHA was one of
11   the projects that I had to implement.  Language
12   access was a key element of that, you know, for
13   customer service and being able to communicate with
14   our tenants, with the public, with applicants.
15   That's why I'm familiar with it.  And as I said,
16   Alison had multiple issues while manager of Mill
17   Brook, and that meeting there was really kind of, as
18   I said, the straw that broke the camel's back.
19        Q.    So what is the process of removing a
20   manager?
21             MS. LIPPMAN:  Objection.
22        A.    So managers and superintendents don't
23   have transfer rights, so it's at the discretion of
24   the Housing Authority to transfer managers.  So
25   provided that there's a vacancy available to move
```

```
 1                    - BRIAN CLARKE -              140
 2    somebody in certainly you could recommend, you know,
 3    transferring a manager -- you know, at least in my
 4    position I could recommend transferring a manager to
 5    another location.
 6           Q.    Who would you recommend transferring a
 7    manager to?  Who would you make that recommendation
 8    to?
 9           A.    I would make it to the general manager,
10    you know, as well as I would have discussions with
11    human resources.
12           Q.    Who would that be, who was the general
13    manager at the time?
14           A.    Michael Kelly.
15           Q.    And the human resources person, who
16    would that be?
17           A.    Well the director of human resources
18    was Kenya Salaudeen, but there's different folks in
19    human resources that are involved in those types of
20    transfers.  I can't remember the exact people that,
21    you know, execute it to put it in place.
22           Q.    Did you, in fact, make that request to
23    Michael Kelly and Kenya Salaudeen?
24           A.    So I discussed the recommendation with
25    Michael and I was going on vacation, and I asked
```

```
 1                  - BRIAN CLARKE -              141
 2    Sibyl to work with human resources to transfer
 3    Alison, you know, from the property.  Really what I
 4    wanted was her out of the program, and also to
 5    follow up with the discipline on her.
 6         Q.    When you discussed the recommendation
 7    with Michael what did he say?
 8         A.    You know, he was fine with it.  He was
 9    okay with it.  He didn't object.
10         Q.    When you discussed recommendation with
11    Kenya what did she say?
12         A.    So as I said, the initial discussions
13    with human resources were with Sibyl, and I'm trying
14    to recall whether or not I had a discussion with
15    Kenya regarding it.
16         Q.    You testified that you did, so are you
17    now testifying that you did not?
18         A.    I did not testify that I had a
19    conversation.
20              MR. FLORESTAL:  Oh, can you read that
21         back.
22         A.    You asked me who's involved in transfer
23    process, and so if I could clarify for you.  So it's
24    the human resources department and she's the
25    director of the department, but there's different
```

1                        - BRIAN CLARKE -              142

2      folks that, you know, are involved that are in the

3      department, who you would contact regarding

4      transfers, so you got to make sure that, one, that

5      there's a vacancy available, that you could -- a

6      budget vacancy that someone can move in.  You also

7      have to check to see if there is a civil service

8      list, because there could be -- you know, that

9      opening might be filled, there might have been a

10     candidate for that opening filled already, or you

11     need to see if somebody is coming back off of leave,

12     you know, to see if there is a spot to place the

13     manager.

14          Q.    Did you discuss with Sibyl about the

15     reason for the transfer?

16          A.    Yes.

17          Q.    What did you discuss with Sibyl?

18          A.    I explained that -- she knew well that

19     Alison was one our poorest performers, if not, our

20     poorest performers in the program, so I asked Sibyl

21     to contact human resources to -- you know, to get

22     the transfer in place to get that going.

23          Q.    Does the manager of Mill Brook report

24     to a RAM?

25          A.    Yes.

```
 1                    - BRIAN CLARKE -              145
 2   they have civil service status in place.  So the
 3   other piece about transferring, that wasn't about,
 4   you know, penalty, that was about the overall OPMOM
 5   program, and I just did not feel that she was
 6   suitable for the program.
 7        Q.    Was a verbal counseling given to
 8   Ms. Williams?
 9        A.    The -- I don't know.
10        Q.    Was a written counseling memo given to
11   Ms. Williams?
12        A.    No.
13        Q.    Do you know whether Ms. Williams had a
14   civil service title?
15        A.    Yes.
16        Q.    Do you recall what that was?
17        A.    Property manager.
18        Q.    How, if at all, did that prevent you
19   from removing her as the manager of Mill Brook?
20              MS. LIPPMAN:  Objection.
21        A.    I just want to clarify, it's
22   transferring her.
23        Q.    Transferring, moving.  I'm sorry.
24        A.    So property managers don't have
25   transfer rights, so transfers can be at the
```

```
 1                    - BRIAN CLARKE -                146
 2    discretion of management.
 3         Q.    Who would that be in this situation?
 4         A.    In this case I was recommending
 5    transfer of Ms. Williams.
 6         Q.    Why did that not occur?
 7         A.    It didn't occur because it was
 8    recommended to me not to transfer at this time.
 9         Q.    When you say "it," who's it?  Is it a
10    person?
11         A.    Law Department.
12         Q.    Who did you speak with?
13               MS. LIPPMAN:   Objection.
14               I'm going to instruct the witness not
15          to answer at this point, because the
16          disclosure of the information calls for
17          attorney-client privilege information.
18               MR. FLORESTAL:   She's correct.
19               What number are we up to?
20               MS. LIPPMAN:   Seven.
21               MR. FLORESTAL:   Please mark this.
22               (Whereupon, a document was marked as
23          Plaintiff's Exhibit 7 for identification.)
24               (Whereupon, an off-the-record
25          discussion was held at this time.)
```

# ERRATA SHEET FOR THE DEPOSITION TRANSCRIPTS OF
# BRIAN CLARKE

RE: *Sibyl Colon v. The City of New York, et al.*, No. 16-CV-4540 (VSB)(OTW)
   *Allison Williams v. The City of New York, et al.*, No. 16-CV-8193 (VSB)(OTW)

**DATES TAKEN: June 13, 2019 and July 1, 2019**

**June 13, 2019**

| PAGE | LINE NUMBER | CORRECTION | REASON |
|------|-------------|------------|--------|
| 12 | 14 | "Yes" should be, "Yes, although technically Sibyl reported to a Deputy Director, who reported to a Director who reported to me." | Clarification |
| 17 | 14 | Yes" should be, "Yes, Shinay Jones." | Clarification |
| 20 | 16-17 | "we want to have a line to the overall agency's mission" should be "we want our goals to align with the overall Agency mission." | Typographical Error |
| 21 | 16-19 | "they're looking for, you know, 77 – you know, 70 percent direct, you know, expenses, you know, at the property, and then the 30 percent for administration, which could be supervisory" should be "they're looking for 70 percent direct expenses at the property and 30 percent administrative costs" | Clarification |
| 29 | 2-4 | "and the OPMOM position we did not fill from the internal and external, you know, posting" should be "and the OPMOM position we did not fill from the internal and external applicants who responded to the posting." | Clarification |
| 35 | 18-19 | "I thought she had actually been a borough administrator longer than what this reflects" should be "I thought she had actually ben a borough administrator longer than what this reflects, the OPMOM | Clarification |

1

| | | Director position was a two-step promotion. I think the resume has her experience as an administrator at a little over a year." | |
|---|---|---|---|
| 41 | 24 | "request from" should be "request for" | Typographical Error |
| 43 | 4 | "there's customer service in the office" should be "there were customer services issues in the office" | Typographical Error |
| 43 | 11 | "issues" should be "issues are." | Typographical Error |
| 44 | 23 | "The intergovernmental" should be "Intergovernmental" | Typographical Error |
| 50 | 13 | "That's not my understanding" should be "That's not my understanding.  She was not fired." | Clarification |
| 53 | 13 | "It was sometime in August" should be "It was sometime in August 2015." | Clarification |
| 54 | 2 | "she had formally dealt in" should be "she had formally held or served in" | Typographical Error |
| 56 | 10 | "successfully implemented two other" should be "successfully implemented asset management in two other" | Clarification |
| 56 | 18 | "I've done" should be "I did" | Clarification |
| 58 | 21 | "I don't understand word for word" should be, "I don't remember word for word" | Clarification |
| 61 | 22 | "balance scorecard" should be "balanced scorecard" | Typographical Error |
| 65 | 7 | "constant approval" should be "constant improvement." | Typographical Error |

| 65 | 16 | "try and prove" should be "try and improve" | Typographical Error |
|---|---|---|---|
| 74 | 19 | "So there's a point in context" should be "So there's a point in context, I need a reference point." | Clarification |
| 81 | 12-14 | "so this was an attempt to try and get all those repairs in a shorter amount of time" should be "so this was an attempt to try and get all those repairs in a shorter amount of time. I assigned Fix It Forward to the OPMOM Properties, particularly those in the Bronx, to improve the SLAs for maintenance and skilled trades. It's one of the reasons that the Mott Haven SLA was reduced per Sibyl's emails." | Clarification |
| 81 | 25 | "No" should be "Yes, the Fix It Forward initiative helped improve the OPMOM service levels." | Correction, witness later recalled correct information |
| 85 | 6 | "When you're dealing with averages, right?" should be "When you're dealing with averages, right?" These reports are high level averages. The Brooklyn properties under Octavia Hayward really helped to improve the overall SLA for the OPMOM program; these properties were the best performers. Sibyl had the least involvement in these areas." | Clarification |
| 93 | 12 | "throwing in a light switch" should be "throwing on a light switch" | Typographical Error |
| 94 | 10 | "January" should be "January 2015." | Clarification |
| 100 | 22-23 | "So you would measure – days vacant? How many days an apartment is, you know, vacant?" should be "So you would measure – days vacant. How many days an apartment is, you know, vacant." | Typographical Error |

| 102 | 19 | "Yes" should be "Yes, but the apartment prep time includes only those apartments already prepped. There could be vacant apartments that were not yet prepped, and apartment prep time would not include those apartments." | Clarification |
| 135 | 7-8 | "in particularly, with an attendance association meeting" should be "in particular, with a tenants association meeting at Mill Brook Houses" | Typographical Error/Clarification |
| 138 | 3 | "involved with the program" should be "involved with the OPMOM program" | Clarification |

**JULY 1, 2019**

| PAGE | LINE NUMBER | CORRECTION | REASON |
|------|-------------|------------|--------|
| 6 | 11 | "balance score card" should be "balanced score card" | Typographical Error |
| 8 | 15 | "balance score card" should be "balanced score card" | Typographical Error |
| 8 | 20-21 | "Yeah, this is a balance scorecard for the OPMOM program" should be, "This is a balanced scorecard for the OPMOM program, it reflects OPMOM on a high level average; it does not reflect the performance of individual properties. The Brooklyn Properties managed by Octavia Hayward heavily influenced these numbers, and additional resources were assigned to the properties by me in order to try different management approaches and improve the performance of the program." | Clarification |
| 11 | 10 | "Yes" should be "Yes, it shows a high level average; doesn't reflect the performance of individual properties; | Clarification |

4

| | | and it was influenced heavily by the performance of the Brooklyn properties and the additional resources I assigned." | |
|---|---|---|---|
| 12 | 18 | "I think it says Priscilla" should be "I think it says Princella." | Typographical Error |
| 13 | 10 | "Priscilla" should be "Princella" | Typographical Error |
| 13 | 21-23 | "Would that surprise you yes, and I said yes and no, because she's a very nice person" should be "Would that surprise you yes, and I said yes and no, because she's a very nice person. Princella didn't want to make trouble for the Manager; also, Princella also had the approach that it's better to deal with the devil you know than the devil you don't." | Clarification |
| 16 | 12 | "residence" should be "residents" | Typographical Error |
| 18 | 21-24 | "Because the service – the customer contact center, at least when I was there, would get hundreds and thousands of repair requests" should be ""Because the service – the customer contact center, at least when I was there, would get hundreds and thousands of repair requests. One of the reasons we created the Customer Contact Center was to create a transparent and unbiased process for service requests." | Clarification |
| 33 | 16 | " – – for my properties regularly?" should be "I reviewed OPMOM SLAs regularly for the approximately 8 months I supervised the OPMOM program." | Clarification |
| 43 | 23 | "those numbers" should be "those numbers. And again, these are high level averages that do not reflect the performance of individual properties; | Clarification |

| | | the Brooklyn properties carried this statistic and my decision to assign additional resources helped the overall statistical performance of the property." | |
|---|---|---|---|
| 53 | 4 | "Coffman" should be "Kaufman, she married around this timeframe" | Typographical Error/Clarification |
| 54 | 21 | "evaluating" should be "evaluate" | Typographical Error |
| 59 | 11 | "late August" should be "August" | Correction |
| 68 | 12 | "Sibel" should be "Sybille" | Typographical Error |
| 72 | 16 | "Emerson" should be "Edmonson" | Typographical Error |
| 81 | 21 | "I don't know" should be "I don't know, but she did not comply with the Mayoral Order regarding language access." | Clarification |

Brian Clarke

Subscribed and sworn to before me

this _23_ day of September, 2019

MICHAEL SHAWN MEENAGHAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME4902301
Qualified in Kings County
Commission Expires November 19, 20__

6

**EXHIBIT 11**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x

SIBYL COLON,

      Plaintiff,

                    CV-16-04540(VSB)

      -against-

THE CITY OF NEW YORK, et al.,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -x

ALLISON WILLIAMS,

      Plaintiff,

                    CV-16-08193(VSB)

      -against-

THE CITY OF NEW YORK, et al.,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

        (Continued on the following page.)

1
2
3
4
5
6
7            CONTINUED DEPOSITION of THE DEFENDANT
8    NEW YORK CITY HOUSING AUTHORITY by BRIAN CLARKE,
9    taken by the Plaintiff in the First Action,
10   pursuant to Court Order, held at the offices of
11   offices of Florestal Law Firm, PLLC, 48 Wall
12   Street, 11th Floor, New York, New York on July 1,
13   2019, at 1:09 p.m., before Christopher Aspromonte,
14   a Shorthand Reporter and Notary Public for the
15   State of New York.
16
17
18
19
20
21
22
23
24
25

```
 1

 2    APPEARANCES:

 3

 4         FLORESTAL LAW FIRM, PLLC

 5         Attorneys for Plaintiff Sibyl Colon

 6              48 Wall Street, 11th Floor

 7              New York, New York  10005

 8         BY:  MARCEL FLORESTAL, ESQ.

                      -and-

 9              LESLIE K. BENNETT, ESQ.,

                         of Counsel

10

11         J. CORBIN CARTER, ESQ.

12         Assistant Corporation Counsel

13         Attorneys for Defendant Melissa Mark-Viverito

14              100 Church Street

15              New York, New York  10007

16

17         NEW YORK HOUSING AUTHORITY

18         Attorneys for Defendants NYCHA, Michael Kelly

19         and Witness Brian Clarke

20              250 Broadway

21              New York, New York 10007

22         BY:  JANE E. LIPPMAN, ESQ.

23

24    Also Present:

25         SIBYL COLON
```

```
 1                        B. CLARKE
 2    the -- the issues and concerns of the
 3    property would be escalated up, that's
 4    something a manager is having an issue with.
 5             Q.   So, the best case scenario I
 6    guess in regards -- with respect to what you
 7    just said, hopefully, so the best case
 8    scenario would be that a RAM would have
 9    knowledge of that nature?
10             MS. LIPPMAN:  Objection.
11             A.   This whole piece is confusing to
12    me.
13             Q.   What's confusing about it?
14             A.   First off, I don't know what
15    timeframe they are talking about, right.
16    And then the other is that the budgets, the
17    lines are set at the property.  And in this
18    case for the OPMOM properties, they had the
19    opportunity to identify the needs that they
20    had at the property and put into the budget
21    the number of positions they felt they
22    needed by -- by title.
23                  And so that's why -- you know
24    this talk of additional housing staff kind
25    of, you know, surprises me, you know, about
```

```
 1                      B. CLARKE
 2          that we can, you know, get that
 3          development up to par."
 4              Do you agree with that statement?
 5              MS. LIPPMAN:  Objection.
 6          Q.   That the development-- that the
 7   Mitchell -- the Millbrook Houses didn't have
 8   the proper staffing?
 9              MS. LIPPMAN:  Objection.
10          A.   I have no timeframe or reference
11   for this -- you know for this statement.
12              And as I explained to you
13   before, as I previously testified, the
14   budget, the staffing levels, the number of
15   positions, the housing manager had the
16   discretion to set up their property, you
17   know, for the number of positions that they
18   felt they needed, you know, for the
19   properties in OPMOM program.
20          Q.   Are you saying Mr. Artis is
21   lying?
22              MS. LIPPMAN:  Objection.
23          A.   I have no idea what he's talking
24   about here.  You asked me whether I agree or
25   disagree with the statement, and I am just
```

1                         B. CLARKE

2    given to the City Council, correct?

3                    MS. LIPPMAN:   Objection.

4         A.    Yes, I believe.

5         Q.    Mr. Clarke, in your opinion,

6    just summarize:   Repair times trending

7    downwards with average service level time of

8    5.5 days, would that be a good thing or a

9    bad thing for OPMOM?

10                   MS. LIPPMAN:   Objection.

11        A.    So, overall that would be a good

12   thing, which you need to understand is all

13   the different resources that go into that.

14                   For example, on this sheet here

15   real time repairs, one-call initiative was

16   launched at OPMOM locations, which these are

17   additional resources which helped overall

18   with the program.

19                   With OPMOM we were trying out

20   different things to overall improve the way

21   that we manage the properties.   So, you know

22   these things here also helped to drive down

23   those numbers.

24        Q.    Got it.   Thank you.   You need a

25   break?

```
 1                      B. CLARKE
 2        reporter.]
 3        A.    Yeah, so the -- you know, like I
 4   said I don't know the word-for-word
 5   specifics we discussed, but in general, for
 6   example, for the IG investigation, you know,
 7   because this was also a disciplinary action.
 8   We wanted Allison Williams to be disciplined
 9   as well.
10             I reached out -- I noted I spoke
11   to Sibyl about that, and she mentioned
12   something about an investigation into.  So I
13   contacted, because this is disciplinary --
14             Typically, with Inspector
15   General type of investigations, they won't
16   necessarily tell you exactly what they are
17   doing.
18             But because of the fact that we
19   wanted to discipline an employee, I reached
20   out to them to find out if there indeed was
21   an investigation that would prevent us from
22   disciplining.  And they told me that there
23   was not an investigation into, specifically,
24   you know, Ms. Williams.
25             And I know that I had follow-up
```

```
1                      B. CLARKE
2    discussions with Human Resources regarding
3    the transfer of Allison Williams.
4         Q.   So, are you stating that the IG
5    told you that there was not an investigation
6    with respect to Alison Williams?
7         A.   They were not investigating
8    Alison Williams.
9         Q.   Okay.  And do you recall the
10   date when you were told that?
11        A.   It's sometime in late August, I
12   don't know the specifics.
13        Q.   Of 2015?
14        A.   Yes.
15             MR. FLORESTAL:  Mark this.
16                 (Whereupon, Plaintiff's
17             Exhibit 14, a copy of an E-mail from
18             Sibyl Colon dated Tuesday August 25th
19             2015 was hereby marked for
20             identification, as of this date.)
21        Q.   Mr. Clarke, you've just been
22   handed what has been marked as Plaintiff's
23   number 14.  Please take a look at it and
24   look up when you are done.  Okay.
25             What is Plaintiff's Exhibit 14?
```

```
 1                      B. CLARKE
 2        question?
 3               MR. FLORESTAL:  Your client was
 4           looking down.  So, I thought he was
 5           refreshing his recollection.
 6           Q.   So, it states right here there
 7    was an active investigation, IG
 8    investigation being conducted on Allison
 9    Williams; is that correct?
10               MS. LIPPMAN:  Objection.
11           A.   It says:
12               "James was contacted by the IG's
13           office and was told they were
14           conducting an active investigation on
15           the manager, and to hold off on any
16           further actions."
17           Q.   Did you respond to this E-mail?
18           A.   I know that I met with the
19    Inspector General who told me that they
20    were -- there was not an investigation into
21    Ms. Williams.
22               MS. LIPPMAN:  Let the record
23           reflect that the deponent is
24           discussing information with -- he can
25           tell what he asked.  Go ahead.
```

                        B. CLARKE

1                       THE WITNESS:  Sure.  I mean the

2       IG was conducting an investigation of

3       tenants at the property.  It was not

4       of Ms. Williams.  And they had no

5       issues with a disciplinary action

6       against her.  And, in fact, it added

7       that they had less than a favorable

8       experience working with her.

9            Q.    I'd like you to -- I'll fast

10     forward.  The e-mail reads:

11                  "Brian:  Disciplinary actions

12          will be addressed this week.  Alfred

13          Rowlins, customer care plan, was

14          developed with the assistance of HR.

15          He was enrolled in a series of

16          courses that are offered by DCAS, it

17          has been paid for already.  One class

18          was in August and three more were

19          scheduled for September."

20                  Who was Alfred Rowlins?

21           A.    He was the manager at Wagner

22     Houses.

23           Q.    And why were classes -- why was

24     he enrolled in classes in these series of

```
 1                        B. CLARKE
 2   classes?
 3        A.    We had a -- a -- it was a
 4   horrible experience for one of our tenant
 5   families in the first floor apartment with
 6   sewer backups.  It was poorly handled at the
 7   local level, at the regional asset level and
 8   at the director level within the OPMOM
 9   program.
10             I directed, as part of the
11   follow-up to this, for a corrective action
12   plan to be put in place for the manager who
13   is Alfred Rowlins.
14        Q.    Fast forward to the second
15   paragraph:
16             "HR informed me that we need
17         more specific information in
18         reference to the cultural needs of
19         the residents in order to transfer
20         the manager at Millbrook."
21             Do you see that?
22        A.    Yes.
23        Q.    What did Ms. Colon mean in
24   reference to the cultural needs of the
25   residents in order to transfer the manager
```

```
 1                      B. CLARKE
 2         A.    Yes.
 3         Q.    Did you ever instruct Ms. Colon
 4    to inform Ms. Emerson that you wanted to
 5    remove Allison Williams from her position as
 6    the manager of Millbrook Houses?
 7         A.    Can you repeat the question,
 8    please.
 9         Q.    Did you ever instruct Ms. Colon
10    to speak to Marla Emerson about removing
11    Allison Williams as the manager of Millbrook
12    Houses?
13         A.    I told her to speak to Human
14    Resources.
15         Q.    Which Marla Emerson works for
16    Human Resources?
17         A.    Yes.
18         Q.    Do you agree with the testimony
19    that she gave when she was asked:
20              "Did she tell you why she needed
21              to remove Allison Williams from the
22              location?"
23              In which she responded:
24              "In reference to something that
25              happened at a meeting.  I can't
```

1                    B. CLARKE

2          Q.    That she was asked to remove

3    Allison Williams from her position in

4    reference to a meeting that took place?

5          A.    I don't know the conversation

6    that Sibyl had with Marla on this.  That's a

7    conversation that they had.

8          Q.    Well, she was posed a question

9    did she tell you why she needed to remove

10   Allison Williams from that location?

11         A.    Yeah, I don't know.  I wasn't

12   privy to that conversation.

13         Q.    What did you tell Sibyl?  Why

14   did you tell Sibyl to remove Allison

15   Williams from her position?

16         A.    I told Sibyl first off to

17   transfer.  Okay, two things.  One --

18         Q.    Transfer and remove.

19         A.    No transfer and remove are two

20   different things.  One, to transfer her and

21   take disciplinary action against Allison

22   Williams.  The transfer -- okay, is managers

23   do not have transfer rights.

24              So, at management's discretion

25   they can they can transfer employees.  I

```
 1                      B. CLARKE
 2    asked Sibyl to contact HR, because all
 3    transfers go through HR.  And the reason why
 4    is, one, we need to know whether or not
 5    there is an open location to move her to.
 6    There has to be a budget line.  Two, you
 7    know is somebody coming back from leave.
 8    All right, is there somebody that's
 9    imminently coming back from leave that may
10    cause a complication for us -- in order to
11    move it.
12              So whatever the -- I never ever
13    told Sibyl Colon to transfer Allison
14    Williams because she didn't speak Spanish.
15    That is an absolute -- that is not the
16    truth.  I transferred her for performance
17    issues.
18              She had performance issues
19    before she got to the OPMOM program.  She
20    went almost a year of training with that
21    program.  She was a poor performing manager.
22    Never came to a meeting prepared, you know,
23    that I -- that I ran.  And this was the
24    straw that broke the camel's back.
25         Q.   Got it.
```

# ERRATA SHEET FOR THE DEPOSITION TRANSCRIPTS OF
# BRIAN CLARKE

RE: *Sibyl Colon v. The City of New York, et al.*, No. 16-CV-4540 (VSB)(OTW)
    *Allison Williams v. The City of New York, et al.*, No. 16-CV-8193 (VSB)(OTW)

**DATES TAKEN: June 13, 2019 and July 1, 2019**

**June 13, 2019**

| PAGE | LINE NUMBER | CORRECTION | REASON |
|------|-------------|------------|--------|
| 12 | 14 | "Yes" should be, "Yes, although technically Sibyl reported to a Deputy Director, who reported to a Director who reported to me." | Clarification |
| 17 | 14 | Yes" should be, "Yes, Shinay Jones." | Clarification |
| 20 | 16-17 | "we want to have a line to the overall agency's mission" should be "we want our goals to align with the overall Agency mission." | Typographical Error |
| 21 | 16-19 | "they're looking for, you know, 77 – you know, 70 percent direct, you know, expenses, you know, at the property, and then the 30 percent for administration, which could be supervisory" should be "they're looking for 70 percent direct expenses at the property and 30 percent administrative costs" | Clarification |
| 29 | 2-4 | "and the OPMOM position we did not fill from the internal and external, you know, posting" should be "and the OPMOM position we did not fill from the internal and external applicants who responded to the posting." | Clarification |
| 35 | 18-19 | "I thought she had actually been a borough administrator longer than what this reflects" should be "I thought she had actually ben a borough administrator longer than what this reflects, the OPMOM | Clarification |

|  |  | Director position was a two-step promotion. I think the resume has her experience as an administrator at a little over a year." |  |
|---|---|---|---|
| 41 | 24 | "request from" should be "request for" | Typographical Error |
| 43 | 4 | "there's customer service in the office" should be "there were customer services issues in the office" | Typographical Error |
| 43 | 11 | "issues" should be "issues are." | Typographical Error |
| 44 | 23 | "The intergovernmental" should be "Intergovernmental" | Typographical Error |
| 50 | 13 | "That's not my understanding" should be "That's not my understanding. She was not fired." | Clarification |
| 53 | 13 | "It was sometime in August" should be "It was sometime in August 2015." | Clarification |
| 54 | 2 | "she had formally dealt in" should be "she had formally held or served in" | Typographical Error |
| 56 | 10 | "successfully implemented two other" should be "successfully implemented asset management in two other" | Clarification |
| 56 | 18 | "I've done" should be "I did" | Clarification |
| 58 | 21 | "I don't understand word for word" should be, "I don't remember word for word" | Clarification |
| 61 | 22 | "balance scorecard" should be "balanced scorecard" | Typographical Error |
| 65 | 7 | "constant approval" should be "constant improvement." | Typographical Error |

| 65 | 16 | "try and prove" should be "try and improve" | Typographical Error |
|---|---|---|---|
| 74 | 19 | "So there's a point in context" should be "So there's a point in context, I need a reference point." | Clarification |
| 81 | 12-14 | "so this was an attempt to try and get all those repairs in a shorter amount of time" should be "so this was an attempt to try and get all those repairs in a shorter amount of time. I assigned Fix It Forward to the OPMOM Properties, particularly those in the Bronx, to improve the SLAs for maintenance and skilled trades. It's one of the reasons that the Mott Haven SLA was reduced per Sibyl's emails." | Clarification |
| 81 | 25 | "No" should be "Yes, the Fix It Forward initiative helped improve the OPMOM service levels." | Correction, witness later recalled correct information |
| 85 | 6 | "When you're dealing with averages, right?" should be "When you're dealing with averages, right?" These reports are high level averages. The Brooklyn properties under Octavia Hayward really helped to improve the overall SLA for the OPMOM program; these properties were the best performers. Sibyl had the least involvement in these areas." | Clarification |
| 93 | 12 | "throwing in a light switch" should be "throwing on a light switch" | Typographical Error |
| 94 | 10 | "January" should be "January 2015." | Clarification |
| 100 | 22-23 | "So you would measure – days vacant? How many days an apartment is, you know, vacant?" should be "So you would measure – days vacant. How many days an apartment is, you know, vacant." | Typographical Error |

3

| 102 | 19 | "Yes" should be "Yes, but the apartment prep time includes only those apartments already prepped. There could be vacant apartments that were not yet prepped, and apartment prep time would not include those apartments." | Clarification |
| 135 | 7-8 | "in particularly, with an attendance association meeting" should be "in particular, with a tenants association meeting at Mill Brook Houses" | Typographical Error/Clarification |
| 138 | 3 | "involved with the program" should be "involved with the OPMOM program" | Clarification |

## JULY 1, 2019

| PAGE | LINE NUMBER | CORRECTION | REASON |
|------|-------------|------------|--------|
| 6 | 11 | "balance score card" should be "balanced score card" | Typographical Error |
| 8 | 15 | "balance score card" should be "balanced score card" | Typographical Error |
| 8 | 20-21 | "Yeah, this is a balance scorecard for the OPMOM program" should be, "This is a balanced scorecard for the OPMOM program, it reflects OPMOM on a high level average; it does not reflect the performance of individual properties. The Brooklyn Properties managed by Octavia Hayward heavily influenced these numbers, and additional resources were assigned to the properties by me in order to try different management approaches and improve the performance of the program." | Clarification |
| 11 | 10 | "Yes" should be "Yes, it shows a high level average; doesn't reflect the performance of individual properties; | Clarification |

| | | and it was influenced heavily by the performance of the Brooklyn properties and the additional resources I assigned." | |
|---|---|---|---|
| 12 | 18 | "I think it says Priscilla" should be "I think it says Princella." | Typographical Error |
| 13 | 10 | "Priscilla" should be "Princella" | Typographical Error |
| 13 | 21-23 | "Would that surprise you yes, and I said yes and no, because she's a very nice person" should be "Would that surprise you yes, and I said yes and no, because she's a very nice person. Princella didn't want to make trouble for the Manager; also, Princella also had the approach that it's better to deal with the devil you know than the devil you don't." | Clarification |
| 16 | 12 | "residence" should be "residents" | Typographical Error |
| 18 | 21-24 | "Because the service – the customer contact center, at least when I was there, would get hundreds and thousands of repair requests" should be ""Because the service – the customer contact center, at least when I was there, would get hundreds and thousands of repair requests. One of the reasons we created the Customer Contact Center was to create a transparent and unbiased process for service requests." | Clarification |
| 33 | 16 | " - - for my properties regularly?" should be "I reviewed OPMOM SLAs regularly for the approximately 8 months I supervised the OPMOM program." | Clarification |
| 43 | 23 | "those numbers" should be "those numbers. And again, these are high level averages that do not reflect the performance of individual properties; | Clarification |

| | | | |
|---|---|---|---|
| | | the Brooklyn properties carried this statistic and my decision to assign additional resources helped the overall statistical performance of the property." | |
| 53 | 4 | "Coffman" should be "Kaufman, she married around this timeframe" | Typographical Error/Clarification |
| 54 | 21 | "evaluating" should be "evaluate" | Typographical Error |
| 59 | 11 | "late August" should be "August" | Correction |
| 68 | 12 | "Sibel" should be "Sybille" | Typographical Error |
| 72 | 16 | "Emerson" should be "Edmonson" | Typographical Error |
| 81 | 21 | "I don't know" should be "I don't know, but she did not comply with the Mayoral Order regarding language access." | Clarification |

Brian Clarke

Subscribed and sworn to before me

this ٢ ٣ day of September, 2019

MICHAEL SHAWN MEENAGHAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ME4902301
Qualified in Kings County
Commission Expires November 19, 20__

6

**EXHIBIT 12**

Page 1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------x
    SIBYL COLON,
3                    Plaintiff,
4
5            -against-
6
7

    THE CITY OF NEW YORK, NEW YORK CITY HOUSING
8   AUTHORITY, NEW YORK CITY COUNCIL SPEAKER MELISSA
    MARK-VIVERITO, MICHAEL KELLY, and BRIAN CLARKE,
9                    Defendants.
10  ------------------------------------------------x
11                    48 Wall Street
12                    New York, New York
                      May 14, 2019
13                    12:43 p.m.
14
15            EXAMINATION BEFORE TRIAL of MELISSA
16  MARK-VIVERITO, a DEFENDANT in the above-entitled
17  action, held at the above time and place, pursuant
18  to Order, taken before SEAN SAFFERSON, a shorthand
19  reporter and Notary Public within and for the
20  State of New York.
21
22
23
24
25
```

Page 2

```
 1   A P P E A R A N C E S:
 2      FLORESTAL LAW FIRM PLLC
            Attorneys for Plaintiff
 3          SIBYL COLON and ALLISON WILLIAMS
            48 Wall Street, Suite 11
 4          New York, New York 10005
 5      BY: MARCEL FLORESTAL and LESLIE R. BENNETT,
             ESQS.
 6
 7

        NEW YORK CORPORATION COUNSEL
 8          Attorneys for Defendants
            THE CITY OF NEW YORK, COUNCIL SPEAKER
 9          MELISSA MARK-VIVERITO
            100 Church Street
10          New York, New York 10007
11      BY:J. CORBIN CARTER and PETER R. LATTANZIO,
             ESQS.
12
13

        NEW YORK CITY HOUSING AUTHORITY
14          Attorneys for Defendants
            NEW YORK CITY HOUSING AUTHORITY, MICHAEL
15          KELLY, BRIAN CLARKE
            250 Broadway
16          New York, New York 10007
17      BY:JANE E. LIPPMAN, ESQ.
18
19
20
21
22
23
24
25
```

Page 15

1                M. MARK-VIVERITO

2      A   Well, I'm remembering it now because of the

3   complaint; I would not have remembered otherwise.

4      Q   What do you recall?  What do you recall

5   about that meeting, if anything?

6      A   That the meeting was called by me, based on

7   complaints from constituents that their needs were

8   not being met.  My Bronx office is literally a

9   stone's throw away from Mill Brook Houses, which

10  is one of the larger public housing developments

11  in south Bronx portion of the district that I

12  represented.  So, very familiar, obviously, with

13  the constituents.  I was very hands-on, very

14  visible in my district.  And I got a lot of

15  constituents and residents from Mill Brook that

16  were coming physically to my office to ask for our

17  intervention, because they were complaining that a

18  Spanish speaking residents that their issues were

19  not being addressed by the management office at

20  Mill Brook.  So, the staff raised this as a

21  growing issue; and so, we kept -- the staff kept

22  asking NYCHA to address these concerns, and at

23  that point, no changes were happening.  So, I

24  requested a meeting with NYCHA.

25      Q   Do you recall who the participants were at

Page 16

1              M. MARK-VIVERITO

2    the meeting?

3       A   I don't recall.  I do know on my staff

4    side, Gloria Cruz was there; Princella Jamerson

5    was there. I really don't know how to spell

6    Princella, but I think it's P-R-I-N-C-E-L-L-A --

7    Princella.

8              MR. FLORESTAL:  I'm not sure either.

9              (Whereupon, a discussion was held off

10         the record.)

11             MR. CARTER:  Back on the record.

12      Q   So, Gloria Cruz, what exactly does Gloria

13   Cruz do for you?

14      A   She --

15             MR. CARTER:  Objection.

16      A   She was managing constituent services in

17   the Bronx office.

18      Q   What was her official title?

19      A   I believe it was constituent services

20   liason.

21      Q   And her responsibilities?

22      A   She basically managed the Bronx office.

23   She was there day-to-day, and any constituent

24   issues or concerns -- she would handle any

25   walk-ins, follow up with city agencies, go to

Page 17

1                  M. MARK-VIVERITO

2   community meetings.

3      Q   Besides Ms. Cruz and Princella Jamerson, do

4   you recall if Brian Clarke was at the meeting in

5   any way, shape, or form?

6      A   No.

7      Q   Do you recall if -- do you recall if James

8   Artis (phonetic) was at the meeting?

9      A   No.

10     Q   Do you recall if a Sibyl Colon was at the

11  meeting?

12     A   No.

13     Q   Do you recall if an Allison Williams was at

14  the meeting?

15     A   No.

16     Q   Do you recall if a Marcella (phonetic)

17  Medina was at the meeting?

18     A   No.

19     Q   Did -- did you say Camela (sic) Jamerson

20  was at the meeting?  Or did you not?  Princella

21  Jamerson.

22             MR. CARTER:   Objection.

23     A   Yes.

24     Q   Sorry.  Just want to get that straight.  Do

25  you recall for a Brian Honen (phonetic) was at the

1                    M. MARK-VIVERITO

2    meeting?

3        A   I mean, no.

4        Q   Besides Gloria Cruz, Ms. Cruz, did you have

5    any other person from your office at the meeting

6    besides Ms. Cruz?

7        A   Diana Yana (phonetic) was there.

8    A-Y-A-L-A-U -- I think Diana -- Diana.

9        Q   Was there another male individual from your

10   office there?

11       A   I don't know.

12       Q   And what was your purpose for initiating

13   this meeting, Council Speaker?

14           MR. CARTER:   Objection.

15       Q   What was your purpose there?

16       A   It was to find out from NYCHA what they

17   were doing to address the concerns of the

18   Spanish-speaking residents of Mill Brook houses.

19       Q   And did you address that issue with the

20   attendants of that meeting?

21       A   Of course.   I convened the meeting.

22       Q   And please walk me through that.   How did

23   you address that issue with the participants of

24   that meeting?

25       A   So, as indicated earlier, Gloria Cruz is

Page 19

```
 1                M. MARK-VIVERITO
 2   responsible for the office -- made it clear to me
 3   that there were many constituents,
 4   Spanish-speaking residents of Mill Brook, that
 5   were coming to us feeling that -- the concerns
 6   that they had, whether it was repairs that they
 7   needed or any other issues that were happen in
 8   track with the management office, they were not
 9   getting a Spanish-speaking -- not bilingual --
10   they were not feeling welcome in the management
11   office, and they were having a hard time
12   communicate. So, they would come to us, knowing
13   that our door is always open, knowing this that we
14   have fully bilingual staff.  And so, the meeting
15   with NYCHA was to say that it was unsustainable
16   for our office to be serving as a de facto
17   management office for NYCHA -- that there were
18   needs that residents that our Spanish-speaking
19   had, and what was NYCHA doing to address the needs
20   of those residents.
21        Q  And what was NYCHA's response to you?
22              MR. CARTER:   Objection.
23        A  I don't recall the exact interaction.  They
24   were there to listen to my concerns.
25        Q  You don't recall if they addressed your
```

1                M. MARK-VIVERITO

2    concerns?

3        A   I'm sure they did.   I can't recall exactly

4    what was said.

5        Q   Do you recall whether or not you made a

6    specific request to them?

7                MR. CARTER:   Objection.

8        A   My question was that there are needs that

9    the Spanish-speaking residents have that

10   management office is not addressing.   How are you

11   going to address it?   Clearly, there was a lack of

12   communication; there -- there needed to be

13   additional support.

14       Q   Does everybody at your meetings introduce

15   themselves first?

16               MR. CARTER:   Objection.

17               MS. LIPPMAN:   Objection.

18       Q   Did -- on July 30th, 2015, did the

19   individuals at your meeting introduce themselves

20   first?

21       A   Most probably.

22       Q   Do you recall what their titles were?

23       A   No.

24       Q   Council Speaker, are you familiar with

25   NYCHA's language bank?

Page 21

1                    M. MARK-VIVERITO

2       A   Not particularly.

3       Q   Did you do you recall anybody at the

4    meeting explaining to you what the language bank

5    is?

6       A   As a city legislator, it was clear that

7    city agencies did utilize Language Bank; but I

8    wasn't aware NYCHA did.

9       Q   But it's your testimony that city agencies

10   utilize language banks; right?

11      A   There was a familiarity that certain city

12   agencies.   I couldn't tell you specifically which

13   ones, but that there are city agencies that would

14   access language bank.

15      Q   Any reason -- do you think there's any

16   reason why NYCHA would not use a language bank?

17              MR. CARTER:   Objection.

18              MS. LIPPMAN:   Objection.

19      Q   Do you recall making the statement, "I want

20   a Spanish manager?"

21      A   No.

22      Q   Did you have a proposal as to how to

23   address the needs of the Spanish-speaking

24   constituents of the Mill Brook Houses?  Did you

25   come up with a proposal?

Page 22

M. MARK-VIVERITO

1

2     A   The meeting's purpose was to express our

3     experience and that we had attempted on multiple

4     occasions to have the management office address

5     the concerns that the residents were raising.

6     They were raising that they fell unwelcome to the

7     management office; they felt that they were made

8     to feel ashamed if they did not speak English.

9     And that was consistent.  It was not one or two

10    occurrences.  This is reason for my intervention;

11    it was becoming a very prominent feature, and as I

12    mentioned, we were becoming a de facto NYCHA

13    office for Mill Brook -- for the Spanish-speaking

14    residents. So, that was going to be unsustainable,

15    and as a representative, I had to advocate for my

16    constituents that were making those expressions.

17    So, the meeting was to share what our experiences

18    had been, and obviously, since the management

19    office was not addressing those concerns, that was

20    the reason that we needed to have an additional

21    meeting with supervisors; again, what was NYCHA

22    going to do once this concern was being addressed

23    about the lack of responsiveness?  What were they

24    going to do about it?

25    Q   Let's talk about that for a minute.  You

Page 23

1                    M. MARK-VIVERITO

2    mentioned your constituents stated that they were

3    made to feel unwelcome.  Can you explain what you

4    mean by that?  What exactly made them feel

5    unwelcome?

6               MR. CARTER:  Objection.

7               MR. FLORESTAL: If you know.

8        A   What they were communicating -- my

9    understanding from Gloria, is the fact that they

10   did not speak English.  So, there was an inability

11   to communicate.

12       Q   So, is it your testimony, because they did

13   not speak English, they felt unwelcome?  Or

14   somebody made them feel unwelcome because they did

15   not speak English?

16               MR. CARTER:  Objection.

17               MR. FLORESTAL: I'm trying to get some

18          clarity.

19       A   They were coming to us because the issue at

20   hand was not being addressed.

21       Q   Well, right now, I just want to speak about

22   the unwelcome part.

23       A   Right.

24       Q   The statement that you made.

25       A   The issue was not being addressed; that

Page 24

```
 1                M. MARK-VIVERITO
 2   would make them feel unwelcome.  They came to us.
 3      Q   Just for clarity, I think there are
 4   probably multiple issues there; just to clarify:
 5   you said they would come to the office to get
 6   certain issues addressed; correct?  That's your
 7   testimony, correct?
 8      A   Yes.
 9      Q   And in the process, they were made to feel
10   unwelcome; correct?
11            MR. CARTER:  Objection.
12            MS. LIPPMAN:  Objection.
13            MR. FLORESTAL: Well, if that's not
14        correct, then by all means, please state
15        so.
16            MR. CARTER:  Objection.
17      Q   I just want to get some clarity.  You said
18   they were made to feel unwelcome; I just want to
19   understand how they were made to feel unwelcome,
20   if you know.
21      A   They just expressed it because their issues
22   were not being addressed.
23      Q   Okay. So, because their issues were not
24   getting addressed, that made them feel unwelcome
25   is what you're saying?
```

Page 25

1                M. MARK-VIVERITO

2                MR. CARTER: Objection.

3                MR. FLORESTAL: Well, I'm just getting

4           some clarity. No need to object; this is

5           just for clarity.

6      Q  And "ashamed" -- you stated that they felt

7  ashamed of speaking Spanish, or that they didn't

8  speak English, rather; right?

9      A  Yes.

10     Q  Okay. I just, again, want to get some

11  clarity. How is it that they, if you know, were

12  made to feel ashamed for not speaking English?

13                MR. CARTER: Objection.

14     A  They would come to us, because again, there

15  was a language barrier; and there was not an

16  ability for them to communicate. So, they would

17  feel, right -- that the only option they had was

18  to come to our office. That what was was being

19  communicated. They did not feel welcome, they did

20  not feel that the issues they were raising were

21  getting addressed; they weren't getting the

22  attention that they merited and NYCHA had a

23  responsibility to address that. So, the meeting

24  was to ask them to address how were they going to

25  ensure that the residents who are Spanish-speaking

Page 26

1              M. MARK-VIVERITO

2   and Spanish-dominant were getting their issues and

3   concerns addressed.

4      Q   Okay.  So, do you recall if the manager of

5   the Mill Brook Houses was present at the meeting?

6   Not the name, but whether or not that title was

7   present.

8      A   I don't remember who was in the room on the

9   NYCHA side.

10     Q   Yeah.  But this is a meeting regarding Mill

11  Brook Houses; correct?

12     A   Yes.

13     Q   So, would it not be logical for the manager

14  of that development to be present?

15            MR. CARTER:  Objection.

16     A   You're asking for certainty?

17     Q   Do not --

18     A   I can't give you certainty.  You're asking

19  me if I knew whether that title was in the room.

20  I can't recall.

21     Q   Would it be safe to say you were trying to

22  effectuate some change at the meeting?

23     A   I wanted NYCHA -- yes.  I wanted NYCHA to

24  answer how they were going to address the concerns

25  that were being raised by constituents that I

Page 27

1                M. MARK-VIVERITO

2    represented.

3        Q   All right.  To effectuate the type of

4    change that you wanted, what types of people would

5    you meet?  What -- yeah.  What types of people

6    would have the authority to effectuate that

7    change, if you know?

8                MS. LIPPMAN:  Objection.

9                MR. CARTER:  Objection the.

10       Q   At the NYCHA side.

11       A   The purpose of the meeting, again, to raise

12   a concern that my office was experiencing -- was

13   to advocate on behalf of constituents that I

14   represented that felt that their needs were not

15   being addressed.  The issue -- the purpose of the

16   meeting was to say, "this has been our experience;

17   we've been trying to get these issues addressed;

18   they have been not been addressed.  What will

19   NYCHA do about it?" That was the purpose of the

20   meeting.  So, the meeting was to share the

21   experience, tell NYCHA there was a problem, and

22   for NYCHA to figure out how to address it.

23       Q   I understand that.  You said --

24       A   Exactly.

25       Q   I understand that.  I understand that

Page 28

```
 1              M. MARK-VIVERITO
 2   clearly.  But what I'm trying to understand is who
 3   you would be meeting with to effectuate that
 4   change that you were looking for.
 5              MR. CARTER:  Objection.
 6              MS. LIPPMAN:  Objection.
 7      A  NYCHA made the decision of who was going to
 8   be in the room; I don't know who that was.  I
 9   don't recall who that was.
10      Q  Who did you speak with at NYCHA to set this
11   meeting up?
12              MR. CARTER:  Objection.
13      A  My staff sets up the meeting.  I did not
14   make the call myself.
15              (Whereupon, the witness and her
16          attorney left the room.)
17      Q  Back on.  All right, Council Speaker.
18   Council Speaker, have you ever met with Michael
19   Kelly on any matters regarding NYCHA?
20      A  He was the general manager; I probably
21   spoke to him, yes.
22      Q  Have you ever spoken with Brian Clark on
23   any matters regarding NYCHA?
24      A  I don't remember who he is.
25      Q  Have you ever met with Shola Olatoye
```

Page 29

1                    M. MARK-VIVERITO

2    regarding any matters involving NYCHA?

3       A   Yes.

4                    THE WITNESS:  O-L-A-T-O-Y-E.

5       Q   And how frequently would you meet up with

6    him, Ms. Council Speaker?

7                    MR. CARTER:  Objection.

8                    MS. LIPPMAN:  Objection.

9                    MR. FLORESTAL: If you can recall.

10      A   Not often.

11      Q   My apologizes if I've already asked that

12   question, but do you recall anybody mentioning the

13   language bank to you at the July 30th, 2015

14   meeting?

15      A   No.

16                   MR. CARTER:  Objection.

17                   THE WITNESS:  Sorry.

18      Q   Ms. Council Speaker, did you ever refuse to

19   hire somebody because they were not the right

20   color?

21                   MS. LIPPMAN:  Objection.

22                   MR. CARTER:  Objection.

23      A   No.

24      Q   Did you ever hire somebody because they

25   were the right color?

Page 30

```
 1              M. MARK-VIVERITO
 2              MS. LIPPMAN:  Objection.
 3      A  No.
 4      Q  Would you agree that that would be
 5  prejudiced; correct?
 6              MR. CARTER: Objection.
 7      A  Clearly.
 8      Q  Did you ever refuse to hire somebody
 9  because they were not the right ethnicity?
10              MR. CARTER:  Objection.
11              MS. LIPPMAN:  Objection.
12      A  No.
13      Q  Did you ever hire somebody because they
14  were the right ethnicity?
15              MR. CARTER: Objection.
16              MS. LIPPMAN: Objection.
17      A  No.
18      Q  Once again, that would be prejudiced;
19  correct?
20              MR. CARTER: Objection.
21              MS. LIPPMAN: Objection.
22      A  Clearly.
23      Q  Do you agree that most African Americans do
24  not speak Spanish?  The majority of Americans do
25  not speak Spanish?
```

```
 1              M. MARK-VIVERITO
 2              MR. CARTER: Objection.
 3              MS. LIPPMAN: Objection.
 4      A   No.
 5      Q   That the majority of African Americans do
 6   speak Spanish?
 7              MR. CARTER: Objection.
 8              MS. LIPPMAN: Objection.
 9      Q   It's a question.  In your opinion, do you
10   think the majority of African Americans speak
11   Spanish?
12              MR. CARTER: Objection.
13              MS. LIPPMAN: Objection.
14      A   I don't make assumptions.
15      Q   Just an opinion.
16              MS. LIPPMAN:  Objection.
17      A   (No response given.)
18      Q   You don't know?  Or --
19              MR. CARTER:  Objection.
20      A   I haven't seen any data on that issue.
21      Q   Would you agree that the statement, "I want
22   a Spanish manager," would exclude people who don't
23   speak Spanish; correct?  Would you agree with that
24   statement?
25              MR. CARTER: Objection.
```

Page 32

1                    M. MARK-VIVERITO

2                    MS. LIPPMAN: Objection.

3     A   I would never use that term.

4     Q   I know.  But I'm just saying -- but would

5  would you agree that that statement, "I want a

6  Spanish manager," would exclude people who do not

7  speak Spanish?

8                    MR. CARTER: Objection.

9                    MS. LIPPMAN: Objection.

10    A   No.

11    Q   "I want a Spanish manager" would not

12  exclude people who do not speak Spanish?

13                   MR. CARTER: Objection.

14                   MS. LIPPMAN: Objection.

15    A   I'm not following the question.

16    Q   My question to you is: the statement, "I

17  want a Spanish manager," would that include people

18  who do not speak Spanish?

19                   MR. CARTER: Objection.

20                   MS. LIPPMAN: Objection.

21    A   Let me -- I do not -- I do not use that

22  term.

23    Q   I'm not saying you.  That statement --

24    A   When you say "a Spanish manager," it means

25  someone from Spain.

Page 33

1                    M. MARK-VIVERITO

2       Q   Someone from Spain?

3       A   Yes.

4       Q   "Spanish manager?"

5       A   Yes.

6       Q   Let's talk about that for a minute.  So, "I

7   want a Spanish manager," to you, means what?

8               MR. CARTER:  Objection.

9       A   A Spanish person, to me, is a person from

10  Spain.

11      Q   Is --

12      A   I would never use the term "Spanish person"

13  to reference myself or to reference a Latino or to

14  reference a African American -- a Latino or Puerto

15  Rican person.  That's not my terminology.

16      Q   What term would you use to reference a

17  Latino person?

18      A   Latino.

19      Q   What term would you use to reference a

20  Spanish-speaking person?

21              MR. CARTER:  Objection.

22      A   I said the constituents that were coming to

23  us were Spanish-speaking.  That's the way I've

24  always referenced it.  I've never indicated what

25  their background, race, or their ethnicity is.

Page 34

```
 1              M. MARK-VIVERITO
 2   Those that came to my office that were
 3   Spanish-dominant and Spanish-speaking, had
 4   concerns.  My questions to NYCHA in the meaning
 5   were constantly about Spanish-speaking,
 6   Spanish-dominant residents, what are you doing to
 7   address their concerns.
 8     Q   Understood.  But my question to you is:
 9   What term would you use to reference a
10   Spanish-speaking Latino person?
11              MR. CARTER: Objection.
12              MS. LIPPMAN: Objection.
13     A   My question is Spanish-speaking residents.
14   So, the concerns are, Spanish-speaking --
15   Spanish-speaking, right?  So, whoever speaks
16   Spanish.  That was the concern and that was the
17   issue and that was the need, was to have people
18   that could communicate with the Spanish-speaking
19   residents of Mill Brook Houses.
20     Q   Do you know whether the manager of the Mill
21   Brook Houses spoke Spanish?
22     A   No.
23     Q   Did you ask whether the manager of the Mill
24   Brook Houses spoke Spanish?
25     A   I don't recall.
```

```
 1              M. MARK-VIVERITO
 2      Q   So, how do you know that the needs of the
 3   Spanish-speaking residents of Mill Brook Houses
 4   were not being met?
 5              MR. CARTER: Objection.
 6              MS. LIPPMAN: Objection.
 7      A   Because residents were coming to us.
 8      Q   And you did not inquire whether there was
 9   any Spanish-speaking people on the staff?
10              MR. CARTER:  Objection.
11      A   My staff was constantly communicating with
12   NYCHA management at Mill Brook to address the
13   concerns of the residents that were coming to us.
14   We continue to have -- so, whatever engagement and
15   conversations, particularly, that's -- the issue
16   was about constituents consistently coming to us
17   and saying that there was a challenge that they
18   were having with the management office.  The
19   meeting was for them to hear us out, to then
20   process that information, and address the concerns
21   that were being raised.  That's what I do as an
22   advocate. That's what I do as a City Council
23   member:  Representation of my constituents.
24      Q   And again, the concerns were?
25              MR. CARTER: Objection.
```

Page 36

1              M. MARK-VIVERITO

2              MS. LIPPMAN: Objection.

3      A   That the Spanish-speaking residents were

4   not getting their concerns addressed, whether it

5   was any sort of rental issue, whether it was

6   repair issues, whenever they had to interact with

7   the management office, their needs were not being

8   tended to.  So, as NYCHA being a provider of

9   services to my residents and my community, my role

10  was to intervene and to request NYCHA to address

11  the concerns we were hearing and then to address

12  them.

13     Q   Now, why did you associate the needs not

14  being addressed with Spanish-speaking?

15              MR. CARTER: Objection.

16              MS. LIPPMAN: Objection..

17     A   Because that is what was communicated by my

18  staff, was on the front lines and interacting with

19  the residents and constituents in that district.

20     Q   So, the needs that were communicated to

21  your constituents -- to your office was that there

22  was not a Spanish-speaking person?  Is that

23  correct?

24              MR. CARTER: Objection.

25              MS. LIPPMAN: Objection.

Page 37

M. MARK-VIVERITO

1

2      Q   Was that the need?

3      A   Gloria Cruz was my liason.  She had

4   interacted with management office multiple times

5   on behalf of Spanish-speaking residents in Mill

6   Brook.  She was not getting her answers.  She was

7   not getting -- did not feel that their concerns

8   were being addressed.  That's why the meeting was

9   convened:  To take it to another level and ask

10  what was NYCHA going to do to address these

11  concerns -- what are you doing to address them.

12     Q   Again, just so, my apologies if I'm beating

13  a dead horse, but I need some clarity.  The issue

14  that I need clarity on is:  The issue that Ms.

15  Cruz was trying to ameliorate, was it the fact

16  that the Spanish-speaking residents could not

17  understand?  Or were there other needs that the

18  Spanish-speaking residents had that were not being

19  met?

20             MR. CARTER: Objection.

21             MS. LIPPMAN: Objection.

22     A   They were not able to communicate

23  effectively with the NYCHA management office.

24     Q   And that was due to what, exactly?

25             MR. CARTER: Objection.

Page 39

1           M. MARK-VIVERITO

2   things out.  It's not an effective way of

3   providing services to the constituents of New York

4   City.

5      Q  Do you know if NYCHA had other means to

6   facilitate communication between NYCHA management

7   and NYCHA constituents?

8              MR. CARTER: Objection.

9              MS. LIPPMAN: Objection.

10     A  No.

11     Q  Ms. Council Speaker, what does -- what does

12   the term "Spanish person" mean to you?

13             MR. CARTER: Objection.

14             MS. LIPPMAN: Objection.

15     A  I answered that question.

16     Q  I don't recall.  If you might answer it

17   again, please?

18             MR. CARTER: Objection.

19             MS. LIPPMAN: Objection.

20     A  A Spanish person is a person from Spain.

21     Q  And what is the difference between a

22   Spanish person and a Latino person?

23             MR. CARTER: Objection.

24             MS. LIPPMAN: Objection.

25     A  A Spanish person is not a Latino person.

Page 40

1                    M. MARK-VIVERITO

2        Q   Okay. So, what's the difference been a

3    Spanish person and a Latino person?

4                MR. CARTER: Objection.

5                MS. LIPPMAN: Objection.

6        Q   If you know.

7        A   A Spanish person is a not a Latino person.

8    Spanish is, in my experience as a Latina, a

9    Spanish speaker, is usually something I reference

10   here -- it's a generational issue.  People in

11   their 50's or 60's, they usually refer to Latino

12   people as "Spanish."  I do not use that

13   terminology.  Random people that do use the

14   terminology to identify me as a Latina, but I'm

15   not a Spanish person.

16       Q   You've never used the term "Spanish person"

17   to refer to a Latino before?

18       A   Never.

19       Q   Would you agree that the statement, "I want

20   a Spanish manager," would include a Spanish

21   person?  A person from Spain?

22                MR. CARTER: Objection.

23                MS. LIPPMAN: Objection.

24       Q   Would you agree with that statement?

25       A   Repeat the question.

Page 41

1                    M. MARK-VIVERITO

2      Q   "I want a Spanish manager."  Would that

3   include a person from Spain?

4              MR. CARTER: Objection.

5              MS. LIPPMAN: Objection.

6      A   I don't use -- I don't use that

7   terminology, so, whoever uses that terminology has

8   to explain to you what it means to them.

9      Q   What does it mean to you?

10     A   I already indicated what it means to me.

11     Q   So, it's your testimony that your --

12  "Spanish" to you only includes people from Spain;

13  correct?

14             MR. CARTER: Objection.

15             MS. LIPPMAN: Objection.

16     A   Yes.  Yes.

17     Q   Just give me one second.  Ms. Council

18  Speaker, you stated that constituents made

19  complaints to your Bronx office; correct?

20     A   Yes.

21     Q   Okay.  Do you recall -- do you recall how

22  many complaints were made about the Mill Brook

23  Houses?

24     A   No.

25     Q   And who would have received those

Page 42

1                    M. MARK-VIVERITO

2    complaints?

3                    MR. CARTER:  Objection.

4        Q   From your office?  Who would they go to?

5        A   Could be received multiple ways; primarily,

6    whoever is in the office with express intent to

7    walk-ins.  Gloria was there; we had interns, other

8    staff based on the day.  So, it was depending on

9    who was there.

10       Q   Are you aware that the manager of the Mill

11   Brook Houses testified that she never received any

12   complaints?

13                   MR. CARTER: Objection.

14                   MS. LIPPMAN: Objection.

15       A   Complaints from who?

16       Q   From the Mill Brook Houses.

17                   MS. LIPPMAN:  Objection.

18       A   So, if constituents the are coming to us,

19   saying they have an inability to communicate with

20   the staff at the management office, then how would

21   she receive complaints?  Complaints were coming to

22   us that they had an inability to communicate

23   effectively with the management office, and we

24   were now serving as a de facto management office,

25   racking up the complaints from the constituents,

Page 43

1                M. MARK-VIVERITO

2    and having to express those concerns to the

3    management office; and to us, that was not the

4    role of my office.  The role of my office is not

5    to serve as the management office for NYCHA.

6        Q  Do you know whether there were any

7    Spanish-speaking individuals in the management

8    office of Mill Brook?

9                MR. CARTER: Objection.

10               MS. LIPPMAN: Objection.

11       A  No, I don't recall.

12       Q  Did you ever inquire?

13       A  I would -- I would, if Gloria is telling us

14   that constituents are coming to us, Gloria is the

15   one that would interact with the management

16   office.  I'm sure she would ask that question; and

17   probably, the answer was no.

18       Q  Are you guessing?

19       A  I'm saying the rationale of the meeting was

20   because Spanish-speaking constituents, who had no

21   other way of communicating, were not getting

22   attention at the management office.

23       Q  Ms. Council Speaker, are you familiar with

24   how NYCHA -- are you familiar with how NYCHA

25   grades the performance of the different

```
1                M. MARK-VIVERITO
2    call us, they could email us.  They could walk in.
3    We're in the shadow of Mill Brook Houses.  So,
4    people knew we were there.
5       Q  Okay. So, please walk me through the
6    process, by  way of example.  Say they call
7    something -- about an issue they wanted resolved
8    in the Mill Brook Houses.  How would that work
9    from beginning to end?
10               MR. CARTER:  Objection.
11      A  What do you mean?
12      Q  They would ring up phone and call your
13   office?
14      A  Yes.
15      Q  And then what would happen?
16               MR. CARTER: Objection.
17      A  They would express the issue that they had,
18   and the question, logically, would be, "well, did
19   you go to the management office?  What happened?"
20   A lot of times, they said they were not able to
21   communicate; then they would continue to give the
22   complaint to us, that then we would have to
23   interact on their behalf with the management
24   office and communicate what their needs were.
25      Q  Okay. So, they would give the complaint to
```

**EXHIBIT 13**

LUIS PONCE - 03/15/2019

```
  1    --

  2    UNITED STATES DISTRICT COURT

  3    SOUTHERN DISTRICT OF NEW YORK

  4    ---------------------------------------x

  5    SIBYL COLON,

  6                     Plaintiff,

  7                          Index No.  16-04540

  8              v.

  9    THE CITY OF NEW YORK,  NEW YORK
       CITY HOUSING AUTHORITY, NEW YORK
 10    CITY COUNCIL SPEAKER MELISSA
       MARK-VIVERITO, MICHAEL KELLY and
 11    BRIAN CLARKE,

 12                     Defendants.

 13    ---------------------------------------x

 14

 15                     11:00 a.m.
                        March 15, 2019
 16
                        48 Wall Street
 17                     New York, New York

 18

 19         DEPOSITION of LUIS PONCE, a Witness in the

 20    above entitled matter, pursuant to Notice, before

 21    Stephen J. Moore, a Registered Professional

 22    Reporter, Certified Realtime Reporter and Notary

 23    Public of the State of New York.

 24

 25
```

1                    LUIS PONCE

2    ---------------------------------------x

3    UNITED STATES DISTRICT COURT

4    SOUTHERN DISTRICT OF NEW YORK

5    ---------------------------------------x

6    ALLISON WILLIAMS,

7                    Plaintiff,

8                         Index No.  16-cv-08193

9                    v.

10   THE CITY OF NEW YORK,  NEW YORK
     CITY HOUSING AUTHORITY, NEW YORK
11   CITY COUNCIL SPEAKER MELISSA
     MARK-VIVERITO, MICHAEL KELLY and
12   BRIAN CLARKE,

13                    Defendants.

14   ---------------------------------------x

15

16                    11:00 a.m.

17                    March 15, 2019

18                    48 Wall Street

19                    New York, New York

20

21             DEPOSITION of LUIS PONCE, a Witness in the

22   above entitled matter, pursuant to Notice, before

23   Stephen J. Moore, a Registered Professional

24   Reporter, Certified Realtime Reporter and Notary

25   Public of the State of New York.

```
 1                    LUIS PONCE
 2.  A P P E A R A N C E S:
 3
 4         THE FLORESTAL LAW FIRM, PLLC
 5                Attorneys for Plaintiffs
 6                48 Wall Street
 7                New York, New York  10005
 8
 9         BY:    MARCEL FLORESTAL, ESQ.
10                marcel.florestal@florestallaw.com
11         NEW YORK CITY HOUSING AUTHORITY
12                Attorneys for Defendants
13                250 Broadway
14                New York, New York  10007
15
16         BY:    JANE E. LIPPMAN, ESQ.
17
18         NEW YORK CITY LAW DEPARTMENT
19                Attorneys for Defendant Melissa
20                Mark-Viverito
21                100 Church Street
22                New York, New York  10007
23
24         BY:    J. CORBIN CARTER, ESQ.
25
```

```
 1                        LUIS PONCE
 2    MR. FLORESTAL                                6 --
 3    MS. LIPPMAN                                     83
 4
 5                   E X H I B I T S
 6
 7    PLAINTIFF - RETAINED                       PAGE
 8
 9    1     Board meeting minutes from        21   15
10          Wednesday, September 30, 2015
11
12    2     CD of recordings                  41   17
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                       LUIS PONCE
2    violations unit.
3                    I think I went back to the fuel
4    oil remediation unit and I became an assistant
5    director in technical services, and then I
6    became the deputy director technical services,
7    became the director of technical services, and
8    then senior director of technical services, and
9    then senior vice president of operations for
10   support services.
11          Q      What year was that, what year
12   did you become senior vice president, SVP of
13   operations?
14          A      Maybe 2012 or 2013.
15          Q      Okay.
16                 Can you tell us a little bit --
17   and that was -- I should ask, are you currently
18   employed with NYCHA?
19          A      No, I am not.
20          Q      Was that your last title at
21   NYCHA?
22          A      Yes, it was.
23          Q      So can you tell us a little bit
24   about your job responsibilities as an SVP of
25   operations?
```

```
 1                      LUIS PONCE
 2          A      The manager of --
 3          Q      She was upset at what, please,
 4   or reiterate?
 5          A      She was upset with how the
 6   manager handled Spanish speaking residents.
 7          Q      And which manager was that,
 8   Mr. Ponce?
 9          A      I believe it was Allison
10   Williams.
11          Q      Did you ever speak to Brian
12   Clark about that meeting, the July 20th, 2015
13   meeting at Melissa Mark-Viverito's office?
14          A      I did not.
15          Q      At any point in time during your
16   tenure with NYCHA, did Ms. Colon ever speak to
17   you about removing Ms. Allison Williams as the
18   manager of the Millbrook Houses?
19          A      Yes, we had a conversation.
20          Q      And what was that conversation
21   about?
22          A      So, while Brian Clark was on
23   vacation, he called me and asked me to follow
24   up on, I believe it was three items.
25                      One of the items was for the  /
```

```
 1                     LUIS PONCE
 2    transfer of the Millbrook manager.  He told me
 3    he had asked Ms. Colon to work on that.
 4                     He asked me that he would like
 5    to have that done before he returns from
 6    vacation.
 7          Q      Did he tell you why he wanted to
 8    remove her?
 9          A      He did not.
10          Q      Was that after July 30th, 2015,
11    that the conversation between you and Brian
12    Clark occurred?
13          A      I don't recall.
14          Q      Okay.  So are you familiar with
15    the names Richard Bernardo?
16          A      Yes.
17          Q      Are you familiar with the name
18    Kenya Saludin?
19          A      Yes.
20          Q      Did you ever have conversations
21    with Richard Bernardo and Kenya Saludin about
22    removing Allison Williams as the manager of
23    Millbrook Houses?
24          A      I do not remember having a
25    conversation with them about Ms. Williams.
```

```
 1                     LUIS PONCE
 2          Q       Did you ever inform Ms. Colon
 3   that Brian's directives to remove Ms. Williams
 4   as the manager of Millbrook Houses was
 5   discriminatory?
 6          A       Sorry, can you repeat that?
 7          Q       Did you ever inform Ms. Colon
 8   that it was your opinion that Brian's
 9   directives to remove Ms. Williams as the
10   manager of Millbrook was illegal?
11          A       No.
12                  MS. LIPPMAN:  Objection
13          Q       Did you ever inform Ms. Williams
14   that Brian's directives to remove Ms. Williams
15   as a manager of Millbrook as discriminatory?
16                  MR. CARTER:  Did you ever inform
17          Ms. Williams or Ms. Colon?  I didn't
18          catch that.
19                  MR. FLORESTAL:  Thank you for the
20          correction.
21                  So, for the record, I'm going to
22          withdraw the last question, I'm going to
23          rephrase.
24          Q       Did you ever inform Ms. Colon
25   that Brian Clark's directive to remove Ms.
```

```
 1                    LUIS PONCE
 2          was played as follows:)
 3                MS. COLON:  "I heard he was in
 4          there bringing up that Spanish speaking
 5          stuff today in a meeting, to the
 6          manager, publicly to everybody, that's
 7          illegal.  Ponce,, that's illegal.  And
 8          everybody think I'm Spanish."
 9          Q       Once again, Mr. Ponce, I am
10   going to ask you if you can identify the
11   individuals in that recording?
12          A       Sibyl Colon and myself.
13          Q       And what are you guys talking
14   about during that snippet of time that I played
15   for you?
16                MS. LIPPMAN:  Objection.  Go
17          ahead.
18          A       She is saying that he was
19   talking about a comment that the manager --
20   Millbrook, Ms. Williams, made at a meeting,
21   right.
22          Q       But again, does she use the term
23   illegal at any point?
24          A       Yes, she said that, speaking
25   about it is illegal.
```

```
1                       LUIS PONCE
2          Q     Did you respond at all?
3                I'll play it again.
4          A     Please.
5                (The previously described recording
6          was played as follows:)
7                MS. COLON:  "I heard he was in
8          there bringing up that Spanish speaking
9          stuff today in a meeting, to the
10         manager, publicly to everybody, that's
11         illegal.  Ponce,, that's illegal.  And
12         everybody think I'm Spanish."
13         A     I didn't hear myself respond.
14               MR. FLORESTAL:  Let the record
15         reflect I'm going to play from 3:57 to
16         4:00.
17               (The previously described recording
18         was played as follows:)
19               MR. PONCE:  "We have a process to
20         show when you are not performing.
21               MS. COLON:  Right, where did it
22         come from?  It's the opposite, I have
23         performed."
24         Q     Did you hear that?
25         A     No.
```

```
 1                        LUIS PONCE
 2                 And then she revealed to me that
 3    they were bringing someone in from Chicago to
 4    replace her.
 5         Q    And what was your response to
 6    that?
 7         A    I believe I asked her was there
 8    any -- did they bring any performance issues to
 9    her attention about her present work?  And she
10    said no.
11                 MR. FLORESTAL:  I'm going to play
12            5:50 to 6:05.
13                 (The previously described recording
14            was played as follows:)
15                 MR. PONCE:  "Like you said, so
16            why hurt me?  Unless you have issues
17            with me, so give me another Senior Vice
18            President, or tell me whatever you want.
19                 MS. COLON:  Or allow for due
20            process.
21                 MR. PONCE:  But there can't be
22            due process, because then you would have
23            had to do something wrong.
24                 MS. COLON:  Right, and I haven't
25            done anything wrong.  You know it, I
```

```
 1                      LUIS PONCE
 2            know it, the whole world knows it."
 3            Q     Did you hear that?
 4            A     I believe so, yes.
 5            Q     I will play it one more time
 6   just in case, okay?
 7                  (The previously described recording
 8            was played as follows:)
 9                  MR. PONCE:  "Like you said, so
10            why hurt me?  Unless you have issues
11            with me, so give me another Senior Vice
12            President, or tell me whatever you want.
13                  MS. COLON:  Or allow for due
14            process.
15                  MR. PONCE:  But there can't be
16            due process, because then you would have
17            had to do something wrong.
18                  MS. COLON:  Right, and I haven't
19            done anything wrong.  You know it, I
20            know it, the whole world knows it."
21            Q     Okay.  Did you hear that?
22            A     Yes.
23            Q     Now, you used the words "due
24   process," did you not?
25            A     Yes.
```

```
 1                        LUIS PONCE
 2                MR. FLORESTAL:  The record.
 3         Q      Mr. Ponce, do you have an
 4    opinion as to why Sibyl Colon was demoted?
 5         A      I don't think -- I think she --
 6    I don't know if she got the demotion or she
 7    resigned before she was demoted.
 8                But after she was gone, then I
 9    became aware of that she was replaced by Janet
10    Abrahams, so that was the reason why she was
11    moved, in my opinion.
12         Q      Are you familiar with the name
13    Octavia Hayward?
14         A      Yes.
15         Q      How are you familiar with the
16    name Octavia Hayward?
17         A      She was one of, I believe they
18    called them regional asset managers in OPMOM,
19    she had a title in OPMOM she was a
20    supervisorOPMOM in OPMOM.
21         Q      Was it aOPMOM greater or a
22    lesser title than Ms. Colon?
23         A      I believe it was lesser than Ms.
24    Colon, yes.
25         Q      To your knowledge, did Ms.
```

```
1                      LUIS PONCE
2           Q      Are you familiar at all with the
3    job responsibilities of Janet Abrahams'
4    position?
5           A      Just based on my interactions
6    with her and what she did, yes.
7           Q      Were they the same
8    responsibilities, to your knowledge, that Sibyl
9    Colon had?
10                 MS. LIPPMAN:  Objection.
11          A      As I -- again, I forget if it
12   was vice president or senior vice president,
13   you would be higher in the organization and you
14   would have more access to the general manager,
15   or the Chair of the Authority at a director
16   level.
17                 You would be reporting to a vice
18   president or a senior vice president or
19   executive vice president, depending on where
20   you were in the organization.
21          Q      Just so we are clear, you are
22   describing Janet Abrahams' position, correct?
23          A      The first part of it was Janet
24   Abrahams' position, because she was higher, she
25   attended higher level meetings.
```

```
1                        LUIS PONCE
2                 So, like I had discussed
3    earlier, the meeting that we had with the
4    general manager, oftentimes the directors would
5    not -- were not in that meeting, they might
6    have called in, but they weren't participating
7    in the meeting in face-to-face.
8                     Senior vice president or the
9    vice president -- the vice president level
10   would be -- would have access, higher levels in
11   the Authority, and had access to approve higher
12   level of monetary amounts for budgets and for
13   contracts.
14         Q      Okay.
15                MR. FLORESTAL:  I am going to
16         impose a break, you are yawning.
17                MS. LIPPMAN:  That sounds good.
18                MR. FLORESTAL:  I want you fresh.
19                THE WITNESS:  I am okay.
20                (At this point in the proceedings
21         there was a recess, after which the
22         deposition continued as follows:)
23                MR. FLORESTAL:  Back on.
24         Q      Now, Mr. Ponce, you did not know
25   that you were being recorded, did you?
```