**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**
X------------------------------------------------------------X

SIBYL COLON,

                    **Plaintiff,**

           **-against-**

THE CITY OF NEW YORK, *et al.*,

           **Defendants.**

X------------------------------------------------------------X

**PLAINTIFF'S
RESPONSE TO THE
DEFENDANT MELISSA
MARK-VIVERITO'S
STATEMENT
PURSUANT TO
LOCAL RULE 56.1**

**CV-16-04540 (VSB)**

Plaintiff Sibyl Colon ("Colon"), by and through her undersigned counsel, submits the following response to Defendant Mark-Viverito Local Rule 56.1 Statement of Undisputed Material Facts filed on January 17, 2020 ("Mark-Viverito's 56.1 Statement").

Unless otherwise indicated, references to exhibits are to the exhibits annexed to the Declaration of Natalie S. Marcus dated January 17, 2020, and the Declaration of Marcel Florestal filed on April 17, 2020 ("Florestal Dec.").

**Mark-Viverito's Statement**

           1.        Sibyl Colon, a former director of the New York City Housing Authority ("NYCHA") Optimal Property Management Operating Model Program ("OPMOM"), alleges that Melissa Mark-Viverito ("Mark-Viverito") aided and abetted retaliatory actions in violation of the New York State Human Rights Law ("SHRL"). *See* Complaint ("Complaint"), dated June 17, 2016, Exhibit A and *Colon v. City of New York*, No. 16 Civ. 4540 (VSB), 2019 U.S. Dist. LEXIS 48188 (S.D.N.Y. Mar. 22, 2019).

**Plaintiff's Response**

           1.        Not disputed.

**Mark-Viverito's Statement**

2.     Following a motion to dismiss, the City of New York was dismissed from the action as were all the claims that were brought against Mark-Viverito. See Colon v. City of New York, No. 16 Civ. 4540 (VSB), 2018 U.S. Dist. LEXIS 49582 (S.D.N.Y. Mar. 26, 2018). Plaintiff moved for reconsideration of that decision and the Court reinstated the SHRL aiding and abetting retaliation claim against Mark-Viverito. See Colon 2019 U.S. Dist. LEXIS 48188,  at *8.

**Plaintiff's Response**

2.     Not disputed.

**Mark-Viverito's Statement**

3.     Plaintiff alleges that she was removed from her position as Director of the OPMOM because of her purported opposition to the transfer of a manager out of the Mill Brook Houses ("Mill Brook"). See Compl. 1 62, Ex. A.

**Plaintiff's Response**

3.     Not disputed.

**Mark-Viverito's Statement**

4.     On August 5, 1985, plaintiff commenced her employment with NYCHA, in the civil service title of housing assistant. *See* Human Resources Department Record Card, NYCHA 4501- NYCHA 4502, Ex. O.

**Plaintiff's Response**

4.     Not disputed.

**Mark-Viverito's Statement**

5.     On May 12, 2015, plaintiff was promoted to the position of Director of OPMOM. *See* Human Resources Department Record Card, NYCHA 4501- NYCHA 4502, Ex. O.

**Plaintiff's Response**

     5.     Not disputed.

**Mark-Viverito's Statement**

     6.     Plaintiff did not have a civil service title as the Director of OPMOM. *See* Colon Depo. at 62:16-19, Ex. B.

**Plaintiff's Response**

     6.     Not disputed.

**Mark-Viverito's Statement**

     7.     Plaintiff was an at-will employee. *See* Kelly Depo. July 3, 2019 at  49:2-15, Ex. D.

**Plaintiff's Response**

     7.     Not disputed.

**Mark-Viverito's Statement**

     8.     Plaintiff remained the Director of OPMOM until her resignation on August 28, 2015. *See* Human Resources Department Record Card, NYCHA 4501- NYCHA 4502, Ex. O.

**Plaintiff's Response**

     8.     Disputed.  That statement is factually incorrect, as Plaintiff was removed as Director on August 28, 2015, and did not resign as Director of OMPMOM.

**Mark-Viverito's Statement**

     9.     Allison Williams served as a housing manager from 1999 until her retirement from NYCHA on May 1, 2017. *See* Williams May 8, 2019 Depo. at 23:4-6, 27:14-18, Ex. H.

**Plaintiff's Response**

      9.     Not disputed.

**Mark-Viverito's Statement**

      10.    Williams retired after working for NYCHA for 33 years. *See* Williams

May 8, 2019, Depo. at 286:12-13, Ex. H.

**Plaintiff's Response**

      10.    Not disputed.

**Mark-Viverito's Statement**

      11.    Mill Brook is a development that is operated by NYCHA.   *See*

Introducing OPMOM, dated Dec. 5, 2014, NYCHA 4, Ex. P.

**Plaintiff's Response**

      11.    Not disputed.

**Mark-Viverito's Statement**

      12.    In 2006, Williams started working at Mill Brook as a housing manager.

*See* Williams May 8, 2019 Depo. at 28:6-7, Ex. H.

**Plaintiff's Response**

      12.    Not disputed.

**Mark-Viverito's Statement**

      13.    Michael Kelly served as the General Manager of NYCHA from April

2015 until 2018. *See* Kelly May 3, 2019 Depo. at 7:15-8:3; 9:7-11, Ex. C.

**Plaintiff's Response**

      13.    Not disputed.

**Mark-Viverito's Statement**

14.      In 2015, Brian Clarke was the NYCHA Senior Vice President of

Operations for Property Management. *See* Clarke June 13, 2019 Depo. at 25:18-20, Ex. F.

**Plaintiff's Response**

14.      Not disputed.

**Mark-Viverito's Statement**

15.      As the Director of OPMOM, plaintiff reported to Clarke. *See* Clarke July

1, 2019 Depo. at 70:18-20, Ex. G.

**Plaintiff's Response**

15.      Not disputed.

**Mark-Viverito's Statement**

16.      Clarke reported to Kelly. *See* Kelly May 3, 2019 Depo. at 11:7-14, Ex.

C.

**Plaintiff's Response**

16.      Not disputed.

**Mark-Viverito's Statement**

17.      Marcela Medina served as the State Legislative Affairs Officer in

NYCHA's City and State Legislative Affairs Department. *See* Medina Depo. at 6:11-19, Ex. I.

**Plaintiff's Response**

17.      Not disputed.

**Mark-Viverito's Statement**

18.      Brian Honan served as the Director of NYCHA Intergovernmental

Special Legislative Affairs. *See* Colon Depo. at 121:6-8, Ex. B.

**Plaintiff's Response**

5

18.     Not disputed.

**Mark-Viverito's Statement**

19.     James Artis was the Regional Asset Manager for the Bronx in the

OPMOM Program. *See* Clarke June 13, 2019 Depo. at 40:18-20, Ex. F.

**Plaintiff's Response**

19.     Not disputed.

**Mark-Viverito's Statement**

20.     As the Regional Asset Manager for the Bronx, Artis supervised Williams.

*See* Artis Depo. at 18:3-14, Ex. J.

**Plaintiff's Response**

20.     Not disputed.

**Mark-Viverito's Statement**

21.     In July 2015, Mark-Viverito was a member of the New York City Council

and the New York City Council Speaker. *See* Mark-Viverito Depo. at 7:17-20, Ex. K.

**Plaintiff's Response**

21.     Not disputed.

**Mark-Viverito's Statement**

22.     The OPMOM Program was launched in January 2015 as a pilot program

consisting of 18 NYCHA properties including Mill Brook. *See* Colon Depo. at 55:9-18, 66:24- 25;

Clarke June 13, 2019 Depo. at 93:18-20, 95:21-25; Kelly July 3, 2019 Depo. at 55:8-9; Introducing

OPMOM, dated Dec. 5, 2014, NYCHA 4, Exs. B, F, D, P.

**Plaintiff's Response**

22.     Not disputed.

**Mark-Viverito's Statement**

23.     The OPMOM model gave a development's managers more control in terms of staffing and budget. *See* Williams May 8, 2019 Depo. at 36:10-13, Ex. H.

**Plaintiff's Response**

23.     Not disputed.

**Mark-Viverito's Statement**

24.     Under the OPMOM model it was the manager's responsibility to determine the development's staffing needs. *See* Williams May 8, 2019 Depo. at 36:14-17, Ex. H.

**Plaintiff's Response**

24.     Not disputed.

**Mark-Viverito's Statement**

25.     OPMOM allowed property managers to (1) take more control over their location, (2) become more involved with budgeting, and (3) have more control over hiring. *See* Colon Depo. at 69:9-70:3, Ex. B.

**Plaintiff's Response**

25.     Not disputed.

**Mark-Viverito's Statement**

26.     When the OPMOM pilot program was changed to a NYCHA-wide initiative it was renamed the Next Generation Operation. *See* Kelly Sept. 23, 2019 Depo. at 70:15-20, 155:8-14, Ex. E.

**Plaintiff's Response**

26.     Not disputed.

**Mark-Viverito's Statement**

27.     The NYCHA language bank assists residents with translation services. *See* Medina Depo. at 46:23-24, Ex. K.

**Plaintiff's Response**

27.     Not disputed.

**Mark-Viverito's Statement**

28.     The NYCHA language bank contains a list of certified translators that provide translation services for various languages. *See* Colon Depo. at 133:10-14, Ex. B.

**Plaintiff's Response**

28.     Not disputed.

**Mark-Viverito's Statement**

29.     The translators listed in the NYCHA language bank are volunteer employees from NYCHA. *See* Colon Depo. at 133:15-17, Ex. B.

**Plaintiff's Response**

29.     Not disputed.

**Mark-Viverito's Statement**

30.     The NYCHA language bank provides over the phone translation. *See* Colon Depo. at 134:10-12, Ex. B.

**Plaintiff's Response**

30.     Objection.  The statement is immaterial.

        Not otherwise disputed.

**Mark-Viverito's Statement**

31.     If in-person translation services are needed, then an appointment must be scheduled with the NYCHA language bank. *See* Colon Depo. at 134:13-14, Ex. B.

8

**Plaintiff's Response**

        31.     Objection.  The statement is immaterial.

        Not otherwise disputed.

**Mark-Viverito's Statement**

        32.     On August 3, 2009, Williams entered into a Local Hearing Settlement Agreement whereby she agreed to a loss of two days of annual leave in exchange for the dismissal of three charges for failure to perform her duties. *See* Local Hearing Settlement Agreement, dated August 3, 2009, NYCHA 1426; Notice of Local Hearing/Specification of Charges, dated July 21, 2009, NYCHA 1427, Exs. Q, R.

**Plaintiff's Response**

        32.     Objection.  The statement is immaterial.

        Not otherwise disputed.

**Mark-Viverito's Statement**

        33.     On January 20, 2015, Williams was served with three charges for incompetency and/or misconduct. *See* Notice of Local Hearing/Specification of Charges, dated January 14, 2015, NYCHA 2059, Ex. S.

**Plaintiff's Response**

        33.     Objection.  The statement is immaterial.

        Not otherwise disputed.

**Mark-Viverito's Statement**

        34.     On February 4, 2015, Williams was found guilty of two of the charges and one charge was withdrawn. *See* Record of Local Hearing Conducted by Neutral, dated February 4, 2015, NYCHA 2060, Ex. T.

**Plaintiff's Response**

34.    Objection.  The statement is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

35.    Williams's penalty was a reprimand. *See* Record of Local Hearing Conducted by Neutral, dated February 4, 2015, NYCHA 2060; Williams May 8, 2019 Depo. at 188:23-25; Exs. T, H.

**Plaintiff's Response**

35.    Objection.  The statement is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

36.    Williams was subject to numerous counseling memoranda including memoranda that were issued in 2007, 2008, 2009, 2011, 2012, 2013, and 2014. *See* Counseling Memo: Failure to Report Information as Requested, dated Dec. 6, 2007, NYCHA 1260 - NYCHA 1261; Counseling Memo: Chronic Rent Delinquents, dated Dec. 6, 2017, NYCHA 1262- NYCHA 1263; Counseling Memo: Time and Attendance, dated Sept. 30, 2008, NYCHA 1264; Counseling Memo: Failure to Prepare General Managers Visit, dated Sept. 30, 2008, NYCHA 1265- NYCHA 1266; Counseling Memo: Failure to Submit Chronic Rent Delinquents, dated October 10, 2008, NYCHA 1267- NYCHA 1268; Counseling Memo: Failure to Update Legal Action for Rent Delinquents, dated March 12, 2009, NYCHA 1269; Counseling Memo: Failure to Conduct Joint Building Inspections, dated Mar. 12, 2009, NYCHA 1270; Counseling Memo: Failure to Update Legal Action for Rent Delinquents, dated July 13, 2009, NYCHA 1271- NYCHA 1272; Counseling Memo: Failure to Update TTL, dated Mar. 2, 2011, NYCHA 1273; Counseling Memorandum, dated May 8, 2012, NYCHA 1274; Counseling Memo, dated Feb. 26, 2013,

NYCHA 1275; Counseling Memorandum, dated Feb. 19, 2014, NYCHA 1276; Counseling Memorandum, dated July 17, 2014, NYCHA 1277; Counseling Memorandum: Work Orders (Tickets), dated Nov. 26, 2014, dated NYCHA 1278- NYCHA 1279; Exs. U, V, W, X, Y, Z, AA, BB, CC, DD, EE, FF, GG, HH.

**Plaintiff's Response**

36.    Objection.  The statement is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

37.    In October 2014, Gloria Cruz (Mark-Viverito's constituent services liaison) emailed NYCHA that a Mill Brook resident had complained to Mark-Viverito's office that "[e]very time [the Mill Brook resident] goes to the office he feels like he's being bullied by management because he cannot speak English. This issue is making him sick and upset please can you help us with this issue." *See* Email from Vega to Taylor, Williams and others, sent October 30, 2014, NYCHA 673- NYCHA 680, Ex. II.

**Plaintiff's Response**

37.    No dispute the email was sent.

Objection.  The email contains inadmissible hearsay immaterial, and lacks foundation as it does not identify who the alleged bully was.

Disputed as to Ms. Cruz's position; her title was constituent services liaison, but she "managed [the Council Speaker's] Bronx office."  M-V Tr. at 16-17.

**Mark-Viverito's Statement**

38.    In November 2014, it was brought to the attention of the NYCHA Chair

(Olatoye) that there was an individual named Janet Abrahams who was very grounded in the principles of the OPMOM Program and that she would make an excellent candidate to manage the program. *See* Kelly July 3, 2019 Depo. at 34:17-35:3; Email from Pennington to House, sent Nov. 7, 2014, NYCHA 4896 – NYCA 4899, Exs. D, JJ.

**Plaintiff's Response**

        38.     Not disputed.

**Mark-Viverito's Statement**

        39.     In November 2014, Abrahams was interviewed by the NYCHA General Manager (Cecil House), the NYCHA Chief Administrative Officer (Natalie Rivers) and the Chair of NYCHA (Olatoye). *See* Kelly July 3, 2019 Depo. at 35:2-6, 38:17-20, Ex. D.

**Plaintiff's Response**

        39.     Not disputed.

**Mark-Viverito's Statement**

        40.     Kelly testified that Abrahams impressed him during the interview. *See* Kelly July 3, 2019 Depo. at 35:6-7, Ex. D.

**Plaintiff's Response**

        40.     Not disputed.

**Mark-Viverito's Statement**

        41.     In early December 2014, Olatoye reached out to a colleague who had worked with Abrahams in Chicago and confirmed that she was an excellent candidate. *See* Kelly July 3, 2019 Depo. at 35:8-11, Ex. D.

**Plaintiff's Response**

41.     Not disputed.

**Mark-Viverito's Statement**

42.     On December 4, 2014, Olatoye wrote to Todd Gomez that she had interviewed Abrahams and was seeking feedback from him about Abrahams. *See* Email from Olatoye to Gomez, sent December 5, 2014, NYCHA 4924, Ex. KK.

**Plaintiff's Response**

42.     Not disputed.

**Mark-Viverito's Statement**

43.     Gomez had previously worked with Abrahams at the Chicago Housing Authority. *See* Email from Olatoye to Gomez, sent December 5, 2014, NYCHA 4924, Ex. KK.

**Plaintiff's Response**

44.     Not disputed.

**Mark-Viverito's Statement**

44.     Gomez responded that Abrahams was the "best" and "authentic and really cares about her work." *See* Email from Gomez to Olatoye, sent Dec. 5, 2014, NYCHA 4924, Ex. KK.

**Plaintiff's Response**

44.     Not disputed.

**Mark-Viverito's Statement**

45.     House had conversations with Abrahams regarding her possibly accepting a position as the Vice President of OPMOM. *See* Kelly July 3, 2019 Depo. at 35:11- 13, Ex. D.

**Plaintiff's Response**

45.     Disputed.  Statement contains inadmissible hearsay and conflicts with the documentary evidence that Ahrahams was being considered for a strong senior operating position which is not defined.   Florestal Dec., Exhibit 24 emails concerning Janet Abrahams.

**Mark-Viverito's Statement**

46.     Those negotiations did not result in Abrahams taking the job and House left NYCHA in April 2015. *See* Kelly Depo. July 3, 2019 at 35:11-15, Ex. D.

**Plaintiff's Response**

46.     Not disputed.

**Mark-Viverito's Statement**

47.     Kelly testified that Abrahams was the first choice for the position. *See* Kelly July 3, 2019 Depo. at 39:4-5, Ex. D.

**Plaintiff's Response**

47.     Not disputed.

**Mark-Viverito's Statement**

48.     At that time, Kevin Norman was managing OPMOM. *See* Kelly July 3, 2019 Depo. at 35:15-16, Ex. D.

**Plaintiff's Response**

48.     Not disputed.

**Mark-Viverito's Statement**

49.     Norman left NYCHA in approximately April 2015. *See* Kelly July 3, 2019 Depo. at 35:15-17, Ex. D.

**Plaintiff's Response**

49.     Not disputed.

**Mark-Viverito's Statement**

50.     In approximately April 2015, Olatoye went on maternity leave.  *See*
Kelly July 3, 2019 Depo. at 35:22-23, Ex. D.

**Plaintiff's Response**

50.     Not disputed.

**Mark-Viverito's Statement**

51.     On July 1, 2015, Mark-Viverito's office requested a meeting with NYCHA.
*See* Email from Sinnwell to Honan, sent July 1, 2015, NYCHA 1778, Ex. LL.

**Plaintiff's Response**

51.     Not disputed.

**Mark-Viverito's Statement**

52.     Mark-Viverito requested the meeting because she had received complaints
from constituents that their needs were not being met. *See* Mark-Viverito Depo. at 15:6-8, Ex. K.

**Plaintiff's Response**

52.     Objection.  The statement contains inadmissible hearsay and lacks
foundation.

**Mark-Viverito's Statement**

53.     Mark-Viverito testified that many Mill Brook residents were asking her
office for assistance because they were Spanish-speaking residents whose issues were not being
addressed by the Mill Brook management. *See* Mark-Viverito Depo. at 15:14-20, Ex. K.

**Plaintiff's Response**

53.     Objection.  The substance of the alleged complaints are inadmissible hearsay.

Objection.  There is no foundation for any such complaints, except for one
complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit

15

II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

**Mark-Viverito's Statement**

54.     Mark-Viverito testified that the Spanish-speaking residents of Mill Brook were coming to her office because they were having a hard time communicating with the management office of Mill Brook. *See* Mark-Viverito Depo. at 18:22-19:12, Ex. K.

**Plaintiff's Response**

54.     Objection.  The substance of the alleged complaints are inadmissible hearsay.

Objection.  There is no foundation for any such complaints, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

**Mark-Viverito's Statement**

55.     Mark-Viverito testified that the individuals who contacted her office to express these concerns were Spanish-dominant and Spanish-speaking individuals. *See* Mark-Viverito Depo. at 34:2-4, Ex. K.

**Plaintiff's Response**

55.     Objection.  The substance of the alleged complaints are inadmissible hearsay.

Objection.  There is no foundation for any such complaints, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit

II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

**Mark-Viverito's Statement**

56.     Prior to the July 30, 2015 meeting, Mark-Viverito's staff had repeatedly asked NYCHA to address these concerns to no avail. *See* Mark-Viverito Depo. at 15:20-24, Ex. K.

**Plaintiff's Response**

56.     Objection.  The substance of the alleged complaints are inadmissible hearsay.

Objection.  There is no foundation for any such complaints, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

**Mark-Viverito's Statement**

57.     The purpose of the meeting was to find out what NYCHA was doing to address the concerns of the Mill Brook Spanish speaking residents. *See* Mark-Viverito Depo. at 18:15-18, Ex. K.

**Plaintiff's Response**

57.     Objection.  The substance of the alleged complaints are inadmissible hearsay.

Objection.  There is no foundation for any such complaints, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints

17

received by the Mark-Viverito; Exhibit II was the only document received.

**Mark-Viverito's Statement**

58.     Mark-Viverito testified that it was unsustainable for her office to continue to serve as a de facto NYCHA office for the Mill Brook Spanish-speaking residents. *See* Mark-Viverito Depo. at 19:12-20, Ex. K.

**Plaintiff's Response**

58.     Objection.  The substance of the alleged complaints are inadmissible hearsay.

Objection.  There is no foundation for any such complaints, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

**Mark-Viverito's Statement**

59.     Mark-Viverito wanted to work with NYCHA to figure out how to bring better language services citywide. *See* Medina Depo. at 26:8-11, Ex. I.

**Plaintiff's Response**

59.     Objection, there is no foundation.

**Mark-Viverito's Statement**

60.     On July 1, 2015, Honan wrote to Clarke and Ponce (NYCHA Senior Vice President of Operations) regarding the anticipated meeting that "this will not be a good meeting as they've expressed their unhappiness with the manager in the past." *See* Email sent by Honan to Clarke and Ponce, sent July 1, 2015, NYCHA 1778; Ponce Depo. at 11:11-15, Exs. LL, L.

**Plaintiff's Response**

60.     Objection.   The substance of the alleged complaints or alleged past

18

expressions of unhappiness are inadmissible hearsay.

Disputed to clarify Mr. Ponce's title, which was Senior Vice President of Operations for Support Services.  Marcus Decl., Exhibit L at 10-11.

**Mark-Viverito's Statement**

61.     In July 2015, Olatoye returned from maternity leave and asked Kelly if he knew Abrahams. *See* Kelly July 3, 2019 Depo. at 36:3-5, Ex. D.

**Plaintiff's Response**

61.     Not disputed.

**Mark-Viverito's Statement**

62.     Kelly testified that Olatoye was very impressed with Abrahams and asked him to interview her and to resume the discussions that the prior General Manager had with Abrahams regarding her potential employment with NYCHA. *See* Kelly July 3, 2019 Depo. at 36:6-13, Ex. D.

**Plaintiff's Response**

62.     Not disputed.

**Mark-Viverito's Statement**

63.     It was determined by Olatoye and Kelly that Abrahams would be an exceptional candidate to move OPMOM from the 18 units that were serving as a model program to a full-blown program that was to replace all of NYCHA's management protocols with the OPMOM Protocol. *See* Kelly July 3, 2019 Depo. at 36:10-20, Ex. D.

**Plaintiff's Response**

63.     Not disputed.

**Mark-Viverito's Statement**

64.     Abrahams had been successful in implementing such a change in the Newark and Chicago housing authorities. *See* Kelly July 3, 2019 Depo. at 36:13-20, Ex. D.

**Plaintiff's Response**

64.     Not disputed.

**Mark-Viverito's Statement**

65.     Kelly checked with NYCHA's human resources department and determined that plaintiff was an at-will employee and as such it was within NYCHA's ability to make an offer to Abrahams. *See* Kelly July 3, 2019 Depo. at 49:2-15, Ex. D.

**Plaintiff's Response**

65.     Not disputed.

**Mark-Viverito's Statement**

66.     On July 28, 2015, Abrahams provided a copy of her resume to Acosta (secretary to the General Manager). *See* Email from Abrahams to Acosta, sent July 28, 2015, NYCHA 4931; Email from Acosta to Payamps-Roure to Acosta, sent July 28, 2015, NYCHA 4932; Kelly July 3, 2019 Depo. at 57:15-19, Exs. MM, NN, D.

**Plaintiff's Response**

66.     Not disputed.

**Mark-Viverito's Statement**

67.     On July 28, 2015, the Chief of Staff to the General Manager emailed the Chief of Staff for the Deputy Mayor for Housing and Economic Development a copy of Abrahams's resume because they were considering Abrahams for the position of Executive Vice President of Operations. *See* Email from Payamps-Roure to Patchette, sent July 28, 2015, NYCHA 4939, Ex. OO.

**Plaintiff's Response**

> 67.    Not disputed.

**Mark-Viverito's Statement**

> 68.    On July 28, 2015, the Chief of Staff to the General Manager asked Acosta to schedule a meeting between the Chief of Staff for the Deputy Mayor for Housing and Economic Development (James Patchett) and Abrahams as well as a meeting between Abrahams and the Chief of Staff to the General Manager. *See* Email from Payamps-Roure to Acosta, sent July 28, 2015, NYCHA 4936, Ex. PP.

**Plaintiff's Response**

> 68.    Not disputed.

**Mark-Viverito's Statement**

> 69.    On July 29, 2015, Honan sent Clarke an email reminding him that the Mark-Viverito meeting had been scheduled for July 30, 2015 and that Mark-Viverito would like to meet the Mill Brook manager. *See* Email from Honan to Clarke, sent July 29, 2015, NYCHA 2739, Ex. QQ.

**Plaintiff's Response**

> 69.    Not disputed.

**Mark-Viverito's Statement**

> 70.    Artis responded the following morning, that the manager of Mill Brook (Williams) had been out sick for the last two days and that he would inform Honan if she did not report to work that day. *See* Email from Artis to Honan, Clarke, and Colon, sent July 30, 2015, NYCHA 2738, Ex. RR.

**Plaintiff's Response**

70.     Not disputed.

**Mark-Viverito's Statement**

71.     Later that morning, Artis sent another email informing Clarke, Honan, and plaintiff that Williams was in the office and had been informed of the meeting. *See* Email from Artis to Honan, Clarke, and Colon, sent July 30, 2015, NYCHA 2738, Ex. RR.

**Plaintiff's Response**

71.     Not disputed.

**Mark-Viverito's Statement**

72.     The plaintiff, Medina, Mark-Viverito, Honan, Artis, Williams, Princella Jamerson (Mill Brook Tenant Association President), Diana Ayala (from Mark-Viverito's office) and Cruz attended the July 30, 2015 meeting at the Bronx office of Mark-Viverito. *See* Medina Depo. at 20:17-21:4; 47:17-19; Colon Depo. at 131:8-9; Mark-Viverito Depo. at 15:25-16:7, 16:12-20, 18:4-8; Clarke June 13, 2019 Depo. at 40:15-17, Exs. I, B, K, F.

**Plaintiff's Response**

72.     Not disputed.

**Mark-Viverito's Statement**

73.     Clarke joined the meeting by telephone. *See* Clarke June 13, 2019 Depo. at 38:19-39:3, Ex. F.

**Plaintiff's Response**

73.     Not disputed.

**Mark-Viverito's Statement**

74.     Mark-Viverito's office was a block away from Mill Brook. *See* Williams May 8, 2019 Depo. at 192:12-16, Ex. H.

**Plaintiff's Response**

       73.    Not disputed.

**Mark-Viverito's Statement**

       75.    During the meeting, Mark-Viverito's questions to NYCHA were about Spanish-speaking and Spanish-dominant residents and what was being done to address their concerns. *See* Mark-Viverito Depo. at 34:4-7, Ex. K.

**Plaintiff's Response**

       75.    Objection.  The statement lack adequate foundation and is misleading.

       Disputed.  The statement is a superficial, self-serving summary that ignores other testimony.

**Mark-Viverito's Statement**

       76.    Mark-Viverito asked Williams how she was handling the Spanish-speaking residents at Mill Brook. *See* Williams May 8, 2019 Depo. at 291:13-23, Ex. H.

**Plaintiff's Response**

       76.    Not disputed.

**Mark-Viverito's Statement**

       77.    Williams responded that they use the NYCHA language bank.  *See* Williams May 8, 2019 Depo. at 197:24-198:13, Ex. H.

**Plaintiff's Response**

       77.    Not disputed.

**Mark-Viverito's Statement**

       78.    Mark-Viverito said that the use of the language bank was unacceptable. *See* Williams May 8, 2019 Depo. at 292:10-13, Ex. H.

**Plaintiff's Response**

23

78.     Not disputed.

**Mark-Viverito's Statement**

79.     Mark-Viverito did not believe the use of a language bank was an effective means of communication because the translator is not physically present in the room with the person requiring the translation services so a lot of nuance is lost; this situation results in the translator being left to figure out how to properly translate the conversation. *See* Mark-Viverito Depo. at 38:13-39:4, Ex. K.

**Plaintiff's Response**

79.     Disputed.  Mark-Viverito's belief is irrelevant and the statement lacks foundation.

**Mark-Viverito's Statement**

80.     Williams explained that she has called the Spanish speaking Mill Brook superintendents or the supervisor of the caretakers to translate for her and Mark-Viverito responded that was not acceptable. *See* Williams May 8, 2019 Depo. at 211:12-212:2; Colon Depo. at 136:23-25, Exs. H, B.

**Plaintiff's Response**

80.     Not disputed.

**Mark-Viverito's Statement**

81.     Artis explained that when they are faced with a language barrier, they use the NYCHA language bank to find a Spanish speaking person who can provide translation services over the telephone. *See* Artis Depo. 30:5-11, Ex. J.

**Plaintiff's Response**

81.     Not disputed.

**Mark-Viverito's Statement**

82.     Mark-Viverito said that it was unacceptable to have translation services over the telephone and that they needed a Spanish-speaking person in the room. *See* Williams Depo. 292:18-292:5, 293:6-9; Artis Depo. at 30:13-17, Exs. H, J.

**Plaintiff's Response**

82.     Not disputed.

**Mark-Viverito's Statement**

83.     Mark-Viverito allegedly stated that she wanted a "Spanish manager" and plaintiff testified that she understood this to mean that Mark-Viverito wanted a manager who spoke the Spanish language. *See* Colon Depo. at 146:8-12, Ex. B.

**Plaintiff's Response**

83.     Disputed.  As testified by Plaintiff, Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'"  Exhibit B at 135:24-137:20. Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate."  *Id*. at 156:4-158:6, Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Florestal Dec., Exhibit 1 at 154-56.

**Mark-Viverito's Statement**

84.     Mark-Viverito testified that the phrase "Spanish manager" refers to someone from Spain. *See* Mark-Viverito Depo. at 32:24-25, Ex. K.

**Plaintiff's Response**

84.     Objection.  Ms. Viverito's understanding of the term is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

85.     Mark-Viverito testified that she would not use the term "Spanish person" to refer to herself, a Latino, or an African-American. *See* Mark-Viverito Depo. at 33:9-15, Ex.  K.

**Plaintiff's Response**

85.     Objection.  Ms. Viverito's understanding of the term is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

86.     Mark-Viverito testified that she would refer to a Latino person as Latino. *See* Mark-Viverito Depo. at 33:16-18, Ex. K.

**Plaintiff's Response**

86.     Objection.  Ms. Viverito's understanding of the term is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

87.     During the meeting, when Mark-Viverito referred to her Spanish-speaking constituents, she did not refer to any particular race or ethnicity. *See* Mark-Viverito Depo. at 33:19-25, Ex. K.

**Plaintiff's Response**

87.     Objection.  Ms. Viverito's understanding of the term is immaterial.

Objection.  The cited testimony is speculative and does not support the statement.

Disputed.  "Spanish" in the context of the meeting was understood by

26

Plaintiff, James Artis and Allison Williams to mean Latino and not African-American.  As testified by Plaintiff, Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'"  Exhibit B at 135:24-137:20.  Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate."  *Id*. at 156:4-158:6, Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Florestal Dec., Exhibit 1 at 154-56.  In short, the "connotation" suggested by the statement is erroneous.

### Mark-Viverito's Statement

88.     Mark-Viverito testified that did not know whether the manager of Mill Brook spoke Spanish. See Mark-Viverito Depo. at 34:20-22, Ex. K.

### Plaintiff's Response

88.     Disputed.  This testimony is inconsistent and incongruous in light of the Council Speaker's demands and remarks that she requested the meeting as a means of assisting Mill Brook's Spanish speaking residents who could not communicate with management because of a language barrier.  As testified by Plaintiff, Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'"  Exhibit B at 135:24-137:20.  Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate."  *Id.* at 156:4-158:6,

Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Florestal Dec., Exhibit 1 at 154-56.

**Mark-Viverito's Statement**

88.    During the meeting, plaintiff noted that NYCHA does not have a title called bilingual housing managers but does have bilingual housing assistants. See Colon Depo.  at 136:6-9, Ex. B.

**Plaintiff's Response**

89.    Not disputed.

**Mark-Viverito's Statement**

89.    Plaintiff explained that having a bilingual housing assistant at Mill Brook might be of assistance to Williams because a bilingual housing assistant speaks Spanish. *See* Colon Depo. at 136:10-11, 146:2-7, Ex. B.

**Plaintiff's Response**

90.    Not disputed.

**Mark-Viverito's Statement**

90.    Plaintiff asked Williams if Mill Brook had a vacant housing assistant position and Williams responded that it did not. *See* Colon Depo. at 136:11-13, Ex. B.

**Plaintiff's Response**

91.    Not disputed.

**Mark-Viverito's Statement**

91.    Plaintiff offered to contact human resources and try to get a bilingual

housing assistant line placed at Mill Brook. *See* Colon Depo. at 136:13-16, Ex. B.

**Plaintiff's Response**

92.     Not disputed.

**Mark-Viverito's Statement**

92.     During the meeting, Mark-Viverito explained that there was a tenants' association meeting where the tenants were not allowed to speak in the language they were most comfortable speaking. Moreover, she explained that, there were customer service issues with the office, and there were maintenance issues with the property. *See* Clarke June 13, 2019 Depo. at 135:6-12, Ex. F.

**Plaintiff's Response**

93.     Objection.   The substance of the alleged tenants' alleged comments are inadmissible hearsay.

Objection.  There is no foundation for any such comments, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

Disputed.  There was no discussion of any complaints regarding a tenants' association meeting.  *See* Exhibit TT (as Marcela Medina wrote, "the insult things didn't come up").

**Mark-Viverito's Statement**

93.     Specifically, during a tenants' association meeting, Williams told the tenants not to speak to her in Spanish or to try to communicate with her in Spanish. *See* Clarke June 13, 2019 Depo. at 135:24-136:10, Ex. F.

**Plaintiff's Response**

94.    Objection.   The substance of the alleged tenants' alleged comments are inadmissible hearsay.

Objection.    There is no foundation for any such comments, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

Disputed.  Allison Williams denied that such a comment was made.  Exhibit H at 159:7-159:18.

**Mark-Viverito's Statement**

94.    During the tenants' association meeting, Williams said "no mira, mira, mira here" in a derogatory and offensive manner. *See* Clarke June 13, 2019 Depo. at 136:8-10, Ex. F.

**Plaintiff's Response**

95.    Objection.   The substance of the alleged tenants' alleged comments are inadmissible hearsay.

Objection.  There is no foundation for any such comments, except for one complaint from one complainant dated October 30, 2014.  See Statement no. 37 above and Exhibit II.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.

Disputed.  Allison Williams denied that such a comment was made.  Exhibit H at 159:7-159:18.

**Mark-Viverito's Statement**

95.    At the conclusion of the meeting, NYCHA agreed to review its general language access policy. *See* Medina Depo. at 69:9-15, Ex. I.

**Plaintiff's Response**

96.     Objection.  The cited testimony is based on inadmissible hearsay.

**Mark-Viverito's Statement**

96.     NYCHA also agreed to inquire if it was possible to create a Spanish bilingual line for someone in the management office at Mill Brook. *See* Medina Depo. at 69:17-19, Ex. I.

**Plaintiff's Response**

97.     Objection.  The cited testimony is based on inadmissible hearsay.

**Mark-Viverito's Statement**

98.     During the July 30, 2015 meeting, Mark-Viverito never used the words "Latino" or "Hispanic" but rather used the word "Spanish." *See* Williams May 8, 2019 Depo. at 296:8-12, Ex. H.

**Plaintiff's Response**

98.     Disputed.  The cited testimony does not support the statement.  Allison Williams testified that she could not "recall" if Mark-Viverito used the words Latino or Hispanic. Plaintiff testified that Mark-Viverito said "Spanish Hispanic."  Exhibit B at 186:14-186:22, 189:9-189:25.

**Mark-Viverito's Statement**

99.     Mark-Viverito testified that a Spanish person is not a Latino person. See Mark-Viverito Depo. at 40:7, Ex. K.

**Plaintiff's Response**

99.     Objection.  Ms. Viverito's understanding of the term is immaterial.
        Not otherwise disputed.

**Mark-Viverito's Statement**

100.    Mark-Viverito testified that she never uses the term "Spanish person" to refer

to a Latino person. See Mark-Viverito Depo. at 40:16-18, Ex. K.

**Plaintiff's Response**

99.     Objection.  Ms. Viverito's use of the term is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

101.    Plaintiff and Williams testified that an individual can speak Spanish fluently without being Spanish. See Williams Depo. May 8, 2019 Depo. at 202:22-25, Ex. H.

**Plaintiff's Response**

101.    Not disputed.

**Mark-Viverito's Statement**

102.    Williams testified that an individual can speak Spanish fluently without being Spanish. See Williams Depo. May 8, 2019 Depo. at 202:22-25, Ex. H.

**Plaintiff's Response**

102.    Not disputed.

**Mark-Viverito's Statement**

103.    During the July 30, 2015 meeting, none of the attendees including Mark-Viverito asked Clarke to remove Williams. *See* Clarke June 13, 2019 Depo. at 136:19-21, Ex.F.

**Plaintiff's Response**

103.    Disputed.  As testified by Plaintiff, Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'"  Exhibit B at 135:24-137:20. Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate." *Id*.

32

at 156:4-158:6, Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Exhibit B at 154-56.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Exhibit B at 154-56.

**Mark-Viverito's Statement**

104.    Medina took notes during the July 30, 2015 meeting. *See* Medina Depo. at 43:15-44:5; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

**Plaintiff's Response**

104.    Not disputed.

**Mark-Viverito's Statement**

105.    Medina's notes state "staff is very rude" and Medina testified that the meaning of that note was that several staff members from Mill Brook were rude to the residents of Mill Brook. See Medina Depo. at 46:2-7; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

**Plaintiff's Response**

105.    Objection.  The statement contains inadmissible hearsay.

Objection.  There is no foundation for the alleged rudeness by staff members to "the residents" except for one email to the Mark-Viverito's staff.  See Statement no. 37 above and Exhibit II.

Disputed.  Plaintiff asked defendant Mark-Viverito to produce all complaints received by the Mark-Viverito; Exhibit II was the only document received.  The only other complaint of rudeness was denied by Allison Williams and was never confirmed by NYCHA.

Exhibit H at 159:7-161:20.  Luis Ponce, who first told Plaintiff about this alleged remark, "couldn't tell me a time, a place, a location or who allegedly made the remark.  Exhibit B at 110:18-111:8.

**Mark-Viverito's Statement**

106.    Medina's notes also state "Language Bank - help residents - long waits" because, Medina testified that, during the meeting Mark-Viverito and her staff mentioned that there were long waits for the residents of Mill Brook before they could receive translation services. See Medina Depo. at 46:19-47:8; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

**Plaintiff's Response**

106.    Objection.  The statement contains inadmissible hearsay.

**Mark-Viverito's Statement**

107.    Medina's notes also state "Housing Assistant?" because, (as  she testified), that, Mark-Viverito asked if NYCHA ever assigned staff such as housing assistants to the developments based on data on the languages spoken by the residents. See Medina Depo. at 49:19-50:3; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

**Plaintiff's Response**

107.    Not disputed.

**Mark-Viverito's Statement**

108.    Medina testified that she placed a question mark after the words "Housing Assistant" because using housing assistants to help meet a resident's language needs was an interesting idea since housing assistants engage in constant contact with the  residents. See Medina Depo. at 50:4-9, 53:22-25; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

**Plaintiff's Response**

108.    Objection.  The statement is immaterial opinion testimony.

**Mark-Viverito's Statement**

109.    Medina's notes also state "see about hiring a Spanish speaker" because Medina testified that NYCHA intended to look into securing an additional line to hire someone within the management office who spoke Spanish. See Medina Depo. at 60:7-10; Medina Notes, dated July 30, 2015, NYCHA 4582, Exs. I, SS.

**Plaintiff's Response**

109.    Objection.  The statement contains inadmissible hearsay.


**Mark-Viverito's Statement**

110.    Medina testified that Mark-Viverito did not appear angry at the meeting but rather appeared upset and not content with the language barrier issue. See Medina Depo. at 27:2-21, Ex. S.

**Plaintiff's Response**

110.    Not disputed that Marcela Medina so testified.  Disputed as to the substance: As testified by Plaintiff, Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'"  Exhibit B at 135:24-137:20.  Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate."  *Id*. at 156:4-158:6, Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Florestal *Dec.*, Exhibit 1 at 154-56.


**Mark-Viverito's Statement**

111.    Medina testified that Mark-Viverito appeared to be upset that elderly residents had to wait in the management office for hours before someone could assist them in their language. See Medina Depo. at 28:5-9, 47:3-8; Medina Notes, dated July 30, 2015, NYCHA 4582, Ex. I, SS.

**Plaintiff's Response**

111.    Not disputed that Marcela Medina so testified.  Disputed as to the substance: As testified by Plaintiff, the Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'" Exhibit B at 135:24-137:20.  Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate."  *Id.* at 156:4-158:6, Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Florestal Dec., Exhibit 1 at 154-56.

**Mark-Viverito's Statement**

112.    Medina testified that Mark-Viverito also appeared to be upset that residents had to take time off from work because they were not sure whether somebody was going to visit their unit in order to make a repair. See Medina Depo. at 28:11-15, Ex. I.

**Plaintiff's Response**

112.    Not disputed.

**Mark-Viverito's Statement**

113.    After the meeting, Artis and plaintiff had a discussion and came to the conclusion that Mark-Viverito wanted a Spanish-speaking manager at Mill Brook. See Artis Depo.

37:17-25, Ex. J.

**Plaintiff's Response**

113.   Disputed.  As testified by Plaintiff, the Mark-Viverito "slammed her fist," "she said that she wanted a Spanish manager about three times," and was "very hostile, very angry, again screamed 'that's unacceptable I want a Spanish manager.'"  Exhibit B at 135:24-137:20. Plaintiff, Allison Williams and James Artis met directly after the meeting at the Mark-Viverito's office and agreed that what the Mark-Viverito requested was "racist," i.e., she wanted "a Spanish manager," and that "it was heartbreaking that I [Plaintiff] was being directed to discriminate."  *Id.* at 156:4-158:6, Exhibit J at 37:15-39:4.  Plaintiff, Williams and Artis "rehashed what happened with the speaker," were "very upset," and "cried" due to the "verbal hostility and the verbal assault that we all three had just gone through, especially as African American people."  Florestal Dec., Exhibit 1 at 154-56.

**Mark-Viverito's Statement**

114.   On July 31, 2015, Medina wrote that Mark-Viverito wants NYCHA to deal with the "language barrier issue" and "the idea is to bring in a housing assistant who can speak Spanish." See Email from Medina to Montalvo, sent  July 31, 2015, NYCHA 2852, Ex. TT.

**Plaintiff's Response**

114.   Not disputed that Marcela Medina so wrote.  Objection as to the substance of the contents of the document as inadmissible hearsay.

**Mark-Viverito's Statement**

115.   Clarke decided to transfer Williams out of the OPMOM Program because she was not a good manager. See Clarke June 13, 2019 Depo. at 137:14-138:2, Ex. F.

**Plaintiff's Response**

115.   Disputed.  This statement purports to address one of the ultimate issues of

37

fact to be determined by the factfinder, here a jury, i.e., "the [proposed] transfer was for

performance reasons and poor customer service," and is inappropriate for a motion for

summary judgment and thus for a Rule 56.1 statement.  Brian Clarke "told [Plaintiff] to call

Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.

Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . .

This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-159:13.  Brian "told me to

remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic

manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to

implement the directives regarding Allison Williams.  He said tell Kenya don't use the words

"Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."

*Id.* at 160:24-161:22.

Additionally, Brian Clarke's assessment of Allison Williams'

performance is contradicted by Plaintiff's assessment that "Allison Williams was thriving and

doing extremely well under my leadership."  Lippman Dec., Exhibit 5 at  210:17-18.  As the

Manager of Mill Brook Houses, Allison Williams reported directly to Plaintiff.  Declaration of

Sybil Colon, January 17, 2020, ¶ 2.  Allison Williams became a Housing Manager in 1999,

became the Housing Manager at Mill Brook Houses in 2006 and remained the Housing

Manager at Mill Brook Houses until she retired from NYCHA on May 1, 2017.  Lippman

Dec., Exhibit 6 at 27:14 to 28:7, 232:10-12. Allison Williams was not transferred from Mill

Brook Houses before Plaintiff became Director of OPMOM or following Plaintiff's

resignation from NYCHA on August 28, 2015.  *Id.*

**Mark-Viverito's Statement**

116.    Williams was not prepared for meetings and failed to create corrective action

plans to address pending issues. See Clarke June 13, 2019 Depo. at 138:4-10, Ex. F.

**Plaintiff's Response**

116.   Objection.  The statement contains inadmissible hearsay.

Disputed.  Brian Clarke "told [Plaintiff] to call Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.  Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . . This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-159:13.  Brian "told me to remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to implement the directives regarding Allison Williams.  He said tell Kenya don't use the words "Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."  *Id.* at 160:24-161:22.

Additionally, Brian Clarke's assessment of Allison Williams' performance is contradicted by Plaintiff's assessment that "Allison Williams was thriving and doing extremely well under my leadership."  Lippman Dec., Exhibit 5 at  210:17-18.  As the Manager of Mill Brook Houses, Allison Williams reported directly to Plaintiff.  Declaration of Sybil Colon, January 17, 2020, ¶ 2.  Allison Williams became a Housing Manager in 1999, became the Housing Manager at Mill Brook Houses in 2006 and remained the Housing Manager at Mill Brook Houses until she retired from NYCHA on May 1, 2017.  Lippman Dec., Exhibit 6 at 27:14 to 28:7, 232:10-12. Allison Williams was not transferred from Mill Brook Houses before Plaintiff became Director of OPMOM or following Plaintiff's resignation from NYCHA on August 28, 2015.  *Id.*

**Mark-Viverito's Statement**

117.   Clarke decided to seek Williams's transfer out of the OPMOM Program upon learning that in addition to Williams's work performance issues, she had told Mill Brook residents (who had limited ability to speak or understand English) that they should not communicate with

Williams at a public meeting. See Clarke June 13, 2019 Depo. at 138:4-20, Ex. F.

**Plaintiff's Response**

117.   Objection.  The statement contains inadmissible hearsay.

Disputed.  Plaintiff was told by Luis Ponce, NYCHA's Senior Vice President of Operations, "'I don't know *supposedly* she [Allison Williams] had a meeting and said meda, meda something.  No speaking meda, meda, *I'm not quite sure.*'  And he said I don't know what it means.  He didn't seem bothered by it.  He said just sign up for a class called satisfying the internal customer. . . .  Ponce directed me what to do."  Exhibit B at 187:2-188:25, Exhibit L at 11:11-11:22 (emphasis added).

The alleged remark was never confirmed by NYCHA.  Luis Ponce, who first told Plaintiff about this alleged remark, "couldn't tell me a time, a place, a location or who allegedly made the remark.  Exhibit B at 110:18-111:8.

Brian Clarke "told [Plaintiff] to call Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.  Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . . This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-159:13.  Brian "told me to remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to implement the directives regarding Allison Williams.  He said tell Kenya don't use the words "Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."  *Id.* at 160:24-161:22.

Additionally, Brian Clarke's assessment of Allison Williams' performance is contradicted by Plaintiff's assessment that "Allison Williams was thriving and doing extremely well under my leadership."  Lippman Dec., Exhibit 5 at  210:17-18.  As the

Manager of Mill Brook Houses, Allison Williams reported directly to Plaintiff. Declaration of Sybil Colon, January 17, 2020, ¶ 2. Allison Williams became a Housing Manager in 1999, became the Housing Manager at Mill Brook Houses in 2006 and remained the Housing Manager at Mill Brook Houses until she retired from NYCHA on May 1, 2017. Lippman Dec., Exhibit 6 at 27:14 to 28:7, 232:10-12. Allison Williams was not transferred from Mill Brook Houses before Plaintiff became Director of OPMOM or following Plaintiff's resignation from NYCHA on August 28, 2015. *Id.*

**Mark-Viverito's Statement**

118.    Williams's actions ran in direct contravention of a key component of the OPMOM Program, which was tenant engagement. See Clarke June 13, 2019 Depo. at 138:4-20, Ex. F.

**Plaintiff's Response**

118.    Objection. The statement contains inadmissible hearsay.

Disputed. Plaintiff was told by Luis Ponce, NYCHA's Senior Vice President of Operations, "'I don't know *supposedly* she [Allison Williams] had a meeting and said meda, meda something. No speaking meda, meda, *I'm not quite sure.*' And he said I don't know what it means. He didn't seem bothered by it. He said just sign up for a class called satisfying the internal customer. . . . Ponce directed me what to do." Exhibit B at 187:2-188:25, Exhibit L at 11:11-11:22 (emphasis added).

The alleged remark was never confirmed by NYCHA. Luis Ponce, who first told Plaintiff about this alleged remark, "couldn't tell me a time, a place, a location or who allegedly made the remark. Exhibit B at 110:18-111:8.

**Mark-Viverito's Statement**

119.    In order to have tenant engagement, it was imperative for tenants be able to

communicate with NYCHA. See Clarke June 13, 2019 Depo. at 139:7-18, Ex. F.

**Plaintiff's Response**

119.   Disputed to the extent that the purpose of the NYCHA language bank and the utilization of Spanish-speaking staff at the Mill Brook Houses management office (such as the superintendent and supervisor of caretakers) supported tenant engagement and communication.

**Mark-Viverito's Statement**

120.   Clarke wanted Williams removed from the OPMOM Program and disciplined for her actions at the public meeting. See Clarke June 13, 2019 Depo. at 138:19-21, Ex. F.

**Plaintiff's Response**

120.   Objection.  The statement contains inadmissible hearsay.

Disputed.  Plaintiff was told by Luis Ponce, NYCHA's Senior Vice President of Operations, "'I don't know *supposedly* she [Allison Williams] had a meeting and said meda, meda something.  No speaking meda, meda, *I'm not quite sure.*'  And he said I don't know what it means.  He didn't seem bothered by it.  He said just sign up for a class called satisfying the internal customer. . . .  Ponce directed me what to do."  Exhibit B at 187:2-188:25, Exhibit L at 11:11-11:22 (emphasis added).

The alleged remark was never confirmed by NYCHA.  Luis Ponce, who first told Plaintiff about this alleged remark, "couldn't tell me a time, a place, a location or who allegedly made the remark.  Exhibit B at 110:18-111:8.

**Mark-Viverito's Statement**

121.   Clarke discussed his recommendation of transferring Williams out of Mill

Brook with Kelly. See Clarke June 13, 2019 Depo. at 140:24-25, Ex. F.

**Plaintiff's Response**

121.    Not disputed that Brian Clarke discussed transferring Williams out of Mill Brook Houses with Kelly.

Disputed as to the reason for the transfer.

**Mark-Viverito's Statement**

122.    Kelly did not object to Clarke's recommendation of transferring Williams out of Mill Brook.  See Clarke June 13, 2019 Depo. at 141:6-9, Ex. F.

**Plaintiff's Response**

122.    Not disputed that Michael Kelly did not object to Brian Clarke's recommendation of transferring Allison Williams out of Mill Brook Houses.

Disputed as to the reason for the transfer.

**Mark-Viverito's Statement**

123.    Because Williams's civil service title was property manager she could be transferred at the discretion of management. See Clarke June 13, 2019 Depo. at 145:24-146:2; Colon Depo. at 104:11-14, 145:13-17, Exs. F, B.

**Plaintiff's Response**

123.    Not disputed.

**Mark-Viverito's Statement**

124.    On July 31, 2015, plaintiff had a meeting with Clarke. See Colon Depo. at 160:20-23, Ex. B.

**Plaintiff's Response**

124.    Not disputed.

**Mark-Viverito's Statement**

125.   Clarke was going on vacation and he wanted plaintiff to complete three assignments: (1) terminate a NYCHA employee, (2) write up another NYCHA employee and place him on an improvement performance plan, and (3) transfer Williams from Mill Brook. See Colon Depo. at 161:5-8, Ex. B.

**Plaintiff's Response**

125.   Not disputed.

**Mark-Viverito's Statement**

126.   Clarke told plaintiff to contact Kenya Salaudeen (NYCHA Director of Human Resources) so as to implement the transfer of Williams. See Colon Depo. at 161:10-12; Clarke June 13, 2019 Depo. at 49:7-9, Exs. B, F.

**Plaintiff's Response**

126.   Not disputed that Clarke told Plaintiff to contact Kenya Salaudeen so as to implement a transfer of Allison Williams.

Disputed as to the reason for the transfer.  Brian Clarke "told [Plaintiff] to call Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.  Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . . This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-159:13.  Brian "told me to remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to implement the directives regarding Allison Williams.  He said tell Kenya don't use the words "Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."  Lippman Dec., Exhibit 5 at 160:24-161:22.

**Mark-Viverito's Statement**

44

127.    Plaintiff was instructed to contact the Human Resources Department because that department could determine if there were any vacant manager positions where Williams could be transferred to. See Clarke June 13, 2019 Depo. at 142:17-22, Ex. F.

**Plaintiff's Response**

127.    Not disputed that Clarke told Plaintiff to contact Kenya Salaudeen so as to implement a transfer of Allison Williams.

Disputed as to the reason for the transfer.  Brian Clarke "told [Plaintiff] to call Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.  Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . . This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-159:13.  Brian "told me to remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to implement the directives regarding Allison Williams.  He said tell Kenya don't use the words "Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."  Lippman Dec., Exhibit 5 at 160:24-161:22.

**Mark-Viverito's Statement**

128.    Plaintiff testified that Clarke instructed plaintiff to tell Salaudeen that the Williams transfer was necessary due to the cultural sensitivity needs of the Mill Brook development. See Colon Depo. at 161:13-15, Ex. B.

**Plaintiff's Response**

128.    Not disputed.

**Mark-Viverito's Statement**

129.    Plaintiff did not respond to Clarke's instructions regarding these three

tasks identified in paragraph 125 above. See Colon Depo. at 162:10-12; Ex. B.

**Plaintiff's Response**

129.    Disputed.    The statement distorts the testimony by omitting Plaintiff's

testimony that she was "listening in shock" to Mr. Clarke's directives "and that I was once again

being asked to discriminate." Lippman Dec., Exhibit 5 at 162:4-6.

**Mark-Viverito's Statement**

130.    While Clarke was on vacation he contacted Luis Ponce (NYCHA Senior

Vice President of Operations) and asked Ponce to follow-up on the transfer of the Mill Brook

manager. See Ponce Depo. at 11:11-15, 38:22-39:2, Ex. L.

**Plaintiff's Response**

130.    Only disputed to the extent of correcting Mr. Ponce's title as Senior Vice

President of Operations for Support Services.

**Mark-Viverito's Statement**

131.    Clarke told Ponce that he had asked plaintiff to work on the Williams

transfer and that he would like to have the transfer completed by the time he returned from

vacation. See Ponce Depo. at 38:22-39:6, Ex. L.

**Plaintiff's Response**

131.    Not disputed.

**Mark-Viverito's Statement**

132.    Approximately two days after the July 30, 2015 meeting, Colon attended

a meeting with Williams, Artis, OPMOM managers and the Tenant Association President. See

Williams May 8, 2019 Depo. at 213:23-214:24, Ex. H.

46

**Plaintiff's Response**

        132.    Not disputed.

**Mark-Viverito's Statement**

        133.    Williams told plaintiff and Artis that she felt bullied at the July 30, 2015 meeting because she did not speak Spanish. See Williams May 8, 2019 Depo. at 213:17-215:11, Ex. H.

**Plaintiff's Response**

        133.    Not disputed.

**Mark-Viverito's Statement**

        134.    Plaintiff and Artis responded that Williams was not being bullied. See Williams May 8, 2019 Depo. at 215:12-14, Ex. H.

**Plaintiff's Response**

        134.    Disputed.  This statement attempts to mischaracterize Plaintiff's and Artis's perception of the meeting which they described as "racist."  Florestal Dec., Exhibit 1 at 154-56; Exhibit 4 at 38-39.

**Mark-Viverito's Statement**

        135.    On August 3, 2015, plaintiff called Salaudeen regarding the Williams transfer. See Colon Depo. at 166:6-18, Ex. B.

**Plaintiff's Response**

        135.    Not disputed.

**Mark-Viverito's Statement**

        136.    Plaintiff testified that she told Salaudeen that Williams was to be replaced with a Hispanic manager. See Colon Depo. at 167:10-12, Ex. B.

**Plaintiff's Response**

> 136.   Not disputed.

**Mark-Viverito's Statement**

> 137.   Plaintiff testified that Salaudeen said she was offended by that request and that such a request was illegal because it was a race based transfer. See Colon Depo. at 167:13-23, 169:15-18, Ex. B.

**Plaintiff's Response**

> 137.   Not disputed.

**Mark-Viverito's Statement**

> 138.   Salaudeen denied telling plaintiff that such a transfer was illegal, that she did not care if President Obama wanted the transfer completed, and that such a transfer could not occur. See Salaudeen Depo. at 27:2-17, Ex. M.

**Plaintiff's Response**

> 138.   Disputed.  The Mark-Viverito mischaracterizes the cited testimony. Kenya Salaudeen did not deny making these statements to Plaintiff; she did not "recall making them.  She also did not recall having a conversation with Plaintiff regarding removing Allison Williams as the manager of Mill Brook Houses.  Exhibit M at 25:9-25:22.

> In fact, Kenya Salaudeen recalled almost nothing about her experience as NYCHA's Director of Human Resources and Labor Relations ("HR") during the period relevant to this action starting in 2015 until March 2017.  *Id.* at 7:9-11:5.  Ms. Salaudeen had virtually no recollection of numerous matters, invoking the phrase "I don't recall" or "I do not recall" at least forty (40) times throughout her deposition.  [N.B.: The entire transcript of the deposition will be submitted to the Court pursuant to Judge Broderick's Individual Rules of

Practice.] She did not recall the size of her HR unit because "I blocked it out of my memory so I don't really recall." *Id.* at 8:24-9:4. Further, when asked why she left NYCHA, she responded: "I was terminated." *Id.* at 10:20-:21. When asked why she was terminated, she responded, "I don't know why." *Id.* at 10:22-:23.

**Mark-Viverito's Statement**

139.    Plaintiff asked Marla Edmonson (a member of the NYCHA Human Resources Employee Relations Department) about transferring Williams to another location. See Edmonson Depo. at 6:19-7:6, 44:7-15, Ex. N.

**Plaintiff's Response**

139.    Objection to the extent that the statement suggests that Plaintiff "asked" to have Allison Williams transferred.

Not otherwise disputed.

**Mark-Viverito's Statement**

140.    Edmonson advised plaintiff that after reviewing Williams's Human Resources file Williams could not be transferred. See Edmonson Depo. at 12:4-11, Ex. N.

**Plaintiff's Response**

140.    Not disputed.

**Mark-Viverito's Statement**

141.    The file that Edmonson reviewed did not accurately reflect the contents of Williams's personnel file or location folder. See Edmonson Depo. at 45:4-9, Ex. N.

**Plaintiff's Response**

141.    Disputed. This statement lacks foundation.

**Mark-Viverito's Statement**

142.     Edmonson never told plaintiff that an attempt to transfer Williams was illegal. See Edmonson Depo. at 6:19-7:6; 13:20-14:3, Ex. N.

**Plaintiff's Response**

142.     Disputed.  *See* Exhibit B at 172:19-175:4.


**Mark-Viverito's Statement**

143.     On August 6, 2015, Sheila Pinckney (Senior Advisor, Office of the SVP Operations) sent plaintiff an email inquiring whether the "move [was] completed" "regarding the Property Manager at Mill Brook Houses." See Email from Pickney to Colon, sent August 6, 2015, NYCHA 3517- NYCHA 3518, Ex. UU.

**Plaintiff's Response**

143.     Not disputed.

**Mark-Viverito's Statement**

144.     That same day, Colon responded that "HR needs more information from us. There is also is an ig [inspector general] investigation going on. HR wants to talk to the ig's office first." See Email from Colon to Pickney, sent August 6, 2015, NYCHA 3517, Ex. UU.

**Plaintiff's Response**

144.     Not disputed.

**Mark-Viverito's Statement**

145.     In late August 2015, Clarke was informed by the Inspector General that Williams was not under investigation but rather that the Inspector General was investigating tenants at Mill Brook. See Clarke July 1, 2019 Depo. at 62:2-9, Ex. G.

**Plaintiff's Response**

145.    Objection.  This statement omits critical testimony.  Richard Bennardo, NYCHA's Deputy Director of Employee and Labor Relations, told Plaintiff that he wanted to see the IG referral before moving forward on the transfer of Allison Williams because "everyone was trying to make Brian happy.  And he felt that we could not do a racial type transfer.  However, if there is something in the IG complaint that warrants a transfer, maybe we can do it. . . . Because he said let's humor them a little bit.  It can't be done.  Maybe we can do it through an IG."  Exhibit B at 229:19-230:22; Florestal Dec., Exhibit 36.

Not otherwise disputed.

**Mark-Viverito's Statement**

146.    On August 7, 2015, plaintiff asked Williams to respond to a July 28, 2015 inquiry made by the Bronx Borough President's office concerning a young mother with a five-month-old daughter who did not have a working refrigerator. See Email from Colon to Williams, sent August 7, 2015, NYCHA 3556-3557, Ex. VV.

**Plaintiff's Response**

146.    Objection.  The statement is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

147.    On August 12, 2015, plaintiff emailed Clarke that she was "experienc[ing] difficulty with the transferring of the Manager at Mill Brook." See Email from Colon to Clarke, sent August 12, 2015, NYCHA 3666, Ex. WW.

**Plaintiff's Response**

147.    Not disputed.

**Mark-Viverito's Statement**

148.    Later that day, Clarke called plaintiff and inquired about the status of the Williams transfer. See Colon Depo. at 207:4-17, Ex. B.

**Plaintiff's Response**

148.    Not disputed.

**Mark-Viverito's Statement**

149.    Plaintiff told Clarke "what was going on." See Colon Depo. at 207:17-19, Ex. B.

**Plaintiff's Response**

149.    Not disputed.

**Mark-Viverito's Statement**

150.    Clarke responded that plaintiff had failed him and had not carried out her assignment. See Colon Depo. at 207:19-20, Ex. B.

**Plaintiff's Response**

150.    Not disputed.

**Mark-Viverito's Statement**

151.    Plaintiff went on vacation from August 17, 2015 through August 23, 2015. See Colon Depo. at 212:1-3, Ex. B.

**Plaintiff's Response**

151.    Not disputed.

**Mark-Viverito's Statement**

152.    In July and August 2015, Abrahams was interviewed by Kelly, Olatoye, and the Chief of Staff to the Deputy Mayor of New York City. See Kelly July 3, 2019 Depo. at 38:21-24, Ex. D.

**Plaintiff's Response**

152.    Not disputed.

**Mark-Viverito's Statement**

153.    On August 18, 2015, Kelly emailed his Chief of Staff (Payamps-Roure) "Let's find out where we are with [Abrahams's] start date and our move with sybil [sic]." See Email from Kelly to Payamps-Roure, sent Aug. 18, 2015, NYCHA 3916, Ex. XX.

**Plaintiff's Response**

153.    Not disputed.

**Mark-Viverito's Statement**

154.    Later that day, Rivers wrote to Clarke and Payamps-Roure that "[Abrahams] is scheduled to start on or around September 28th." See Email from Rivers to Clarke and Payamps-Roure, NYCHA 4109, Ex. YY.

**Plaintiff's Response**

154.    Not disputed.

**Mark-Viverito's Statement**

155.    On August 20, 2015, Abrahams was formally offered a job with NYCHA as the Vice President of the Optimal Property Management Department. See Kelly July 3, 2019 Depo. at 36:21-23; Email from Rivers to Abrahams, sent Aug. 20, 2015, NYCHA 4278-NYCHA 4282, Exs. D, ZZ.

**Plaintiff's Response**

155.    Not disputed.

**Mark-Viverito's Statement**

156.    Abrahams accepted the job offer and began working for NYCHA in September 2015 overseeing the OPMOM Program. See Kelly July 3, 2019 Depo. at 36:21-24; Kelly Sept. 23, 2019 Depo. at 61:2-5; 78:8-17, Exs. D, E.

**Plaintiff's Response**

156.    Not disputed.

**Mark-Viverito's Statement**

157.    Kelly and NYCHA Chair Olatoye made the decision to remove plaintiff as the Director of OPMOM. See Clarke June 13, 2019 Depo. at 51:11-19, Ex. F.

**Plaintiff's Response**

157.    Objection.  The statement is based on inadmissible hearsay.

Objection.  The statement lacks a foundation in the record.

Disputed.  The statement is not supported by the record.  Brian Clarke "told [Plaintiff] to call Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.  Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . . This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-159:13.  Brian "told me to remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to implement the directives regarding Allison Williams.  He said tell Kenya don't use the words "Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."  Lippman Dec., Exhibit 5 at 160:24-161:22.  Plaintiff's opposition to Mr. Clarke's directive is what led to her demotion, which occurred on August 28, 2015, one month before Janet Abrahams allegedly "replaced" her, which was effective September 28, 2015.  *See* Florestal Dec., **prior Exhibits 33 and 34.** ------------------------

**Mark-Viverito's Statement**

54

158.    Kelly told  Clarke that  plaintiff  was  to  be  replaced by Abrahams.  See Clarke June 13, 2019 Depo. at 51:3-52:15, Ex. F.

**Plaintiff's Response**

158.    Objection.  The statement is based on inadmissible hearsay.

Objection.  The statement lacks foundation in the record.

Disputed.  The statement is not supported by the record.

**Mark-Viverito's Statement**

159.    Kelly told Clarke that NYCHA had recruited Abrahams and Abrahams had successfully implemented asset management at two other Housing Authorities. See Clarke June 13, 2019 Depo. at 52:16-23, Ex. F.

**Plaintiff's Response**

159.    Not disputed.

**Mark-Viverito's Statement**

160.    Clarke was surprised when he received this news because he was not involved in the decision making process to hire Abrahams or to remove plaintiff as the Director of OPMOM. See Clarke June 13, 2019 Depo. at 51:20-23, 52:16-53:5, Ex. F.

**Plaintiff's Response**

160.    Objection.  The statement is based on inadmissible hearsay.

Objection.  The statement lacks a foundation in the record.

Disputed.  The statement is not supported by the record.  Brian Clarke "told [Plaintiff] to call Kenya [Salaudeen, NYCHA's HR Director] and tell him [*sic*] that Mr. Kelly wants it done.  Melissa – Mr. Kelly wants it done, Melissa wants it done and I [Brian Clarke] want I done. . . . This is what Brian told me."  Florestal Dec., Exhibit 1 at 158:14-

159:13.  Brian "told me to remove and replace Allison [Williams] from Mill Brook Houses . . . with a Spanish Hispanic manager.  He further stated I should reach out to Kenya Salaudeen, the HR Director to implement the directives regarding Allison Williams.  He said tell Kenya don't use the words "Spanish" manager.  He said tell her it's for the cultural sensitivity needs of the development."  Lippman Dec., Exhibit 5 at 160:24-161:22.  Plaintiff's opposition to Mr. Clarke's directive is what led to her demotion, which occurred on August 28, 2015, one month before Janet Abraham allegedly "replaced" her, which was effective September 28, 2015.  *See* Florestal Dec., **prior Exhibits 33 and 34.**  -----------------

**Mark-Viverito's Statement**

161.    On August 24, 2015, plaintiff spoke to Clarke regarding her attempt to effectuate the transfer of Williams out of Mill Brook. See Colon Depo. at 216:2-5, Ex. B.

**Plaintiff's Response**

161.    Not disputed.

**Mark-Viverito's Statement**

162.    Plaintiff told Clarke that the transfer could not be completed because it was "illegal" but plaintiff did not provide Clarke with an explanation as to why the transfer was "illegal." See Colon Depo. at 216:2-19, Ex. B.

**Plaintiff's Response**

162.    Disputed.  Plaintiff told Brian Clarke "what HR told me . . . as well as my own thoughts of what was being asked of me . . . about it being illegal and me opposing doing this behavior. . . [i]t was a hostile conversation . . . Brian Clarke was harassing me basically every day to do this."  Exhibit B at 217:8-220:5, 165:25-168:11, 169:1-176:11.

**Mark-Viverito's Statement**

163.    On August 25, 2015, Clarke emailed plaintiff "Where are we with moving the manager from Millbrook?" See Email from Clarke to Colon, sent August 25, 2015, NYCHA 4252, Ex. AAA.

**Plaintiff's Response**

163.    Not disputed.

**Mark-Viverito's Statement**

164.    Plaintiff responded that "HR informed me that we needed more specific information in reference to the cultural needs of the residents, in order to transfer the Manager at Mill Brook. James was contacted by the IG's office and was told that they were conducting an active in [sic] investigation on the Manager and to hold off on any further actions. At this point, HR advised me that they would like to see the IG's referral before moving forward on the transfer request." See Email from Colon to Clarke, sent August 25, 2015, NYCHA 4251 - NYCHA 4252, Ex. AAA.

**Plaintiff's Response**

164.    Not disputed.

**Mark-Viverito's Statement**

165.    At 8:26 a.m. on August 26, 2015, Payamps-Roure emailed Clarke that "Since there is a concern that Sybille Colon [sic] might hear of Janet Abrahams coming on board to run OPMOM from other folks, we would like [to] give her the news of her new assignment this week." See Email from Payamps-Roure to Clarke, sent Aug. 26, 2015, NYCHA 4257, Ex. BBB.

**Plaintiff's Response**

165.    Not disputed.

**Mark-Viverito's Statement**

166.   At the conclusion of a meeting that was held on August 26, 2015, plaintiff told Clarke that the transfer was "illegal" and "it was along those lines that it was racial." See Colon Depo. at 233:24-237:17, Ex. B.

**Plaintiff's Response**

166.   Not disputed.

**Mark-Viverito's Statement**

167.   On August 28, 2015, plaintiff had a meeting with Kelly and Clarke. See Colon Depo. at 239:1-5, Ex. B.

**Plaintiff's Response**

167.   Not disputed.

**Mark-Viverito's Statement**

168.   Kelly told plaintiff that he had decided to hire someone that he used to work with in Chicago and that he had a new position for plaintiff. See Colon Depo. at 239:5-11, 241:19-22 Ex. B.

**Plaintiff's Response**

168.   Not disputed.

**Mark-Viverito's Statement**

169.   Plaintiff was to serve as a senior administrator in the Management Service Department. See Colon Depo. at 143:12-16, Ex. B.

**Plaintiff's Response**

169.   Not disputed.

**Mark-Viverito's Statement**

170.   Plaintiff designed and created the Management Services Department. See Colon Depo. at 246:11-14, 21:23, 248:8-10, 258:14-16, Ex. B.

**Plaintiff's Response**

   170. Not disputed.

**Mark-Viverito's Statement**

   171. Instead of accepting this new position, plaintiff immediately resigned

from NYCHA. See Colon Depo. at 250:6-7, Ex. B.

**Plaintiff's Response**

   171. Not disputed.

**Mark-Viverito's Statement**

   172. On May 23, 2016, Octavia Hayward (Regional Asset Manager for

Brooklyn) became the new Director of the OPMOM Program. See Email from Abrahams to

Almanzar and others, sent May 20, 2016; Kelly Sept. 23, 2019 Depo. at 22:20-23:4, Exs. CCC,

E.

**Plaintiff's Response**

   172. Not disputed.

**Mark-Viverito's Statement**

   173. There was no acting director of OPMOM between the departure of

plaintiff and the appointment of Hayward. See Kelly Sept. 23, 2019 Depo. 41:16-21, Ex. E.

**Plaintiff's Response**

   173. Disputed.  This statement lacks foundation and is inconsistent with the

documentary evidence.

**Mark-Viverito's Statement**

   174. During the summer of 2016, Abrahams was promoted to Senior Vice

President. See Kelly Sept. 23, 2019 Depo. at 78:8-17, Ex. E.

**Plaintiff's Response**

174.   Objection.  The statement is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

175.   Kelly testified that Abrahams had the experience and the ability to take the 18 property modeling of OPMOM and produce a program that would expand it to the entire NYCHA portfolio. See Kelly July 3, 2019 Depo. at 47:13-17, Ex. D.

**Plaintiff's Response**

175.   Not disputed.

**Mark-Viverito's Statement**

176.   Kelly testified that Abrahams did this successfully. See Kelly July 3, 2019 Depo. at 47:18, Ex. D.

**Plaintiff's Response**

176.   Objection.  The statement is immaterial.

Not otherwise disputed.

**Mark-Viverito's Statement**

177.   Abrahams remained at NYCHA until July 2017 when she accepted the job of executive director of the Baltimore Housing Authority. See Kelly Sept. 23, 2019 Depo. at 78:20-21, 155:2-7, Ex. D.

**Plaintiff's Response**

177.   Objection.  The statement is immaterial.

Not otherwise disputed.

Dated:  New York, New York
        April 17, 2020

Respectfully submitted,

/s/Marcel Florestal, Esq.
FLORESTAL LAW FIRM,
PLLC
*Trial Counsel for Plaintiff*
48 Wall Street, Suite 11
New York, NY 10005
(212) 918-4416  - Voice
(646) 417-7777  - Fax