UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                             :

SIBYL COLON,                        :
                             :

                        Plaintiff,   :

                             :

             - against -       :

                             :

NEW YORK CITY HOUSING AUTHORITY,:
BRIAN CLARKE, MICHAEL KELLY, and  :
MELISSA MARK-VIVERITO,       :

                             :

                 Defendants.  :
                             :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/26/2021

16-CV-4540 (VSB)

**OPINION & ORDER**

Appearances:

Leslie R Bennett
Leslie R Bennett LLC
Melville, NY

Marcel Florestal
Florestal Law Firm
New York, NY

*Counsel for Plaintiff*

Adam G. Kurtz
E72 Law
New York, NY

Donna Marie Murphy
New York City Housing Authority
New York, NY

*Counsel for Defendants New York City Housing Authority, Brian Clarke, and Michael Kelly*

Heather Marie Martone
Reed Smith LLP
Los Angeles, CA

Natalie Sharon Marcus
New York City Law Department
New York, NY

*Counsel for Defendant Mark-Viverito*

VERNON S. BRODERICK, United States District Judge:

Plaintiff Sibyl Colon ("Plaintiff" or "Colon") brings this action alleging retaliatory discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*., New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296, *et seq*., New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-107, *et seq*., and 42 U.S.C. § 1983 ("Section 1983"), and aiding and abetting under the NYSHRL. Plaintiff alleges, in short, that she was removed from her position at the New York City Housing Authority ("NYCHA") as a result of her failing to carry out a directive to transfer another employee because Plaintiff believed the transfer to be motivated by discrimination.

Before me are the cross-motions of (1) Defendants Senior Vice President of NYCHA Brian Clarke ("Clarke"), General Manager of NYCHA Michael Kelly ("Kelly"), and NYCHA (collectively, "the NYCHA Defendants"), (Docs. 122, 130), (2) Defendant Former Council Speaker Melissa Mark-Viverito ("Mark-Viverito"), (Doc. 120), and (3) Plaintiff Colon, (Doc. 132), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also before me is the motion for sanctions of the NYCHA Defendants seeking to preclude the declarations of Robert Knapp ("Knapp") and Louis Nieves ("Nieves") because Plaintiff failed to disclose those witnesses under Federal Rules of Civil Procedure 26(a) and 37(c), and for attorneys' fees incurred in bringing the instant motion to strike. (Doc. 184.)

Because genuine issues of material fact remain concerning whether NYCHA retaliated against Plaintiff, and whether Defendants Clarke and Kelly participated in such retaliation, the

cross-motions for summary judgment regarding the claims against the NYCHA Defendants are DENIED. However, because the record is devoid of evidence that Defendant Mark-Viverito participated in the alleged retaliation against Plaintiff, Defendant Mark-Viverito's motion for summary judgment is GRANTED to the extent that it seeks dismissal of Plaintiff's aiding and abetting claims against Defendant Mark-Viverito, and Plaintiff's cross-motion requesting summary judgment on the same claims is correspondingly DENIED. Finally, the NYCHA Defendants' motion for sanctions is GRANTED in part and DENIED in part, in that I grant the NYCHA Defendants reasonable attorneys' fees in connection with filing the instant motion for sanctions and in connection with any additional discovery needed as a result of Plaintiff's untimely disclosures of the declarations of Knapp and Nieves; however, I decline to preclude those declarations.

## I.   **Factual Background**[1]

Plaintiff is an African-American woman who began her employment with NYCHA in August 1985 and rose through the ranks over the years. (Doc. 143, Pl.'s R. 56.1 Statement ¶¶ 1, 4;[2] *see* Doc. 155, Marcus Decl., Ex. O.)[3] During her tenure at NYCHA, Plaintiff was never subject to disciplinary action and received three commendation letters. (*See* Pl.'s R. 56.1 Statement, Ex. 19; Doc. 154, Mark-Viverito's R. 56.1 Counterstatement ¶ 7;[4] Doc. 157, NYCHA R. 56.1 Counterstatement ¶ 7.)[5]

---

[1] The statements of fact set forth in this section are undisputed unless noted otherwise.

[2] "Pl.'s R. 56.1 Statement" refers to the Plaintiff's Statement Pursuant to Local Civil Rule 56.1, filed January 22, 2020. (Doc. 143.)

[3] "Marcus Decl." refers to Natalie S. Marcus's Declaration in Opposition to Plaintiff's Motion for Summary Judgment, filed April 17, 2020. (Doc. 155.)

[4] "Mark-Viverito's R. 56.1 Counterstatement" refers to Defendant Mark-Viverito's Counter Statement of Undisputed Facts and Responses and Objections to Plaintiff's Statement Pursuant to Local Civil Rule 56.1, filed April 17, 2020. (Doc. 154.)

[5] "NYCHA R. 56.1 Counterstatement" refers to the Response of the NYCHA Defendants to Plaintiff Sibyl Colon's

In 2014, NYCHA began preparing for a property management model pilot program called the Optimal Property Management Operating Model ("OPMOM"). (Doc. 124, NYCHA R. 56.1 Statement ¶ 9.)[6] The program began operation in January 2015. (*Id.* ¶ 12.) The original 18 OPMOM developments were in Brooklyn, the Bronx, and Manhattan, and there was a Regional Asset Manager ("RAM") assigned to each borough. (*Id.*)

In November 2014, Janet Abrahams ("Abrahams"), then Chief Operating Officer of the Newark Housing Authority, was recommended to NYCHA Chair Shola Olatoye (the "Chair" or "Olatoye") as a potential candidate to manage the OPMOM Program. (*Id.* ¶¶ 17, 21; Marcus Decl., Ex. D, Kelly July 3, 2019 Dep. Tr. 34:17-35:6.)[7] On November 7, 2014, NYCHA Executive Vice-President Cathy Pennington emailed General Manager Cecil House ("General Manager" or "House") to strongly recommend Abrahams for "new executive leadership." (NYCHA R. 56.1 Statement ¶ 16; Doc. 126, Lippman Decl., Ex. 19, November 7-10, 2014 Email Chain between House and Pennington;[8] Kelly July 3, 2019 Dep. Tr. 34:19-35:6). Two days later, Pennington emailed House, "Cecil I spoke with Janet this weekend and would like to fill you in on her situation and why I think she would be a great addition to your PH team." (NYCHA R. 56.1 Statement ¶ 19; Lippman Decl., Ex. 19.) On November 10, 2014, House responded to Pennington, "I am interested. Let's talk." (*Id.*) Abrahams first interviewed with General Manager House, the Chair, and Chief Administrative Officer Natalie Rivers ("Rivers") for a Vice President level position between November and early December of 2014, and the

_____

Local Rule 56.1 Statement, filed April 17, 2020. (Doc. 157.)

[6] "NYCHA R. 56.1 Statement" refers to the Local Rule 56.1 Statement in Support of the NYCHA Defendants' Motion for Summary Judgment Against Plaintiff Sibyl Colon, filed January 17, 2020. (Doc. 124.)

[7] "Kelly July 3, 2019 Dep. Tr." refers to the transcript of the July 3, 2019 deposition of Michael Kelly. (Marcus Decl., Ex. D.)

[8] "Lippman Decl." refers to the Declaration of Jane E. Lippman in Support of the NYCHA Defendants' Motion for Summary Judgment Against Plaintiff Sibyl Colon, filed January 17, 2020. (Doc. 126.)

Chair reported that "she had a good interview." (NYCHA R. 56.1 Statement ¶¶ 22, 23; Lippman Decl., Ex. 21; Email from Olatoye to Gomez, dated December 5, 2014; Kelly July 3, 2019 Dep. Tr. 38:17-21.) Defendant Kelly claims that House continued to have conversations with Abrahams about her assuming the role of OPMOM Vice President, but that he had heard these negotiations were not consummated due to a disagreement over salary. (Kelly July 3, 2019 Dep. Tr. at 35:11-14, 39:6-9.) Plaintiff argues that Kelly's testimony regarding Abrahams's derailed hiring lacks foundation. (Doc. 165, Pl.'s Counterstatement to NYCHA R. 56.1 Statement ¶ 24.).[9]

In late January 2015, Cecil House appointed Kevin Norman, Director of Mixed Finance, as the Director of OPMOM. (NYCHA R. 56.1 Statement ¶ 25; *see* Lippman Decl., Ex 18.) House and Norman left NYCHA in March or April 2015. (NYCHA R. 56.1 Statement ¶ 27.) With their departures, Defendant Clarke became responsible for filling three Director vacancies as quickly as possible: namely, the Director of Manhattan Property Management, the Director of Mixed Finance, and the Director of OPMOM. (*Id.* ¶ 35.) A Borough Director job description, reporting to the Senior Vice President for Operations, was posted in January 2015 and used to recruit candidates for all three positions. (*Id.*) Plaintiff submitted her resume for consideration for the Borough Director position on April 8, 2015; she claims that she was applying for the OPMOM Director position. (*Id.* ¶ 41; Lippman Decl., Ex. 22, Email from Colon to Clarke, dated April 8, 2015.) The majority of Plaintiff's interview panel selected her, and she commenced working as OPMOM Director on June 1, 2015 at a salary of $135,000. (Pl.'s R. 56.1 Statement ¶ 11; NYCHA R. 56.1 Statement ¶ 45.) Plaintiff did not have civil service status as Director of

---

[9] "Pl.'s Counterstatement to NYCHA R. 56.1 Statement" refers to Plaintiff's Response to the NYCHA Defendants' Statement Pursuant to Local Rule 56.1, filed April 18, 2020. (Doc. 165.)

OPMOM, but rather served on a provisional basis in the civil service title of Administrative Housing Manager and in the business capacity as Director of OPMOM.[10]  (*Id.* ¶ 53.)  As OPMOM Director, Plaintiff reported to Defendant Clarke, Senior Vice President of Operations for Property Management.  (*Id*. ¶¶ 47, 3.)  She never reported directly to Defendant Kelly, who was General Manager of NYCHA.  (*Id.* ¶¶ 47, 2.)  Three Regional Asset Managers reported directly to Plaintiff:  James Artis ("Artis") in the Bronx, Octavia Hayward ("Hayward") in Brooklyn, and Shinay Jones ("Jones") in Manhattan.  (*Id.* ¶ 64.)

During the relevant time period, Defendant Mark-Viverito served as Council Speaker of the New York City Council.  (*Id.* ¶ 4.)  Before Plaintiff assumed the role of OPMOM Director, Defendant Mark-Viverito's office began to lodge complaints with NYCHA regarding the management of the Mill Brook Houses, an OPMOM property.  Specifically, in October 2014, Gloria Cruz, Defendant Mark-Viverito's constituent services liaison, sent an email to Sylvia Vega, NYCHA Principal Administrative Associate for State and City Legislative Affairs, reporting that a Mill Brook resident had complained to Defendant Mark-Viverito's Office that "[e]very time [the resident] goes to the [Mill Brook] office he feels like he's being bullied by management because he cannot speak English.  This issue is making him sick and upset please can you help us with this issue."  (*Id.* ¶ 90; Lippman Decl., Ex. 28, Email from Vega to Taylor, Williams and others, dated October 30, 2014.)  The email was sent before Plaintiff became Director of OPMOM and Plaintiff was unaware that there was a complaint regarding Mill Brook

---

[10] NYCHA employees who serve in civil service titles on a provisional basis, as Plaintiff did, are employed in those titles at will, and therefore may be removed without pre-termination notice and without cause.  (NYCHA R. 56.1 Statement ¶¶ 54–55.)

management bullying a non-English-speaking resident throughout her tenure as Director.

(Marcus Decl., Ex. B, Colon Dep. Tr. 117:10-17.)[11]

On May 14, 2015, Brian Honan ("Honan"), the Director of State and City Legislative

Affairs for NYCHA, emailed Chair Olatoye, stating,

> The manager at Mill Brook is making it very difficult for [Mark-Viverito] to support OPMOM. Yesterday I heard from three of her staff members who complained about a recent meeting at the development. The manager told residents that OPMOM makes it easier for her to evict tenants, so people need to pay their rent (she said that she would evict people for owing as little as 35 dollars); and she make [sic] a very insensitive remark about Spanish speaking residents.

(NYCHA. R. 56.1 Statement ¶ 92; Lippman Decl., Ex. 27, May 14, 2015 Email Chain between

Honan and Olatoye.) The Chair copied Defendant Kelly on her reply to Honan, with the remark

that the "GM"—presumably in reference to General Manager Kelly—"plans to visit all NGN

sites asap. Clearly, needs to start with this one." (*See id.*) Other employees testified that they

had heard that the NYCHA Mill Brook Manager, Allison Williams, had made derogatory

remarks about Spanish-speaking residents. Marcela Medina, State Legislative Affairs Officer in

NYCHA's City and State Legislative Affairs Department, explained that she learned from one of

Defendant Mark-Viverito's staff members, Diana Ayala, that during a tenant association

meeting, Williams told the Mill Brook residents that she did not want to hear any "mira mira

talk." (Doc. 127, Medina Decl. ¶ 4.)[12] Defendant Clarke testified that he had also heard

secondhand from Honan that Williams had made this statement. (Doc. 129, Clarke Decl. ¶ 19;[13]

Marcus Decl., Ex. F, Clarke June 13, 2019 Dep. Tr. 136:8-10.)[14] Plaintiff first heard about the

---

[11] "Colon Dep. Tr." refers to the transcript of the January 9, 2019 deposition of Sibyl Colon. (Marcus Decl., Ex. B.)

[12] "Medina Decl." refers to the Declaration of Marcela Medina in Support of the NYCHA Defendants' Motions for Summary Judgment Against Plaintiffs Sibyl Colon and Allison Williams, filed January 17, 2020. (Doc. 127.)

[13] "Clarke Decl." refers to the Declaration of Brian Clarke in Support of the NYCHA Defendants' Motions for Summary Judgment Against Plaintiffs Sibyl Colon and Allison Williams, filed January 17, 2020. (Doc. 129.)

[14] "Clarke June 13, 2019 Dep. Tr." refers to the transcript of the June 13, 2019 deposition of Brian Clarke. (Marcus

alleged statement by Williams from Luis Ponce ("Ponce"), a NYCHA Senior Vice President. (Colon Dep. Tr. 110:18-111:4; 185:9-186-8, 187:2-7.)  Plaintiff contests that Williams ever made this derisive remark, since the incident was never confirmed by NYCHA.  (Pl.'s Counterstatement to NYCHA R. 56.1 Statement ¶¶ 91, 92, 93.)  Plaintiff did not know at any time during her NYCHA employment that Defendant Mark-Viverito's Office had received complaints about Williams's treatment of Mill Brook Houses residents.  (NYCHA R. 56.1 Statement ¶ 94.)

On July 1, 2015, Defendant Mark-Viverito's Office requested a meeting with Williams and other NYCHA employees at Mark-Viverito's Office.  (Doc. 125, Mark-Viverito R. 56.1 Statement ¶ 51.)[15]  On July 29, 2015, Honan sent Clarke an email reminding him that the meeting had been scheduled for July 30, 2015.  (NYCHA R. 56.1 Statement ¶ 104; Lippman Decl., Ex. 29, Email from Honan to Clarke, dated July 29, 2015.)  Clarke responded that Plaintiff and Artis would also attend the meeting.  (NYCHA R. 56.1 Statement ¶ 105.)  Plaintiff did not know the purpose of the meeting and did not try to find out other than calling Clarke, who was unavailable to speak on the phone.  (*Id.* ¶ 108; Colon Dep. Tr. 118:19-119:8.)

Present at the July 30, 2015 meeting were:  Plaintiff; Williams; Medina; Honan; Artis; Princella Jamerson, Mill Brook Tenant Association (TA) President; Defendant Mark-Viverito; Diana Ayala, from Mark-Viverito's Office; and Gloria Cruz, Mark-Viverito's constituent services liaison.  (Mark-Viverito R. 56.1 Statement ¶ 72.)  Brian Clarke attended by telephone. (*Id.* ¶ 73.)  Michael Kelly did not attend the meeting.  (NYCHA R. 56.1 Statement ¶ 112.) During the July 30, 2015 meeting, Defendant Mark-Viverito indicated that she was not happy

---

Decl., Ex. F.)

[15] "Mark-Viverito R. 56.1 Statement" refers to Defendant Mark-Viverito's Local Rule 56.1 Statement of Undisputed Material Facts, filed January 17, 2020.  (Doc. 125.)

about the language access barriers NYCHA residents were encountering, and the long waits for a translator through the language bank. (*Id.* ¶ 113.)[16] Defendant Mark-Viverito asked Williams how she was handling the Spanish-speaking residents at Mill Brook. (Mark Viverito R. 56.1 Statement ¶ 76.) Williams responded that they used the NYCHA language bank, which Defendant Mark-Viverito called unacceptable. (*Id.* ¶¶ 77, 78.) Defendant Mark-Viverito also said that it was unacceptable to have translation services over the telephone and that they needed a Spanish-speaking person in the room. (*Id.* ¶ 82.) Williams then explained that she had on previous occasions called Spanish-speaking Mill Brook superintendents or the supervisor of the caretakers to translate for her, which Defendant Mark-Viverito also stated was unacceptable. (*Id.* ¶ 80.) At about this point of the meeting, Plaintiff alleges that Defendant Mark-Viverito stated that she wanted a "Spanish manager," (Mark-Viverito R. 56.1 Statement ¶ 83; Colon Dep. Tr. 135:25-136:4), although the NYCHA Defendants dispute that these were the precise words used, (NYCHA R. 56.1 Statement ¶ 164). Plaintiff, in describing the tone of this exchange, alleges that Defendant Mark-Viverito "slammed her fist," "said that she wanted a Spanish Manager about three times," and was "very hostile, very angry," and "screamed" that she wanted a Spanish Manager. (Pl.'s Counterstatement to Mark-Viverito R. 56.1 Statement ¶ 83; Colon Dep. Tr. 135:24-137:20.) Regarding Defendant Mark-Viverito's manner, Artis testified, "I can't say that she was yelling, but she was excited and passionate about the fact that [the lack of a Spanish-speaking individual at Mill Brook] was unacceptable and she was adamant about there

[16] Plaintiff disputes the purported complaints about the Mill Brook House Manager underlying Defendant Mark-Viverito's remarks on the basis that Defendant Mark-Viverito's Office, when asked to produce all copies of complaints relating to the Mill Brook Houses, provided no documents supporting such complaints, except the October 2014 email from Cruz to Vega, (Lippman Decl., Ex. 28), which Plaintiff contends is based on hearsay. (Pl.'s Counterstatement to NYCHA R. 56.1 Statement ¶ 113.)

should be a Spanish-speaking individual in the office." (Marcus Decl., Ex. J, Artis Dep. Tr. 30:20-23.)[17] He further stated that "her basic demeanor . . . wasn't nice." (*Id*. at 34:12.)

Plaintiff suggested to Defendant Mark-Viverito that NYCHA did not have a job title named "bilingual housing manager" but did have bilingual housing assistants, and explained that having a bilingual housing assistant at Mill Brook might help Plaintiff because a bilingual housing assistant would be able to speak Spanish. (Mark-Viverito R. 56.1 Statement ¶¶ 89, 90; Colon Dep. Tr. 136:6-11; 146:2-7.) Plaintiff offered to contact human resources to try to put in place a bilingual housing assistant line at Mill Brook. (Mark-Viverito R. 56.1 Statement ¶ 92; Colon Dep. Tr. 136:13-16.) According to Plaintiff, these recommendations too went rejected by Defendant Mark-Viverito. (*See* Doc. 142, Pl.'s Mem. 11;[18] Artis Dep. Tr. 33:10-13.)

After the meeting, Plaintiff, Williams, and Artis met to "rehash[] what [had] happened" during the meeting. (Colon Dep. Tr. 154:4-156:9.) The three agreed that it was "racist" for Defendant Mark-Viverito to demand a "Spanish manager," and "personally felt attacked and under assault" by Defendant Mark-Viverito's perfunctory rejections of their suggestions and the "verbal hostility that [they] had just gone through, especially as African American people." (Colon Dep. Tr. 154:6-156:18.)

Defendants produced notes taken by Medina during the July 30, 2015 meeting. (Marcus Decl., Ex. SS, Medina Notes, dated July 30, 2015.) Medina's notes include statements that "staff is very rude," "management must at least represent the language," and "follow-up[:] see about hiring a Spanish speaker." (*Id*.) On July 31, 2015, the day after the meeting, Medina emailed her colleague, Jennifer Montalvo, reporting that the meeting "went okay—speaker was very

---

[17] "Artis Dep. Tr." refers to the transcript of the April 9, 2019 deposition of James Artis. (Marcus Decl., Ex. J.)

[18] "Pl.'s Mem." refers to Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56, filed January 22, 2020. (Doc. 142.)

upset, the insult things didn't come up but she wants us to address the language barrier issue."
(Marcus Decl., Ex. TT, Email from Medina to Montalvo, dated July 31, 2015.)  Montalvo
replied, "having the speaker upset is not good.  But do we have any plans around language
barriers and language access?  Are we going to try to get a bilingual manager."  (*Id*.)  Medina
responded that "it[']s a bit complicated with the TA and what not but the idea is to bring a
housing assistant who can speak [S]panish."  (*Id*.)  Medina testified that the "TA" in her email
referred to Princella Jamerson, the Tenant Association President for Mill Brook, and that she
meant that it was "complicated" to "try to get a bilingual manager" in that "[w]e cannot go in and
change the staff.  The TA sees improvement with the current staff.  That is all."  (Marcus Decl.,
Ex. I, Medina Dep. Tr. 35:10-18; 37:18-38:2.)[19]

Approximately two days after the July 30, 2015 meeting, Plaintiff attended a meeting
with Williams, Artis, OPMOM managers and the Tenant Association Presidents.  (Mark-Viverito
R. 56.1 Statement ¶ 132; Marcus Decl., Ex. H, Williams Dep Tr. 213:17-215:4.)[20]  Williams told
Plaintiff and Artis that she felt bullied at the July 30, 2015 meeting because she did not speak
Spanish.  (Mark-Viverito R. 56.1 Statement ¶ 133; Williams Dep. Tr. 215:5-215:11.)

After the July 30, 2015 meeting at Defendant Mark-Viverito's office, Clarke discussed
with Kelly the possibility of transferring Williams out of the OPMOM program.  (Mark-Viverito
R. 56.1 Statement ¶ 121; Clarke June 13, 2019 Dep. Tr. 140:24-25.)  Pursuant to Williams's civil
service title as a property manager, she could be transferred at the discretion of management.
(Mark-Viverito R. 56.1 Statement ¶ 123; *see* Clarke June 13, 2019 Dep. Tr. 145:24-146:2; Colon

---

[19] "Medina Dep. Tr." refers to the transcript of the June 17, 2019 deposition of Marcela Medina.  (Marcus Decl., Ex. I.)

[20] "Williams Dep. Tr." refers to the transcript of the May 8, 2019 deposition of Allison Williams.  (Marcus Decl., Ex. H.)

Dep. Tr. 104:11-14.)  Kelly did not object to Clarke's recommendation of transferring Williams. (Mark-Viverito R. 56.1 Statement ¶ 122.)

Plaintiff requested to meet with Defendant Clarke on July 31, 2015, supposedly to discuss the meeting at Defendant Mark-Viverito's office.  (*Id*. ¶ 124; Colon Dep. Tr. 159:24-160:9.)  At this meeting, Clarke, because he was going on vacation, asked Plaintiff to work with the Human Resources Department to transfer Williams out of Mill Brook.  (Mark-Viverito R. 56.1 Statement ¶¶ 124, 125; Colon Dep. Tr. 160:20-161:22.)  Clarke directed Colon to contact Kenya Salaudeen ("Salaudeen"), NYCHA Director of Human Resources, so as to effect Williams's transfer out of Mill Brook.  (Mark-Viverito R. 56.1 Statement ¶ 126; Colon Dep. Tr. 161:10-12; *see* Clarke June 13, 2019 Dep. Tr. 49:7-9.)  Plaintiff testified that Clarke told her not to use the words "Spanish Manager" when speaking to Salaudeen, (Colon Dep. Tr. 161:10-16), but instead instructed her to tell Salaudeen that Williams's transfer was necessary due to the "cultural sensitivity needs" of the Mill Brook development.  (Mark-Viverito R. 56.1 Statement ¶ 128; Colon Dep. Tr. 161:13-15.)  Prior to leaving on vacation, Clarke asked Ponce to follow up while Clarke was on vacation on the transfer of the Mill Brook manager.  (Mark-Viverito R. 56.1 Statement ¶ 130; Marcus Decl., Ex. L, Ponce Dep. Tr. 38:22-39:2.)[21]  Clarke told Ponce that he had asked Plaintiff to work on the Williams transfer and that he would like to have the transfer completed by the time he returned from vacation.  (Mark-Viverito R. 56.1 Statement ¶ 131; Ponce Dep. Tr. 39:2-6.)

Plaintiff testified that she called Salaudeen the following week to tell her that Clarke had directed her to transfer Williams out of Mill Brook and replace her with a Hispanic manager. (*See* Colon Dep. Tr. 166:6-167:3.)  According to Plaintiff, Salaudeen then "raised her voice" and

---

[21] "Ponce Dep. Tr." refers to the transcript of the March 15, 2019 deposition of Luis Ponce.  (Marcus Decl., Ex. L.)

said, "I'm offended by what you're saying to me as a Black woman.  (*Id*. at 167:16-17.)  Plaintiff

replied, "Look, Mr. Clarke wants it done.  Brian said to tell you that Melissa [Mark-]Viverito

wants it done.  It has to be and Mr. Kelly wants it done."  (*Id*. at 167:18-22.)  At this point of the

conversation, Salaudeen apparently took offense and told her, "I don't care if Obama wants it

done, it's illegal and you can be sued."  (*Id*. at 167:22-24.)  Plaintiff claims that Salaudeen

elaborated that it was "illegal to make race-based transfers."  (*Id*. at 169:17-18.)  However,

Salaudeen states that she has no recollection of having a conversation with Plaintiff "with respect

to removing Allison Williams as the manager of Mill Brook Houses."  (Marcus Decl., Ex. M,

Salaudeen Dep. Tr. 25:16-22.)[22]  Colon testified that, shortly after her call with Salaudeen, she

had a follow-up telephone conversation with Richard Bernardo, Deputy Director of Human

Resources, and Human Resources employee Marla Edmondson.  (Colon Dep. Tr. 170:5-22,

172:19-173:22.)  Once Plaintiff explained that she was instructed to replace Williams with a

Hispanic manager, Edmondson and Bernardo both also told Plaintiff that it was illegal to do so.

(*Id*. at 174:1-4, 174:22-24.)  Edmondson confirms that she did indeed discuss Williams's

potential removal from Mill Brook with Plaintiff, "[i]n reference to something that happened at a

meeting."  (Marcus Decl., Ex. N, Edmondson Dep. Tr. 10:24-11:18.)[23]  She also recalls

discussing Williams's removal with Bernardo.  (*Id*. at 40:7-14.)  Edmondson further testified that

Human Resources told Plaintiff that the transfer could not be done, because Human Resources

had no information in Williams's file, including her "complete disciplinary history," that would

---

[22] "Salaudeen Dep. Tr." refers to the transcript of the June 20, 2019 deposition of Kenya Salaudeen.  (Marcus Decl., Ex. M.)  As Plaintiff points out, Salaudeen claimed that she had virtually no recollection of numerous matters, invoking the phrase "I don't recall" or "I do not recall" at least forty times throughout her deposition.  She did not recall the size of her HR unit because "I blocked it out of my memory so I don't really recall."  (Salaudeen Dep. Tr. 8:24-9:4.)  When asked why she herself had been terminated from NYCHA, she responded, "I don't know."  (*Id*. at 10:22-:23.)

[23] "Edmondson Dep. Tr." refers to the transcript of the April 23, 2019 deposition of Marla Edmondson.  (Marcus Decl., Ex. N.)

legitimate her transfer from Mill Brook, specifically, "counseling memos . . . [or] any information that they could tell us about the employee performing poorly at that location." (*Id*. at 11:5-17; 44:20-24.) However, Edmondson denies telling Plaintiff that the directive to remove Williams was discriminatory or illegal. (*Id*. at 13:20-14:3.) Neither Plaintiff nor Defendants have produced any notes, memoranda, or any other documents memorializing or referencing Colon's conversations with Human Resources.

During August, NYCHA employees made various inquiries into the status of Plaintiff's effort to transfer Williams. On August 6, 2015, Sheila Pinckney, Senior Advisor at NYCHA's Office of the SVP Operations, sent Plaintiff an email asking on Clarke's behalf whether the "move [was] completed" "regarding the Property Manager at Mill Brook Houses." (Mark-Viverito R. 56.1 Statement ¶ 143; Marcus Decl., Ex. UU, Email from Pickney to Colon, dated August 6, 2015.) Plaintiff responded that "I spoke with Ponce yesterday about it and HR needs more information from us. There is also is an ig [Inspector General] investigation going on. HR wants to talk to the ig's office first. I informed HR of the urgency of the move both today and yesterday and Richard Bernnedo [sic] stated he would call Ponce." (*Id*.; Mark-Viverito R. 56.1 Statement ¶ 144.)

On August 12, 2015, Plaintiff emailed Clarke to report that she was "experienc[ing] difficulty with the transferring of the Manager at Mill Brook. HR is requesting information I am unable to provide. . . . We reached out to the local political office where we had the meeting at and they did not provide complaint documentation or specifics." (Mark-Viverito R. 56.1 Statement ¶ 147; Marcus Decl., Ex. WW, Email from Colon to Clarke, dated August 12, 2015.) Later that day, Clarke called Plaintiff to inquire about the state of Williams's transfer. (Mark-Viverito R. 56.1 Statement ¶ 148.) After Plaintiff informed Clarke that the transfer had been

stalled, Clarke responded that Plaintiff had failed him and had not carried out her assignment. (*Id.* ¶ 150.)

According to Defendant Kelly, towards the end of July 2015, the Chair Olatoye reached out and asked him to "pick up the discussions Cecil House had with her [regarding her potential hiring] prior to his leaving." (Kelly July 3, 2019 Dep. Tr. 36:3-10.) Prior to effectuating the Chair's direction to "aggressively recruit Janet Abraham[s]," Michael Kelly "checked with the human resources department at NYCHA" and confirmed that Plaintiff "was an at-will employee and as such, it was within our privileges to make that offer to Janet at the time." (Kelly July 3, 2019 Dep. Tr. 49:2-10.) Kelly confirmed Plaintiff's at-will status with Kerri Jew, who was the Executive Vice President for Administration, which included the Human Resources Department. (NYCHA R. 56.1 Statement ¶ 202; Kelly July 3, 2019 Dep. Tr. 49:11-15.) On July 27, 2015, at Kelly's direction, Kilsys Payamps-Roure ("Payamps-Roure"), Kelly's Chief of Staff, emailed Kelly's assistant, Juanita Acosta, and asked her to call Abrahams and request that she send a copy of her resume "as soon as possible." (NYCHA R. 56.1 Statement ¶ 204; Lippmann Decl., Ex. 35, Email from Payamps-Roure to Acosta, dated July 27, 2015; Kelly July 3, 2019 Dep. Tr. 57:3-58:14.) On July 28, 2015, Payamps-Roure emailed the Chief of Staff for the Deputy Mayor for Housing & Economic Development and attached Janet Abrahams's resume to the email, stating, "attached is the resume of Janet Abrahams who we are considering for the position of EVP of Operations. Would you like to meet with her before we make an official offer?" (Lippmann Decl., Ex. 35, Email from Payamps-Roure to Patchett, dated July 28, 2015.) Payamps-Roure then proceeded to schedule interviews for Abrahams. (NYCHA R. 56.1 Statement ¶ 205.)

During July and August of 2015, NYCHA leadership picked up on where it had left off with regard to recruiting and hiring of Abrahams, and she was brought in for another round of interviews with Kelly, the Chair, and the Chief of Staff to the Deputy Mayor of New York City. (Mark-Viverito R. 56.1 Statement ¶ 152; Kelly July 3, 2019 Dep. Tr. 38:21-25.)  On August 18, 2015, Kelly emailed his Chief of Staff, "Let's find out where we are with [Abrahams's] start date and our move with sybil [sic]."  (Mark-Viverito R. 56.1 Statement ¶ 153; Marcus Decl., Ex. XX, Email from Kelly to Payamps-Roure, dated August 18, 2015.)  Rivers wrote to Clarke and Payamps-Roure that Abrahams was scheduled to start "on or around September 28th."  (Mark-Viverito R. 56.1 Statement ¶ 154; Marcus Decl., Ex. YY, Email from Rivers to Clarke and Payamps-Roure, dated August 18, 2015.)  On August 20, 2015, Abrahams was formally offered a job with NYCHA as the Vice President of the Optimal Property Management Department. (Mark-Viverito R. 56.1 Statement ¶ 155; Kelly July 3, 2019 Dep. Tr. 36:21-23; Marcus Decl., Ex. ZZ, Email from Rivers to Abrahams, dated August 20, 2015.)  Abrahams accepted the job offer and began working for NYCHA in September 2015.  (Mark-Viverito R. 56.1 Statement ¶ 156.)[24]

Plaintiff went on vacation from August 17, 2015 through August 23, 2015.  (*Id.* ¶ 151.) On August 24, 2015, after returning from vacation, Plaintiff spoke to Clarke regarding Williams's transfer.  (*Id.* ¶ 161.)  Plaintiff told Clarke that the transfer could not be completed because it was "illegal."  (*Id.* ¶ 162.)  On August 25, 2015, Clarke emailed Plaintiff to ask, "Where are we with moving the manager from Millbrook?"  (*Id.* ¶ 163; Marcus Decl., Ex. AAA, Email from Clarke to Colon, dated August 25, 2015.)  Plaintiff responded, "HR informed me that

---

[24] Abrahams was subsequently promoted to Senior Vice President for NextGen Operations in October 2016. (NYCHA R. 56.1 Statement ¶ 231.)

we needed more specific information in reference to the cultural needs of the residents, in order to transfer the Manager at Mill Brook." (*Id.*, Email from Colon to Clarke, dated August 25, 2015.) Plaintiff also reported to Clarke that she "forwarded HR the development's resident population data and was informed that this was not enough information. I also contacted the political office where we had the meeting at and they stated they only had one repair complaint for this Manager. This information was also shared with HR." (*Id.*) Plaintiff testifies that after a meeting that she attended with Clarke on August 26, 2015, she unequivocally told Clarke that the proposed removal of Williams was "illegal" and could not be done as "it was along those lines that it was racial." (Mark-Viverito R. 56.1 Statement ¶ 166; Colon Dep. Tr. 234:2-17.)

At 8:26 a.m. on August 26, 2015, Payamps-Roure emailed Clarke, "Since there is a concern that Sybille [sic] Colon might hear of Janet Abrahams coming on board to run OPMOM from other folks, we would like [to] give her the news of her new assignment this week." (Mark-Viverito R. 56.1 Statement ¶ 165; Marcus Decl., Ex BBB, Email from Payamps-Roure to Clarke, dated August 26, 2015.) She further informed Clarke, "Sybille [sic] will stay in your shop so it's important that you maintain a good relationship with her. Because of this [Manager Kelly] is willing to talk to her and take ownus [sic] for the change so that you don't take the hit." (*Id.*) Clarke claims that it was the Chair's and Kelly's decision to replace Plaintiff, that he was not involved in the decision to hire Abrahams until Kelly informed him of it in August 2015, and that he never had any discussions with anyone about replacing Plaintiff. (Clarke Decl. ¶ 12; Clarke June 13, 2019 Dep. Tr. 51:6-53:14.)

On August 28, 2015, Plaintiff met with Kelly and Clarke. (Mark-Viverito R. 56.1 Statement ¶ 167.) During this meeting, Kelly told Plaintiff that he had decided to replace her with someone else, and that the decision had nothing to do with her job performance. (*Id.* ¶ 168;

Marcus Decl., Ex. DDD, Colon 50-H Tr. 43:15-20.)[25]  Plaintiff responded that the decision could not have been about her job performance since she had been performing well, with which Kelly agreed: "You are doing a great job but I want to go with someone else." (*Id.* at 44:13-25.)  Kelly told Plaintiff that Clarke had a new position for her.  (NYCHA R. 56.1 Statement ¶ 220.) Plaintiff was offered a position as Senior Administrator in the Management Service Department at a salary of $122,000, a reduction of approximately 10 percent from her current salary.  (*Id.* ¶ 221; Pl.'s R. 56.1 Statement ¶ 12.)  Instead of accepting this new position, Plaintiff resigned from NYCHA on the same day.  (*Id.* ¶ 14.)

At some point before leaving NYCHA, Plaintiff had a conversation with Ponce regarding why she thought she was being transferred, during which Plaintiff expressed her frustration at what she perceived to be retaliatory action by Defendants.  (Ponce Dep. Tr. 47:14-18.)  Part of the conversation, which was recorded by Plaintiff, was played at Ponce's deposition, as follows:

> MS. COLON:  I'm okay, again, I came into this program with good intentions, I came to win, I was winning.
>
> MR. PONCE:  Um-hum.
>
> MS. COLON:  I didn't come to lose.  And that's what happened, I know Brian was a little disturbed because I didn't do that illegal transfer he wanted me to do, but I tried.  You know it, I know it.
>
> MR. PONCE:  We talked to Bernardo from HR.  We went to HR, we told them the options.
>
> MS. COLON:  Right, and they said it could not be done and I tried my best.
>
> MR. PONCE:  They can't blame you for that.
>
> MS. COLON:  That's what—again, it's politics, but I tried.
>
> . . .
>
> MS. COLON:  And then I had no specifics and I'm trying to call HR and it's like that's illegal, that's what they are telling me.  And so what am I supposed

---

[25] "Colon 50-H Tr." refers to the transcript of the November 23, 2015 50-H examination of Sibyl Colon.  (Marcus Decl., Ex. DDD.)

to do?  Because the City Council Melissa whatever wanted a Puerto Rican there
and I was not able to do that because it's illegal, I'm crucified?

(*Id*. at 48:3-23, 65:15-23.)  During this conversation, Ponce responded, upon hearing Plaintiff's

account of the June 30, 2015 meeting, that Defendant Mark-Viverito's directive was

"discriminatory."  (*Id*. at 64:3-4.)  Ponce explained that he made that comment because "[i]t

would be discriminatory to ask for a certain ethnic group to fill a civil service position."  (*Id*. at

64:17-19.)

After Plaintiff's resignation, Human Resources continued to exchange emails regarding

the potential transfer of Williams.  On September 1, 2015, Bernardo emailed Rivers to report that

"the issue as defined by Brian is productivity not cultural insensitivity as stated by Ms. Colon."

(Pl.'s R. 56.1 Statement, Ex. 37.)  Rivers forwarded this email to Clarke, asking, "Really???" to

which Clarke replied, "No.  It[']s both."  (*Id*.)  Clarke's attempt to have Williams transferred out

of Mill Brook was unsuccessful.  According to Clarke, the transfer did not occur "because it was

recommended to me [by the Law Department] not to transfer at this time."  (Clarke June 13,

2019 Dep. Tr. 146:7-11.)

Octavia Hayward became the Director of OPMOM effective May 23, 2016.  (Pl.'s R.

56.1 Statement ¶ 25.)  However, prior to this date, in a September 22, 2015 email to Williams,

Hayward responded in the affirmative to Williams's question as to whether she was the Acting

Director of OPMOM.  (Doc. 166, Florestal Decl., Ex. 26, Email from Hayward to Williams,

dated September 22, 2015.)[26]  The NYCHA Defendants submitted a declaration by Hayward

denying that she became Acting Director of OPMOM after Plaintiff resigned in late August

2015, and claiming that there in fact was no Acting Director of OPMOM after Plaintiff resigned.

---

[26] "Florestal Decl." refers to the Declaration of Marcel Florestal in Opposition to Defendants' Motion for Summary
Judgment, filed April 18, 2020.  (Doc. 166.)

(Doc. 163, Hayward Decl. ¶ 6.)[27]  The NYCHA Defendants also argue that the conclusion that

Hayward was OPMOM Acting Director is belied by the September 22, 2015 email itself:  they

point out that Hayward never indicated to Plaintiff in the email which department she considered

herself acting director of and that Hayward's signature block stated that she was "Regional

Manager"—not Acting Director—for OPMOM.  (Doc. 175, NYCHA Reply 1–2;[28] *see* Email

from Hayward to Williams, dated September 22, 2015.)

## II.  <u>Procedural History</u>

On June 17, 2016, Plaintiff Colon commenced this action, alleging:  (1) retaliatory

discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et*

*seq*., New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 296, *et seq*., and

New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code §§ 8-107, *et seq*.; (2)

hostile work environment based on age, race, and gender pursuant to 42 U.S.C. §1983; (3)

violation of 42 U.S.C. § 1983; (4) violation of 42 U.S.C. §1985; (5) First Amendment retaliation;

(6) aiding and abetting; (7) violation of her Fourteenth Amendment Due Process rights; and (8)

intentional infliction of emotional distress ("IIED").  (Doc. 1, Compl. ¶¶ 61–97.)[29]

On March 26, 2018, upon application by the NYCHA Defendants, Defendant Mark-

Viverito, and the City of New York, I dismissed Plaintiff's:  (1) hostile work environment claim

against NYCHA; (2) Section 1985 claim against Kelly and Clarke; (3) First Amendment

retaliation claim against the NYCHA; (4) IIED claim against Kelly and Clarke; and (5) claims

against Defendants City of New York and Mark-Viverito.  (Doc. 43, at 23.)  In addition, I found

---

[27] "Hayward Decl." refers to the Declaration of Octavia Hayward in Opposition to Plaintiff Sibyl Colon's Motion for Summary Judgment, filed April 18, 2020.  (Doc. 163.)

[28] "NYCHA Reply" refers to the NYCHA Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment Against Plaintiff Sibyl Colon, filed May 15, 2020.  (Doc. 175.)

[29] "Compl." refers to the complaint filed by Plaintiff on June 17, 2016.  (Doc. 1.)

that Plaintiff had withdrawn (1) all claims against the City; (2) her § 1983 and § 1985 claims

against NYCHA; (3) her Due Process Clause claim; and (4) her Title VII claims based on sex

and gender discrimination, and accordingly dismissed those claims without prejudice.  (*Id.* at 9;

*see* Doc. 34, at 5.)  On April 9, 2018, Plaintiff filed a motion for reconsideration requesting that I

restore her claim against Defendant Mark-Viverito for aiding and abetting under the NYSHRL,

(Doc. 44), which Defendant Mark-Viverito opposed on April 23, 2018, (Doc. 50).  On March 22,

2019, I granted Plaintiff's motion for reconsideration, thereby reinstating the aiding and abetting

claim against Defendant Mark-Viverito.  (Doc. 76.)

The following claims remain:  (1) the retaliation claims under Title VII, NYHRL, and

NYCHRL against NYCHA, (First, Second, and Third Claims for Relief); (2) the Section 1983

retaliation claim against Defendants Clarke and Kelly, (Fifth Claim for Relief); and (3) the

aiding and abetting claims under NYSHRL against Defendants Mark-Viverito, Clarke, and

Kelly, (Eighth Claim for Relief).

On November 2, 2018, I consolidated this case with *Williams v. New York City Hous.*

*Auth.*, No. 16-cv-8193, for pretrial purposes.  (*See* No. 16-cv-8193, Doc. 45.)  Discovery closed

in both actions on July 15, 2019, (*see* Doc. 100), but was reopened by Magistrate Judge Ona

Wang for the limited purpose of allowing Plaintiff to conduct a follow-up deposition of

Defendant Kelly by October 4, 2019, (*see* Doc. 101, at 10).

On January 17, 2020, pursuant to a briefing schedule, (Doc. 114), (1) Defendant Mark-

Viverito and (2) the NYCHA Defendants moved for summary judgment to dismiss Plaintiff's

Complaint, (Docs. 120, 122, 130), and Plaintiff filed a cross-motion for partial summary

judgment, (Doc. 132).  Along with their motions for summary judgment, Defendant Mark-

Viverito and the NYCHA Defendants filed Rule 56.1 Statements pursuant to Local Civil Rule

56.1 on January 17, 2020.  (Docs. 125 and 124, respectively).  Plaintiff filed a Rule 56.1 Statement on January 22, 2020.  (Doc. 143.)  After Plaintiff requested and was granted two adjournments, (Docs. 150, 152), (1) Defendant Mark-Viverito and (2) the NYCHA Defendants filed oppositions to Plaintiff's cross-motion for summary judgment along with Local Civil Rule 56.1 Statements in opposition to Plaintiff's Rule 56.1 Statement on April 17, 2020, (Docs. 153–154 and 156–157, respectively), and Plaintiff filed her opposition to Defendants' motions on April 18, 2020, (Doc. 167), as well as Local Civil Rule 56.1 Statements in opposition to Defendant Mark-Viverito's and the NYCHA Defendants' Rule 56.1 Statements, (Docs. 168 and 165, respectively).

Defendant Mark-Viverito, the NYCHA Defendants, and Plaintiff filed their respective replies on May 15, 2020.  (Docs. 174, 175, 181.)  Along with her reply, Plaintiff submitted declarations by Robert Knapp, NYCHA Director of Heating in September 2015, and Louis Nieves, NYCHA Deputy Director of Manhattan Property Management Department in September 2015.  (Docs. 178, 179.)

On June 1, 2020, the NYCHA Defendants filed a motion to strike the declarations of Knapp and Nieves for Plaintiff's failure to disclose them as witnesses pursuant to Federal Rule of Civil Procedure 26(a), and for attorneys' fees incurred in bringing the instant motion to strike.  (Doc. 184.)  Plaintiff filed an opposition to the NYCHA Defendants' motion to strike on June 8, 2020.  (Docs. 187–89.)  The NYCHA Defendants filed their reply on June 10, 2020.  (Doc. 190.)

### III.  <u>Legal Standards</u>

#### A.  *Rule 56*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

However, courts must exercise "an extra measure of caution" in determining whether to grant summary judgment in employment discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence . . . ." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotation marks omitted). Nevertheless, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). The ultimate inquiry is "whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000).

## B. *Rules 26(a) and 37(c)*

Federal Rule of Civil Procedure 26(a)(1) mandates the initial disclosure of the name of "each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). A party must further supplement its disclosures and other discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the

additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  "The duty to supplement 'applies whether the corrective information is learned by the client or by the attorney.'"  *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (citing Fed. R. Civ. P. 26(e) advisory committee's note (1993 Amendment)).  Moreover, "the federal discovery rules place a duty on a party to turn over not only proper materials of which he is aware, but also those of which he reasonably *ought* to have been aware." *Id.* (internal quotation marks omitted) (emphasis in original).

The federal rules grant a court "broad discretion" to determine the sanctions appropriate for a violation of Rule 26(a), in light of "all the facts of the case."  *Id.* (citing *AAIpharma Inc. v. Kremers Urban Dev. Co.*, No. 02 CIV.9628 BSJ RLE, 2006 WL 3096026, at *5 (S.D.N.Y. Oct. 31, 2006)).  Rule 37(c)(1) provides that a party that "fails to provide information or identify a witness as required by Rule 26(a) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "This preclusionary rule applies on motions for summary judgment.  Its purpose is to prevent the practice of 'sandbagging' an opposing party with new evidence."  *Fleming v. Verizon New York, Inc.*, 2006 WL 2709766, at *7 (S.D.N.Y. Sept. 22, 2006) (citations omitted).

However, preclusion is a "harsh sanction" that "should be imposed only in rare situations."  *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988); *see also Kunstler v. City of New York*, 242 F.R.D. 261, 265 (S.D.N.Y. 2007) (noting that preclusion is "disfavored").  Indeed, Rule 37 also empowers a court, "on motion and after giving an opportunity to be heard," to impose other appropriate measures "[i]n addition to or instead of"

preclusion. Fed. R. Civ. P. 37(c)(1)(C). Under the "plain text" of the rule, a court may exercise its discretion to impose less severe sanctions in lieu of excluding the previously undisclosed evidence. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006). "Before [resorting to] the extreme sanction of preclusion," a court "should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Outley v. New York*, 837 F.2d 587, 591 (2d Cir. 1988). In deciding on the appropriate sanction, a court should consider: "(1) the party's explanation for the failure to comply with the discovery [requirement]; (2) the importance of . . . the precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Medical & Scientific Communications, Inc*., 118 F.3d 955, 961 (2d Cir. 1997).

The dilatory party bears the burden of justifying its non-disclosure, *Pace v. Air & Liquid Sys. Corp*., 171 F. Supp. 3d 254, 265 (S.D.N.Y. 2016), and may "defend non-disclosure on the basis that it was substantially justified or harmless." *U.S. Licensing Assocs., Inc. v. The Rob Nelson Co*., 2012 WL 1447165 at *5 (S.D.N.Y. 2012). Substantial justification is "justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request." *Am. Stock Exch., LLC v. Mopex, Inc*., 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (internal quotation marks omitted). Non-disclosure is harmless "when there is no prejudice to the party entitled to the disclosure." *Preuss v. Kolmar Labs*., 970 F. Supp. 2d 171,175 (S.D.N.Y. 2013) (quoting *Am. Stock Exch.*, 215 F.R.D. at 93).

Moreover, although not required for a finding that preclusion is warranted, a party's bad faith "can be taken into account" by a court "in considering the party's explanation for its failure to satisfy its discovery obligations." *Ritchie*, 280 F.R.D. at 157 (quoting *Design Strategy*, 469

F.3d at 296). In determining whether a party has acted in bad faith, the court "should view the party's conduct in the case as a whole." *Id.*; *see also, e.g.*, *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1366 (2d Cir.1991) (upholding preclusion sanction because conduct of defendant's counsel at deposition, combined with defendant's repeated refusal to produce demanded documents, "evince[d] a willful frustration" of discovery).

## IV. Discussion

### A. Defendants' and Plaintiff's Cross-Motions for Summary Judgment

#### 1. Title VII, NYSHRL, and NYCHRL Retaliation Claims (First, Second, and Third Claims) Against NYCHA

Defendants move to dismiss Plaintiff's retaliation claims against NYCHA on the basis that she failed to show (1) that she engaged in protected conduct or (2) the requisite causality needed to establish a prima facie case of retaliation. They further argue that Plaintiff cannot rebut Defendants' proffered but-for cause for removing her from her position as Director of OPMOM. Plaintiff contends that she has made the necessary showing to warrant summary judgment on her claims against NYCHA. As discussed in greater detail below, I find that issues of material fact preclude summary judgment for either Defendants or Plaintiff on her claims against NYCHA.

##### a. Applicable Law

"The burden-shifting framework laid out in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)] governs retaliation claims under both Title VII and the NYSHRL." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). To make out a prima facie case of retaliation under this standard, a plaintiff must show that: "(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the

protected activity." *Id.* (citation omitted).

To establish that she engaged in protected activity, Plaintiff "need not establish that the conduct she opposed was actually a violation of Title VII, but only that she possessed a good faith, reasonable belief that the underlying employment practice was unlawful under that statute." *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (internal quotation marks omitted). "Neither must the plaintiff formally oppose the alleged discriminatory behavior." *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 681 (2d Cir. 2009). Rather, "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges" are also protected under Title VII and the NYSHRL. *Id.* However, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by [the statute]." *Galdieri–Ambrosini*, 136 F.3d at 292. Accordingly, a defendant cannot be charged with retaliation "if [a] plaintiff's complaints to management could not be understood to have been about race." *Lee v. Sony BMG Music Entm't, Inc.*, No. 07 CIV. 6733 (CM), 2010 WL 743948, at *11 (S.D.N.Y. Mar. 3, 2010); *see also International Healthcare Exchange, Inc. v. Global Healthcare Exchange, LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) ("[T]he complaint must put the employer on notice that . . . discrimination is occurring.") (internal quotation marks omitted). The reasonableness of a plaintiff's belief that an underlying employment practice was unlawful "is to be evaluated from the perspective of a reasonable, similarly situated person and assessed considering the totality of the circumstances." *Brantman v. Fortistar Capital, Inc.*, No. 15 Civ. 4774 (NSR), 2017 WL 3172864, at *5

(S.D.N.Y. July 21, 2017) (internal quotation marks and citations omitted).

With respect to the fourth prong, a plaintiff can establish a causal connection to support a retaliation claim "either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000). The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001), but has found a three-week period between a plaintiff's complaint and her termination "sufficiently short to make a prima facie showing of causation indirectly through temporal proximity," *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." *Gordon*, 232 F.3d at 117. "A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit upon the orders of a superior who has the requisite knowledge." *Id.*

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001). If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish that the

"retaliation was a 'but-for' cause of the adverse action, not simply a 'substantial' or 'motivating' factor in the employer's decision." *Nieblas-Love v. New York City Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2526 (2013)). "But-for" causation does not require "proof that retaliation was the only cause of the employer's action—it is enough that the adverse action would not have occurred in the absence of the retaliatory motive." *Nieblas-Love*, 165 F. Supp. 3d at 70. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan*, 737 F.3d at 846. "Ordinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000). "Summary judgment is appropriate at this point only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Id.*

Retaliation claims brought under the NYCHRL are subject to a lower standard, and must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citations omitted); *see also Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015). Under the more liberal NYCHRL standard, "a plaintiff must still establish that there was a causal

connection between her protected activity and the employer's subsequent action." *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456 (E.D.N.Y. 2013). Opposing discrimination "can include situations where a person, before the retaliatory conduct occurred, merely made clear her disapproval of [the defendant's] discrimination by communicating to [the defendant], in substance, that she thought [the defendant's] treatment of [the victim] was wrong." *Mihalik*, 715 F.3d at 112 (internal quotation marks omitted).

### b. Application

Defendants do not dispute that Plaintiff satisfies the second and third elements of the *McDonnell Douglas* test—employer awareness and adverse employment action—but contest that she fails to demonstrate that she had engaged in protected activity and that a causal connection exists between the alleged adverse action and the protected activity. They further argue that even if Plaintiff could establish a prima facie case of retaliation, she cannot rebut NYCHA's legitimate, non-retaliatory reason for her removal, namely, the hiring of the Chair's "first choice," Janet Abrahams, or show that but for her alleged opposition to the transfer of Williams, she would not have been removed as OPMOM Director.

#### i. *Plaintiff Engaged in a Protected Activity*

The barometer of whether activity qualifies as "protected" under the first *McDonnell Douglas* prong is not the employer's explanation for its own conduct, but the plaintiff's "good faith, reasonable belief" in the unlawfulness of the employer's conduct. *Galdieri–Ambrosini*, 136 F.3d at 292. Defendants argue that Plaintiff did not have a reasonable and good faith belief that discriminatory conduct had occurred or that a request that NYCHA engage in discriminatory conduct had been made. (Doc. 121, Def. Mark-Viverito's Mem. 5;[30] Doc. 123, NYCHA Defs.'

---

[30] "Def. Mark-Viverito's Mem." refers to Defendant Mark-Viverito's Memorandum of Law in Support of Her

Mem. 9.)[31]  Specifically, Defendants argue that a similarly situated reasonable person would not have believed that Defendant Mark-Viverito requested a manager of a particular race at Mill Brook during the July 30, 2015 meeting at her office.  (*Id.* at 9–12.)  They aver that the circumstances show that Defendant Mark-Viverito merely asked for a NYCHA employee at Mill Brook who could communicate with its Spanish-speaking residents.  (Def. Mark-Viverito's Mem. 6.)  Consequently, Defendants argue that Plaintiff had no objective reason to believe that Defendants engaged or attempted to engage in discriminatory conduct against Williams based on a protected characteristic.

Regardless of what Plaintiff understood Defendant Mark-Viverito's statement at the July 30, 2015 meeting to mean, I find that Plaintiff has raised sufficient facts, considering "the totality of the circumstances," *Brantman*, 2017 WL 3172864, at *5, to show that she had a good faith and reasonable belief that the NYCHA Defendants' attempt to transfer Williams—a fact Defendants do not dispute—was discriminatory.  As an initial matter, a triable issue of fact remains as to whether a reasonable person, under the totality of the circumstances, could find that Defendant Mark-Viverito's statement that she wanted a "Spanish manager" alluded to a desire to replace Williams due to her race.[32]  Although making a distinction on the basis of

---

Motion for Summary Judgment, filed January 17, 2020.  (Doc. 121.)

[31] "NYCHA Defs.' Mem." refers to The NYCHA Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment Against Plaintiff Sibyl Colon, filed January 17, 2020.  (Doc. 123.)

[32] Defendants claim that Plaintiff's own testimony shows that it was her understanding that Defendant Mark-Viverito was requesting a Spanish-speaking—and not specifically Latino—manager.  (Def. Mark-Viverito's Mem. 6; NYCHA Defs.' Mem. 11.)  The evidence on this point is not as one-sided as Defendants portray it.  At one point in her deposition, Plaintiff admitted that she understood Defendant Mark-Viverito to be asking for "somebody who spoke the Spanish language" and that "some Spanish people don't speak Spanish."  (Colon Dep. Tr. 146:8-12, 143:10-11.)  However, at a different point, Plaintiff also testified that she understood Defendant Mark-Viverito to be referring to "someone Hispanic or Latino" and that she construed the request as "racist."  (*Id*. at 142:14-19, 156:11.)  Regardless of Plaintiff's general beliefs about the correlations between Spanish language and ethnicity, she may have reasonably believed that, in the particular circumstances of the June 30, 2015 meeting, Defendant Mark-Viverito's demeanor towards Williams and others during the meeting, and Defendant Mark-Viverito's requests for a "Spanish manager" were laced with racially discriminatory intent.  Furthermore, a reasonable trier of fact could find that, in view of Defendant Mark-Viverito's anger as well as her stature, a NYCHA employee at this meeting could

language alone is not prohibited under Title VII, under certain circumstances, courts have found that "language may be used as a covert basis for national origin discrimination." *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009); *see, e.g.*, *Velasquez v. Goldwater Mem'l Hosp.*, 88 F. Supp. 2d 257, 262–63 (S.D.N.Y. 2000) (stating that a facially-neutral language policy "could be used to disguise a discriminatory motive;" for instance, if an "English-only rule was used to discriminate intentionally against a person of a particular national origin, the employer would have violated Title VII"). Plaintiff did not know what the purpose of the meeting was until she arrived, and was not aware of any complaints regarding the Mill Brook Manager's treatment of Spanish-speaking residents. Plaintiff was also not aware of Williams's disciplinary record, which included two local disciplinary hearings and numerous counseling memoranda. (*See* NYCHA R. 56.1 Statement ¶¶ 183–85.) I must consider the information or lack thereof available to Plaintiff to frame the context of my analysis. In addition, Plaintiff has submitted her own testimony as well as that of Williams and Artis that Defendant Mark-Viverito's tone, actions, and "Spanish manager" comment during the meeting bespoke potentially racially discriminatory motive. (Colon Dep. Tr. 142:14-19; Williams Dep. Tr. 200:8-13; Artis Dep. Tr. 34:7-17; 38:14-39:6.) Therefore, this record alone precludes a determination that no reasonable trier of fact could find the attempted transfer to have been discriminatory.

In any case, Plaintiff's belief that Defendants engaged in proscribed conduct was not solely based on the events of the July 30, 2015 meeting, but also on the NYCHA Defendants' subsequent repeated attempts to transfer Williams for "cultural" reasons. Indeed, Plaintiff has identified evidence that Defendant Clarke asked her to refrain from bringing up the "Spanish

have been so intimidated as to be willing to look the other way concerning whether her demand for a "Spanish Manager" could be perceived as illegal.

manager" comment, and instructed her to instead tell Human Resources employees that the transfer request was being made for "cultural sensitivity" reasons. Defendant Clarke's active avoidance of any racial framing of the transfer request evidences his awareness that others might conceivably construe his request in such a light—including, here, for the purposes of this motion, a reasonable trier of fact. In addition, Plaintiff reached out to Human Resources and Defendant Mark-Viverito's office to look for other disciplinary problems than the "cultural" reasons Clarke cited that might warrant Williams's transfer, and according to her testimony, was unable to find any. Given Williams's apparent lack of disciplinary history from Plaintiff's perspective, I find that a reasonable person in Plaintiff's position might believe that Clarke's attempt to transfer Williams for so-called "cultural" reasons alone was a thinly veiled attempt to hide the discriminatory reason.

Moreover, it appears that Plaintiff was not the only person who construed Defendant Clarke's request as racially suspect or potentially illegal. Plaintiff cites evidence that she faced pushback from various employees of the NYCHA Human Resources Department when she raised the issue of transferring Williams. Given Williams's lack of any apparent disciplinary history that could substantiate the claim that she was underperforming, Human Resources employees were leery of effectuating her transfer on "cultural" reasons alone.[33] These impressions could certainly support an inference that race was a motivating factor in requesting the transfer that a trier of fact could reasonably make. *See, e.g.*, *Abrams v. Dep't of Pub. Safety*,

---

[33] Although Bernardo and Salaudeen refute telling Plaintiff that it would be "illegal" to transfer Williams, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)). In any case, Plaintiff has raised sufficient facts that would allow a reasonable jury to infer that Human Resources hesitated and in fact did not approve of the transfer. As the record demonstrates, Williams's transfer was not approved of by Human Resources, was delayed and ultimately abandoned—according to Clarke, "because it was recommended to me [by the Law Department] not to transfer at this time," (Clarke June 13, 2019 Dep. Tr. 146:7-8)—raising questions about the propriety of the request.

764 F.3d 244, 253 (2d Cir. 2014) (holding that the phrases "'better fit' or 'fitting in' just might have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury"). Therefore, although the NYCHA Defendants may have believed that Defendant Mark-Viverito's request for a "Spanish manager" was racially neutral, there is sufficient evidence on the record to raise a triable issue as to whether Plaintiff had a good faith and reasonable belief that the NYCHA Defendants nonetheless construed Defendant Mark-Viverito's request as racially infected and used the request as pretext to transfer Williams for discriminatory reasons.

Defendants claim that, regardless of whether Plaintiff had a subjective good faith belief that she was opposing discrimination, Plaintiff did not express opposition to the transfer of Williams sufficient to qualify as a protected activity under Title VII, the NYSHRL, or the NYCHRL. Defendants point out that none of Plaintiff's emails to Human Resources employees or Defendant Clarke express opposition to the transfer of Williams on the grounds of racial discrimination. They further argue that Plaintiff's alleged assertions to Defendant Clarke on August 26, 2015 that the transfer was "illegal," "along those lines that it was racial," and "just can't be done" were not sufficient to put NYCHA on notice of a discrimination complaint. (NYCHA Defs.' Mem. 14; Def. Mark-Viverito's Mem. 7.) Rather, they argue that in the context of Plaintiff's email to Clarke the day before claiming that Human Resources needed more information about the "cultural needs of the residents" before executing Williams's transfer, Clarke could not "reasonably have understood" that Plaintiff was opposing perceived discrimination, as opposed to literally making a statement regarding the cultural needs of the Mill Brook residents. (NYCHA Defs.' Mem. 15.) Clarke denies that Plaintiff ever raised any

questions to him regarding the legality of the transfer.

Notwithstanding Defendant Clarke's denials and a lack of paper trail evidencing that Plaintiff formally emailed NYCHA Human Resources employees that Williams's transfer was illegal or discriminatory, I find that a reasonable trier of fact reviewing the totality of the evidence could choose to credit Plaintiff's testimony that she verbally made such complaints to Defendant Clarke and Human Resources. As discussed above, the multiple stops and starts and the eventual abandonment of the effort to transfer Williams—unexplained by Defendants other than by Clarke's disclosure that the NYCHA Law Department told him not to pursue the transfer—raises an inference that Human Resources and Defendant Clarke were on notice of the risk that the transfer was potentially improper or at the very least that Plaintiff viewed it as such. Other evidence in the record is consistent with Plaintiff's testimony that she raised complaints regarding the illegality of the transfer to various employees at NYCHA—for instance, Plaintiff memorialized the back-and-forth with Human Resources regarding the illegality of the transfer in her conversation with Ponce, and Ponce's responses corroborate that Human Resources had considered the transfer unworkable, despite Ponce and Plaintiff laying out the "options" for them.

I find Defendants' contentions concerning Plaintiff's statements to lack substance; Plaintiff's statements to Clarke that the transfer was "illegal" and "racial" were not too vague to put Defendants on notice of alleged discriminatory conduct. Plaintiff need not have incanted the precise words of the statute under which she was declaring the transfer of Williams to be illegal for her to have engaged in protected activity. Plaintiff's complaints to her supervisor, Clarke, that a transfer made upon "racial" lines was "illegal," Plaintiff's emails to Clarke suggesting that Human Resources could find no performance-based information to justify Williams's transfer

and her refusal to carry out Clarke's directions to transfer Williams absent such performance-based information, were sufficient to put an employer on notice that Plaintiff was making a complaint about discrimination. Simply put, "no magic words are required," *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012) (internal quotation marks omitted), and even Plaintiff's inaction on Clarke's numerous directives to transfer Williams could qualify as protected activity, *see Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 277 (2009) (stating that a finding of "opposition" to discrimination for purposes of retaliation claims under Title VII could lie "if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons"). Clarke tacitly recognized Plaintiff's opposition on August 12, 2015, when he told Plaintiff—after she told him that the transfer had been stalled—that she had failed him by not carrying out her assignment. (Mark-Viverito R. 56.1 Statement ¶ 150.)

As such, Plaintiff has raised sufficient evidence to raise an inference that she engaged in protected activity under Title VII, the NYSHRL, and NYCHRL.

> ii. *Plaintiff Has Demonstrated a Prima Facie Causal Connection Between the Protected Activity and the Alleged Retaliatory Actions*

With regard to the question of whether Plaintiff's complaints led to her demotion, I find that Plaintiff has raised sufficient evidence to demonstrate causation under the fourth *McDonnell Douglas* prong. However, a factual issue remains as to whether her complaints were the but-for cause of NYCHA's alleged retaliatory actions under the third step of the test.

Defendants argue that the chronology of events demonstrates that there is no causal nexus between Plaintiff's opposition to the transfer of Williams and her replacement by Abrahams. Defendants point out that the decision to hire Janet Abrahams to run OPMOM was made before

the July 30, 2015 meeting with the Former Speaker. Moreover, Abrahams was formally offered the position of Vice President for the OPMD on August 20, 2015, before Plaintiff claims she told Clarke the transfer of Williams was "illegal" and "along those lines that it was racial" on August 24 and August 26, 2015. They further stress that Defendant Clarke—the only individual to whom Plaintiff allegedly expressed opposition to the transfer of Williams—played no role whatsoever in Plaintiff's removal as OPMOM Director. Given Abrahams's early selection as "first pick" to run OPMOM, Defendants argue that Plaintiff cannot show that, but for her alleged opposition to the transfer of Williams, she would not have been demoted and removed as OPMOM Director. For this reason, Defendants argue that even if Plaintiff has made a prima facie case, she cannot rebut the NYCHA Defendants' legitimate non-retaliatory reason for her transfer and demotion: namely, the hiring of Abrahams to run OPMOM.

Plaintiff contends that Abrahams was hired as Vice President of OPMOM—a separate position from the position that Plaintiff's held—and did not replace her.[34] Rather, she claims that Octavia Hayward formally succeeded Plaintiff as the Director of OPMOM around nine months after her departure, and in fact informally held herself out as "Acting Director," albeit of an unstated department, in an email sent late September 2015, shortly after Plaintiff resigned. An issue of fact remains as to the exact date Hayward assumed Plaintiff's role; nonetheless, it is undisputed that Hayward was formally introduced as the new Director of OPMOM in May 2016. (Marcus Decl., Ex. CCC, Email from Roman to Almanzar and others, dated May 20, 2016.) The

---

[34] Although Defendant Kelly initially testified that Abrahams was brought in as a vice president to oversee OPMOM and to replace Plaintiff, (Kelly July 3, 2019 Dep. Tr. 61:2-9), Kelly stated during his later Rule 30(b)(6) deposition that the Senior Vice President for Next Generation Operations and the Director for OPMOM were "separate positions," with the former being at a higher level than the latter. (Marcus Decl., Ex. E, Kelly September 23, 2019 Dep. Tr. 72:2-7, 62:18-23.) Kelly testified that an executive vice president would report directly to him, the General Manager, (id. at 99:3-15), whereas the director of OPMOM would report to the vice president of OPMOM—in this case, Janet Abrahams, (id. at 33:9-14).

fact that Hayward and Abrahams coexisted as the Director and VP of OPMOM, respectively, suggests that Plaintiff and Abrahams also might have been able to coexist in their respective positions, and Plaintiff could have continued in her role regardless of Abrahams's hiring. Therefore, Defendants' assertion that the decision to replace Plaintiff with Abrahams was made well before Plaintiff complained about the attempt to transfer Williams does not hold up to scrutiny; the record instead supports an inference that the decision to move Plaintiff to a different role and the decision to hire Abrahams were independent. In any case, even assuming for sake of argument that Abrahams's recruitment necessitated Plaintiff's transfer out of Mill Brook, Defendants have provided no explanation as to why this could not have been accomplished through a lateral transfer with the same salary, rather than her apparent demotion to a role with reduced salary.

Although Plaintiff's retaliation-based explanation for her transfer is by no means conclusive, she has shown sufficient temporal proximity between her protected activity and the alleged retaliatory action to satisfy the fourth element of the *McDonnell Douglas* test and to potentially suggest to a reasonable factfinder that her transfer and demotion was at least in part due to her complaints about transferring Williams.[35]  Although Defendants claim that the individual directly responsible for her transfer (Kelly) was not the individual who knew about her alleged protected activity (Clarke), Plaintiff is not required to prove this circumstance in order to make a prima facie case of retaliation; the alleged openness with which she proclaimed her disapproval of Williams's transfer to various NYCHA employees and her demotion by

---

[35] Plaintiff need not disprove at trial Defendants' alleged nonretaliatory reason for her transfer in order to prevail on her retaliation claim. *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993) (a violation occurs whenever there is "retaliatory animus, even if valid objective reasons for the [employment action] exist").  "The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally discriminated or retaliated against the plaintiff for engaging in protected activity." *Cosgrove*, 9 F.3d at 1039 (internal quotation marks omitted).

NYCHA soon thereafter are sufficient at this stage of the litigation. *See Gordon*, 232 F.3d at 117 (noting that a jury "can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities" provided there is circumstantial evidence allowing the jury to infer knowledge by other means); *Malena*, 886 F. Supp. 2d at 364 (denying summary judgment for defendants even where there was no evidence showing "whether or not the decision-makers considered the complaints [the plaintiff] made to HR . . . immediately before the [c]orporate [d]efendants terminated [p]laintiff" as a "genuine issue of material fact as to the motivations for [p]laintiff's termination" remained); *see also Kwan*, 737 F.3d at 844 (a plaintiff may rely on "general corporate knowledge" of her protected activity to establish the knowledge prong of the prima facie case); *see, e.g.*, *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (holding that a plaintiff's complaint to an officer of the company communicated her concerns to the company as a whole for purposes of the knowledge prong of the prima facie case).

It also bears noting that until as recently as at a March 16, 2019 conference before Magistrate Judge Ona Wang, Defendants continued to maintain that Abrahams was not hired to replace Plaintiff. (Doc. 94-1, at 17:22-18:16); *see Colon v. New York City Hous. Auth.*, No. 16CV4540VSBOTW, 2019 WL 4291667, at *3 (S.D.N.Y. Sept. 11, 2019). At Defendant Kelly's July 3, 2019 deposition, counsel for the NYCHA Defendants initially instructed Defendant Kelly not to answer questions relating to whether Abraham was brought in to do Plaintiff's job. (Kelly July 3, 2019 Dep. Tr. 67:8-69:9.) However, later in his deposition, Defendant Kelly testified that Abrahams was brought in to replace Plaintiff. (*Id*. at 61:7-17.) Given Defendants' inconsistency and apparent uncertainty about their purported nonretaliatory reason for Plaintiff's transfer, I cannot find that no question of material fact remains as to the question of causation. *See, e.g.*, *Kwan*, 737 F.3d at 845 (finding employer's "inconsistent and

contradictory explanations for the plaintiff's termination, combined with the close temporal proximity between the [plaintiff's complaint] and [her] termination . . . sufficient to create a genuine dispute of material fact as to whether [the plaintiff's complaint] was a but-for cause of the plaintiff's termination); *Malena*, 886 F. Supp. 2d at 360 (denying summary judgment for corporate defendants where "no evidence shows that [an individual defendant's] potential bias did not influence the decision to terminate [plaintiff] or that it did" even though defendants had shown that financial concerns were a proximate cause of the plaintiff's termination, and "[g]iven such a gap in the evidence, the Court must make all reasonable inferences in favor of the non-moving party—here, the plaintiff").

Whether Defendants can ultimately overcome the inference of retaliation raised by Plaintiff, and whether Plaintiff can counter Defendants' proffered nonretaliatory reason for her transfer and demotion, are questions best left to a trier of fact. What is evident, however, is that because Defendants have not raised a dispositive nondiscriminatory reason rebutting Plaintiff's prima facie case, summary judgment for NYCHA must be denied. *See Carlton*, 202 F.3d at 135.

Based on the foregoing, I find that Plaintiff has made out a prima facie case of retaliation against NYCHA under Title VII and the NYSHRL. It stands to reason that she also meets the lower standard for NYCHRL claims. However, because material questions of fact remain as to whether retaliation was the but-for cause of NYCHA's actions, summary judgment for either party on Plaintiff's retaliation claims against NYCHA is DENIED.

## 2. Section 1983 Retaliation Claim (Fifth Claim) Against Defendants Clarke and Kelly

Plaintiff claims that summary judgment is warranted on her Section 1983 claims, because Kelly and Clarke acted in their official capacities respectively as General Manager and Senior Vice President of NYCHA to deprive her of her equal protection rights. (Pl.'s Mem. 19.) The

NYCHA Defendants argue, in contrast, that a rational jury could not find liability under Section 1983, as there is no evidence that Kelly or Clarke violated any law or participated in the alleged illegal conduct. They point out that Clarke was not involved in the removal of Plaintiff as OPMOM Director and Kelly did not attend the July 30, 2015 meeting with the Former Speaker, and there is no evidence that he ever heard the alleged phrase "Spanish Manager" or how he might interpret this alleged phrase. (NYCHA Defs.' Mem. 25.) Because there remain issues of fact regarding whether Defendants Clarke and Kelly participated in the alleged retaliation against Plaintiff, summary judgment for either side is not warranted with respect to Plaintiff's Section 1983 claims.

### a. Applicable Law

"[R]etaliation claims alleging an adverse action because of a complaint of discrimination are actionable under § 1983." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 80 (2d Cir. 2015). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) (internal quotation marks omitted). Once action under color of state law is established, a plaintiff's equal protection claim parallels his or her Title VII claim; "[t]he elements of one are generally the same as the elements of the other and the two must stand or fall together." *Id.*; *see also Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir.1996) (stating that "Title VII law . . . is utilized by courts considering § 1983 Equal Protection claims" and recognizing that "several circuits have held that, when § 1983 is used as a parallel remedy with Title VII in a discrimination suit . . . the elements of the substantive cause of action are the same under both statutes."). In addition, a finding of "personal involvement of [the individual] defendants" in the

alleged violation is required to impose liability under Section 1983. *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (internal quotation marks omitted).

### b. Application

Defendants do not dispute that Defendants Kelly and Clarke were both acting in their official capacities as NYCHA officers when they took adverse action by transferring and demoting Plaintiff to a less prestigious and lower-paying position. Therefore, the remaining question is whether there is sufficient evidence in the record to raise an inference that Defendants Kelly and Clarke were personally involved in retaliating against Plaintiff.

Although a close call, in light of evidence in the record suggesting that Defendants Clarke and Kelly actively conferred about Plaintiff's imminent transfer, combined with the undisputed fact that they jointly announced to Plaintiff that she was to be transferred, an issue of fact remains as to their level of involvement. In particular, a trier of fact might find suspicious the email from Kelly's Chief of Staff to Clarke stating that Kelly would be "willing to talk to [Plaintiff] and take ownus [sic] for [Plaintiff's transfer] so that [he would not] take the hit," (Marcus Decl., Ex. BBB, Email from Payamps-Roure to Clarke, dated August 26, 2015), which raises the questions of who the onus of demoting Plaintiff belonged to, why Kelly would have offered to "take onus" for a decision that Defendants claim he had made without Clarke's input, and why Kelly was anticipating blowback for Plaintiff's transfer. At the very least, the email might suggest to a reasonable factfinder that there was some sharing of responsibility between Defendants Clarke and Kelly for Plaintiff's transfer, and some communication and concurrence about the intent and the decision to do so. I do not decide today whether either or both Defendants acted pursuant to retaliatory motivations, and to what extent; I merely state that there is sufficient evidence in the record that might allow a reasonable factfinder to conclude that both

Clarke and Kelly participated in the alleged retaliatory actions against Plaintiff, so as to permit her Section 1983 claims to survive summary judgment.

Accordingly, Defendants' motions for summary judgment dismissing Plaintiff's Section 1983 claims against Defendants Clarke and Kelly are DENIED.  Because the question of whether Defendants' conduct was in fact retaliatory remains to be determined, Plaintiff's motion for summary judgment on her Section 1983 claims is also DENIED.

### 3. NYSHRL Aiding and Abetting Claim (Eighth Claim) Against Defendants Mark-Viverito, Clarke, and Kelly

#### a. Applicable Law

An individual defendant may be held liable under § 296(6) of the NYSHRL or § 8-107(6) of the NYCHRL for aiding and abetting a violation of the laws if he or she "participates in the conduct giving rise to the discrimination claim." *See Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009).  "The same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is virtually identical." *Feingold*, 366 F.3d at 158 (internal quotation marks omitted).  "[L]iability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor." *Jain v. McGraw-Hill Companies, Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012) (citing *DeWitt v. Lieberman*, 48 F.Supp.2d 280, 293 (S.D.N.Y. 1999)).  Furthermore, "[a]iding and abetting liability requires that the aider and abettor share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose." *Dodd v. City Univ. of New York*, No. 17 CIV. 9932 (PAE), 2020 WL 5750715, at *36 (S.D.N.Y. Sept. 25, 2020) (internal quotation marks omitted).  Therefore, to support such liability, a plaintiff must show "direct, purposeful participation by the individual defendants."

*Id.* (internal quotation marks omitted).  Where a plaintiff has raised at least a factual issue as to whether a defendant participated in a retaliation claim, summary judgment is precluded with respect to that defendant.  *See, e.g.*, *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 215 (N.D.N.Y. 2002).

### b. Application

For the same reasons as discussed above in reference to Plaintiff's Section 1983 claims, fact issues remain that preclude summary judgment with respect to Plaintiff's aiding and abetting claims against Defendants Clarke and Kelly.  Considering the email from Kelly's Chief of Staff to Clarke informing Clarke that Kelly would "take onwus [sic]" for Plaintiff's transfer and anticipating a "hit" from that adverse employment action, a reasonable factfinder could infer that Clarke discussed Plaintiff's complaints with Kelly, that either or both Defendants actively discussed and concurred on Plaintiff's transfer, and that both shared retaliatory intent in doing so. *See, e.g.*, *Malena*, 886 F. Supp. 2d at 366 (allowing retaliation claims against corporate defendants and aiding and abetting claims against an individual defendant to survive summary judgment "on the basis that [the corporate defendants], knowingly or not, may have terminated [the plaintiff] because of discriminatory or retaliatory intent attributable to [the individual defendant]" and "[b]y supplying the intent and the complaints that may have led to [the plaintiff's] termination, [the individual defendant] may have actually participate[d] in the conduct giving rise to the plaintiff's . . . claim[s]").  Although a trier of fact might ultimately find that neither Clarke or Kelly purposefully participated in the alleged retaliatory action against Plaintiff, this is not a question for me to decide.[36]  The specifics of whether NYCHA was liable

---

[36] Under the NYSHRL, "[a]n individual may not be held liable . . . merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating that law."  *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367–68 (S.D.N.Y. 2012) (internal quotation marks omitted).  This rule applies to NYCHRL aider-and-abettor claims.  *Id.*  Accordingly, if NYCHA is later absolved of the NYSHRL and NYCHRL

as principal for retaliating against Plaintiff and whether and to what degree Clarke and Kelly took part in the alleged retaliatory purpose and actions are questions best reserved for trial.

With regard to Defendant Mark-Viverito, the record is devoid of evidence demonstrating that she actually participated in the bulk of the alleged conduct giving rise to Plaintiff's retaliation claims against NYCHA. Apart from allegedly requesting a "Spanish Manager" at the July 30, 2015 meeting as a supposed replacement for Williams, Defendant Mark-Viverito did not participate in any adverse employment actions against Plaintiff in response to protected activity. First, Defendant Mark-Viverito had no immediate authority to impact the terms of Williams's employment, and, indeed, no adverse employment action against Williams was taken during the meeting. Even if it were assumed that Defendant Mark-Viverito did encourage the NYCHA Defendants to replace Williams, there is no evidence that she had a say in how they should go about doing that, let alone in deciding on whether to delegate the task to Plaintiff. Similarly, the record is devoid of facts showing that Defendant Mark-Viverito was even aware that Plaintiff resisted and outwardly opposed NYCHA's transfer of Williams. Nor has Plaintiff identified evidence to suggest that Mark-Viverito had the authority to decide whether adverse employment actions could be taken against Plaintiff for refusing to transfer Williams, or pled facts suggesting that Mark-Viverito participated in that decision in any way. Given the paucity of facts implicating Defendant Mark-Viverito in Plaintiff's demotion, it would be improper to impute any retaliatory action on the part of the NYCHA Defendants to Defendant Mark-Viverito simply because of her comments during the July 30, 2015 meeting. Summary judgment dismissing the aiding and abetting claims against Defendant Mark-Viverito is therefore warranted.

retaliation claims, then neither Clarke nor Kelly can be found liable for aiding and abetting retaliation under those statutes. However, this is a question I need not address today, having found that the claims against NYCHA are sufficient to survive summary judgment.

Accordingly, Defendants' motions for summary judgment are DENIED to the extent that they seek dismissal of the claims against Defendants Clarke and Kelly and GRANTED to the extent that they seek dismissal of the claims against Defendant Mark-Viverito.  Plaintiff's motion for summary judgment as to the same claims is DENIED.

**B.  *The NYCHA Defendants' Motion to Strike the Declarations of Robert Knapp and Louis Nieves***

The NYCHA Defendants move to strike the declarations of Robert Knapp and Louis Nieves on the grounds that Plaintiff did not disclose the names of those individuals in her initial disclosures or in any subsequent supplementation to those disclosures, as is required under Federal Rule of Civil Procedure 26(a).  (Doc. 185, NYCHA Strike Mem. 1.)[37]  The NYCHA Defendants also urge me to also exercise my discretion to award them attorneys' fees incurred in bringing the instant motion.  (*Id*. at 2.)

Plaintiff's Complaint alleges that after Defendants removed her from her position as OPMOM Acting Director, they replaced her with her former subordinate, Octavia Hayward.  (Compl. ¶ 59.)  In her reply papers in support of her cross-motion for summary judgment, Plaintiff submitted the declarations of Robert Knapp and Louis Nieves to attest to this supposed replacement.  (Docs. 178, 179; *see* Doc. 181, at 8.)  Plaintiff had not previously revealed Knapp and Nieves in her initial disclosures.  Furthermore, between May 2018 and December 2018, Plaintiff amended her Rule 26(a) initial disclosures four times; none of these amended versions lists Knapp or Nieves as individuals likely to have discoverable information that may be used to support her claims.  (NYCHA Strike Mem. 1; *see* Doc. 186, Ex. 1.)

_____

[37] "NYCHA Strike Mem." refers to the NYCHA Defendants' memorandum of law in support of their motion to strike the declarations of Knapp and Nieves and for attorney's fees, filed June 1, 2020.  (Doc. 185.)

The NYCHA Defendants argue that Plaintiff did not have and does not now demonstrate that she had a legitimate reason for her failure to include Knapp and Nieves in her multiple amended initial disclosures, since both Knapp and Nieves were well-known to Plaintiff months or years before the close of discovery. (NYCHA Strike Mem. 7.) Knapp was the former Director of the NYCHA Heating Management Services Department. (Doc. 186, ¶ 10.) In April 2018, Plaintiff's attorney, Marcel Florestal, filed a Notice of Claim against NYCHA on Knapp's behalf. (*Id*. ¶ 10; Ex. 3.) Nieves was the Deputy Director of the NYCHA Manhattan Property Management Department from 2011 to May 2018. (*Id*. ¶ 11.) Plaintiff was a Borough Administrator in the Manhattan Property Management Department between 2014 and 2015. (*Id*. ¶ 12.) As Borough Administrator, Plaintiff reported to Nieves. (*Id*.) Neither Knapp nor Nieves worked in the OPMOM program. (*Id*. ¶¶ 10, 11.) The NYCHA Defendants thus submit that they could not have anticipated that, out of thousands of NYCHA employees, Plaintiff would elect to file declarations from Knapp and Nieves in support of her summary judgment motion. (NYCHA Strike Mem. 7.)

In response, Plaintiff argues that, just as Defendants had no reason to deduce based on Knapp's or Nieves's work backgrounds that either would be likely to provide information relevant to Plaintiff's claims, Plaintiff had no reason to believe that Knapp and Nieves were key individuals at the times of her disclosures. (Doc. 187, Pl.'s Strike Opp. Mem. 3–5.)[38] As Plaintiff interacted with approximately eight hundred employees while she was OPMOM's Director, and approximately six thousand employees throughout her thirty-year career at NYCHA, (Doc. 188, Colon June 8, 2020 Decl. ¶ 2),[39] she avers that she could not have been

---

[38] "Pl.'s Strike Opp. Mem." refers to Plaintiff's memorandum in opposition to the NYCHA Defendants' motion to strike the declarations of Knapp and Nieves, filed June 8, 2020. (Doc. 187.)

[39] "Colon June 8, 2020 Decl." refers to the declaration of Sibyl Colon in opposition to the NYCHA Defendants'

expected to reasonably predict that they had discoverable information regarding any OPMOM-related matter from the outset. She further attests that she did not learn of the information set forth in the declarations of Knapp and Nieves until, at the earliest, several days after NYCHA Defendants filed their opposition to Plaintiff's motion for summary judgment on April 17, 2020—though she fails to explain how she became aware at that time. (*Id.* ¶ 3.) Moreover, Plaintiff argues that the fact that Knapp is Plaintiff's attorney's former client is inapposite, because Rule 26's disclosure obligation is directed towards parties and not their attorneys, and because Knapp is but one of the many NYCHA employees that Plaintiff's attorney has represented. (Pl.'s Strike Opp. Mem. 6.)

Mindful that preclusion is a harsh sanction, I will weigh the factors in favor of and against it, as well as consider "less drastic" alternatives. *Outley*, 837 F.2d at 591.

First, as the NYCHA Defendants point out, Plaintiff supplies no explanation of how she happened to learn, in the middle of summary judgment briefing and four years after she filed her lawsuit, that Knapp and Nieves had "information" to support her summary judgment motion. (Doc. 190, NYCHA Strike Reply 3.)[40] Plaintiff had ample opportunity to engage in discovery to support her claim that Hayward replaced her in the years prior to the close of discovery. Therefore, absent any credible explanation for how she came to learn that Knapp and Nieves had information related to her litigation and why she waited until her summary judgment reply brief to disclose she had such information, I simply cannot find Plaintiff's nondisclosure excusable. Finally, Plaintiff failed to refute the NYCHA Defendants' assertion that her attorney and agent was involved in securing Knapp's testimony in support of her summary judgment claims, and

---

motion to strike and for attorneys' fees, filed June 8, 2020. (Doc. 188.)

[40] "NYCHA Strike Reply" refers to NYCHA Defendants' reply in support of their motion to strike the declarations of Knapp and Nieves, filed June 10, 2020. (Doc. 190.)

therefore should have been on alert that Knapp was a possible witness relevant to her claims. Given the complete lack of explanation for Plaintiff's delay, I find that Plaintiff has not borne her burden of supplying a sufficient explanation for her failure to comply with the Rule 26 disclosure requirement.

Also weighing in favor of preclusion is the fact that Defendants would suffer prejudice in having to prepare to meet the new testimony. Discovery has long closed and Defendants were not given adequate opportunity during that window to seek evidence to defend against the declarations, which pertain to the question of whether Hayward or Abrahams replaced Plaintiff and are therefore relevant to assessing the viability of Defendants' nonretaliatory explanation for Plaintiff's transfer. Plaintiff submits that her non-disclosure was harmless because the two declarants' testimony merely duplicates evidence already contained in the record, and that Hayward's own admission alone is sufficient to establish her argument that Hayward replaced Plaintiff as OPMOM's Acting Director in September 2015. (Pl.'s Strike Opp. Mem. 7); *see Preuss*, 970 F. Supp. 2d at 177 (finding preclusion not warranted for failure to disclose parties where their affirmations were largely duplicative of evidence already in the record). While, as discussed above, *supra* Part IV.A.1.b.ii, there is sufficient evidence in the record at the moment to create a genuine issue of fact regarding whether Hayward—rather than Abrahams—replaced Plaintiff for purposes of evading summary judgment, the testimony in these declarations clearly will later become relevant to convincing a trier of fact of this inference. Indeed, as Defendants point out, the declarations introduce a brand-new claim regarding NYCHA's supposed "custom and practice" of "always" appointing an Acting Director. (NYCHA Strike Reply 6.) As such, although the declarations may be harmless to Defendants at this summary judgment stage since I do not rely on them and they are not necessary to my determination to deny summary judgment

on Plaintiff's retaliation claims against NYCHA, admitting the declarations without giving Defendants additional discovery to defend against the information contained therein at trial would be prejudicial.

However, the other factors caution against my simply precluding the testimony of Knapp and Nieves.  For the same reason that admitting the declarations would be prejudicial to Defendants, precluding them at trial would conversely be harmful to Plaintiff, due to their relevance to her retaliation case.  In summary, the testimony in the declarations suggesting that Hayward was introduced as the Acting Director of OPMOM right after Plaintiff's demotion and during the start of Abrahams's tenure is important to Plaintiff's rebuttal of Defendants' proffered reason for removing Plaintiff as Director of OPMOM:  that is, to hire Abrahams.  To completely bar Plaintiff from employing the testimony of Knapp and Nieves or calling them as witnesses during trial would prevent her from fulsomely supporting and presenting her case.

Finally, a continuance, though burdensome, is certainly feasible.[41]  Although the time for summary judgment motions has elapsed, as stated above, the substance of the declarations could be relevant at trial even though not needed for summary judgment, and here, a trial date has not yet been set.

Weighing all of these factors, I find that allowing the NYCHA Defendants limited discovery to defend against the declarations of Knapp and Nieves would be an appropriate alternative remedy to preclusion, especially if Plaintiff bears the cost of such additional discovery.  *See, e.g.*, *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 162 (S.D.N.Y. 2012) (ordering a continuance and denying preclusion

---

[41] Plaintiff submits that a continuance, although not impossible, is unnecessary and would be an extreme measure, as discovery closed in September 2019.  (Pl.'s Strike Opp. Mem. 7.)  I find this argument entirely without merit.

despite the plaintiffs' inadequate explanation for their delay and the ensuing prejudice to defendants where "the Court would have the authority to shift certain discovery costs to [p]laintiffs, so as to avoid burdening [d]efendants with costs they would not have incurred, but for [p]laintiffs' non-compliance with the discovery rules").  Such a remedy would strike a balance between allowing the parties to develop a full factual record so as to adequately present their respective cases at trial and alleviating the prejudice to the NYCHA Defendants in having to defend against Plaintiff's untimely disclosures.

Accordingly, the NYCHA Defendants' motion is DENIED to the extent that they seek to strike the declarations of Knapp and Nieves and GRANTED to the extent that they seek attorneys' fees associated with bringing the instant motion for sanctions.  The parties are further directed to confer in good faith regarding the additional fact discovery that Defendants would reasonably require in order to respond adequately to the declaration of Knapp and Nieves and jointly submit a proposed schedule—not to exceed 60 days—for the completion of this additional discovery within 30 days of the entry of this Opinion & Order.

It is further ordered that Plaintiff will pay reasonable attorneys' fees and costs—not to exceed the fees and costs for four hours of deposition time per witness, if needed, and a reasonable period of time to prepare for each deposition per witness—associated with deposing Knapp and Nieves or reopening the depositions of any fact witnesses who were already deposed by Defendants, and from whom Defendants now wish to obtain testimony regarding the purported succession of Plaintiff as Director of OPMOM by Octavia Hayward.

Plaintiff shall also pay reasonable attorneys' fees and costs incurred by Defendants in making the instant motion for sanctions.  Defendants shall submit sworn affidavits setting forth reasonable attorneys' fees and costs incurred as a result of the additional discovery necessitated

by Plaintiff's late disclosures and in making the instant motion within 30 days of the completion of the additional discovery by the parties.

## V.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and Defendants' motions for summary judgment are GRANTED in part and DENIED in part. Specifically, Defendants' motions for summary judgment dismissing Plaintiff's First, Second, and Third Claims for Relief against the NYCHA Defendants are DENIED. Defendants' motions for summary judgment dismissing the Fifth Claim for Relief against Defendants Clarke and Kelly are DENIED. Defendants' motions for summary judgment regarding the Eighth Claim for Relief are DENIED as to Defendants Clarke and Kelly and GRANTED as to Defendant Mark-Viverito.

The NYCHA Defendants' motion for sanctions is GRANTED in part and DENIED in part. It is hereby ORDERED that the parties shall confer in good faith regarding the additional fact discovery that Defendants would reasonably require in order to respond adequately to the declaration of Knapp and Nieves and jointly submit a proposed schedule—not to exceed 60 days—for the completion of this additional discovery within 30 days of the entry of this Order.

Plaintiff will pay reasonable attorneys' fees and costs—not to exceed the fees and costs for four hours of deposition time per witness, if needed, and a reasonable period of time to prepare for each deposition per witness—associated with deposing Knapp and Nieves and/or reopening the depositions of any fact witnesses who were already deposed by Defendants, and from whom Defendants now wish to obtain testimony regarding the purported succession of Plaintiff as Director of OPMOM by Octavia Hayward.

It is further ORDERED that Plaintiff will pay reasonable attorneys' fees and costs incurred by the NYCHA Defendants in making the instant motion for sanctions. The NYCHA Defendants shall submit sworn affidavits setting forth reasonable attorneys' fees and costs incurred as a result of the additional discovery necessitated by Plaintiff's late disclosures and in making the instant motion within 30 days of the completion of the additional discovery by the parties.

The Clerk of Court is respectfully directed to terminate the open motions at Documents 120, 122, 130, 132, and 184, and to terminate Defendant Mark-Viverito from the case. The remaining Defendants are directed to meet and confer with Plaintiff regarding a proposed date for the completion of any additional discovery that Defendants might require as a result of Plaintiff's late disclosures of Knapp and Nieves, and file a joint status update including this proposed schedule within 30 days of the entry of this Opinion & Order.

SO ORDERED.

Dated: May 26, 2021
  New York, New York

              Vernon S. Broderick
              United States District Judge