**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

**SIBYL COLON**,

                    **Plaintiff,**

     **-against -**                          **16-CV-04540 (VSB)**

**THE CITY OF NEW YORK,** *et al.***,**

                    **Defendants.**

------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE***

Marcel Florestal, Esq.
**FLORESTAL LAW**
**FIRM, PLLC**
*Trial Counsel for Plaintiff*
48 Wall Street, Suite 11
New York, NY 10005
(212) 918-4416

Dated: September 22, 2023

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

PRELIMINARY STATEMENT ……………………………………………… 1

ARGUMENT …………………………………………………………….. 1

A MOTION *IN LIMINE* IS NOT A PROPER VEHICLE
TO LITIGATE FACTS THAT ARE  IN DISPUTE …………………….….. 1

I.    Clarke's Testimony Regarding the Law Department's
Recommendation Is Admissible in Evidence ……………………….. 2

   a.  Information omitted by Defendants ………………………… 2

   b.  The Law Department's Recommendation
Is Plain, Probative and Not Prejudicial ………………………… 4

   c.  The Recommendation Is Not
Protected by Attorney-Client Privilege ……………………….... 5

   d.  The Recommendation Is Not Hearsay
and Is Fully Admissible …………………………………………… 9

II.    No Temporal Limit Should Be Placed
on Williams's Testimony ……………………………………….. 10

III.    NYCHA's False Certifications Regarding Their Compliance with
Lead Inspections Undermine the Credibility of the NYCHA Principals
Who Were Responsible for and Knowledgeable About the Conduct
of Those Inspections, Including Defendants Kelly and Clarke ……. 11

IV.    Plaintiff's Emotional Distress Claims Are Not Garden Variety, and
It Is Premature to Place Any Limitation on Plaintiff's Damages …. 12

V.    Dr. Papanna Ravichandra Is Listed as Plaintiff's Treating
Physician, and Was Not Identified as an Expert Witness ………….. 13

VI.    Testimony from Regina Chu and Rosie Mendez
Is Directly Relevant and Is Not Character Evidence ……………….. 14

VII.    (1) The Jury Should Hear and Determine All Claims for Monetary

Relief, Including Economic Damages Under 42 U.S.C. § 1983,
Should Hear and Determine Claims for Economic Damages Under
Title VII as an Advisory Jury, and (2) Factual Issues Preclude
Dismissal of Plaintiff's Claims of Constructive Discharge
or Limitation of Plaintiff's Claims for
Failure to Mitigate ……………………………………………………….          15

   a.  The Jury Should Hear and Determine Plaintiff's
Claims for Economic Damages/Backpay and Front Pay ………………..     15

   b.  Determination of Constructive Discharge
Is a Fact Question for the Jury ……………………………………….......      18

   c.  Factual Issues Preclude a Determination Regarding the Utility
of NYCHA's Internal Complaint Procedure and Whether a
Reasonable Person Would Have Felt Compelled to Resign ………….       19

   d.  Factual Questions Preclude a
Determination of Mitigation of Damages ……………………………..       21

VIII.   Plaintiff Has Never Maintained that NYCHA's
Language Requirements Are Discriminatory ………………………….       23

  IX.    Punitive Damages Are Unavailable Against NYCHA.…………….       23

  X.     Punitive Damages Should Not Be Bifurcated
After Liability …………………………………………………………       23

  XI.    Factual Questions Preclude a Finding of Qualified Immunity, and
Clark and Kelly Cannot Shield Themselves with Qualified Immunity
While Asserting Attorney-Client Privilege Over the Underlying
Basis of the Law Department's Recommendation ………………..       23

CONCLUSION …………………………………………………………….       25

# TABLE OF AUTHORITIES

## Cases

*Astrin v. Maharam Fabric Corp.*, 2013 WL 3149462 (E.D.N.Y., June 19, 2013) ............. 1

*Bolents v. City of Niagara Falls, New York*, 1983 WL 48989 (W.D.N.Y., July 18, 1984) ............................................................................................. 16

*Broadnax v. City of New Haven*, 415 F.3d 265 (2d Cir. 2005) .................................. 16, 22

*Business Services, Inc. v. AT&T Corp.*, 251 FRD 121 (S.D.N.Y. 2008) ........................... 8

*Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81 (2d Cir. 1996) .............. 19, 21

*City of Monterey v. Del Monte Dunes at Monterey Ltd.*, 526 U.S. 687 (1999) ............... 16
,
*Colon v. City of New York*, 2021 WL 2159758 (S.D.N.Y., May 26, 2021)....................... 3

*DDK Hotels, LLC v. Williams Sonoma, Inc.*, 2022 WL 2702378 (E.D.N.Y., February 11, 2022) ...................................................................................... 7

*Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998) .................................................. 16, 22

*Hamza v. Saks Fifth Ave., Inc.*, 2011 WL 6187978 (S.D.N.Y., July 17, 2011) ................. 1

*Hinchcliffe v. Costco Wholesale Corp.*, 2010 WL11537927 (D. Vt., Feb. 19, 2010)......... 1

*Israeli v. Ruiz*, 2015 WL 4618055 (S.D.N.Y., July 27, 2015) ......................................... 14

*Koyen v. Consolidated Edison Co. of New York, Inc.*, 560 F. Supp. 1160 (S.D.N.Y. 1983) ............................................................................................. 18

*MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 846 (S.D.N.Y. 2012).........13

*Mercado v. Department of Corrections*, 2019 WL 625697  (D. Conn., February 14, 2019) .............................................................................................14

*MF Global Holdings Ltd. v. PricewaterhouseCoopers LLC*, 232 F. Supp. 2d 558 (S.D.N.Y. 2017) ...................................................................................................7

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006)........................................................13

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) .........................6

*Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585 (S.D.N.Y. 2015)......................8

*Seliger v. Breitbart News Network, LLC*, 2021 WL 707063 (S.D.N.Y., February 22, 2021)....................................................................................................................7

*Sharkey v. J.P. Morgan Chase & Co.*, 2018 WL 1229831 (S.D.N.Y., Mar. 5, 2018)......22

*Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 873-74 (2d Cir. 1992)..............17

*Spanski Enterprises, Inc. v. Televizja Polska, S.A.,* 2009 WL 3270794 (S.D.N.Y., October 13, 2000)...........................................................................................6

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1990) .................................................25

*Vega v. Union Free School Dist.*, 801 F.3d 72 (2d Cir. 2015)...........................................16

*Wade v. Orange County Sheriff's Office*, 844 F.2d 951 (2d Cir. 1988)............................16

*Williams v. NYCHA*, 61 F.4th 55 (2d Cir. 2023) .................................................................4

**Statutes**

42 U.S.C. § 1983 ............................................................................................ 15, 16

Title VII of the Civil Rights Act of 1964, 42 U.S.C.  2000e *et seq*. .................... 15, 16, 17

**Other Authorities**

DOI Report, Investigation into False Certification of NYCHA Lead Paint Inspections (November 2017), appearing at http://www1.nyc.gov/site/doi/newsroom/public-reports.page ...................................................................................................... 12

**Rules**

FRCP 30(b)(6) ...........................................................................................*passim*

FRCP 39(c)(1) ................................................................................................ 17

FRE 607 .......................................................................................................... 12

FRE 608(b) ...................................................................................................... 12

FRE 801(c)(2) ............................................................................................... 9, 10

FRE 801(d)(2)(A) .............................................................................................. 9

FRE 801(d)(2)(B) .............................................................................................. 9

FRE 801(d)(2)(C) .............................................................................................. 9

FRE 801(d)(2)(D) .............................................................................................. 9

FRE 803(3) .................................................................................................... 9, 10

FRE 807(a) .................................................................................................... 9, 10

## PRELIMINARY STATEMENT

Plaintiff Sibyl Colon ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion *in limine*. As explained below, Defendants' motion is essentially a stalking horse for another motion for summary judgment, a pretext that is highly inappropriate for a motion *in limine*. Moreover, the purported facts that form the basis of Defendants' pseudo motion *in limine* are inaccurate, misleading or mischaracterized.

## ARGUMENT

### A MOTION *IN LIMINE* IS NOT A PROPER VEHICLE TO LITIGATE FACTS THAT ARE IN DISPUTE

Courts in this circuit have routinely rejected motions *in limine* that are, in essence, motions for summary judgment on specific factual matters. *See, e.g.*, *Astrin v. Maharam Fabric Corp.*, 2013 WL 3149462 at *1-2 (E.D.N.Y., June 19, 2013) (deferring decision on motion *in limine* until after jury determines liability); *Hamza v. Saks Fifth Ave., Inc.*, 2011 WL 6187978 at *5 (S.D.N.Y., July 17, 2011) (rejection of "effectual motion for summary judgment filed as motion in limine"); *Hinchcliffe v. Costco Wholesale Corp.*, 2010 WL11537927 at *8 (D. Vt., Feb. 19, 2010) ("motions in limine are not the appropriate means through which dispositive issues should be resolved").

Defendants moved for summary judgment on January 17, 2020 (Dkt. No. 122), and the motion for summary judgment was decided by this Court on May 26, 2021. It is improper for Defendants to seek a second bite at the apple now on factual issues that remain in dispute. The Court should reject that effort.

1

In addition to making an improper motion *in limin*e, Defendants have relied upon a distorted statement of the factual record.  Plaintiff will address Defendants' misstatements of facts in the course of discussing the individual points in Defendants' motion *in limine*.

**I.    Clarke's Testimony Regarding the Law Department's Recommendation Is Admissible in Evidence**

**a.  Information omitted by Defendants**

In moving to preclude the testimony of Brian Clarke ("Clarke"), a NYCHA Senior Vice President, regarding the reason he did not move forward with the transfer of Allison Williams, the Property Manager at Mill Brook Houses, Defendants have omitted the context of Clarke's testimony.

First, Clarke was identified by NYCHA as a FRCP 30(b)(6) witness on a variety of topics, including item 16 in Plaintiff's notice of deposition to NYCHA:

> **Requests, instructions, directives, discussions or comments by** former New York City Council Speaker Melissa Mark-Viverito, **Brian Clarke,** Michael Kelly **or any other representative of the New York City Housing Authority to transfer or terminate Allison Williams from her position as the manager of Mill Brook Houses.**

(Email from Jane Lippman, NYCHA's counsel, to Marcel Florestal, Plaintiff's counsel, dated March 12, 2019 (emphasis added).)

Second, Defendants made no motion for a protective order prior to Clarke's deposition to prevent or limit disclosure of potentially privileged information.

Third, the relevant segment of Clarke's testimony follows:

Q.    Was a verbal counseling given to Ms. Williams?
A.    The – I don't know.
Q.    Was a written counseling memo given to Ms. Williams?

A.    No.

Q.    Do you know whether Ms. Williams had a civil service title?

A.    Yes.

Q.    Do you recall what that was?

A.    Property manager.

Q.    How, if at all, did that prevent you from removing her as the manager of Mill Brook?
      MS. LIPPMAN: Objection.

A.    I just want to clarify, it's transferring her.

Q.    Transferring, moving, I'm sorry.

A.    So property managers don't have transfer rights, so transfers can be at the discretion
      of management.

Q.    Who would that be in this situation?

A.    In this case I was recommending transfer of Ms. Williams.

Q.    Why did that not occur?

A.    It didn't occur because it was recommended to me not to transfer at this time.

Q.    When you say "it", who's it?  Is it a person?

A.    Law Department.

Q.    Who did you speak with?
      MS. LIPPMAN: Objection.
      I'm going to instruct the witness not to answer at this point, because the disclosure
      of the information calls for attorney-client privilege information.

Fourth, NYCHA did not move to strike or otherwise protect Mr. Clarke's testimony

regarding the recommendation he received from the Law Department not to transfer Ms.

Williams either at the deposition or at any time after the deposition.

Fifth, the recommendation made by the Law Department to Clarke was referenced

by this Court three times in its decision on the parties' respective motions for summary

judgment.  *Colon v. City of New York*,  2021 WL 2159758 at *8, 16 and n.33 (S.D.N.Y.,

May 26, 2021).  As stated by this Court,

> the multiple stops and starts and the eventual abandonment of
> the effort to transfer Williams—unexplained by Defendants
> other than by Clarke's disclosure that the NYCHA Law
> Department told him not to pursue the transfer—raises an
> inference that Human Resources and Defendant Clarke were
> on notice of the risk that the transfer was potentially improper
> or at the very least that Plaintiff viewed it as such.

3

*Id.* at *16.  The recommendation by the Law Department was likewise referenced by the

Second Circuit in its decision reversing the summary judgment dismissal of the claims in

the related action filed by Williams on at least five occasions.  *Williams v. NYCHA*, 61 F.4th

55, 63, 71, 72, 75 (2d Cir. 2023).  As the Second Circuit observed,

> What the [lower] court calls an "aborted attempt"—suggesting
> that Clarke himself stopped the effort—a jury could reasonably
> conclude was a stymied attempt, halted only because human
> resources employees repeatedly told Clarke and others it was
> illegal to make transfers on the basis of race, and the Law
> Department ultimately advised against the transfer. Another
> basis from which a jury could conclude that Clarke's
> motivation for the transfer was race-based can be gleaned from
> the fact that Clarke stopped pursuing the transfer after human
> resources told him it flowed from illegal motivation. If the
> transfer was based on Williams's performance, as Clarke
> claims, then it is odd that he stopped pursuing the transfer.
> Given that some NYCHA employees characterized the transfer
> as racially motivated, and the Law Department advised Clarke
> against the transfer, a jury could surely draw a reasonable
> inference to that effect.

*Id.* at 72.

### b.  The Law Department's Recommendation
###      Is Plain, Probative and Not Prejudicial

Defendants assert, without any basis, that the recommendation by the Law

Department was "*after* Plaintiff quit," and as such, is irrelevant.  Def. *in Limine* Mem. at

2.  There is nothing in the record that indicates when the recommendation was made.  In

fact, Defendants foreclosed any such inquiry by directing the witness not to answer any

further questions at the deposition as privileged attorney-client information.

Defendants further assert that, "[m]ore importantly, the meaning of this statement is unclear and was not further explored at the time of Clarke's deposition." *Id.* at 3. There is nothing unclear about the statement—the Law Department made a recommendation not to transfer Williams. There was nothing to explore, as Defendants blocked any further explanation of who made the recommendation, when it was recommended, and why it was recommended. Moreover, to the extent that Defendants seek to introduce testimony now on any of these areas, they must be precluded from doing so.

Contrary to Defendants' assertions, the recommendation is not "rife with vagueness" and it is perfectly clear "what was recommended." *Id.* This Court and the Second Circuit certainly understood what the recommendation was and its potential significance. The jury can likewise consider and assess the meaning of Clarke's testimony and its implications.

Lastly, Defendants assert that, even if relevant − and it is highly relevant − the recommendation is prejudicial. However, Defendants fail to explain why this would be so, when it is simply the explanation for Clarke's decision not to proceed.

### c. The Recommendation Is Not Protected by Attorney-Client Privilege

As noted, Clarke was designated as NYCHA's Rule 30(b)(6) witness for matters that included "[r]equests, instructions, directives, discussions or comments by . . . Brian Clarke, . . . or any other representative of the New York City Housing Authority to transfer or terminate Allison Williams from her position as the manager of Mill Brook Houses."

The obligations imposed on corporations to comply with a Rule 30(b)(6) deposition notice are well recognized:

> Under Rule 30(b)(6), when a party seeking to depose a corporation announces the subject matter of the proposed deposition, the corporation must produce someone familiar with that subject. . . .  To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available "such number of persons as will" be able "to give complete, knowledgeable and binding answers" on its behalf.

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 268 (2d Cir. 1999) (internal citations omitted).  And the corporation "**is obligated to prepare [the witness] so that they may give knowledgeable answers**." *Spanski Enterprises, Inc. v. Televizja Polska, S.A.,* 2009 WL 3270794 at *3 (S.D.N.Y., October 13, 2000) (Circuit Judge Lynch sitting by designation) (internal citation omitted) (emphasis added).

In order to prepare Clarke for the Rule 30(b)(6) deposition subjects assigned to him, it was necessary to prepare him for the answer to the question posed:  Why did he not proceed with his mandate to transfer Williams from her position as Manager of Mill Brook Houses?  And to do so, the answer to this 30(b)(6) subject was apparent:  The Law Department recommended against doing so.  NYCHA expected this inquiry, knew this would be the answer, but did not object to the question or move to strike the response at any time in the four years since it was provided.  NYCHA did, however, object, on grounds of privilege, to any further inquiry regarding this recommendation.  Thus, NYCHA never considered this response privileged at the time of the deposition or since that time until it moved to preclude it now on the eve of trial.

Moreover, if NYCHA intended to preclude the response itself as privileged, NYCHA could have filed a motion for a protective order prior to the deposition. Motions for a protective order are commonly filed in the context of a Rule 30(b)(6) witness who testifies on behalf of the corporation where potentially privileged matters may be disclosed during the witness's testimony. *See, e.g., DDK Hotels, LLC v. Williams Sonoma, Inc.*, 2022 WL 2702378 (E.D.N.Y., February 11, 2022); *Seliger v. Breitbart News Network, LLC*, 2021 WL 707063 (S.D.N.Y., February 22, 2021). However, NYCHA did not seek such protection in advance of the Clarke deposition. Thus, the deposition proceeded as NYCHA expected, permitting disclosure of the Law Department's recommendation but preventing the disclosure of any further information.

Permitting NYCHA to take an antithetical position now in light of what transpired at the deposition and the subsequent history would be highly prejudicial to Plaintiff. Clarke's response as to the reason for not proceeding with the transfer is highly relevant to the claims of racial discrimination alleged by Plaintiff, as already acknowledged by this Court and the Second Circuit. Defendants should not be permitted to shield this testimony four years after they anticipated the response and prepared their deponent to disclose it.

In any event, if Defendants wish to make a belated claim of privilege as to this response now, Defendants have unquestionably waived the privilege by their failure to take reasonable steps to protect the response at any time in the past four years. The case law they cite is not only inapposite, it supports Plaintiff. Thus, in *MF Global Holdings Ltd. v. PricewaterhouseCoopers LLC*, 232 F. Supp. 2d 558, 569 (S.D.N.Y. 2017), the district court expressly held that the"[t]he Plan Administrator **cannot now assert, after Ferber has**

7

**already answered these questions in a sworn deposition, that this testimony is privileged.**" (Emphasis added.)

Further, in *Business Services, Inc. v. AT&T Corp.*, 251 FRD 121, 127 (S.D.N.Y. 2008), "the issue in dispute [was] whether the defendant knew about [the corporate employee's] disclosure to the plaintiff." The district court held that the defendant ratified the disclosure of attorney-client privileged information by "failure to dissent within a reasonable time after learning what had been done." *Id.* Here, by contrast, it is indisputable that counsel was fully aware of the disclosure of the recommendation by the Law Department from the moment it was made by Clarke at the deposition.

And in *Scott v. Chipotle Mexican Grill, Inc.*, 94 F. Supp. 3d 585, 597 (S.D.N.Y. 2015), the district court stated:

> [T]he plaintiffs argue that Dominguez waived Chipotle's privilege as to the Parcheta documents **by testifying in her deposition in such a way as to imply what Parcheta's advice might have been**. . . . This argument is unavailing. **Nowhere in the deposition transcript** pages provided to the Court **does Dominguez state what legal advice Parcheta provided to her** or to Chipotle, and Chipotle's counsel carefully objected to the legal aspects of Dominguez's conversation with Parcheta.

(Emphasis added.) Here, Clarke **did not "imply" what counsel "might" have said; he testified that the Law Department actually recommended against the transfer.** The disclosure was made at the deposition, Defendants never argued that **this disclosure** was privileged in the four years since it was made and referenced by the courts, never moved to prevent its disclosure, and never moved to strike the disclosure. Thus, the Defendants affirmatively waived **and** ratified the disclosure of the recommendation.

8

### d. The Recommendation Is Not Hearsay and Is Fully Admissible

Neither Clarke's statement nor the Law Department's recommendation constitutes hearsay. Clarke's statement is not hearsay for multiple reasons. It is a statement "offered against an opposing party" that was "made by the party in an individual or representative capacity." FRE 801(d)(2)(A). This is clearly so, as Clarke testified as a Rule 30(b)(6) witness on behalf of NYCHA. It is also a statement "offered against an opposing party" that "is one the party manifested that it adopted or believed to be true." FRE 801(d)(2)(B).

Alternatively, the statement is not hearsay because it is not offered "to prove the truth of the matter asserted in the statement." FRE 801(c)(2). The statement explains why Clarke acted as he did in this instance by not following through with his (and the Speaker's) demand "at this time."

Even if it were considered hearsay, Clarke's statement is otherwise admissible under FRE 803(3) (statement of declarant's then-existing state of mind (such as motive, intent or plan)) and under FRE 807(a) (residual exception), particularly in the context of prepared testimony offered by a Rule 30(b)(6) witness.

The Law Department's recommendation is likewise not hearsay because it is a statement "offered against an opposing party" that "was made by a person whom the party authorized to make a statement on the subject." FRE 801(d)(2)(C). It is also a statement "offered against an opposing party" that "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FRE 801(d)(2)(D). NYCHA's Law Department is clearly authorized to make statements/recommendations on

9

the conduct or proposed conduct of NYCHA's officers and employees and such statements/recommendations are clearly made within the scope of the Law Department's relationship to NYCHA.

Alternatively, as with Clarke's statement, the Law Department's statement is not hearsay because it is not offered "to prove the truth of the matter asserted in the statement." FRE 801(c)(2).

Even if it were considered hearsay, the Law Department's statement is otherwise admissible under FRE 803(3) (statement of declarant's then-existing state of mind (such as motive, intent or plan)) and under FRE 807(a) (residual exception), particularly in the context of prepared testimony offered by a Rule 30(b)(6) witness.

Defendants ignore these FRE provisions in their motion *in limine*. Accordingly, the deposition testimony is fully admissible.

## II.    No Temporal Limit Should Be Placed on Williams's Testimony

Contrary to Defendants' contention, the experiences Williams had vis a vis NYCHA after Plaintiff's resignation are relevant and are not unfairly prejudicial. This is another instance where Defendants have omitted or misstated key facts. Defendants state: "Notably, Williams was unaware of any directive or attempt to transfer her until after Plaintiff resigned." Def. *in Limine* Mem. at 6. Notably, Defendants make no reference to the record in support of this statement. In fact, Williams was aware of the Speaker's directive the moment it was issued at the July 30 meeting. Colon, Artis and Williams, the three African-Americans who attended the meeting on behalf of NYCHA, were

immediately startled and offended by the Speaker's directive, considering it racist bullying based on ethnicity. (Colon at 135-37, 154-58; Artis at 33-34, 38-39; Williams at 213-14, 294-97.)

In any event, this fact is irrelevant to the actions taken against Ms. Williams after Plaintiff resigned. Clarke explicitly told Colon that if she would not take action to transfer Williams, "I will do it myself." (Colon at 234.) Thus, all of the actions taken by NYCHA, and Clarke in particular, **after Plaintiff resigned** to limit the housing assistants assigned to Mill Brook and to fail to replace them, as well as other efforts to undermine Williams's position, are part of Clarke's continuing effort to do what he wanted to do in the first place **before Plaintiff resigned.** These attempts to proceed notwithstanding the Legal Department's recommendation are relevant to Clarke's state of mind regarding the discriminatory nature of his conduct. There is nothing prejudicial to Defendants about this evidence.

### III. NYCHA's False Certifications Regarding Their Compliance with Lead Inspections Undermine the Credibility of the NYCHA Principals Who Were Responsible for and Knowledgeable About the Conduct of Those Inspections, Including Defendants Kelly and Clarke

On November 14, 2017, the New York City Department of Investigation ("DOI") issued a devastating report, disclosing that

> NYCHA has violated city and federal laws by failing to conduct mandatory safety inspections for lead paint. Further, since 2013, NYCHA has falsely certified to the United States Department of Housing and Urban Development (HUD) that it was in compliance with the federal law. **By 2015, certain senior NYCHA officials were aware that NYCHA was violating city lead laws.** By summer 2016, NYCHA's Chair, Shola Olatoye, knew that NYCHA was out of compliance both

11

> with city and federal lead laws when she submitted a false
> certification to HUD.

DOI Report, Investigation into False Certification of NYCHA Lead Paint Inspections (November 2017), appearing at http://www1.nyc.gov/site/doi/newsroom/public-reports.page (emphasis added). The senior officials referred to by DOI included NYCHA General Manager Michael Kelly, Senior Vice President Brian Clarke, and Senior Vice President, Luis Ponce.

NYCHA's violations of HUD and New York City's regulations is not the subject of this litigation, but the credibility of these three NYCHA officials are. They held senior executive positions with day-to-day responsibility at varying times while these violations occurred, and each was a participant in deceiving state and federal authorities regarding NYCHA's purported compliance with federal and city laws and regulations. Each will be subject to cross-examination affecting their credibility if called by either party, FRE 607, and their character for truthfulness or untruthfulness, FRE 608(b).

Thus, Plaintiff should be permitted to impeach Clarke and Kelly (and others) who participated in this fraudulent conduct.

## IV.    Plaintiff's Emotional Distress Claims Are Not Garden Variety, and It Is Premature to Place Any Limitation on Plaintiff's Damages

Defendants omit relevant facts and rely on inapposite cases in arguing that Plaintiff's emotional distress claims are garden variety claims. Unlike the allegations in the cases cited by Defendants, Plaintiff's claims of emotional distress are not conclusory or based solely on her own testimony. She saw her treating physician, Papanna Ravichandra on multiple occasions, was also treated at Beth Israel Medical Center, suffered

from multiple physical symptoms, including, diarrhea, stomach issues, palpitations, sleeplessness and vomiting, and was prescribed medication.  These are not garden variety claims.  *See Patterson v. Balsamico*, 440 F.3d 104, 119-20 (2d Cir. 2006); *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 846, 559-64 (S.D.N.Y. 2012).

Moreover, as a question of fact that remains to be heard and considered, this is not a matter that is appropriate for a motion *in limine*.  Thus, it is fundamentally improper and premature to make any determination regarding the scope of Plaintiff's emotional distress damages.

## V.    Dr. Papanna Ravichandra Is Listed as Plaintiff's Treating Physician, and Was Not Identified as an Expert Witness

Plaintiff's 3rd Amended Rule 26(a) Initial Disclosures, dated December 12, 2018, did not list Plaintiff's treating physician, Dr. Papanna Ravichandra, as an expert.  He was listed as a treating physician who "will testify as to what he saw, observed and concluded regarding Plaintiff's health and well-being."   The proposed Joint Pretrial Order is to the same effect ("injuries, examination, observations and findings, and treatment of Plaintiff). Thus, Defendants' extended discussion of excluding testimony from Dr. Ravichandra as an expert witness is moot.

Defendants further assert that Dr. Ravichandra should be precluded from offering any opinions "as unreliable because they are based entirely on statements Plaintiff made herself."  Defendants' Memorandum of Law in Support of Motion in Limine ("Def. *in Limine* Mem.) at 11.  But a treating physician's testimony cannot be so cabined, even in the absence of a degree in a designated specialty, such as psychiatry.  Treating physicians

are routinely permitted to testify regarding the matters set forth in Plaintiff's initial disclosure and in the Joint Pretrial Order. *See, e.g., Mercado v. Department of Corrections*, 2019 WL 625697 at *4 (D. Conn., February 14, 2019); *Israeli v. Ruiz*, 2015 WL 4618055 at *4 (S.D.N.Y., July 27, 2015).   As the district court observed in *Mercado*:

> "The key to what a treating physician can testify without being declared an expert is based on *his personal knowledge from consultation, examination and treatment of the Plaintiff, not from information acquired from outside sources.* . . . Accordingly, a treating physician's testimony is not limited to facts; they "may testify as to opinion formed during their treatment, *including causation*, severity, disability, permanency and future impairments." . . . . He or she is "permitted to offer opinion testimony on diagnosis, treatment, prognosis and causation, but solely as to the information he/she has acquired through observation of the Plaintiff in his/her role as a treating physician limited to the facts in Plaintiff's course of treatment."

2019 WL 625697 at *4 (italics in original).

Thus, Dr. Ravichandra should be permitted to testify as proposed. Defendants are free to cross-examine Dr. Ravichandra on the scope of his knowledge, observations, treatment and the records regarding them.

## VI.    Testimony from Regina Chu and Rosie Mendez Is Directly Relevant and Is Not Character Evidence

Defendants erroneously characterize Plaintiff's proffer of testimony from Regina Chu, a Property Manager who reported to Plaintiff within the OPMOM program, and Rosie Mendez, a former New York City Council member who worked with Plaintiff on matters involving NYCHA.

Defendants have expressly challenged Plaintiff's performance as Director of OPMOM as part of their defense in this litigation. Thus, for example, Defendants have alleged that "Colon's claim . . . that she was meeting and exceeding expectations with her performance . . . is belied by the evidence." NYCHA Defendants' Memorandum of Law in Opposition to Plaintiff Sybil Colon's Motion for Summary Judgment at 17, Dkt. No. 156. And Colon's "performance as OPMOM Director was unsatisfactory to her supervisor, Brian Clarke." *Id.* at 27.

Plaintiff must be able to challenge these assertions by testimony and documents. Both of the witnesses worked with Plaintiff, Regina Chu in the OPMOM program, and Rosie Mendez in contacts with the City Council. In short, Plaintiff is not proffering "character" evidence; she is proffering evidence regarding her performance both within and outside NYCHA. These witnesses should not be excluded.

**VII.** **(1) The Jury Should Hear and Determine All Claims for Monetary Relief, Including Economic Damages Under 42 U.S.C. § 1983, Should Hear and Determine Claims for Economic Damages Under Title VII as an Advisory Jury, and (2) Factual Issues Preclude Dismissal of Plaintiff's Claims of Constructive Discharge or Limitation of Plaintiff's Claims for Failure to Mitigate**

Defendants have incorporated disparate requests under section VII. of their motion, including requests that are wholly unrelated to the heading of that section, necessitating the foregoing complex heading.

**a. The Jury Should Hear and Determine Plaintiff Claims for Economic Damages/Backpay and Front Pay**

Defendants' request to exclude jury consideration of Plaintiff's claims for front pay and backpay is unwarranted. As stated in the principal case relied upon by Defendants:

> We must also consider whether the district court erred in submitting to the jury both the appropriateness of granting an award of lost wages, and the amount of the lost wages award. Because a lost wages award—whether in the form of back pay or front pay—is an equitable remedy, a party is generally not *entitled* to a jury determination on the question.

*Broadnax v. City of New Haven*, 415 F.3d 265, 270-71 (2d Cir. 2005) (italics in original). While a party may not be **entitled** to a jury trial of certain claims, here Title VII claims for front pay and backpay, this does not **preclude** a jury from hearing and determining such claims.  Defendants' argument also ignores Plaintiff's request for monetary relief under 42 U.S.C. § 1983, under which Plaintiff is **entitled** to a jury trial, including claims for backpay and front pay.  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999); *Vega v. Union Free School Dist.*, 801 F.3d 72, 81-82 (2d Cir. 2015) (retaliation claim available under section 1983); *Gierlinger v. Gleason*, 160 F.3d 858, 874 (2d Cir. 1998) (upholding prejudgment interest on jury award of backpay); *Bolents v. City of Niagara Falls, New York*, 1983 WL 48989 at *2 (W.D.N.Y., July 18, 1984).  Here, the underlying core of facts is the same for the claims for relief under both Title VII and section 1983.  Thus, precluding the jury from hearing and calculating the front pay and backpay claims makes no sense.

Moreover, it is important that the jury make its determination of economic damages under section 1983 in the first instance, **prior** to the court's determination of economic damages under Title VII.  To do otherwise would violate Plaintiff's right to a jury trial under section 1983.  *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 954 (2d Cir. 1988):

16

> To safeguard this right, the general rule is that the jury must decide the legal claims prior to the court's determination of the equitable claims, . . . in order to prevent the court's determination of a common factual issue from precluding, by collateral estoppel effect, a contrary determination by the jury.

(Citation omitted.)  And, in the event the jury and the court arrive at conflicting rulings on the same factual issues, the jury's determination prevails, estopping the court from finding otherwise.  *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 873-74 (2d Cir. 1992). To avoid a potential conflict, the Court may, upon motion, or *sua sponte*, "try any issue with an advisory jury" pursuant to FRCP 39(c)(1).

Accordingly, Plaintiff requests that the Court try the economic damage claims under Title VII with an advisory jury.

Last, on the backpay/front pay issue, Plaintiff's claims are not speculative, as argued by the Defendants, without citation.  Def. *in Limine* Motion at 14.  Plaintiff's claims for backpay and front pay are no different than any other claimant; no one knows what the future will bring.  If the OPMOM/NextGen program was terminated by NYCHA after Janet Abrahams left in 2017, as alleged by Defendants, that has no direct bearing on the economic losses sustained by Plaintiff.  She has not been able to reach the levels she attained after thirty years at NYCHA, with multiple commendations and no complaints about her performance.  She was unable to attain the salary she had as Director of OPMOM, the salary for the position to which she was demoted, or even the salary she held before defendant Clarke selected her as OPMOM Director following interview of multiple candidates.

As former Chief Judge Weinfeld observed in another, yet apropos context forty years ago:

> The manifest purpose of this broad grant of legal and equitable power is to enable the courts to fashion whatever remedy is required to fully compensate an employee for the economic injury sustained by him. The power so granted is sufficient to authorize an award of future loss of earnings in appropriate cases. To deny that authority would defeat a purpose of the Act to make a victim of discrimination "whole" and to restore him to the economic position he would have occupied but for the unlawful conduct of his employer. To deny such authority would remove a deterrent force against future violations.
>
> Similarly, the Court does not agree with those holdings which deny future damages solely because of the prospect of speculative and windfall awards. . . . The problem is more imaginary than real. Courts and juries are not without experience in assessing damages for future loss of earnings in breach of employment contract and personal injury cases.

*Koyen v. Consolidated Edison Co. of New York, Inc.*, 560 F. Supp. 1160, 1169-70 (S.D.N.Y. 1983). Courts and juries have capably addressed backpay and front pay issues long before Judge Weinfeld's tenure and can certainly do so now under the facts and law applicable to this case.

**b. Determination of Constructive Discharge Is a Fact Question for the Jury**

Defendants elide numerous facts and the law in asking this Court to determine the constructive discharge issue rather than the jury. Once again, they seek to circumvent the summary judgment process that was available and was utilized by them three years ago, under the cloak of an *in limine* motion.

The Second Circuit made clear in *Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 89-90 (2d Cir. 1996), that the determination of constructive discharge is a factual determination, based on multiple factors and the inferences to be drawn from them:

> A constructive discharge occurs if a reasonable person subjected to the same conditions as the plaintiff would have felt compelled to step down. Because a reasonable person encounters life's circumstances cumulatively and not individually, it was error to treat the various conditions as separate and distinct rather than additive. Viewed as a whole, the facts in the case at hand, if proven, would permit a finder of fact to conclude that Chertkova was forced to resign.

*Id.* at 90. Indeed, the Second Circuit concluded that it was error for the district court to grant summary judgment to the defendants.

The constructive discharge issue should remain with the jury.

### c. Factual Issues Preclude a Determination Regarding the Utility of NYCHA's Internal Complaint Procedure and Whether a Reasonable Person Would Have Felt Compelled to Resign

Defendants' reliance on the NYCHA internal complaint procedure is misplaced. Defendants fail to mention the experience Plaintiff was subjected to by defendant Clarke and NYCHA's Human Resources Department after alerting them that Clarke's directive to transfer Williams constituted racial discrimination violative of the law and NYCHA's internal policies.

When Plaintiff met with Kenya Salaudeen, NYCHA's Director of Human Resources, shortly after the July 30 meeting, Ms. Salaudeen stated vociferously that she was "offended," as an African-American (as were Plaintiff, Artis and Williams, the three NYCHA African-American employees who attended the July 30 meeting in the Speaker's

19

office).  Salaudeen immediately objected to the Speaker's and Clarke's proposed transfer

of Williams stating:  "I don't care if Obama wants it done, it's illegal and you can be sued."

(Colon at 167.)[1]

Salaudeen referred Colon to Richard Bernardo, her deputy director.  However, when

Colon attempted to pursue this issue further, the Human Resources Department, including

Bernardo and Marla Edmonson, both of whom acknowledged that the transfer was illegal

(Colon at 174), led Plaintiff down a pointless path to explore the ethnic demographics of

the Mill Brook development and to ascertain whether there was a basis for transferring or

discharging Williams in her employment record.  Colon obtained and forwarded the ethnic

data information to HR, but Bernardo responded that "the data  doesn't mean anything,"

and the data "does not make a racial type transfer any more acceptable than it was prior to

getting the data." (Colon at 180.)  Bernardo explained that he was engaging in this process

to "'humor them a bit.'  This cannot be done it's illegal." (*Id.* at 182.)  On the question of

Williams's employment record, Edmonson advised that the transfer could not be done,

because there was nothing in Williams's file to support it.  (Edmonson at 11-12.)  Thus,

this meaningless process played out without any purpose, except "just trying to make Brian

[Clarke] happy."  (Colon Dep, at 230.)

---

[1] At her deposition, Salaudeen conveniently did not recall this conversation.  As noted by this Court, Salaudeen had virtually no recollection of numerous matters, answering "I do not recall" at least forty times, and could not remember the size of her HR unit or even the reason why she was terminated from NYCHA.  *Colon v. NYCHA*, 2021 WL 2159758 at n.22.  In regard to her failure of recollection, Ms. Salaudeen explained that "I blocked it out of my memory so I don't really recall."  *Id.*

Despite this experience with HR, Clarke proceeded to insist on the transfer, even after Colon told him it was illegal, informing Plaintiff that she had let him down and would effect the transfer on his own.  (Colon at 234.)

Ultimately, following this charade with HR, Clarke demoted Plaintiff as Director of OPMOM and proposed to place her as a "senior administrator" in the management services department, consisting of three or four people.  (Colon at 243, 245.)   At that time, no one at NYCHA held this title; it was a "made up" title with no staff reporting to the position. (*Id.* at 245.)  Thus, in addition to a pay cut and loss of benefits, Plaintiff would have no one reporting to her, in contrast to her position as Director, where she had eight hundred staff members reporting to her.  (*Id.* at 75.)  To top off this humiliating demotion, Plaintiff would continue reporting to Clarke.  (*Id.* at 246-47.)

Defendants omit these critical facts, which are certainly significant factors for the jury to consider in determining whether "a reasonable person *subjected to the same . conditions as the plaintiff* would have felt compelled to step down."  *Chertkova*, 91 F.3d at 90 (italics in original).   Accordingly, the constructive discharge issue remains an open question for the jury to determine.

### d.  Factual Questions Preclude a Determination of Mitigation of Damages

Once again, Defendants have fiddled with the truth by distorting the factual record. Plaintiff testified that she was still suffering from emotional distress shortly after her resignation on August 28, 2015, but commenced her job search in early 2016.  (Colon at 307.)  She explored jobs on Indeed and submitted resumes for potential positions.  (*Id.* at

308.)    Ultimately, she submitted an application to her current employer based on a referral from a former NYCHA employee, who worked at the company.    Contrary to Defendants' assertion, Colon did not testify that "she took the first job she found in her search."    (Def. *in Limine* Mem. at 18.)    And even if that were so, that would not be a basis for cutting off her economic damages claims.    Nothing in the sole case Defendants cite supports that conclusion.    Nor does the absence of a Plaintiff's expert "to speak on her mitigation efforts."    (*Id.*)

Indeed, Defendants' reliance on *Sharkey v. J.P. Morgan Chase & Co.*, 2018 WL 1229831 (S.D.N.Y., Mar. 5, 2018), is misplaced.    In fact, *Sharkey* supports Plaintiff, not Defendants.    The case makes clear that the "burden of proving a defense of failure to mitigate rests, . . . squarely on the defendant," citing *Broadnax*, 415 F.3d at 269.    Thus, Defendants' reference to the absence of an expert retained by Plaintiff on mitigation efforts is meaningless.

Neither *Sharkey* nor any other case known to Plaintiff provides that "claims for back pay must . . . cease on the date" when she found employment after a six-month search. (Def. *in Limine* Mem. at 18.)    The purpose of an award of backpay is "to ensure that the plaintiff is meaningfully made whole."    *Gierlinger*, 160 F.3d at 874.    Unfortunately, the income Plaintiff earned at her post-NYCHA job was substantially below the levels she had reached after thirty years at NYCHA, even below her position prior to being Director of OPMOM.    In *Sharkey*, the plaintiff's backpay was cut off because plaintiff **did not find a job** before ceasing her efforts to search for one.    Here, Plaintiff made reasonable efforts,

**found a job**, but unfortunately could not achieve the salary level she had reached at NYCHA.

In sum, Plaintiff's backpay and front pay claims are not cut off, and her damages continue to date.

### VIII.  Plaintiff Has Never Maintained that NYCHA's Language Requirements Are Discriminatory

This point is moot.

### IX.  Punitive Damages Are Unavailable Against NYCHA

Plaintiff does not dispute this point.

### X.  Punitive Damages Should Not Be Bifurcated After Liability

Defendants sole argument to bifurcate is to prevent prejudice to the individual defendants by introduction of evidence relating to their financial information.  Plaintiff has no objection to deferring that information.  However, but for this information, the core evidence supporting punitive damages is the same as the evidence supporting compensatory damages and economic losses.  The jury should hear the entire case and receive jury charges on punitive damages before hearing testimony regarding the financials of the individual defendants.  Bifurcation is otherwise inappropriate.

### XI.  Factual Questions Preclude a Finding of Qualified Immunity, and Clark and Kelly Cannot Shield Themselves with Qualified Immunity While Asserting Attorney-Client Privilege Over the Underlying Basis of the Law Department's Recommendation

Defendants claim that Clark and Kelly are shielded from liability by virtue of qualified immunity, based on purportedly undisputed facts.  Again, this is clearly a factual

question.  As noted at the outset, a motion *in limine* is not the appropriate vehicle for resolution of factual questions.

Significantly, Defendants did not utilize the appropriate vehicle for resolving this issue short of trial, a summary judgment motion.  And there is good reason why they did not do so: as discussed in Plaintiff's motion *in limine*, Defendants never asserted this affirmative defense at any time prior to the filing of the Joint Pretrial Order.  Had they done so prior to the close of discovery, Plaintiff would have explored at great length the scope of the individual defendants' knowledge of discrimination law and procedures and discriminatory conduct.  It is too late to do so now.  Defendants thus waived this affirmative defense, and should not be permitted to prejudice Plaintiff's case by asserting it now on the eve of trial.

Of equal significance, Defendants should not be permitted to maintain a qualified privilege defense in light of their refusal to disclose the substance of their discussions with counsel on the propriety of carrying through with the proposed transfer of Williams at the direction of the Speaker.  It is apparent that the question was discussed, because the Law Department recommended not to proceed.   But NYCHA has vigorously resisted any inquiry into these discussions on grounds of attorney-client privilege.

The Second Circuit has made clear that

> the attorney-client privilege cannot at once be used as a shield and a sword. . . . A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. . . . Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications. . . . **This waiver principle is applicable here**

> **for Bilzerian's testimony that he thought his actions were
> legal would have put his knowledge of the law and the basis
> for his understanding of what the law required in issue. His
> conversations with counsel regarding the legality of his
> schemes would have been directly relevant in determining
> the extent of his knowledge and, as a result, his intent**. . . .

*United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1990) (citations and internal

quotations omitted) (emphasis added). This is precisely the scenario presented here. Even

if Defendants had not waived their affirmative defense, they should not be permitted to

proceed with it when they are unwilling to disclose the information that is directly pertinent

to that defense.

## CONCLUSION

Defendants' motion *in limine* should be denied as set forth herein.

Dated: New York, New York
       September 22, 2023

                                        Respectfully submitted,


                                        /s/ Marcel Florestal, Esq.
                                        **FLORESTAL LAW FIRM, PLLC**
                                        *Trial Counsel for Plaintiff*
                                        48 Wall Street, Suite 11
                                        New York, NY 10005
                                        (212) 918-4416